**No. 25-2144**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————————

CHICAGO WOMEN IN TRADES,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, President of the United States, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court for the Northern District of Illinois, No. 1:25-cv-02005 (Matthew F. Kennelly, J.)

————————————

## BRIEF FOR APPELLANT

————————————

BRETT A. SHUMATE
  *Assistant Attorney General*
ANDREW S. BOUTROS
  *United States Attorney*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
DANIEL TENNY
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3306*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ............................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 2

STATEMENT OF THE ISSUES ........................................................... 4

PERTINENT STATUTES ................................................................... 4

STATEMENT OF THE CASE .............................................................. 5

    A.    Background ............................................................... 5

    B.    Prior Proceedings ..................................................... 6

SUMMARY OF ARGUMENT ............................................................. 12

STANDARD OF REVIEW .................................................................. 14

ARGUMENT ................................................................................... 15

I.    CWIT's Challenge to the Certification Provision Is Unlikely to Succeed. ............................................................ 15

    A.    CWIT Lacks Standing Because Certifying Compliance With Federal Civil Rights Law Is Not an Injury-in-Fact. ................................................................... 16

    B.    The Certification Provision Does Not Violate the First Amendment. ........................................................ 27

II.    The Equitable Factors Favor the Government, and the District Court's Nationwide Injunction Exceeds in Any Case Its Authority to Grant CWIT Complete Relief. ....................... 33

CONCLUSION ............................................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*ACLU of Ill. v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ................................................... 9

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) .......................................................... 6, 32

*California v. Texas*,
   593 U.S. 659 (2021) .............................................................. 26

*Chicago Women in Trades v. Trump*,
   773 F. Supp. 3d 592 (N.D. Ill. 2025) ..................................... 7

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................ 16, 24

*Doe v. University of S. Ind.*,
   43 F.4th 784 (7th Cir. 2022) ................................................ 15

*Guardians Ass'n v. Civil Serv. Comm'n*,
   463 U.S. 582 (1983) ........................................................ 28, 29

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*,
   767 F. Supp. 3d 243 (D. Md. 2025) ........................................ 9

*National Urb. League v. Trump*,
   — F. Supp. 3d —, No. 25-471,
   2025 WL 1275613 (D.D.C. May 2, 2025) ......................... 20, 27

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................. 33

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ......................................................... 32-33

*San Francisco A.I.D.S. Found. v. Trump,*
  — F. Supp. 3d —, No. 25-cv-01824,
  2025 WL 1621636 (N.D. Cal. June 9, 2025) ............................ 20, 22, 27

*Schirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010) ........................................................ 16, 23

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020) ................................................................................ 33

*Simic v. City of Chicago,*
  851 F.3d 734 (7th Cir. 2017) ............................................................... 18

*Speech First, Inc. v. Killeen,*
  968 F.3d 628 (7th Cir. 2020) ................................... 16, 16-17, 17, 23, 26

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................................ 16

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ............................... 2, 4, 11, 14, 34, 35, 37, 38, 39

*United States ex rel. Purcell v. MWI Corp.,*
  807 F.3d 281 (D.C. Cir. 2015) ............................................................. 31

*United States ex rel. Schutte v. SuperValu Inc.,*
  598 U.S. 739 (2023) ................................................................................ 31

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
  579 U.S. 176 (2016) ................................................................................ 29

*Venckiene v. United States,*
  929 F.3d 843 (7th Cir. 2019) ............................................................... 15

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) .............................................................................. 14, 15

iv

**U.S. Constitution:**

Art. II, § 1, cl. 1 ...................................................................... 33

Art. II, § 3 ................................................................................. 33

**Statutes:**

28 U.S.C. § 1292(a)(1) ............................................................. 3

28 U.S.C. § 1331 ....................................................................... 3

29 U.S.C. § 2503(a) ................................................................ 11

31 U.S.C. § 3729(a)(1)(B) ...................................................... 29

31 U.S.C. § 3729(b)(4) ............................................................. 5

42 U.S.C. § 2000d-1 .............................................................. 48

**Regulatory Materials:**

Exec. Order No. 14,151
   90 Fed. Reg. 8,339 (Jan. 20, 2025) ..................................... 11

Exec. Order No. 14,173, *Ending Illegal Discrimination and Restoring
   Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 31, 2025) .......... 4, 5
      § 1 ..................................................................................... 5
      § 3(b)(iv)(A) ..................................................................... 5
      § 3(b)(iv)(A)-(B) ..................................................... 15-16, 17
      § 3(b)(iv)(B) .......................................................... 5, 8, 18, 19
      § 7(b) ................................................................................. 5

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ....................................................... 3

Fed. R. App. P. 4(a)(4)(A)(iv) .................................................. 3

Fed. R. Civ. P. 59 ................................................................... 3

Fed. R. Civ. P. 59(e) ............................................................. 3

Fed. R. Civ. P. 62.1(a)(3) ....................................................... 11

## INTRODUCTION

An array of civil rights laws prohibit invidious discrimination by entities that receive federal funds. This case is about whether federal agencies may require entities that receive such funds to certify that they comply with applicable federal antidiscrimination laws in their operation of programs that promote diversity, equity, and inclusion (DEI). That requirement should be unremarkable; recipients of federal funds have, for many years, been required to certify their compliance with Title VI of the Civil Rights Act of 1964, one of the most prominent civil rights laws applicable in these circumstances.

The district court nonetheless held that the First Amendment likely prevents the President from directing federal agencies to impose this requirement. The court entered a universal preliminary injunction barring the Department of Labor from implementing that policy nationwide. That order was wrong several times over.

Most fundamentally, the district court proceeded from a basic misunderstanding of the policy at issue, which requires a certification that grantees are not violating their pre-existing legal obligations—not that they refrain from any protected speech. Based on that error, the

district court found standing to sue, and a likely First Amendment violation, in a case where plaintiff Chicago Women in Trades (CWIT) is being asked to do nothing more than verify its compliance with laws that do not regulate protected speech, and that CWIT was already required to follow. In doing so, the district court split from other courts that have interpreted the same Executive Order according to its terms.

Moreover, even if the district court were right on both standing and the merits, it seriously erred with respect to the scope of relief. Earlier this year, the Supreme Court held in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), that nationwide injunctions exceed the equitable powers Congress has granted the federal courts. The district court's sweeping order—which is expressly designed for the benefit of nonparties, and far exceeds the scope needed to grant CWIT complete relief—cannot be reconciled with that binding command.

This Court should vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

Because CWIT alleges that enforcing an executive order against recipients of federal funding would violate the First Amendment, the

district court had jurisdiction over the subject matter of this appeal[1] under 28 U.S.C. § 1331. This Court has interlocutory appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because the government is challenging the grant of a preliminary injunction. The parties dispute whether CWIT has Article III standing. *See* Part I, *infra*.

The preliminary injunction being appealed was entered on April 15, 2025. Dkt. Nos. 68, 69. Three days later, on April 18, 2025, CWIT filed a timely motion to alter or amend the preliminary injunction under Federal Rule of Civil Procedure 59. Dkt. Nos. 73, 74; *see also* Fed. R. Civ. P. 59(e) (providing that motion to alter or amend may be filed up to 28 days after entry of judgment). That motion tolled the deadline to appeal for all parties until 60 days after entry of an order disposing of it. Fed. R. App. P. 4(a)(1)(B), (a)(4)(A)(iv). The district court entered an order denying the motion on May 7, 2025. Dkt. No. 90. The government

---

[1] This appeal addresses CWIT's challenge to a requirement that it certify compliance with certain provisions of federal law. In the district court, CWIT is also seeking to prevent termination of its federal grants. Although jurisdiction was contested as to that aspect of CWIT's suit, the government is not appealing that aspect of the district court's order so it is not at issue here.

filed a timely notice of appeal 57 days later, on July 3, 2025. Dkt. No.
112.

## STATEMENT OF THE ISSUES

1.     Whether the district court erroneously concluded that
plaintiff Chicago Women in Trades has established jurisdiction and a
likelihood of success on the merits for its First Amendment challenge to
the Certification Provision of Executive Order 14,173, *Ending Illegal
Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg.
8,633 (Jan. 31, 2025) (EO 14,173), which directs federal agencies to
require that contractors certify compliance with federal law in certain
respects, and to acknowledge that such compliance is material to the
federal government's payment decisions.

2.     Whether, under the Supreme Court's decision in *Trump v.
CASA, Inc.*, 145 S. Ct. 2540 (2025), the district court erred by entering a
nationwide injunction that bars enforcement of the Certification
Provision against nonparty grantees.

## PERTINENT STATUTES

Pertinent statutory provisions are reproduced in the addendum to
this brief.

4

## STATEMENT OF THE CASE

### A.     Background

**1.** On January 21, 2025, the President issued Executive Order 14,173, 90 Fed. Reg. 8,633, to "enforc[e] our civil-rights laws" by "ending illegal preferences and discrimination." EO 14,173, § 1. As relevant here, EO 14,173 includes a Certification Provision instructing each agency head to "include in every contract or grant award" a requirement that the recipient "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B). Agency heads must also require recipients to agree that such compliance "is material to the government's payment decisions for purposes of [the False Claims Act]." *Id.* § 3(b)(iv)(A) (citing 31 U.S.C. § 3729(b)(4)). EO 14,173 expressly provides that it "does not prevent . . . Federal contractors . . . from engaging in First Amendment-protected speech." *Id.* § 7(b).

**2.** Plaintiff Chicago Women in Trades (CWIT) is a nonprofit organization that works to promote "diversity, equity, and inclusion

within the skilled trades." SA2 (quotation marks omitted).[2] It offers job-training programs and other resources focused on "preparing women . . . to enter and remain in high-wage skilled trades" such as carpentry, welding, and plumbing. SA2. About 40% of CWIT's annual budget comes from federal funds, some of which it receives from the government directly and some of which it receives as a subgrantee. SA2-5. CWIT's federal funding comes from programs administered by the Department of Labor. SA2-5.

## B.    Prior Proceedings

CWIT filed this lawsuit in the United States District Court for the Northern District of Illinois in February 2025. SA10. As relevant to this appeal, CWIT challenged the Certification Provision as a condition on federal funding that "regulate[s] speech outside the contours of the [funded] program itself" in violation of the First Amendment. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013); Dkt. No. 1, ¶¶ 120-127.[3] CWIT moved for a temporary

---

[2] Citations to the short appendix bound with the government's opening brief will be abbreviated "SA__." Citations to the government's appendix will be abbreviated "GA__."

[3] In addition to its funding-condition claim, CWIT alleges that the Certification Provision (1) violates the First Amendment because it is

*Continued on next page.*

restraining order (which the district court granted, *see Chicago Women in Trades v. Trump*, 773 F. Supp. 3d 592 (N.D. Ill. 2025)), and then for the preliminary injunction at issue in this appeal. SA10. The district court granted CWIT's preliminary-injunction motion in relevant part. *See* SA51-53.

**a.** At the threshold, the district court held that CWIT has standing to sue and that its challenge to the Certification Provision is ripe. The district court did not identify any instances in which the government required CWIT to change the content of its non-federally funded programming. Instead it highlighted—still without identifying a link to the Certification Provision, the False Claims Act, or violations of federal civil rights law—instances in which CWIT was asked to stop using federal funds to promote DEI, or to offer a program without DEI content. SA14-15.

---

overbroad, vague, and discriminates based on viewpoint, Dkt. No. 1, ¶¶ 102-119; (2) denies CWIT due process under the Fifth Amendment, *id.* ¶¶ 128-139; and (3) encroaches on Congress's power under the Spending Clause, *id.* ¶¶ 148-155, 169-187. Because the district court found a likelihood of success on the funding-condition claim, *see infra* p. 8-9, it did not reach these additional challenges in granting a preliminary injunction against the Certification Provision. SA26.

The district court concluded on that basis that CWIT has shown a concrete injury sufficient for standing because "enforcement is imminent," and "compliance with the Certification Provision . . . calls upon . . . CWIT to modify its activities and advocacy *now* so that it can make an appropriate certification to avoid having the axe fall." SA15-16. On the same basis, the district court held that CWIT's claim regarding the Certification Provision is ripe because "CWIT faces serious harm if consideration . . . is withheld" as the passage of time "increases the pressure to self-censor its speech." SA16-17.

**b.** Turning to CWIT's request for a preliminary injunction, the district court held that CWIT is likely to succeed on the merits of its First Amendment claim. It asserted that the Certification Provision is probably unconstitutional because it would require CWIT to certify as to *all* its DEI programming, "irrespective of whether [it] is federally funded." SA23-26. The district court reached that conclusion notwithstanding the fact that the required certification would only implicate "programs . . . that violate . . . Federal anti-discrimination laws." EO 14,173, § 3(b)(iv)(B). In the district court's view, this made no difference because EO 14,173 neither defines "DEI" nor explains "what

might make any given 'DEI' program violate Federal anti-discrimination laws," SA25, and because "advoca[cy] for violation of the law" remains protected by the First Amendment "unless it rises to incitement," SA26. The district court's reasoning in this regard closely resembled a decision of the District of Maryland that has since been stayed by the Fourth Circuit. *See* Order, *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), Dkt. No. 29 (staying *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 281-83 (D. Md. 2025)).

The district court briefly disposed of the remaining preliminary-injunction factors. It concluded that preliminary relief is necessary to avert irreparable harm because, in its view, it was likely that enforcing the Certification Provision would violate the First Amendment, SA41; *see ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). It held the same for the balance of harms, because "injunctions protecting First Amendment freedoms are always in the public interest," and "the public interest is not harmed by preliminarily enjoining the enforcement of [an executive order] that is probably unconstitutional." SA42 (alteration omitted) (quoting *Alvarez*, 679 F.3d at 590).

9

**c.** Finally, the district court decided that a nationwide injunction against the Certification Provision was "necessary to ensure that CWIT is provided complete relief and to prevent infringement of the First Amendment rights of other grantees and contractors." SA44. Applying this Court's pre-*CASA* decisions on universal injunctions, the district court first held that because the Certification Provision is likely unconstitutional on its face, nationwide relief is appropriate to protect "all federal grantees and contractors" who might choose to accept burdens on speech rather than "spend their resources" on litigation and "bear[] the risks inherent" therein. SA44-45. It also concluded that "there is a good chance that CWIT itself w[ould] not obtain complete relief" from the Certification Provision if an injunction were limited to "CWIT and entities for whom CWIT serves as a sub-contractor or sub-grantee." SA46 (alteration and quotation marks omitted). As the district court saw it, other recipients of federal funds might be "chill[ed] . . . from partnering with CWIT" if doing so required "affirmatively invok[ing] the injunction" and thereby "clueing the government into the fact that non-grant-related advocacy relating to DEI . . . may come into play." SA46-47.

10

For these reasons, the district court entered a preliminary injunction prohibiting the Department of Labor from "requir[ing] any grantee or contractor to make any 'certification' or other representation pursuant to the Certification Provision," and from "initiat[ing] any False Claims Act enforcement action against CWIT" based upon the same. SA52.[4] CWIT moved to alter or amend the judgment. *See* Dkt. No. 73. After the district court denied that motion, Dkt. No. 90, the government filed a timely notice of appeal, Dkt. No. 112.

After it filed its notice of appeal, on the basis of the Supreme Court's newly-announced decision in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), the government moved in the district court (1) for an indicative ruling, *see* Fed. R. Civ. P. 62.1(a)(3), that on a limited remand it would modify the preliminary injunction to cover only CWIT and pass-through entities from which it receives federal funds, and (2) in

---

[4] In the same order, the district court also enjoined the Department of Labor from terminating, on the basis of a different executive order, *see* Exec. Order No. 14,151, § 2(b)(i), 90 Fed. Reg. 8,339 (Jan. 20, 2025) (EO 14,151), a grant that CWIT receives under the Women in Apprenticeship and Nontraditional Occupations Act, *see* 29 U.S.C. § 2503(a). SA52. The government is not appealing that portion of the preliminary injunction, which addresses a distinct provision of a separate executive order and rests on the separation of powers rather than the First Amendment.

the alternative, for a stay of the preliminary injunction pending appeal to the extent it sweeps beyond that narrower scope. *See* Dkt. 119. As of the date of this brief, that motion remains pending before the district court.

## SUMMARY OF ARGUMENT

**I.** The district court's preliminary injunction was premised on a misunderstanding of the Certification Provision that caused it to err on both standing and the merits.

**A.** The Certification Provision directs agencies to require grantees to certify that their DEI programs comply with federal antidiscrimination laws and that this condition is material to the federal government's payment decisions for purposes of the False Claims Act. There can be no serious dispute that the provision, properly understood, provides no basis for an injunction. But the district court misconstrued it. The court concluded that grantees would need to certify not only that they do not violate federal antidiscrimination laws in operating any programs that promote DEI, but that they do not promote DEI at all. Nothing in the Certification Provision supports that reading.

12

Properly understood, the Certification Provision has not caused CWIT any injury in fact. CWIT does not claim any intent to violate the civil rights laws, and even if it suspects that the government will accuse it of doing so, it provides no basis for attributing that risk of enforcement to the Certification Provision. In particular, to the extent that CWIT believes that the government does not share its understanding of the civil rights laws, any such disagreement is not traceable to the Certification Provision and would not be redressed by an injunction against it. CWIT therefore lacks standing to bring a pre-enforcement challenge to the Certification Provision.

**B.** For essentially the same reason, CWIT has also failed to show a likelihood of success on the merits of its First Amendment claim. The district court held that the Certification Provision is probably unconstitutional because it is a funding condition that implicates CWIT's activities outside the bounds of its federally funded programming. But because the Certification Provision, properly understood, only implicates activity that violates the federal civil rights laws, whatever activities it burdens cannot constitute protected speech. Simply put, because there is no First Amendment right to engage in

unlawful discrimination, it cannot violate the First Amendment to ask federal grantees to verify that they do not do so.

**II.** The district court also erred in its balancing of the equitable factors, and in entering a universal injunction designed to provide relief to all federal grantees, rather than one tailored to CWIT itself. The government is injured by an injunction against lawful enforcement of federal prohibitions on invidious discrimination, which is plainly in the public interest. And even if some relief were warranted, the injunction entered by the district court was far too broad. The Supreme Court held in *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), that universal injunctions exceed the equitable powers of a federal court. At a minimum, this Court should vacate or modify the preliminary injunction to the extent necessary to comply with that mandatory limitation on the district court's authority.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain that relief, CWIT "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable

14

harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. In reviewing the entry of a preliminary injunction, this Court reviews "the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the [equitable] factors for . . . abuse of discretion." *Doe v. University of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quotation marks omitted). A district court abuses its discretion when it "bases an exercise of discretion on a legal error." *Venckiene v. United States*, 929 F.3d 843, 853 (7th Cir. 2019).

## ARGUMENT

## I.     CWIT's Challenge to the Certification Provision Is Unlikely to Succeed.

The Certification Provision provides that "[t]he head of each agency shall include in every contract or grant award": (1) a "term requiring [the contractor] or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," and (2) a "term requiring the [contractor] or . . . recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act]." EO 14,173,

§ 3(b)(iv)(A)-(B). The district court erred in holding that CWIT is likely to succeed in its First Amendment challenge to that provision.

### A. CWIT Lacks Standing Because Certifying Compliance With Federal Civil Rights Law Is Not an Injury-in-Fact.

To demonstrate Article III standing, a plaintiff must allege an injury-in-fact that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted). To satisfy that standard, the injury in question "must be 'concrete and particularized,' and 'actual or imminent, not conjectural or hypothetical.'" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 158 (2014)).

Because of the difficulties inherent in showing Article III injury based on "threatened"—rather than actual—enforcement action, *see SBA List*, 573 U.S. at 158-59; *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010), this Court has held that plaintiffs bringing pre-enforcement challenges under the First Amendment "must make one of two showings to establish an injury in fact," *Speech First*, 968 F.3d at

16

638. "*First*, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat [that] the policy will be enforced against him when he does." *Id.* (emphasis added). "*Second*, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* (emphasis added)

Importantly, the "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion." *Speech First*, 968 F.3d at 638 (quotation marks omitted). To show it meets one of this Court's two tests for standing in a pre-enforcement First Amendment challenge, CWIT must "set forth by affidavit or other evidence specific facts, rather than general factual allegations of injury." *Id.* (quotation marks omitted). The district court erred when it held that CWIT has met that burden here.

**1.** CWIT does not claim that it has "an intention to engage" in violations of federal antidiscrimination law—the only "course of conduct arguably affected" by the Certification Provision. *See Speech First*, 968 F.3d at 638; EO 14,173, § 3(b)(iv)(A)-(B). CWIT does assert that it

17

intends to continue pursuing its "mission . . . to achieve gender equity in male-dominated industries," GA90, and allocating its "non-federal funding . . . towards work related to diversity, equity, inclusion, and accessibility," GA91. But compliance with the Certification Provision would not implicate CWIT's pursuit of those activities unless it "violate[d] . . . Federal anti-discrimination laws" in the process. EO 14,173, § 3(b)(iv)(B). Where CWIT does not say it means to break the law, courts may not fill the gap by presuming otherwise. "For purposes of standing to seek injunctive relief against future harm, courts generally assume that litigants will conduct their activities within the law . . . . That assumption surely holds with respect to obeying laws that are"—as federal antidiscrimination laws are here —"not themselves the target of a party's constitutional challenge." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citation and quotation marks omitted).

The district court failed to consider whether CWIT in fact intends to violate federal civil rights law. Instead, it found standing by adopting CWIT's view that the Certification Provision requires grantees to state that they "do not operate any programs that promote DEI"—full stop.

18

*See* GA91. If compliance "requires a verification by the grantee that none of its programs . . . promote DEI," the court explained, then CWIT must "modify its activities and advocacy *now* so that it can make an appropriate certification to avoid having the axe fall." SA16 (alteration and quotation marks omitted).

But the Certification Provision says no such thing. Certifying grantees need not state that they do not "promote DEI," *cf.* SA16 (alteration and quotation marks omitted), only that they do not "operate any programs promoting DEI *that violate any applicable Federal anti-discrimination laws*," EO 14,173, § 3(b)(iv)(B) (emphasis added). Simply put, the Certification Provision in this case requires nothing more than a statement that CWIT is complying with laws it was already required to follow.

The district court is a notable outlier in holding otherwise. A unanimous panel of the Fourth Circuit has stayed the only other decision to treat the Certification Provision as if it demands more than a straightforward promise to follow the law. *See* Order, *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025), Dkt. No. 29 (staying *National Ass'n of Diversity Officers*

*in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 281-83 (D. Md. 2025)). As one Fourth Circuit judge explained, the Certification Provision "appl[ies] only to conduct that violates existing federal anti-discrimination law" and does not "purport to establish the illegality of all efforts to advance diversity, equity or inclusion." *Id.* at 7 (Harris, J., concurring). Two other district courts have likewise held that the plain text of the Certification Provision requires only a statement "that the grant recipient . . . will not violate [pre-existing] federal antidiscrimination laws." *National Urb. League v. Trump*, — F. Supp. 3d —, No. 25-471, 2025 WL 1275613, at *24 (D.D.C. May 2, 2025); *see also San Francisco A.I.D.S. Found. v. Trump*, — F. Supp. 3d —, No. 25-cv-01824, 2025 WL 1621636, at *19 (N.D. Cal. June 9, 2025).

Lastly, to the extent the district court found injury-in-fact based on a "belie[f] that the government may consider" CWIT programs to violate federal antidiscrimination laws, *see* SA13-14, that conclusion lacks any support in the record and in any event would have little to do with the Certification Provision. The court based its finding partly on the Department of Labor's instructions that grantees should cease certain DEI-related activities, but on their face those instructions apply

only to activities that are "under" or "directly tied to" a federal grant, *see* GA97, GA99, GA102, and are thus subject to other executive order provisions that call for the termination of federally funded DEI programs regardless of whether they violate the civil rights laws, *see infra* p. 22. Those instructions therefore provide no basis to find injury relating to CWIT's obligation to refrain from illegal discrimination.

And even if the government were to adopt an understanding different from CWIT's regarding the scope of the antidiscrimination laws, any such disagreement would not be traceable to the Certification Provision, or redressable by an injunction against its implementation. So to the extent the district court regarded that speculative possibility as a source of injury-in-fact, *see* SA25 (hypothesizing that "the government's view of what is illegal . . . has changed significantly"), it still would not support standing here, where the civil rights laws in question will apply to CWIT by their own terms whether or not it is required to certify compliance as a condition of receiving federal funds.

The district court also over-read the significance of the Department of Labor's statement that it might move to terminate grants "consistent with the requirements of" EO 14,173 and EO 14,151

21

(another DEI-related executive order that is not at issue in this appeal, *see supra* n.4). *See* GA97, GA99. The Certification Provision here implicates only DEI programs (regardless of their funding source) that violate federal civil rights law. But the provisions of EO 14,173 and EO 14,151 that "direct[] the termination of DEI and 'equity-related' programs do not include the same limiting qualifier." *San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *19 (discussing Section (3)(c)(iii) of EO 14,173 and Section (2)(b)(i) of EO 14,151). "Instead, the termination provisions explicitly call for the termination of *all* federally funded DEI programs, regardless of whether those programs violate antidiscrimination law." *Id.* The termination of a DEI program's federal grant does not mean that the government has determined that the program engages in unlawful discrimination. Such terminations thus have little to do with the issues presented here. What matters here is that CWIT has not claimed that it plans to illegally discriminate within the meaning of the Certification Provision, and it has offered no credible reason to believe that the government will nevertheless treat its certification as false and take enforcement action accordingly. The district court erred in finding standing on that basis.

22

**2.** This Circuit's second test for standing in a pre-enforcement First Amendment suit likewise does not give CWIT grounds to challenge the Certification Provision as an unconstitutional condition on its non-federally funded speech. The record does not demonstrate either an "objectively reasonable" chilling effect on those activities, or that CWIT has "self-censor[ed] as a result." *See Speech First*, 968 F.3d at 638.

To begin with, CWIT cannot as a legal matter rely on any chill traceable to its erroneous belief that the Certification Provision implicates *every* "program[] that promote[s] DEI." *See* GA91. However sincerely felt, fear of adverse action cannot be objectively reasonable if it is based on an objectively incorrect understanding of the law. *See Speech First*, 968 F.3d at 638 ("A plaintiff's notional or subjective fear . . . is insufficient to sustain a court's jurisdiction under Article III." (alteration and quotation marks omitted)); *Schirmer*, 621 F.3d at 587 ("While it is possible that the plaintiffs might be prosecuted under a statute the text of which clearly failed to cover their conduct, such remote fear does not justify an injunction absent something more than a

nontrivial probability of prosecution." (alteration and quotation marks omitted)).

As explained above, *see supra* at 19-21, the Certification Provision imposes no new requirements on CWIT's primary conduct. Whether it certifies or not, CWIT will still be obligated to follow any and all federal civil rights laws that apply to each aspect of its operations, including those that promote DEI. To the extent CWIT has changed its behavior because it erroneously believes that the Certification Provision implicates all DEI activities rather than only those that are independently unlawful, it "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears" of a different executive order than the one the President signed. *Clapper*, 568 U.S. at 416.

CWIT also fails to demonstrate as a factual matter that the Certification Provision has actually caused any "pressure to self-censor" in its non-federally funded programming. SA14. The district court entirely overlooked that crucial distinction, giving weight to a single instance in which a "pass-through entity"—one from which CWIT receives *federal dollars*—asked CWIT to modify the contents of a "technical assistance program" to conform with the terms of the

24

relevant *federal grant*. SA14 (quotation marks omitted) (discussing GA111); *see also* GA91 (describing an organization that initially wanted to partner with CWIT as a federal subgrantee changing its mind based on concern it would "los[e] federal funding"). An instance in which CWIT was asked to alter its federally funded activities cannot establish an objectively reasonable chill to its non-federally funded speech.

The district court's reliance on that anecdote (and one other) to find an objectively reasonable chill, *see* SA14-15, was also erroneous for another reason—neither contains any indication that the request for CWIT to change its programming was traceable to the Certification Provision. *See* GA111 (describing a pass-through entity's request that CWIT change its programming based on the terms of the entity's federal contract "subsequent to the Executive Orders"); GA88-89 (describing a CWIT customer requesting, "because of the Executive Orders," "a presentation on a topic that did not involve [DEI]"); *see also* GA91 (describing loss of interest from prospective subgrantee that "fear[ed] . . . triggering the Executive Order"). These general allegations about the overall effect of multiple executive orders are insufficient to establish standing to challenge the Certification Provision in particular,

because they "fail[] to show a concrete, particularized injury fairly traceable to . . . the specific . . . provision [CWIT] attack[s] as unconstitutional." *California v. Texas*, 593 U.S. 659, 680 (2021)

Finally, even if CWIT had established an objectively reasonable chill as to its non-federally funded speech, it would still lack standing because it has not shown any "self-censor[ship] as a result." *See Speech First*, 968 F.3d at 638. At most, CWIT claims that it now "work[s] in a climate of fear and uncertainty," GA81, and the district court concluded that CWIT "faces pressure to self-censor," SA14. But to establish standing based on a chill to its non-federally funded activities, Article III would require CWIT to identify a program that is neither federally funded nor illegal and explain that it "planned or wished to sponsor [that program] in the future" but has refrained from doing so because of the Certification Provision (or would have so refrained but for the district court's intervention). *Speech First*, 968 F.3d at 639-40. Because CWIT has made no such showing, it has not "demonstrated that . . . the [government] deterred some specific intended act of expression protected by the First Amendment." *Id.* at 640 (quotation marks omitted).

26

**B.     The Certification Provision Does Not Violate the First Amendment.**

CWIT's claims fail on the merits for similar reasons. There is nothing remotely unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs they operate comply with the antidiscrimination laws and to acknowledge that the government considers compliance with such laws material to its payment decisions. The district court did not suggest otherwise, but instead reached its First Amendment conclusion by misinterpreting the challenged Executive Order.

**1.** At bottom, the Certification Provision does not violate the First Amendment because it imposes no new requirements on CWIT's primary conduct. It does not require CWIT to certify that it does not advocate for DEI. *See* Order at 7, *National Ass'n of Diversity Officers*, No. 25-1189 (Harris, J., concurring); *National Urb. League*, 2025 WL 1275613, at *24; *San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *19. It does not even, as the district court mistakenly believed, *see* SA26, require CWIT to certify that it does not advocate for violations of the law, *San Francisco A.I.D.S. Found.*, 2025 WL 1621636, at *20. Rather, it simply requires CWIT to certify compliance with its existing

27

legal obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1—rules that are already binding independent of any certification requirements. The Certification Provision does nothing more than instruct agencies to require a certification that these pre-existing obligations are being honored.

That is not novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 629-30, 630 n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury). These "assurance[s]" of compliance are "given in consideration of federal aid, and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply

28

regardless of any certification. *Id.* at 630 (quotation marks omitted). The requirement here is no different: although recipients must certify specifically that any DEI programs they run comply with federal antidiscrimination law, this certification "does not place upon a recipient [any] unanticipated burdens because any recipient must anticipate having to comply with the law." *Id.*

The government has a strong interest in enforcing federal grantees' compliance with these long-established civil rights protections. One mechanism by which it does so is the False Claims Act. As relevant here, the Act imposes civil liability on persons who "knowingly make[] . . . false . . . statement[s] material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The Certification Provision announces, and requires the funding recipient to acknowledge, that the government considers compliance to be a material condition on payment. Such an express certification is not required to establish False Claims Act liability, but it can serve as evidence of materiality and the claimant's knowledge thereof. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194-95 (2016) (explaining that the "Government's decision to expressly identify a provision as a

condition of payment is relevant," though "not automatically dispositive," evidence of materiality).

**2.** Like its analysis of standing, the district court's First Amendment analysis was premised on its belief that the Certification Provision means something very different from what it says. *See supra* pp. 19-20. In the court's view, the provision requires CWIT to "certify that it does not operate *any* program that promotes DEI." SA24. And building on that misunderstanding, it read the "thrust" of the Certification Provision to be "that the government's view of what is illegal in this regard has changed significantly," but how "is left entirely to the grantee's imagination." SA25.

These assertions are irreconcilable with the text of the Certification Provision, which does not purport to adopt any new construction of antidiscrimination law, let alone threaten liability for failure to divine a new interpretation. Once more, federal antidiscrimination law already applies and already governs the conduct of government contractors among others. The Certification Provision merely directs agencies to expressly remind counterparties about those

30

obligations and their materiality to the government's payment decisions. None of this implicates the First Amendment.

Moreover, the district court appeared to misconstrue the False Claims Act to allow liability based on a good-faith misunderstanding of the law that turns out to be incorrect. In the court's view, contractors and grantees must guess the government's interpretation of antidiscrimination law and conform their speech to that interpretation, or risk all federal funding as well as liability under the False Claims Act. But the False Claims Act is "a *fraud* statute" that punishes false statements made with a "culpable state of mind." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749-52 (2023) (emphasis added) (quotation marks omitted). It reaches neither "an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). That provides ample protection against the sort of unfair liability that worried the district court.

The Certification Provision does not require a certification that a grantee's DEI programs conform with some particular interpretation of federal law that the government has yet to announce. Rather, like other longstanding certification requirements, it simply requires entities to acknowledge their existing obligations under already "applicable Federal anti-discrimination laws" and to recognize that they may face liability if they make a knowingly false statement in this respect.

That is neither novel nor unconstitutional, and the Supreme Court's decision in *Agency for International Development v. Alliance for Open Society International, Inc.* does not suggest otherwise. *See* 570 U.S. 205 (2013). *Agency for International Development* stands for a straightforward proposition: to the extent conduct is protected by the First Amendment, the government may not impose a funding condition that "effectively prohibit[s] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 218-19 (quotation marks omitted). But no such conduct is at issue here, because there is no First Amendment right to actually violate federal civil rights laws, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 389-90

32

(1992), and that—not protected "advoca[cy] for violation of the law," *cf.* SA26—is the only conduct that the Certification Provision implicates.

## II. The Equitable Factors Favor the Government, and the District Court's Nationwide Injunction Exceeds in Any Case Its Authority to Grant CWIT Complete Relief.

**1.** The district court erred in concluding that the equitable factors—irreparable harm, the balance of harms, and the public interest—weigh in favor of preliminary relief. The court's injunction indefinitely restrains the government from carrying out lawful and important policies with respect to funding, contracting, and enforcement of civil rights law. Such an injunction irreparably injures both the government and the public, whose interests "merge" in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And these injuries are not outweighed by the purported benefits of relieving plaintiffs' "fears" about the President's announcement of enforcement priorities that are inconsistent with their own policy preferences.

"Under our Constitution, the 'executive power'—all of it—is vested in a President," who must "take Care that the laws be faithfully executed." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). The district

court's injunction interferes with this core executive function because it prevents the Department of Labor from implementing the President's directive to faithfully execute the civil rights laws by requiring recipients of federal funds to certify that they do not engage in illegal discrimination.

By contrast, the district court's conclusions regarding the harm to CWIT were premised on a fundamental misreading of the Certification Provision. Implementation of that directive, which instructs executive agencies to confirm that federal civil rights laws are being followed, is plainly in the public interest. And CWIT has no cognizable interest in receiving or retaining funds in violation of the antidiscrimination laws or in avoiding investigation for illegal practices.

**2.** The district court's errors in granting preliminary relief are further compounded by the injunction's unlawful scope. In *Trump v. CASA*, 145 S. Ct. 2540 (2025), the Supreme Court held that district courts lack authority to issue "universal injunctions" that bar enforcement of "a law or policy against *anyone.*" *Id.* at 2548 (quotation marks omitted). While equity may provide a party with "complete relief," "complete" is not synonymous with "universal." *Id.* at 2557.

34

Courts can grant complete relief to the parties before them, but cannot provide relief designed to benefit third parties who are not before the court. The district court exceeded that fundamental limit on its power when it barred the Department of Labor from "enforcing the Certification Provision against *any* grantee or contractor." SA44.

Moreover, even the "[c]omplete relief" that courts are entitled to grant "is not a guarantee—it is the maximum a court can provide." *CASA*, 145 S. Ct. at 2558. Put another way: completeness is "a ceiling" that prevents an award of "relief beyond that necessary to redress the plaintiffs' injuries." *Id.* at 2563 (Thomas, J., concurring).

**a.** The Supreme Court has spoken clearly: "universal injunction[s] . . . fall[] outside the bounds of a federal court's equitable authority." *CASA*, 145 S. Ct. at 2554. That remedy has been "conspicuously nonexistent for most of our Nation's history." *Id.* at 2553. It has no "founding-era antecedent." *Id.* at 2554. And it ignores the longstanding rule that while "courts generally may administer complete relief *between the parties*," an injunction "should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Id.* at 2557 (quotation marks omitted).

35

Even if the First Amendment violation of which CWIT complains were not illusory, and even if CWIT had otherwise met the stringent standards for preliminary relief, then "complete" relief from the purported First Amendment violation at issue in this appeal would entail, at most, an order preventing enforcement of the Certification Provision as to (1) CWIT itself, and (2) other recipients of federal funds for whom CWIT is a sub-contractor or sub-grantee. Such an order would fully protect CWIT's rights. It would do so first by ensuring that CWIT itself is not required to certify, and second by ensuring that CWIT will not lose funds based on other grantees' concern that working with CWIT might affect their own ability to do so. No more could be required to remedy CWIT's purported First Amendment injury.

**b.** The district court's entry of a universal injunction, and its stated reasons for doing so, cannot be squared with *CASA*. At the outset, the Supreme Court flatly rejected the district' court's first ground for universal relief—that it was needed "to prevent infringement of the First Amendment rights of *other* grantees and contractors" whose speech might be chilled were they required to certify. SA44-45 (emphasis added). After *CASA*, the question is never "whether an

36

injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." 145 S. Ct. at 2557.

The district court's second ground for entering a universal injunction—that "CWIT itself will not obtain complete relief" otherwise—fares no better after *CASA. See* SA46-47. This case is plainly not in the narrow category where a court's only "feasible option" for complete relief is to enter an injunction that "[a]s a matter of law . . . extends only to the suing plaintiff," but nevertheless as a practical matter "incidental[ly]" benefits nonparties. *CASA*, 145 S. Ct. at 2557 (quotation marks omitted). In such cases—such as suits to halt a public nuisance, *id.*, or challenges to congressional district boundaries, *id.* at 2257 n.12—the breadth of available relief reflects the base fact that "there is no way to peel off just the portion of the [unlawful conduct] that harmed the plaintiff," *id.* at 2557 (quotation marks omitted); *see also id.* at 2557 n.12 (explaining that broad relief may be appropriate in cases where it is "all but impossible . . . to craft relief that is complete *and* benefits only the named plaintiffs").

Here, as discussed above, it would be straightforward to provide relief to CWIT without incidentally benefiting everyone else. CWIT's interest is in preventing the Certification Provision from burdening its own speech, either directly or through its effect on CWIT's partner organizations. The district court identified no practical obstacle to drafting an injunction applicable only to that narrow subset of grantees, which would fully protect CWIT's interest because, as the court acknowledged, such an "injunction . . . would relieve them from the need to make a certification." SA47. The fact that the preliminary injunction benefits nonparties is hardly an "incidental" feature of the court's order—that is precisely who "the injunction is designed to benefit." *See CASA*, 145 S. Ct. at 2557-58; SA44-45 (explaining at length district court's intent to protect "other grantees and contractors") (quotation marks omitted).

The district court speculated, with no basis in the record, that an order limited to CWIT and the entities for whom it is a subgrantee would be inadequate because "prospective" partner organizations might be chilled by having to "affirmatively invoke the injunction vis-à-vis the government before dealing with CWIT." SA46-47. The Supreme Court

rejected that very argument in *CASA*. 145 S. Ct. at 2565 (Thomas, J., concurring) (noting Court's rejection of argument that complete relief needed to be universal to avoid its intended beneficiaries "having to identify and disclose [that status] to the government." (quotation marks omitted)). This Court should not hesitate to do the same.

Moreover, the notion of an injury in that regard is highly speculative and plainly could not justify an injunction applicable to every other federal grantee (or hypothetical future federal grantee) in the nation. If CWIT had brought this suit seeking relief only as to some unidentified entity that might hypothetically obtain a grant and later form a relationship with CWIT, standing would plainly have been lacking even apart from the defects in CWIT's own standing identified above. CWIT is not entitled to that relief merely because it packages it with other relief to which its entitlement is more plausible.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction against enforcement of the Certification Provision. In the alternative, the Court should vacate the preliminary injunction to the extent it prohibits enforcement of the Certification

Provision against persons other than CWIT and recipients of federal

funds for whom CWIT is a sub-contractor or sub-grantee.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
ANDREW S. BOUTROS
  *United States Attorney*


DANIEL TENNY
 *s/ Gabriel I. Schonfeld*
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3306*
  *Gabriel.I.Schonfeld@usdoj.gov*

August 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7,629 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/Gabriel I. Schonfeld*
Gabriel I. Schonfeld

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Gabriel I. Schonfeld*

Gabriel I. Schonfeld

# CIRCUIT RULE 30(d) STATEMENT

I hereby certify that the short appendix and appendix include all of the materials required by Circuit Rule 30(a) and (b).

s/Gabriel I. Schonfeld
Gabriel I. Schonfeld

**ADDENDUM**

**Executive Order 14,173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg 8633**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1 . *Purpose.* Longstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin. These civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans. As President, I have a solemn duty to ensure that these laws are enforced for the benefit of all Americans.

Yet today, roughly 60 years after the passage of the Civil Rights Act of 1964, critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) that can violate the civil-rights laws of this Nation.

Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system. Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex.

These illegal DEI and DEIA policies also threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society, including all levels of government, and the medical, aviation, and law-enforcement communities. Yet in case after tragic case, the American people have witnessed first-hand the disastrous

A1

consequences of illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing.

The Federal Government is charged with enforcing our civil-rights laws. The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination.

Sec. 2 . *Policy.* It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

Sec. 3 . *Terminating Illegal Discrimination in the Federal Government.* (a) The following executive actions are hereby revoked:

***

(b) The Federal contracting process shall be streamlined to enhance speed and efficiency, reduce costs, and require Federal contractors and subcontractors to comply with our civil-rights laws. Accordingly:

(i) Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), is hereby revoked. For 90 days from the date of this order, Federal contractors may continue to comply with the regulatory scheme in effect on January 20, 2025.

(ii) The Office of Federal Contract Compliance Programs within the Department of Labor shall immediately cease:

(A) Promoting "diversity";

(B) Holding Federal contractors and subcontractors responsible for taking "affirmative action"; and

(C) Allowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin.

A2

(iii) In accordance with Executive Order 13279 of December 12, 2002 (Equal Protection of the Laws for Faith-Based and Community Organizations), the employment, procurement, and contracting practices of Federal contractors and subcontractors shall not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws.

(iv) The head of each agency shall include in every contract or grant award:

(A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

(B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

(c) The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall:

(i) Review and revise, as appropriate, all Government-wide processes, directives, and guidance;

(ii) Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and

(iii) Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

Sec. 4 . *Encouraging the Private Sector to End Illegal DEI Discrimination and Preferences.* (a) The heads of all agencies, with the assistance of the Attorney General, shall take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work identified in section 2 of this order.

A3

(b) To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying:

(i) Key sectors of concern within each agency's jurisdiction;

(ii) The most egregious and discriminatory DEI practitioners in each sector of concern;

(iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;

(iv) Other strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws;

(v) Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and

(vi) Potential regulatory action and sub-regulatory guidance.

Sec. 5 . *Other Actions.* Within 120 days of this order, the Attorney General and the Secretary of Education shall jointly issue guidance to all State and local educational agencies that receive Federal funds, as well as all institutions of higher education that receive Federal grants or participate in the Federal student loan assistance program under Title IV of the Higher Education Act, 20 U.S.C. 1070 *et seq.,* regarding the measures and practices required to comply with *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College,* 600 U.S. 181 (2023).

A4

Sec. 6 . *Severability*. If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 7 . *Scope.* (a) This order does not apply to lawful Federal or private-sector employment and contracting preferences for veterans of the U.S. armed forces or persons protected by the Randolph-Sheppard Act, 20 U.S.C. 107 *et seq.*

(b) This order does not prevent State or local governments, Federal contractors, or Federally-funded State and local educational agencies or institutions of higher education from engaging in First Amendment-protected speech.

(c) This order does not prohibit persons teaching at a Federally funded institution of higher education as part of a larger course of academic instruction from advocating for, endorsing, or promoting the unlawful employment or contracting practices prohibited by this order.

Sec. 8 . *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to and does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 21, 2025.

A5

**SHORT APPENDIX**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO WOMEN IN TRADES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 25 C 2005** |
| | ) | |
| **PRESIDENT DONALD J. TRUMP,** | ) | |
| **DEPARTMENT OF LABOR, ACTING** | ) | |
| **SECRETARY OF LABOR VINCENT** | ) | |
| **MICONE, OFFICE OF MANAGEMENT** | ) | |
| **AND BUDGET, DIRECTOR OF THE** | ) | |
| **OFFICE OF MANAGEMENT AND** | ) | |
| **BUDGET RUSSELL VOUGHT, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE, ATTORNEY** | ) | |
| **GENERAL OF THE U.S. DEPARTMENT** | ) | |
| **OF JUSTICE PAMELA BONDI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

In this order, the Court considers plaintiff Chicago Women in Trades's (CWIT) motion for a preliminary injunction. The order describes the lawsuit, the motion, and the basis for the Court's ruling.

The Court concludes that a preliminary injunction is warranted against the Department of Labor (DOL) from requiring any grantee or contractor to make a certification pursuant to section 3(b)(iv) of Executive Order 14173. The Court further enjoins DOL from applying section 2(b)(i) of Executive Order 14151 against CWIT to prevent termination of its Women in Apprenticeship and Nontraditional Occupations

SA1

grant.  The Court otherwise denies CWIT's motion for a preliminary injunction.

## Background

### A.    Chicago Women in Trades

Chicago Women in Trades is a non-profit organization dedicated "to promoting diversity, equity, and inclusion within the skilled trades industry."  Compl. ¶ 12.  It provides programming "centered on equity," including "training programs, best practices guides, employer resources, and advocacy to attract and retain women in skilled trades."  *Id.* ¶ 35; Mem. in Supp. of Prelim. Inj. at 2.  These programs are focused on "preparing women across the country to enter and remain in high-wage skilled trades, including carpentry, electrical work, welding, plumbing, and others."  Compl. ¶ 12.  Although primarily based in Illinois, CWIT "has provided technical assistance and gender equity training to industry stakeholders in all 50 states."  Vellinga Decl. ¶ 15; *see also* Compl. ¶ 38.

Federal funding accounts for roughly forty percent of CWIT's annual budget.  The remainder of CWIT's budget is funded by private donors and non-federal grants.  In particular, CWIT highlights five federal funding sources.

First, CWIT receives a Women in Apprenticeship and Nontraditional Occupations (WANTO) grant from the DOL Women's Bureau.  Under the Women in Apprenticeship and Nontraditional Occupations Act, DOL must "make grants to community-based organizations to provide technical assistance to employers and labor unions." 29 U.S.C. § 2503(a).  The Act's provided examples of these "technical assistance" grants all involve supporting women in the skilled trades.  *See id.* § 2503(a)(1)–(7).  This grant funds CWIT's "Transforming the Workforce System to Ensure Gender Equity in

Infrastructure" program, under which CWIT provides technical assistance, apprenticeship, and workforce equity plans for women in the skilled trades.

In 2024, Congress enacted the Further Consolidated Appropriations Act of 2024, which "*[p]rovided further*, That of the amounts made available to the [DOL] Women's Bureau, not less than $5,000,000 shall be used for grants authorized by the Women in Apprenticeship and Nontraditional Occupations Act."  *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 641; *see also* Compl. ¶ 49. The Further Consolidated Appropriations Act of 2024 "appropriated [funds], out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2024."  *Id.* 138 Stat. 460, 461.  On September 26, 2024, Congress passed the Continuing Appropriations and Extensions Act of 2025, which appropriated

> [s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Act for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities . . . that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024, and for which appropriations, funds, or other authority were made available in the following appropriations Acts: . . . (8) The Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024 (division D of Public Law 118-47).

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, Div. A, § 101, 138 Stat. 1524, 1524–25.  This Act stated that "[a]ppropriations made by section 101 shall be available to the extent and in the manner that would be provided by the pertinent appropriations Act" and that "appropriations and funds made available and authority granted pursuant to this Act shall be available until . . . December 20, 2024." *Id.*, Div. A, §§ 103, 106, 138 Stat. 1524, 1526.  The Act does not otherwise reference the Further Consolidated Appropriations Act of 2024's provision requiring not less than

$5 million to be allocated to grants under the WANTO Act, indicating that those grants are to continue to be funded "as provided in the applicable appropriations Act for fiscal year 2024." *Id.*, Div. A, § 101, 138 Stat. 1524, 1524.

On March 15, 2025, Congress enacted the Full-Year Continuing Appropriations and Extensions Act of 2025, again appropriating

> [s]uch amounts as may be necessary, at the level specified in subsection (c) and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024, for projects or activities . . . that are not otherwise specifically provided for, and for which appropriations, funds, or other authority were made available in the following appropriations Acts: . . .  (8) The Department of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024 (division D of Public Law 118-47).

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, Div. A, Title I, § 1101, 139 Stat. 9, 10.  Subsection (c) states that "[t]he level referred to in subsection (a) shall be the amounts appropriated in the appropriations Act referred to in such subsection, including transfers and obligation limitations." *Id.*, Div. A, Title I, § 1101(c), 139 Stat. 9, 12.  The Act again does not otherwise reference the Further Consolidated Appropriations Act of 2024's provision that not less than $5 million be allocated to grants under the WANTO Act, again indicating that those grants should continue to be funded "as provided in the applicable appropriations Act for fiscal year 2024." *Id.*, Div. A, Title I, § 1101, 139 Stat. 9, 10.

Second, CWIT receives an Apprenticeship Building America (ABA) grant from DOL.  Two acts authorize the ABA grant:  the National Apprenticeship Act and the American Competitiveness and Workforce Improvement Act.  These Acts authorize DOL to "bring together employers and labor for the formulation of programs of apprenticeship" and "award grants" to "establish demonstration programs or projects to

4

SA4

provide technical skills training for workers, including both employed and unemployed workers." 29 U.S.C. §§ 50, 2916a(1)–(2).  This grant partially funds two of CWIT's apprenticeship programs that build participants' test preparedness and workplace readiness.

Third, CWIT holds a subcontract with an organization called Jobs for the Future (JFF).  JFF, in turn, is funded by DOL through its Improving Diversity and Equity Apprenticeship for Manufacturing (IDEA-M) program.  Under this subcontract, CWIT receives funding in exchange for providing services that increase and retain women in advanced manufacturing apprenticeship programs.

Fourth, CWIT is a subrecipient to JFF's Apprenticeship USA grant, again funded by DOL.  To receive grant funding, CWIT is required to conduct apprenticeship programs, serve as a subject matter expert at events, research and document best practices for recruitment of women, and lead training sessions.

Fifth, CWIT is a subrecipient of a Tradeswomen Building Infrastructure Initiative (TBII) grant.  DOL, under the Workforce Innovation and Opportunity Act, awarded the Illinois Department of Labor a TBII grant, and CWIT received a subaward.  Under this grant, CWIT works with local communities to promote diverse worksites and harassment-free workplaces and to conduct data evaluation and best practices training.

In sum, CWIT leads a diverse array of educational and apprenticeship programs focused on retaining and increasing the employment of women in skilled trades.  A substantial amount of CWIT's funding to conduct these programs comes from grants that originate with the Department of Labor, a department in the Executive Branch.

**B.    The Executive Orders**

In the first two days of the new administration, President Donald J. Trump issued two Executive Orders addressing diversity, equity, and inclusion (DEI).  The January 20, 2025 Order (J20 Order), titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," focused on ending DEI programs within the federal government.  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1; Compl., Ex. A.  The January 21, 2025 Order (J21 Order), titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," focused on "enforcing civil rights laws" by "ending illegal preferences and discrimination" in both the federal government and the private sector.  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 1; Compl., Ex. B.

CWIT challenges the legality of two provisions of the J20 Order and three provisions of the J21 Order.  Other provisions of these orders are not in dispute.  Because both Orders contain a severability clause, unchallenged provisions will remain in effect even if CWIT is successful in its lawsuit.  *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 3 ("If any provision of this order . . . is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby."); Exec. Order No. 14173, 90 Fed. Reg. 8633, § 6 (same).

**1.    Termination Provisions**

The disputed provisions fall into three buckets.  First, CWIT challenges the Termination Provisions of the J20 and J21 Orders.  Section 2 of the J20 Order, labelled "Implementation," requires the Director of the Office of Management and Budget (OMB) to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs,

6

preferences, and activities in the Federal Government, under whatever name they

appear."  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2.  Two subsections of section

2, both challenged by CWIT, further describe how these terminations will be effectuated.

All executive agencies, departments, and commission heads must, "within sixty days" of

the J20 Order:

> (i) terminate, to the maximum extent of the law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees[] [and]

> (ii) provide the Director of the OMB with a list of all:  (A) agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether [those initiatives] have been misleadingly relabeled . . . .

*Id.* § 2(b)(i)–(ii)(A).

CWIT also challenges a similar Termination Provision in the J21 Order, which

only addresses activities within the government:

> The Director of the Office of Management and Budget . . . shall: . . . (iii) Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(c)(iii).

**2.    Certification Provision**

Next, CWIT challenges the Certification Provision of the J21 Order.  This

provision, section 3(b)(iv), requires the "head of each agency" to include "term[s]" in

"every contract or grant award" that requires the counterparty to "certify" certain matters.

*Id.* § 3(b)(iv)(A)–(B).  Specifically, two terms are to be included in every contract or grant

agreement under the J21 Order:

> (A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act]; and

> (B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

*Id.*

### 3.    Section 4(b) of the J21 Order

Finally, CWIT challenges section 4(b) of the J21 Order.  Section 4(b) directs the Attorney General to submit "recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI."  *Id.* § 4(b).  Under this directive, the Attorney General must submit

> [a] plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences.

*Id.* § 4(b)(iii).  And, "[a]s part of this plan," each agency is required to "identify . . . potential civil compliance investigations of . . . large non-profit corporations."  *Id.*

### C.    Pre-litigation history

On January 21, 2025, the United States Office of Personnel Management (OPM) issued a memorandum to the "Heads and Acting Heads of Departments and Agencies" directing them to, among other actions, "terminate any DEIA-related contractors" by January 22, 2025.  Off. of Personnel Mgmt., Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025); Parker Decl., Ex. B at 1–2.

On January 22, 2025, CWIT received an email from the grant administrator at the

8

DOL Women's Bureau, which issues the WANTO grant.  The email stated that "[e]ffective immediately, all recipients of federal financial assistance are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the Executive Orders."  Vellinga Decl., Ex. 1.  The email further stated that DOL was "reviewing all active federal awards and will take appropriate action, including terminating the awards, consistent with the Executive Orders."  Id.  That same day, CWIT received an identical email forwarded by the Illinois Department of Labor concerning the TBII grant.

Later on January 22, 2025, CWIT received a Training and Employment Notice from DOL Acting Deputy Assistant Secretary Michelle Paczynski with the subject heading, "Immediate Implementation of Executive Orders."  Id., Ex. 2 at 1.  The notice echoed the earlier emails:  "Effective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to 'diversity, equity and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under the federal awards, consistent with the requirements of the EOs."  Id.  DOL recirculated this email on March 20, 2025.  It then rescinded it five days later, claiming it had been sent in error.  Roughly sixty other grantees received these notices as well.

On January 23, 2025, CWIT received an email from JFF, with which CWIT subcontracts regarding the IDEA-M and Apprentice USA grants.  JFF's email stated that the Executive Orders required it "to pause immediately all activities directly tied to our federally funded work related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)."  Id., Ex. 3 at 1.  In response, JFF asked

CWIT to stop "any further work" on its subcontracted DEI projects. *Id.*

On March 26, 2025, JFF sent CWIT an email stating that it would be terminating its contract with CWIT. JFF directly cited the Executive Orders as the basis for termination: "JFF contracted with [CWIT] expressly to engage in activities no longer 'allowable' under Federal guidelines, pursuant to Executive Orders 14151 and 14173." Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1. At the preliminary injunction hearing, CWIT indicated that JFF has agreed to pause termination pending further developments in this case.

## D.    The present suit

CWIT filed the present suit on February 26, 2025 against President Trump and the Department of Labor, the Office of Management and Budget, the Department of Justice, and the heads of those agencies. It then moved for a temporary restraining order (TRO) on March 18, 2025, arguing that it faces imminent, irreparable harm from various terms of the J20 and J21 Orders. This Court granted the motion in part on March 27, 2025, enjoining DOL from enforcing section 2(b)(i) of the J20 Order (Termination Provision) against CWIT and from enforcing section 3(b)(iv) of the J21 Order (Certification Provision) against any grantee or contractor. *See Chi. Women in Trades v. Trump*, --- F. Supp. 3d ---, No. 25 C 2005, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025).

CWIT now moves for a preliminary injunction, contending that five provisions of the J20 and J21 Orders violate its rights under the First and Fifth Amendments to the Constitution and also run afoul of the Constitution's Spending Clause and the separation of powers.

**Discussion**

**A.    Standing**

The parties present no new arguments regarding why this Court should modify the conclusions it reached in its TRO ruling regarding CWIT's standing.  The Court adopts and incorporates its determination that CWIT lacks standing to challenge section 2(b)(ii)(A) of the J20 Order and sections 3(c)(iii) and 4(b) of the J21 Order.  *Id.* at *2. CWIT does have standing, however, to pursue its claims regarding section 2(b)(i) of the J20 Order (Termination Provision) and section 3(b)(iv) of the J21 Order (Certification Provision).  *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(iv).  The Court will elaborate on its prior conclusion below.

"Article III of the Constitution limits the federal judicial power to certain 'cases' and 'controversies.'"  *Silha v. ACT, Inc.*, 807 F.3d 169, 172–73 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992)).  A case or controversy is present when a plaintiff establishes the "irreducible constitutional minimum" of standing. *Id.* (quoting *Lujan*, 504 U.S. at 559–60).  Standing has three elements:  a plaintiff must demonstrate that it has (1) "suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant," and (3) "that it is likely that a favorable decision will redress that injury."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007).

Although "imminent" injury may suffice for standing, it "must be *certainly impending* to constitute injury in fact"—"allegations of *possible future injury* are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

11

Still, "[i]t is well established that preenforcement challenges are within Article III."  *ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (cleaned up).  A plaintiff may establish imminent injury prior to enforcement by showing either an "intention to engage in a course of conduct arguably affected by a policy" coupled with a "credible threat the policy will be enforced against" the plaintiff or a "chilling effect" on its speech that is "objectively reasonable" and results in "self-censorship."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

The "burden to demonstrate standing in the context of a preliminary injunction motion is 'at least as great as the burden of resisting a summary judgment motion.'"  *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990) (Blackmun, J., dissenting)).  The plaintiff must "set forth by affidavit or other evidence 'specific facts,' rather than general factual allegations of injury."  *Id.* (cleaned up).

When, as in this case, a plaintiff "attack[s] a number of diverse provisions" of an enactment, its "standing to sue must be evaluated with respect to each specific challenge."  *Genusa v. City of Peoria*, 619 F.2d 1203, 1209 (7th Cir. 1980). Accordingly, the Court addresses CWIT's standing to challenge the Termination and Certification Provisions of the Executive Orders.

### 1.    Section 2(b)(i) of the J20 Order (Termination Provision)

Section 2(b)(i) of the J20 Order requires each agency to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants."  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i).  Although the government has not yet terminated CWIT's grants, CWIT has shown a sufficiently imminent injury to maintain a pre-enforcement challenge.  CWIT's grants appear to be squarely targeted by this Termination

12

Provision—the provision requires the termination of "equity-related" grants, and CWIT alleges that it is a grantee that provides programming "centered on equity." *See* Compl. ¶ 35. CWIT has also received several credible threats of enforcement, including from grant issuers, to "cease all activities related to [DEI] or [DEIA] under the federal awards, *consistent with the requirements of the Executive Orders*." Vellinga Decl., Ex. 1 (emphasis added). This provision of the J20 Order requires the termination of grants "within sixty days of this order," i.e., March 21, 2025, a clear indication of imminent injury. *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i). Finally, CWIT has been notified that one of its subcontracts will be terminated due to the Executive Orders. As discussed, JFF, with which CWIT subcontracts for two of the grants at issue, recently advised CWIT that "[b]ecause once-allowable activities are no longer allowable, corresponding funding is no longer available." Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1. As noted above, it appears that JFF has, due to the Court's TRO, temporarily paused its decision to terminate its subcontracts. But that does not make the injury any less imminent. Rather, it appears that JFF has held off on termination only because of the present lawsuit.

### 2.    Section 3(b)(iv) of the J21 Order (Certification Provision)

Section 3(b)(iv) of the J21 Order states that each agency "shall include in every . . . grant award" a certification, enforceable via the False Claims Act, that the grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(iv). CWIT alleges that because it is a grantee that provides programs promoting employment opportunities for women, there is a strong basis to believe that the

13

government may consider its conduct to fall within the scope of this provision. As described above, the day after the J20 Order was signed, OPM issued an internal memorandum directing all agency heads to "terminate any DEIA-related contractors" by January 22, 2025. Off. of Personnel Mgmt., Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025); Parker Decl., Ex. B at 1–2. CWIT received multiple emails from DOL on January 22 directing it to cease DEI-related activity and warning of possible termination of grants. *See* Vellinga Decl., Exs. 1–2. Further, JFF sent CWIT a notice of termination of its subcontract—paused only due to the proceedings in this case—based on the threatened enforcement of these Executive Orders. These are credible threats of enforcement from the government and indicate that CWIT may run afoul of any required certifications included in future grant awards pursuant to the J21 Order.

In addition, CWIT alleges that it faces pressure to self-censor in response to the Orders, which supports the proposition that there is a chilling effect on grantees. For example, "one of the pass-through entities with which CWIT works informed CWIT that subsequent to the Executive Orders, its contract with DOL had been unilaterally modified to remove all references to 'DEI' and 'DEIA.'" Suppl. Vellinga Decl. ¶ 14. This pass-through entity "threatened to terminate CWIT's subgrant unless it self-censored and . . . eliminate[d] any references to 'DEI' and 'DEIA' for an upcoming technical assistance program." *Id.* ¶ 15. CWIT further contends that the "pass-through entity has rejected CWIT's proposed training materials that retained the words 'Diversity and Equity' in the title, though the materials did not otherwise mention diversity, equity, or inclusion." *Id.* Despite this, CWIT alleges that it has received no guidance from the entity on how to modify its materials to comply with the amended contract requirement.

SA14

*Id.* ¶ 16.

Similarly, CWIT says that one of its contractors contacted CWIT to ask if any presentations could be made without referencing DEI or including DEI content. According to CWIT, "[t]he contractor suggested that it asked these questions because of the Executive Orders."  Vellinga Decl. ¶ 46.

CWIT is not alone in this regard.  Both the January 22, 2025 Training and Employment Notice and its recirculation on March 20, 2025, which directed "all recipients of federal financial assistance awards . . . to cease all activities related to 'diversity, equity and inclusion' (DEI)," were sent by DOL to CWIT *and* roughly sixty other grantees.  *See* Vellinga Decl., Ex. 2 at 1; Pl.'s Mot. to Suppl. the Factual R., Ex. A at 1.  Even if DOL recirculated the notice in error, the mistake does not overcome the fact that grantees had already been made well aware by the January 22, 2025 email that their financial awards were in peril as long as they continued DEI programs.

Defendants do not dispute any of CWIT's averments in this regard.  CWIT contends that these matters exemplify the sort of self-censorship pressure that it and other grantees face and will continue to face under the J20 and J21 Orders.

*                    *                    *

The Court concludes that for both the Termination and Certification Provisions, CWIT has established injuries imminent enough to constitute concrete injuries in fact that support standing.  In addition to the fact that the Orders themselves, and the communications CWIT and others have received, indicate that enforcement is imminent, the provisions put grantees like CWIT in the position of having to act now to avoid adverse consequences in the near future.  Among other things, compliance with the

15

Certification Provision—which requires a verification by the grantee that none of its programs (not just its programs under government grants) "promot[e] DEI"—calls upon a grantee like CWIT to modify its activities and advocacy *now* so that it can make an appropriate certification to avoid having the axe fall.

The imminent injuries are also fairly traceable to the defendants.  Specifically, the Termination and Certification Provisions are included in Executive Orders signed by the President that, by their terms, require implementation by DOL and other federal agencies.  Finally, an injunction preventing these provisions from being enforced would prevent the injury from taking place.

In sum, the Court is persuaded that CWIT has standing to pursue its challenges to the Termination Provision (section 2(b)(i) of the J20 Order) and the Certification Provision (section 3(b)(iv) of the J21 Order).

## B.    Ripeness

The government also argues that CWIT's challenges are not ripe.  "Much like standing, ripeness gives effect to Article III's Case or Controversy requirement by 'preventing the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'"  *Sweeney v. Raoul*, 990 F.3d 555, 559–60 (7th Cir. 2021) (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 148 (1967)).  Although standing and ripeness are "related," they require "distinct inquiries."  *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007).  Whereas "standing focuses on *who* may bring a ripe action," ripeness concerns "*when* an action may be brought."  *Id.* (quoting *Pic-A-State Pa. Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996)).  In evaluating ripeness, courts consider "both the fitness of the issues for judicial decision

16

and the hardship to the parties of withholding court consideration."  *Sweeney*, 990 F.3d at 560 (quoting *Abbott Laby's*, 387 U.S. at 149).

**1.      General ripeness considerations**

The government contends that CWIT's claims are not ripe as they are based on "*possible* actions that agencies *might* take under the EOs."  Defs.' Mem. in Opp. at 13. But as discussed above, a plaintiff may bring a pre-enforcement action in appropriate circumstances.  *See Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) ("A party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality . . . .").  And based on CWIT's affidavits, CWIT faces serious harm if consideration of its challenges is withheld—every day that passes increases the risk of termination of its grants and, correspondingly, increases the pressure to self-censor its speech.  In fact, as indicated, JFF has already informed CWIT that it will terminate its subcontracts with CWIT due to the Executive Orders, with only this Court's proceedings convincing it to pause such termination.  *See* Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

**2.      Tucker Act**

The government further contends that CWIT's claims against the Termination Provision are unripe in light of the Tucker Act.  *See* Defs.' Mem. in Opp. at 13. Specifically, the government argues that CWIT's claims are properly breach of contract claims that should only be brought after its grants are terminated.  Accordingly, the government contends that the present matter is unripe and that jurisdiction would properly lie with the Court of Federal Claims under the Tucker Act once a grant has been terminated.

The Tucker Act provides for exclusive jurisdiction in the Court of Federal Claims over contract actions against the United States exceeding $10,000.  *See* 28 U.S.C. § 1491(a)(1) (conferring upon the U.S. Court of Federal Claims jurisdiction over actions "founded . . . upon any express or implied contract with the United States"); *Id.* § 1346(a)(2) (granting district courts concurrent jurisdiction with the Court of Federal Claims for claims against the United States "not exceeding $10,000" founded upon express or implied contracts); *Clark v. United States*, 691 F.2d 837, 840 (7th Cir. 1982).

An action does not fall within the exclusive jurisdiction of the Court of Federal Claims, however, simply because it implicates a contract in some way.  "[T]he mere fact that a court may rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  Rather, an action invokes the Tucker Act's jurisdictional hook only when the claim is "at its essence" a contract claim.  *Id.* at 967.  "[W]here there is a possible alternative basis for jurisdiction independent of the Tucker Act," a court "must be more deliberat[ive] in [its] examination" of whether the particular action is "one which is or is not 'at its essence' a contract action."  *Id.* at 968.

To determine the essence of an action, a court looks at "both the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought (or appropriate)."  *Id.*; *see also Evers v. Astrue*, 536 F.3d 651, 657–58 (7th Cir. 2008) (collecting cases using this framework to determine whether an action "relates to a contract" and citing them persuasively).

The Court remains unpersuaded by the government's argument that CWIT's

18

claims arise out of a "contract."  The government contends that CWIT's "claim as to the

Termination Provision is not ripe for review" in light of a recent Supreme Court order

that, it says, indicates "serious questions about whether this Court would have

jurisdiction to review [CWIT's] future post-termination claims."  Defs.' Notice of Suppl.

Authority at 1 (referencing the Supreme Court's April 4, 2025 order staying an injunction

in *Department of Education v. California*, 604 U.S. ---, 2025 WL 1008354 (April 4, 2025)

(per curiam)).  Because, the government contends, CWIT's suit is, "[a]t bottom, a

request to enjoin the termination of contracts/grants," it is, "in essence, an 'enforcement

of the Government's contractual obligation to pay money.'"  *Id.* at 2 (quoting *Dep't of

Educ.*, 2025 WL 1008354, at *2) (cleaned up).  In particular, the government argues, the

Court's enjoining of the Termination Provision amounts to an order to continue paying

funds to CWIT.  On these grounds, the government contends that the case amounts to

a contract dispute, meaning jurisdiction would lie in the Court of Federal Claims once

CWIT's grants are terminated but that, until that condition occurs, the claims remain

unripe for review.

    The government also contends that, at the TRO hearing, CWIT's counsel

"conceded that jurisdiction over a contract dispute would [lie] in the Court of Federal

Claims even if the dispute involved constitutional rights" but argued that "the same

jurisdictional limit does not apply to disputes over federal grants."  *Id.*  According to the

government, however, "[t]he Supreme Court's order, which applies the Tucker Act to a

dispute involving federal grants, forecloses any such distinction."  *Id.*

    The Court is unpersuaded that CWIT's claims are unripe on the basis argued by

the government.  Irrespective of whether grants and contracts are indistinguishable

19

SA19

when it comes to Tucker Act jurisdiction, the facts of this case and CWIT's requested relief distinguish it from the Supreme Court's recent decision.

CWIT's claims are not in essence contract actions.  Both the source of the rights claimed and the type of relief sought are disconnected from any underlying contract. *See Megapulse, Inc.*, 672 F.2d at 405–06 ("We disagree, however, with the district court's . . . suggest[ion] that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act."). CWIT's claims arise under the First and Fifth Amendments, the Spending Clause, and the separation of powers and thus all derive from the Constitution.  They are not claims for, or like, breach of contract.

Additionally, the fact that CWIT exclusively seeks injunctive relief highlights that it is not seeking relief that is "in essence" monetary relief from the federal government. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1102, 1110–11 (D.C. Cir. 2022) ("We conclude that Crowley's requested declaratory and injunctive relief is 'not specific to actions that sound in contract.' . . .  And, critically, Crowley does not 'in essence' seek more than $10,000 in monetary relief from the federal government, as the declaratory and injunctive relief sought has 'considerable value' apart from and is not 'negligible in comparison' to any potential monetary recovery that Crowley might obtain in other proceedings.") (citations omitted).  It is true, of course, that an injunction precluding DOL from terminating a grant to CWIT effectively requires the government to keep funding the grant.  But "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  Here, CWIT in its

20

complaint expressly asks only for injunctive relief.  It has made no request for money

damages (other than its request for attorney's fees, which does not amount to a request

for specific performance of contractual obligations).

This sole focus on injunctive relief further supports this Court's jurisdiction, as the

Court of Federal Claims could not provide the equitable relief CWIT seeks.  The Court

of Federal Claims "has no power to grant equitable relief."  *Id.* at 905 (citation omitted).

Yet only the equitable relief of enjoining the government from enforcing the Certification

Provision can prevent harms such as chilled speech, a harm that monetary remedies

are insufficient to address.  *Cf. Alvarez*, 679 F.3d at 589 (noting the "loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury" and that that "damages are . . . not an adequate remedy" (first

quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

Of course, CWIT's claims implicate its grant agreements; it would have no basis

to pursue its claims were it not a grant recipient or a subgrantee.  But its rights under

the First Amendment, the Fifth Amendment, and the other constitutional provisions it

cites exist independent of the Termination Provision's enforcement.  *See Megapulse*,

672 F.2d at 968 ("[T]he mere fact that a court may have to rule on a contract issue does

not, by triggering some mystical metamorphosis, automatically transform an action

based on trespass or conversion into one on the contract and deprive the court of

jurisdiction it might otherwise have."); *see also Crowley Gov't Servs.,* 38 F.4th at 1110

("Granted, Crowley's claim presupposes the existence of a contract, as without one the

GSA would have no invoices to audit.  But the right Crowley seeks to vindicate is not a

contract right and its action in district court only 'require[s] some reference to or

incorporation of [the] contract.'") (citation omitted).   CWIT is not seeking via this lawsuit to vindicate a contractual right to grant funds; rather, it alleges infringement of constitutional prohibitions, including a contention that the Executive Orders chill First Amendment-protected speech.

These circumstances make this case quite different from *Department of Education v. California*.  In that case, the plaintiffs' only claim was that the government's termination of grants was arbitrary and capricious under the Administrative Procedures Act.  *Dep't of Educ.*, 2025 WL 1008354, at *1.  In a two-page, per curiam opinion, the Court found the government was "likely to succeed in showing the District Court lacked jurisdiction," stating that jurisdiction would likely lie in the Court of Federal Claims under the Tucker Act.  *Id.* at *2. "The whole premise" of the plaintiffs' suit was that "the grants were wrongfully terminated."  Reply in Supp. of Appl. to Vacate at 8, *Dep't of Educ.*, 2025 WL 1008354.  There was no indication that there was a claim of an infringement of a constitutional right or a chilling effect on free speech.

The Court therefore finds that *Department of Education v. California* distinguishable and concludes that the Tucker Act does not preclude CWIT from proceeding in district court.

Having established CWIT's standing, ripeness, and the Court's jurisdiction, the Court proceeds to the merits of CWIT's claims.

## D.    Standard for preliminary injunction

To obtain a preliminary injunction, the movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is

in the public interest." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023)

(quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  When, as here,

the government is a party to the suit, "assessing the harm to the opposing party and

weighing the public interest . . . merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because injunctive relief is "an extraordinary and drastic remedy," the party seeking an

injunction "carries the burden of persuasion" on each of these points.  *Mazurek v.

Armstrong*, 520 U.S. 968, 972 (1997).

> **1.     Likelihood of success on the merits**

CWIT first argues that the challenged provisions of the Executive Orders violate

the First Amendment.  The Court begins with this contention, as "[i]n First Amendment

cases, the likelihood of success . . . will often be the determinative factor" in deciding

whether to grant an injunction.  *Alvarez*, 679 F.3d at 589 (cleaned up).

> **a.     Certification Provision**

> **i.     First Amendment**

In granting CWIT's motion for a TRO, the Court concluded that CWIT was likely

to prevail on the merits in showing that the Certification Provision violated certifying

entities' First Amendment rights.  *See Chi. Women in Trades*, 2025 WL 933871, at *8–9.

In its supplemental memorandum opposing a preliminary injunction, the government

does not present any new arguments about the Certification Provision but rather asks

the Court to reconsider its analysis based on the arguments the government raised in its

initial memorandum.  Even with a second look, the Court concludes that CWIT will likely

succeed on the merits of this claim.

CWIT argues that section 3(b)(iv) of the J21 Order unconstitutionally infringes on

its First Amendment rights because the Order effectively regulates CWIT's conduct outside of the contours of the federal grants.  As discussed below, the government has wide latitude in making funding decisions.  *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).  When the government puts an unwanted condition on funding, a fund recipient's usual "recourse is to decline the funds."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (hereinafter *AID*).  "This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights."  *Id.*

Still, the government may not use funding conditions to regulate speech generally.  Although the government may use conditions to "define the federal program," it may not "reach outside" the program to influence speech.  *Id.* at 217.  "[F]unding condition[s] can result in an unconstitutional burden on First Amendment rights" when the government goes beyond "defining the limits of the Government spending program" and extends to "leverag[ing] funding to regulate speech outside of the contours of the federal program itself."  *Id.* at 206.

The government conceded at oral argument that the Certification Provision attempts to regulate grantees' speech outside of their federally-funded programs.  Defs.' Second Mem. in Opp., Ex. A at 44:13–15 (transcript from the TRO hearing in which the government stated:  "[W]e're not arguing that the Certification Provision doesn't apply outside of the grants or contracts.  It does.  It plainly does.").  The provision on its face makes clear that a counterparty must certify that it does not operate *any* program that promotes DEI, irrespective of whether the program is federally funded.

The government contends that the Certification Provision is permissible, as it simply requires certification that the grantee is not breaking the law.  Because a grantee

24

has no constitutional right to violate the law, the government argues, its receipt of funds may appropriately be conditioned upon its certification that it abides by anti-discrimination laws.  In this regard, the government emphasizes that the Certification Provision requires acknowledging only that the grantee does not operate any DEI programs that "violate any applicable Federal antidiscrimination laws."  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(iv).

The problem, however, is that the meaning of this is left entirely to the grantee's imagination.  The Order that contains the Certification Provision does not define the term "DEI" itself, and it does not refer to any other source indicating what the term means as used in the Order—let alone what might make any given "DEI" program violate Federal anti-discrimination laws.  And although the government emphasized, both in its briefing and at oral argument, that the Certification Provision implicates only *illegal* DEI programs, it has studiously declined to shed any light on what this means.  The answer is anything but obvious.  Indeed, the thrust of the Orders is that the government's view of what is illegal in this regard has changed significantly with the new Administration—even though the government has not (in the Orders) and has been unwilling to (in its briefs or at argument) define how it has changed.

Against this backdrop, the Certification Provision puts CWIT and other grantees in a difficult and perhaps impossible position.  They have received multiple communications from DOL directing them to ensure compliance with the J20 and J21 Orders.  The Certification Provision's application to grantees' activities that are *not* federally funded means that CWIT and other grantees must either take steps now to revise their programmatic activity so that none of it "promote[s] DEI" (whatever that is

25

deemed to mean), decline to make a certification and thus lose their grants, or risk

making a certification that will be deemed false and thus subject them to liability under

the False Claims Act.

The J21 Order's reference to "programs promoting DEI," moreover, is fairly read

as an *express* reference to First Amendment-protected speech and advocacy.  Even if

the Certification Provision is limited to promoting whatever the government may now

contend is "illegal DEI," it is a bedrock First Amendment principle that advocating for

violation of the law cannot be proscribed unless it rises to incitement.  *See Virginia v.*

*Black*, 538 U.S. 343, 359 (2003) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447

(1969)) ("[T]he constitutional guarantees of free speech and free press do not permit a

State to forbid or proscribe advocacy . . . of law violation except where such advocacy is

directed to inciting or producing imminent lawless action and is likely to incite or produce

such action.").

Because CWIT has demonstrated that it is likely to succeed on the merits of its

claim in challenging the Certification Provision, the Court need not address its

arguments concerning this provision involving the Fifth Amendment, the separation of

powers, and the Spending Clause.

      **b.    Termination Provision**

          **i.    First Amendment**

The majority of the parties' preliminary injunction briefing discusses whether

CWIT is likely to succeed on the merits of its claim that the Termination Provision

violates CWIT's First Amendment rights.  CWIT contends that, as written, the

Termination Provision violates its First Amendment right to engage in protected speech

and expressive conduct—specifically, to use its grants to implement its mission of

providing women-focused trade apprenticeship and training programs.  CWIT acknowledges that the government may selectively fund projects.  But it argues that because the government has *already* awarded CWIT with a series of grants, termination of funding would constitute a coercive post-funding penalty.

In its TRO ruling, the Court concluded CWIT was likely to succeed on its First Amendment claim regarding the Termination Provision.  *See Chi. Women in Trades*, 2025 WL 933871, at *5–8.  The Court's conclusion was twofold.  First, the Court determined that the Termination Provision was unduly coercive, relying on *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024).  Second, the Court found the provision's vagueness produced an impermissible chilling effect on speech, citing *Grayned v. City of Rockford*, 408 U.S.104 (1972).

The government asks the Court to reconsider this ruling.  It argues that *Vullo*'s coercion analysis is inapposite for cases involving government funding, as the government has wide latitude to determine what it does and does not fund.  *See Rust*, 500 U.S. at 193.  Because it acts as "patron" when making funding decisions, the government contends, it may terminate funding in accordance with its policy priorities. This funding context, according to the government, also makes the First Amendment vagueness concerns inapplicable.  *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).

With the benefit of further briefing and argument on this issue, the Court concludes that CWIT is not likely to succeed on the merits of its First Amendment claim relating to the Termination Provision.

The Court begins with a basic premise:  "The government can say what it wishes

and select the views that it wants to express." *Vullo*, 602 U.S. at 187 (cleaned up).  The government must be able to pursue its policy priorities—it "could barely function otherwise." *Id.*  To that end, the government has more leeway when funding activities than it does when regulating them.  Although the government cannot "favor one speaker over another" when regulating activities, *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995), it may pick and choose what activities to fund:  "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities . . . without at the same time funding an alternative program which seeks to deal with the problem another way." *Rust*, 500 U.S. at 193.

Still, the government is not altogether unrestrained when funding.  As discussed earlier with regard to the Certification Provision, the government may not impose a condition on its funding that affects "protected conduct outside the scope of the federally funded program." *AID*, 570 U.S. at 218.  The government may not attempt to use its funding power to regulate beyond the scope of the funded program and avoid First Amendment scrutiny in the process.  *Id.* at 214–15 (noting the government cannot "seek to leverage funding to regulate speech outside the contours of the program itself").

The question regarding the Termination Provision, then, is whether it reflects a funding decision or an impermissible attempt to regulate.  The Court is persuaded at this juncture that the provision concerns funding.  As discussed earlier, the Termination Provision requires agencies to terminate all "equity-related" federal grants; it does not prohibit equity-related activities outside of funded programs.  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i).  The government has made a policy choice that it no longer wishes to support equity-related programs—a choice that it may make when

28

funding. *See Rust*, 500 U.S. at 193. Grantees who find their grants threatened by termination remain able to pursue equity-related activities on their "own time and dime." *AID*, 570 U.S. at 218.

National Rifle Association of America v. Vullo* does not suggest a different conclusion. *Vullo* and the cases it cites concern situations in which the government attempts to use "coercive threats" to "punish[] or suppress[] disfavored speech." *Vullo*, 602 U.S. at 197. At first glance, *Vullo*'s analysis would appear to apply here. CWIT (and the Court previously) has described how the Executive Order's denunciation of "illegal and immoral" DEI supports a conclusion that the Termination Provision is aimed at "disfavored speech." *See Chi. Women in Trades*, 2025 WL 933871, at *6 (quoting Exec. Order No. 14151, 90 Fed. Reg. 8339, § 1). And although the government argues otherwise, "coercive threats" are not limited to threats of government investigations or prosecutions—as the Court repeated in *Vullo*, "[t]he First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions *and other means of coercion* . . . to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 197 (emphasis added) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)); *see also id*. at 191 ("To state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of *adverse government action* in order to punish or suppress the plaintiff's speech." (emphasis added)).

Yet even if "coercion" encompasses more than investigation and prosecution, it likely does not encompass the termination of government funding. As discussed above,

the government must be able to make funding decisions.  A finding that the government

acts "coercively," for purposes of the *Vullo* line of cases, when it terminates grants

would essentially force the government to continue to support activities that conflict with

its current policy determinations.  *Cf. Harris v. McRae*, 448 U.S. 297, 317 n.19 (1980)

("A refusal to fund protected activity, without more, cannot be equated with the

imposition of a 'penalty' on that activity.").  This result cannot be squared with the

government's power to selectively fund some programs and not others.  *See Rust*,

500 U.S. at 193.

Because the Court has concluded that the Termination Provision simply involves

the government engaging in funding, as opposed to regulating, the vagueness concerns

fall away as well.  *National Endowment for the Arts v. Finley* is analogous.  In *Finley*, the

plaintiff brought a facial challenge to language in the National Foundation on the Arts

and Humanities Act directing the grantor to "tak[e] into consideration general standards

of decency and respect for the diverse beliefs and values of the American public" when

issuing a grant.  *Finley*, 524 U.S. at 572 (quoting 20 U.S.C. § 954(d)(1)).  The Supreme

Court noted that "[t]he terms of the provision are undeniably opaque, and if they

appeared in a criminal statute or regulatory scheme, they could raise substantial

vagueness concerns."  *Id.* at 588.  But it went on to state that it was unlikely "that

speakers will be compelled to steer too far clear of any 'forbidden area' in the context of

grants of this nature" and thus that any concerns over chilled speech due to vagueness

were "not constitutionally severe."  *Id.* at 589; *see id.* at 590 (finding that the challenged

language "merely adds some imprecise considerations to an already subjective

selection process").

The Court previously distinguished *Finley* by noting that the Termination Provision would lead grantees to "steer" away from the "forbidden area" of DEI to avoid termination. *See Chi. Women in Trades*, 2025 WL 933871, at *7. That remains true. Yet *Finley* makes clear that this result is not "constitutionally severe" when it is prompted by a funding decision. *Finley*, 524 U.S. at 589. Although it certainly is true that prospective grantees "may conform their speech to what they believe to be the decisionmaking criteria in order to acquire funding," this is not akin to the chill a "criminal statute or regulatory scheme" imposes. *Id.* at 588–89. Vague criminal and regulatory statutes exert a stronger stifling force due to their legal consequences—they "lead citizens to steer *far wider* of the unlawful zone." *Grayned*, 408 U.S. at 109 (cleaned up) (emphasis added). Vague funding criteria certainly influences speech, but the consequence of grant termination or denial is significantly less severe than criminal or regulatory sanction, so it is likely that less speech will be stifled. *See Finley*, 524 U.S. at 588. And although citizens cannot simply opt out of criminal or regulatory proscriptions, grantees are free to decline federal funding that they believe unduly hinders their exercise of First Amendment rights. *See AID*, 570 U.S. at 214 ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights.").

The Court recognizes that this does not address CWIT's concern that the government is targeting disfavored speech by terminating already funded grants. But as the Court explained above, the language of the Termination Provision does not rise to the level of a coercive threat such that *Vullo* controls. The better match for this

situation is government-as-funder, placing this case closer to the context of *Finley*.  And, in the funding context, the law does not limit the government from identifying and limiting funds for a disfavored area of speech pursuant to its policy goals.  *See Rust*, 500 U.S. at 193.

Therefore, the Court finds that CWIT is unlikely to succeed on its contention that the Termination Provision violates its First Amendment rights.

### ii.    Fifth Amendment

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned*, 408 U.S. at 108.  An enactment can be void for vagueness if it contains "terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its applications." *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984)).  To avoid triggering the void-for-vagueness doctrine, an enactment "must articulate terms 'with a reasonable degree of clarity' to reduce the risk of arbitrary enforcement and allow individuals to conform their behavior to the requirements of the [enactment]."  *Id.* (quoting *Roberts*, 468 U.S. at 629).

To succeed on a facial void-for-vagueness challenge under the Fifth Amendment, a plaintiff must show that "the enactment is impermissibly vague in all its applications."  *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).  When determining whether an enactment is unconstitutionally vague on its face, "a federal court must, of course, consider any limiting construction that a[n] . . . enforcement agency has proffered."  *Id.* at 494 n.5 (citing *Grayned*, 408 U.S. at 110); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In

32

evaluating respondent's facial challenge, we must consider the [government]'s authoritative constructions of the ordinance, including its own implementation and interpretation of it.").

CWIT contends that the Termination Provision runs afoul of the void-for-vagueness doctrine. According to CWIT, the J20 Order does not contain any "statutory definitions, narrowing context, or settled legal meanings" regarding what constitutes "illegal DEI." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 12. Therefore, CWIT argues that the J20 Order "do[es] not let Plaintiff 'know what is required of them so they may act accordingly.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

In response, the government contends that CWIT's "facial challenge under the Due Process Clause to Presidential directives is categorically improper." Defs.' Mem. in Opp. at 15. According to the government, the void-for-vagueness doctrine is inapplicable to CWIT's challenges because the Termination Provision only directs executive policy and actors, as opposed to the grantees themselves.[1] The Due Process Clause, the government argues, "prohibits uneven enforcement, and ensures notice, of requirements with which the public must comply," and "[n]o such concerns arise when

---

[1] The government also contends that courts have only applied the Fifth Amendment (as opposed to the First Amendment) void-for-vagueness doctrine outside of the statutory context to direct regulations of primary conduct, and it cites to *FCC v. Fox Television Stations* to support this proposition. The Court does not find this persuasive. Other courts have indicated that a court may properly entertain CWIT's void-for-vagueness challenge to Executive Orders under the Fifth Amendment. *See Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (evaluating Executive Orders for vagueness); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 545 (N.D. Cal. 2020) (holding that "Plaintiffs have demonstrated a likelihood of success on their Due Process claim challenging . . . the Executive Order as void for vagueness").

33

the President gives his subordinates an unclear directive." *Id.*

The Court finds that CWIT has not shown that it is likely to succeed on the merits of its Fifth Amendment claim regarding the Termination Provision. There are no references in this provision to "illegal DEI," although it appears elsewhere in the Order. Parsing the remainder of this provision, one arguably vague phrase is "to the maximum extent allowed by law." *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i). Prior to filing its second opposition memorandum, the government had not clarified what the phrase "to the maximum extent allowed by law" meant. It now has. The Court must consider the government's clarification in its determination of whether the Termination Provision is unconstitutionally vague under the Fifth Amendment. *See Village of Hoffman Estates*, 455 U.S. at 494 n.5; *Forsyth County*, 505 U.S. at 131.

In its supplemental preliminary injunction brief, the government states that the Termination Provision's direction to federal agencies to "terminate, to the maximum extent allowed by law . . . all . . . 'equity-related' grants or contracts" pertains to "the government's *legal authority* to terminate a contract or grant, which does not depend on whether the equity-related activity is 'legal' or 'illegal.'" Defs.' Second Mem. in Opp. at 3. In other words, the phrase "to the maximum extent allowed by law" as contained in the Termination Provision references the Executive Branch's authority under Article II and the corresponding statutes that authorize the grants. It is a limit solely on the *government's* authority. Any concerns of vagueness regarding exactly what authority an agency may have to terminate a grant are internal considerations for the agency itself; this is not an outward-facing provision. The Fifth Amendment's void-for-vagueness doctrine is concerned with "lack of notice" and "may be overcome in any specific case

34

SA34

where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  But here, the grantees face no notice concerns arising from arguably vague directions by the President to his subordinates.

The provision's reference to "equity-related" grants is another arguably vague phrase.  As the Court has discussed, the government has shed no light on what this phrase means or what grants it may encompass.  At the preliminary injunction hearing, the government declined to address whether, for instance, the WANTO Act—which expressly requires funding programs to promote opportunities for women—is considered an equity-related program such that grants under it must be terminated under this provision of the J20 Order.  But although the lack of clarity is concerning and the statement is certainly vague, the Court must follow binding authority stating that such vagueness is less "constitutionally severe" in the context of government funding. *See Finley*, 524 U.S. at 589 ("In the context of selective subsidies, it is not always feasible . . . to legislate with clarity."); *see also Kilborn v. Amiridis*, 131 F.4th 550, 565 (7th Cir. 2025) ("The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." (quoting *Village of Hoffman Estates*, 455 U.S. at 498)).  It is hard to see how the directive to terminate "equity-related" grants is any vaguer than a statute "awarding scholarship and grants on the basis of subject criteria such as 'excellence,'" which the Supreme Court allowed in *Finley*.  *Finley*, 524 U.S. at 589.

For these reasons, the Court concludes that CWIT is not likely to succeed on the merits of its claim that the Termination Provision violates the Fifth Amendment. Because the Court has determined that CWIT is unlikely to succeed on the merits of its

void-for-vagueness claim, it is unnecessary to address arguments regarding whether CWIT holds an underlying property right to its grants.

### iii.     Spending Clause and separation of powers

Under the Spending Clause, "the power of the purse . . . rests in the Legislative Branch." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018). This authority enables Congress to appropriate funds based on congressionally-approved priorities. U.S. Const. art. 1, § 8, cl. 1. To abide by the separation of powers, the Executive Branch must respect congressional appropriations; it lacks the authority to condition the payment of grants on its political priorities, except when Congress has delegated such authority. *See Sessions*, 888 F.3d at 283; *see also In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections."). The decisive question, then, is whether a grant's appropriation statute provides the Executive with the authority to add additional conditions disbursing the grant. *See id.*

CWIT asserts both a facial and as-applied challenge under the Spending Clause, asserting that the government's anticipated termination of its grants via the Executive Orders violates the separation of powers doctrine. Facial challenges are more difficult to make outside the First Amendment context: in those circumstances, "a law is not facially unconstitutional unless it is 'unconstitutional in all of its applications.'" *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

The Court concludes that CWIT is unlikely to succeed on the merits of its facial separation of powers challenge to the Termination Provision. To show that the

provision's requirement to terminate equity-related grants violates the separation of powers in all applications, CWIT would need to show that the Termination Provision conflicts with *every* statute that appropriates funds for grants.  *See Ezell*, 651 F.3d at 698.  CWIT has not attempted to make such a showing.  Because the Termination Provision impacts grant statutes, including some involved in this case, that do not require the government to fund equity-related projects, there are situations in which the Executive Branch could lawfully terminate such grants without running afoul of the separation of powers.  *See Sessions*, 888 F.3d at 284 (explaining that Congress can delegate authority to the President vis-à-vis the grant's organic statute).  Due to CWIT's failure to show that every grant's termination would be unconstitutional, its facial challenge is unlikely to succeed.

CWIT also challenges the Termination Provision as applied to its grants in particular.  Of the five government funded grants that CWIT asserts, the Court finds that only the termination of the WANTO grant runs afoul of the Spending Clause.  Under the WANTO Act, the DOL "shall make grants to community-based organizations to provide technical assistance to employers and labor unions."  29 U.S.C. § 2503(a).  As the Court has indicated, every example of "technical assistance" that the Act lists involves supporting women, in particular, who hold nontraditional occupations.  *See id.* § 2503(a)(1)–(7).  Congress has apportioned $5 million towards grants under the WANTO Act.  *See* Further Consolidated Appropriations Act, Pub. L. 118-47 (2024); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4 (2025); Continuing Appropriations and Extensions Act, Pub. L. 118-83 (2025).

Although the government has studiously avoided defining the term "equity," the

37

Court is unable to conceive of any grant issued under the WANTO Act that would *not* be an "equity-related" grant.  "Equity," at least in common understanding, denotes "freedom from disparities in the way people of different races, *genders*, etc. are treated." *Equity*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/equity (last visited April 14, 2025) (emphasis added).  As the examples in the WANTO Act and the Act's very name indicate, grants issued pursuant to the Women in Apprenticeship and Nontraditional Occupations Act almost by definition are aimed at reducing the disparity of women in apprenticeship and nontraditional occupations.  *See* 29 U.S.C. § 2501(b) (describing the purpose of the Act as "encourag[ing] employment of women in apprenticeable occupations and nontraditional occupations").

The Termination Provision directs the Executive to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts."  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i).  When viewed in light of the WANTO Act and the relevant appropriation statute that authorized funds for WANTO grants, this provision seems to run headlong into Congress's directive that WANTO grants are to go toward projects benefitting women.  Congress expressly stated in the WANTO Act that the Executive "*shall*" award grants for projects impacting women.  29 U.S.C. § 2503(a) (emphasis added).  Neither the WANTO Act nor its accompanying appropriations statute authorize the Executive to bypass Congress's condition and policy goal requiring the Secretary of Labor to use appropriated WANTO funds to support projects focused on promoting employment opportunities for women.  The government has not pointed to any language in these statutes enabling the Executive to modify these goals or add additional conditions to disburse WANTO funds, let alone to completely stop

38

effectuating the purpose of the statute.

In response, the government contends that the Termination Provision does not require the termination of equity-related grants mandated by Congress. It relies upon the term in the J20 Order stating that the termination of all equity-related grants is required only "to the maximum extent allowed by law." Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i). The government argues that this means that agencies and departments may terminate only equity-related grants that are not mandated by Congress, as doing otherwise would not be "allowed by law."

To support its proposition, the government relies on the D.C. Circuit's decision in *Building and Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002). In *Allbaugh*, the D.C. Circuit considered an executive order which barred any federal agency, "to the extent permitted by law," from requiring or prohibiting contractors or bidders from entering into a labor agreement. *Id.* at 29. The district court granted a permanent injunction, finding that the executive order amounted to a condition on federal funds that the Executive Branch lacked authority to impose without congressional authorization. *Id.* at 31. The D.C. Circuit reversed. Because the executive order limited agencies' power "to the extent permitted by law," the court emphasized, the order did not infringe on Congress's spending power, as it only "instruct[ed] . . . agenc[ies] to follow the law." *Id.* at 33. The court concluded that the possibility an agency would contravene a congressional enactment based on the order was irrelevant, as "[t]he mere possibility that some agency might make a legally suspect decision . . . does not justify an injunction against enforcement of a policy." *Id.*

Yet the D.C. Circuit is not the only federal circuit that has considered this sort of

39

"savings" clause.  In *City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), the Ninth Circuit considered an executive order that made so-called sanctuary jurisdictions ineligible to receive federal grants "to the extent consistent with law." *Id.* at 1232–33.  The court distinguished *Allbaugh*, finding the savings clause "does not and cannot override [the executive order's] meaning." *Id.* at 1240.  Because the order "unambiguously command[ed] action," the court was not persuaded that there was only a "mere possibility that some agency might make a legally suspect decision." *Id.* (quoting *Allbaugh*, 295 F.3d at 1240).  The court further concluded that the government's argument would lead it into "an intellectual cul-de-sac," as interpreting "consistent with the law" as immunizing an executive order would make "judicial review . . . a meaningless exercise." *Id.*; *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) (agreeing with the Ninth Circuit that "[t]he President cannot immunize his Order from scrutiny" by using a savings clause).

The Court finds that the Ninth Circuit's analysis more accurately fits the case at hand.  By expressly requiring agencies and departments to terminate *all* equity-related grants, the Termination Provision "unambiguously commands action." *City & County of San Francisco*, 897 F.3d at 1240.  And because the WANTO Act requires DOL to issue equity-related grants, there is more than a "mere possibility" that DOL, following the requirements imposed by the Executive Order, will violate the WANTO Act's prescriptions.  Indeed, DOL's actions cited by CWIT further support that such is the case—DOL Women's Bureau, which disburses the WANTO grant, has already instructed CWIT "to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards,"

40

though it has not specifically singled out the WANTO grant.  Vellinga Decl., Ex. 1.  On this record, the Court cannot ignore the Termination Provision's command for a wholesale termination of equity-related grants based on "a purely theoretical savings clause."  *HIAS, Inc.*, 985 F.3d at 325.

In sum, the Court finds that CWIT has demonstrated a likelihood of success on its claim that the Termination Provision violates the separation of powers when applied to CWIT's WANTO grant.  CWIT has not made this showing, however, regarding the application of the Termination Provision to the other four grants that CWIT receives from the government.  CWIT has not been able to show that Congress intended for the other grants to fund exclusively equity-related projects.  Thus, the potential termination of those grants does not appear to implicate the separate of powers.

### 2.     Irreparable harm

Given the Court's finding that CWIT has established a likelihood of success on its claim that the Certification Provision violates its First Amendment rights, it has made a sufficient showing of irreparable harm that would result from enforcement of this provision.  "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Alvarez*, 679 F.3d at 589 (quoting *Elrod* 427 U.S. at 373).  Further, when First Amendment rights are at stake, the "quantification of injury is difficult and damages are therefore not an adequate remedy."  *Id.* (citation omitted).

The Court also finds that CWIT is likely to suffer irreparable harm if the Termination Provision is enforced against the WANTO Act grants, which the Court has concluded would violate the separation of powers.  "When an alleged deprivation of a

constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary." *Ezell*, 651 F.3d at 699 (quoting 11A Charles Alan Wright, et al.,

Federal Practice and Procedure § 2948.1 (2d ed. 1995)).  This is especially true when

the right in question "protects . . . intangible and unquantifiable interests." *Id.*  The

separation of powers is one such interest.  By protecting against "the concentration of

power" that "would allow tyranny to flourish," it is "one of the most vital of the procedural

protections of individual liberty found in our Constitution." *City of Chicago v. Barr*,

961 F.3d 882, 892 (7th Cir. 2020) (quoting *Gundy v. United States*, 588 U.S. 128, 173

(2019) (Gorsuch, J., dissenting)).  The termination of CWIT's WANTO grant would result

in the Executive unlawfully acting contrary to Congress's express direction.  This

unauthorized use of power would be a clear separation of powers violation and lead to

CWIT suffering a deprivation of a constitutional right.  Thus, no further showing of

irreparable injury or inadequacy of legal remedies is required.

### 3. Balancing of the harms & public interest

"[I]njunctions protecting First Amendment freedoms are always in the public

interest." *Alvarez*, 679 F.3d at 589 (citation omitted).  The same may be said of

injunctions protecting the separation of powers.  *See Barr*, 961 F.3d at 918 (affirming

the lower court's conclusion that "the public interest was served by an injunction in that

it acts as a check on the executive's encroachment of congressional power that violates

the separation of powers").  Accordingly, "the balance of harms normally favors granting

preliminary injunctive relief because the public interest is not harmed by preliminarily

enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*,

679 F.3d at 589–90.

Further, because both Orders contain a severability clause, the unchallenged provisions of the Orders will remain in effect even if the Court issues a preliminary injunction. *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 3 ("If any provision of this order . . . is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby."); Exec. Order No. 14173, 90 Fed. Reg. 8633, § 6 (same). Finally, issuance of a preliminary injunction will not prevent the government from enforcing existing anti-discrimination laws.

For these reasons, the balance of harms and public interest weighs in favor of granting the preliminary injunction.

### E.    Scope of the preliminary injunction

CWIT seeks to enjoin enforcement of the relevant provisions of the Orders across the board, not just for itself but also for other grantees and contractors. It contends that the Termination and Certification Provisions are particularly appropriate for a nationwide injunction because the government relies on a categorical policy and the facts would not require different relief for other federal grantees and contractors.

The Seventh Circuit has held that a district court has discretion to grant a nationwide injunction "to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions." *Barr*, 961 F.3d at 916–17 (citation omitted); *see also id.* at 916 ("[B]oth historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court."). Still, the Seventh Circuit has made clear that nationwide injunctions "present real

43

dangers." *Id.* at 916. In particular, they "can truncate the process of judicial review" by "elevating the judgment of a single district court," and thus may create "the potential for forum shopping." *Id.* Such broad injunctive relief is therefore "appropriate only in rare circumstances." *Id.*

### 1.     Certification Provision

The Court is persuaded that granting a preliminary injunction barring DOL from enforcing the Certification Provision against *any* grantee or contractor is appropriate in these circumstances. This is necessary to ensure that CWIT is provided complete relief and to prevent infringement of the First Amendment rights of other grantees and contractors. *See id.* at 920–21 ("[A] court may impose the equitable relief necessary to render complete relief to the plaintiff . . . ."); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . ."). The far-reaching impact of the Certification Provision combined with its encroachment on grantees' and contractors' First Amendment rights create the type of "exceptional circumstances" in which "the proper scope" of the injunctive relief is nationwide. *Barr*, 961 F.3d at 917. In deciding on the proper scope of an injunction, courts look to factors such as "the nature of the violation, the extent of the impact, the urgency of the situation, the multiplicity of litigation, and the ability of others to even access the courts.*" Id.* In this case, these factors weigh in favor of a nationwide injunction. In particular, the Court considers the significant nature of the violation and the extensive impact of the Certification Provision.

First, the nature of the First Amendment right at stake supports a broad preliminary injunction that is not limited to CWIT. *See Zamecnik v. Indian Prairie Sch.*

44

*Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) ("When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself." (citation omitted)).   As explained earlier, CWIT is likely to succeed on the merits in showing that the Certification Provision violates its First Amendment rights.  And because CWIT has raised a facial challenge, the Court's analysis that the Certification Provision violates the First Amendment applies to all federal grantees and contractors. The significance of the underlying First Amendment right underscores the critical need and urgency to properly protect grantees and contractors from suffering irreparable injury to their free-speech rights.

Second, it is not an abstract possibility that the Certification Provision will impact and chill speech beyond the federally-funded program.  The J21 Order requires every federal grant recipient to certify that it does not engage in *any* programs involving "illegal DEI"—not just federally funded programs—without knowing which programs fall under that umbrella.  It is likely that few such recipients will choose to follow CWIT's example and put their organizations at risk by suing the government.  In fact, rather than spend their resources to challenge their patron in court or risk False Claims Act litigation, it is more likely that grantees and contractors will take the safer route, keep their heads down, and choose to simply stop speaking on anything remotely related to what the government might consider as promoting DEI or equity.  A nationwide injunction is appropriate to protect grantees and contractors who will have to choose between giving up their First Amendment rights on one hand and bearing the risks inherent in biting the hand that feeds them on the other.  *See Barr*, 916 F.3d at 917.

As one example of the likelihood of self-censorship by other federal grantees,

JFF has stated that it will terminate its subcontract with CWIT due to fear that it will run afoul of the Executive Orders by working with CWIT. As CWIT represented during the preliminary injunction hearing, the only reason why JFF has not yet taken action to terminate its subcontract with CWIT is this Court's TRO and the pending motion for preliminary injunction.

Further, there is a good chance that CWIT itself will not obtain complete relief with regard to the Certification Provision in the absence of a nationwide injunction. CWIT does not just work alone, but (at least in some instances) in conjunction with other organizations that may be considered to provide DEI-related programming. The Certification Provision requires grant recipients to certify that they do "not operate any programs promoting DEI." Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(vi). As a result of this provision, CWIT will not be able to work with other recipients or sub-recipients unless they also eliminate whatever may be considered as DEI-related efforts.

On this particular point, the government responds that CWIT may obtain complete relief if the Court restricts its injunction to "CWIT and entities for whom CWIT serves [a]s a sub-contractor or sub-grantee." Defs.' Second Mem. in Opp. at 15. The Court, however, is not persuaded that an injunction limited in this way would completely remedy the effect of the Certification Provision on CWIT. The Certification Provision requires every agency to include in "every contract or grant award" a "term" certifying the prospective recipient does not operate any programs promoting illegal DEI. Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(b)(iv). This means the Certification Provision likely will be in every contract and grant offered by an agency irrespective of whether

46

the prospective recipient is protected under the injunction.  It is true, of course, that an injunction limited to CWIT and others for which it is a subgrantee would relieve them from the need to make a certification.  But a preliminary injunction limited in this way still would impact any prospective grant recipient who might want to work with CWIT.  The recipient would have to affirmatively invoke the injunction vis-à-vis the government before dealing with CWIT, effectively clueing the government into the fact that non-grant-related advocacy relating to DEI—which the Certification Provision expressly impacts—may come into play.  There is a strong likelihood that the prospect of such disclosure would chill any prospective fund recipient from partnering with CWIT.  In such situations, CWIT would suffer the consequences.

The government's other arguments against a nationwide injunction are unavailing.  Concerns that nationwide relief might prevent percolation of the issues in district and reviewing courts have not borne out in practice.  Several courts continue to review the Executive Orders at issue in this case.  *See Nat'l Ass'n of Diversity Offs. in Higher Educ. v. Trump*, --- F. Supp. 3d ---, No. 25 C 333 ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025); *Nat'l Urban League v. Trump*, No. 25 C 471 (D.D.C.); *S.F. AIDS Found. v. Trump*, No. 25 C 1824 (N.D. Cal.).  There is no indication that these courts will be stifled in their review by an injunction entered here.

Nor does the Court find the "evolving" factual record counsels in favor of limiting the injunction, as the government suggests.  Defs.' Second Mem. in Opp. at 18.  Nothing in the record indicates any attempt to remedy the constitutional infirmities in the Certification Provision—indeed, the government's unwillingness or inability to define what type of non-grant activity it reaches shows as much.

47

SA47

Finally, the Court limits its injunction to enjoining DOL. CWIT has demonstrated a risk of imminent harm with regards only to DOL, as illustrated by the emails DOL has recently sent to CWIT and other grant recipients. And given the work that CWIT does, which involves providing support for women in nontraditional occupations, it is hard to see—and CWIT does not suggest—a basis upon which it would seek grants from agencies other than DOL.

### b. Termination Provision

The Court has concluded that it is appropriate to issue a preliminary injunction precluding DOL from terminating CWIT's WANTO grant funds. In contrast to the Certification Provision, the Court does not see an appropriate basis for extending an injunction beyond CWIT itself (whether as a grantee or subgrantee). If nothing else, there is likely a low risk that other grantees who risk termination or are terminated will not challenge enforcement of this provision against them. Such grantees likely will have a sufficient incentive to challenge termination to retain their funding, and this provision, unlike the Certification Provision, does not involve activity outside the government grant itself. Although there certainly is a risk that a given grantee may modify its programming to attempt to avoid termination, the Court is not persuaded at this juncture that this risk outweighs the concerns involving nationwide injunctions expressed by the Seventh Circuit. The Court therefore limits the reach of its injunction as to the Termination Provision to enjoining DOL from terminating CWIT's WANTO grant.

### F. Bond

The government asks the Court to require a bond as a condition of any injunctive relief. *See* Fed. R. Civ. P. 65(c). The purpose of a bond is to ensure that the enjoined

party is not permanently harmed "by an erroneous preliminary injunction." *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011). A court must "take care that the bond is set high enough to cover the losses that [its] handiwork could cause." *Id.*

Still, Seventh Circuit caselaw identifies two scenarios in which a district court may forgo requiring a bond. First, no bond is required if the enjoined party does not demonstrate it will "incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Second, a court may forgo a bond when "a bond that would give the opposing party absolute security against incurring any loss from the injunction would exceed the applicant's ability to pay, and the district court balances (often implicitly) the relative cost to the opponent of a smaller bond against the cost to the applicant of having to do without a preliminary injunction that he may need desperately." *Id.*

Both scenarios support waiving the bond requirement in this case. The government's request for bond offers no indication of the amount of expected damages from an erroneous injunction, if any. *See Swart v. City of Chicago*, 440 F. Supp. 3d 926, 945 (N.D. Ill. 2020) (forgoing imposition of a bond when the plaintiffs requested waiver and the defendant did not "demonstrate[] any costs or monetary damages that might result from issuance of the injunction"). Perhaps more importantly, when a court implicitly balances the potential cost of an injunction against the harm to speech if an injunction is denied, free speech prevails. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (waiving bond after imposing a preliminary injunction to prevent the violation of First Amendment rights); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*,

685 F. Supp. 3d 688, 695 (N.D. Ill. 2023) (same). That is the case here. The Court therefore declines to require CWIT to post a bond.

**Conclusion**

For the reasons stated above, the Court grants, in part, CWIT's motion for a preliminary injunction [dkt. no. 25]. The Court will separately enter a preliminary injunction order. CWIT is directed to submit, by 10:00 a.m. on April 15, a Word version of a draft preliminary injunction to the undersigned judge's proposed order email address. This should include an updated version of the current TRO's reporting requirement. The TRO will remain in effect until the preliminary injunction is entered on the docket. The telephonic status hearing set for April 24, 2025 is vacated and reset to May 1, 2025 at 9:10 a.m., using call-in number 650-479-3207, access code 2305-915-8729. The parties are to confer regarding any further proceedings needed to bring the case to a final conclusion, and specifically regarding whether further discovery and/or evidentiary development is required. A joint status report stating the parties' views in this regard and proposing a schedule for further proceedings is to be filed by April 24, 2025.

Date: April 14, 2025

MATTHEW F. KENNELLY
United States District Judge

**UNITED STATES DISTRICT COURT OF THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHICAGO WOMEN IN TRADES,<br><br>        Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>        Defendants. | Case No. 1:25-cv-02005<br><br>Judge: Hon. Matthew F. Kennelly |

**ORDER ON**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

This matter comes before the Court on the motion by Plaintiff Chicago Women in Trades'

("CWIT") motion for preliminary injunction.  CWIT's motion is GRANTED in part and DENIED in part

for the following reasons:

1.  CWIT has standing to challenge the Termination Provision (§ 2(b)(i)) of Executive
    Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("J20 Order"), and the Certification
    Provision (§ 3(b)(iv)) of Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)
    ("J21 Order"), and its claims are ripe for review.

2.  CWIT has shown that it is likely to succeed on the merits of its First Amendment claim
    in challenging the Certification Provision.

3.  CWIT has shown that it is likely to succeed on the merits of its claim that the

1

Termination Provision violates the separation of powers when applied to CWIT's Women in Apprenticeship and Nontraditional Occupations ("WANTO") Act grants.

4. CWIT has shown irreparable harm that would result from enforcement of the Certification Provision. CWIT is likely to suffer irreparable harm if the Termination Provision is enforced against the WANTO grant.

5. The balance of harms and public interest favors CWIT because the public interest is not harmed by preliminary enjoining the Certification Provision and the Termination Provision which are likely unconstitutional, and because the government can still enforce existing anti-discrimination laws.

Therefore, upon consideration of CWIT's motion for preliminary injunction and the parties' briefs and exhibits, it is hereby:

**ORDERED** that the motion for preliminary injunction is **GRANTED** to the extent stated in this Order; and it is further

**ORDERED** that, the Secretary of Labor; the U.S. Department of Labor; its officers, agents, servants, employees, attorneys; and other persons who are in active concert or participation with any of them (collectively, the "Enjoined Parties"), shall not pause, freeze, impede, block, cancel, or terminate CWIT's WANTO grant, or change the terms of the WANTO grant with CWIT, on the basis of the Termination Provision (§ 2(b)(i)) of Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

**ORDERED** that, the Enjoined Parties shall not require any grantee or contractor to make any "certification" or other representation pursuant to the Certification Provision (§ 3(b)(iv)) of Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); and it is further

**ORDERED** that the Government shall not initiate any False Claims Act enforcement action against CWIT pursuant to the Certification Provision of (§ 3(b)(iv)) of the J21 Order;

2

SA52

and it is further

**ORDERED** that the Department of Labor shall provide a copy of this Order to all agency and bureau heads, and all relevant parties; and it is further

**ORDERED** that the Department of Labor file a status report within 24 hours of the issuance of this order, and every week thereafter while this Order is in effect, confirming compliance with this Order.

This Order shall apply to the maximum extent provided for by Fed. R. Civ. P. 65(d)(2) and shall persist until further order of this Court.

SO ORDERED this 15th day of April, 2025.

MATTHEW F. KENNELLY
United States District Court Judge

3