**No. 25-2144**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———————————

CHICAGO WOMEN IN TRADES,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, President of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court for the Northern
District of Illinois, No. 1:25-cv-02005 (Matthew F. Kennelly, J.)

———————————

## APPENDIX FOR APPELLANT

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ANDREW S. BOUTROS
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
GABRIEL I. SCHONFELD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7219*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3306*

# TABLE OF CONTENTS

**Page**

Complaint & Exhibits (Dkt. 1)............................................................GA1

Declaration of Warrington Parker in Support of Plaintiff's
Motion for Preliminary Injunction (Dkt. 26-1) ...........................GA56

    Exhibit B – Jan. 21, 2025 OPM Memorandum
        (Dkt. 26-3) ................................................................GA58

    Exhibit C – Jan. 27, 2025 OMB Memorandum
        (Dkt. 26-4) ................................................................GA63

    Exhibit D – Jan. 28, 2025 OMB Fact Sheet (Dkt. 26-5)...........GA66

    Exhibit E – Jan. 29, 2025 OMB Memorandum
        (Dkt. 26-6) ................................................................GA71

    Exhibit F – Jan. 29, 2025 White House Press Sec'y
        Statement (Dkt. 26-7)................................................GA73

    Exhibit G – Feb. 5, 2025 Attorney General
        Memorandum (Dkt. 26-8) ........................................GA75

Declaration of Jayne Vellinga in Support of Plaintiff's
Motion for Preliminary Injunction (Dkt. 26-9) ...........................GA78

    Exhibit 1 – Jan. 22, 2025 Email From Women's
        Bureau, Department of Labor (Dkt. 26-10)..........................GA96

    Exhibit 2 – Jan. 22, 2025 Training and Employment
        Notice No. 21-24, Employment and Training
        Administration, Department of Labor (Dkt. 26-11).............GA98

    Exhibit 3 – Jan. 23, 2025 Email From Jobs For The
        Future (Dkt. 26-12)............................................................GA101

Exhibit 4 – Jan. 31, 2025 Email From Employment and
Training Administration, Department of Labor
(Dkt. 26-13) ........................................................... GA104

Exhibit 5 – Mar. 3, 2025 Email From Women's Bureau,
Department of Labor (Dkt. 26-14) ..................... GA106

Supplemental Declaration of Jayne Vellinga in Support of
Plaintiff's Motion for Preliminary Injunction (Dkt. 41-1) .......... GA108

Feb. 5, 2025 OPM Memorandum (Dkt. 44-1) ................................. GA119

Mar. 19, 2025 DOJ Press Release (Dkt. 44-2) .............................. GA123

Mar. 20, 2025 Email From Employment and Training
Administration, Department of Labor (Dkt. 47) ..................... GA127

Mar. 26, 2025 Email From Jobs For the Future (Dkt. 51) .............. GA132

District Court Opinion on Plaintiff's Motion for Temporary
Restraining Order (Dkt. 52) ......................................... GA136

Mar. 28, 2028 Email from Department of Labor re:
Compliance With TRO (Dkt. 54-1) ............................... GA160

Mar. 25, 2025 Email from Employment and Training
Administration, Department of Labor (Dkt. 57-2) ..................... GA166

Second Supplemental Declaration of Jayne Vellinga in
Support of Plaintiff's Motion for Preliminary Injunction
(Dkt. 65-1) ................................................................. GA171

Exhibit A – Feb. 27, 2025 Training and Employment
Notice No. 21-24, Change 1, Employment and
Training Administration, Department of Labor
(Dkt. 65-2) .......................................................... GA175

District Court Opinion on Plaintiff's Rule 59 Motion to
Modify Preliminary Injunction (Dkt. 90) .................................. GA177

Notice of Appeal (Dkt. 112) ..............................................................GA196

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHICAGO WOMEN IN TRADES,

       Plaintiff,

       v.

PRESIDENT DONALD J. TRUMP,
DEPARTMENT OF LABOR, ACTING
SECRETARY OF LABOR VINCENT MICONE,
OFFICE OF MANAGEMENT AND BUDGET,
DIRECTOR OF THE OFFICE OF
MANAGEMENT AND BUDGET RUSSELL
VOUGHT, U.S. DEPARTMENT OF JUSTICE,
ATTORNEY GENERAL OF THE U.S.
DEPARTMENT OF JUSTICE PAMELA
BONDI,

       Defendants.

Case No. 1:25-cv-02005

**COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF**

## INTRODUCTION

1.      Diversity is not illegal.  Equity is not illegal.  Inclusion is not illegal.  Diversity, equity, and inclusion are aspirational ideals that have for centuries been fundamental to our progress as a nation.  Efforts to promote them do not violate federal civil rights laws.  *See Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *1 (D. Md. Feb. 21, 2025) ("[E]nsuring diversity, equity, and inclusion has long been a goal, and at least in some contexts arguably a requirement, of federal anti-discrimination law.").  These efforts are achieving goals that many Americans believe are worth working for and that our Constitution and civil rights laws embody.

2.      Nonetheless, on January 20, 2025, President Donald J. Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "J20 EO").  The J20 EO declares programs promoting diversity, equity, and inclusion "illegal and immoral discrimination."  Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025).

3.      On January 21, 2025, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "J21 EO").  The J21 EO echoes the J20 EO, declaring programs supporting diversity, equity, and inclusion "that can violate the civil-rights laws of this Nation" as "dangerous, demeaning, and immoral."  Exec. Order No. 14173, 90 Fed. Reg. 8663 (Jan. 21, 2025).

4.      The J20 and J21 EOs (collectively, the "anti-diversity EOs") brazenly seek to eliminate ***any*** efforts to promote diversity, equity, or inclusion, regardless of what they are, how they are undertaken, who they impact, or the sources of funding used to support them.

5.      The anti-diversity EOs make one thing abundantly clear—the goal is the

"Ending" or extinction of any effort aimed at achieving the goals of diversity, equity, and

inclusion.  To that end, the anti-diversity EOs:

- Order all executive agencies to "terminate . . . 'equity-related' grants or contracts" (J20 EO, § 2(b)(i)) (the "J20 Termination Provision");

- Order the OMB Director, with the assistance of the Attorney General, to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate" (J21 EO, § 3(c)(iii)) (the "J21 Termination Provision," referred to with the J20 Termination Provision as the "Termination Provisions");

- Order all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act[1], that the contractor and grantee "does not operate any programs *promoting DEI* that violate any applicable Federal anti-discrimination laws" (J21 EO, § 3(b)(iv)) (the "Certification Provision"); and

- Order the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]" (J21 EO, § 4(b)(iii)) (the "Enforcement Threat Provision").

6.      Moreover, the J21 EO, *inter alia*, directs the Director of the Office of

Management and Budget (OMB), to "[e]xcise references to DEI and DEIA principles" from,

*inter alia*, "contracting" and "grants" and also "[t]erminate all 'diversity,' 'equity,' 'equitable

decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing

equity,' and like mandates, requirements, programs, or activities[.]"  J21 EO, § 3(c)(ii-iii).

---

[1] The False Claims Act directs that a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" is "liable to the United States government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1)(G).

7.     The Certification Provision further directs the U.S. Office of Federal Contract Compliance Programs within the Department of Labor to "immediately cease . . . [p]romoting diversity."  *See* Certification Provision, J21 EO, § 3(b)(iv).

8.     The anti-diversity EOs declare all diversity, equity, and inclusion programs illegal, and identify the lengths to which the federal government will go to end them.  But the anti-diversity EOs offer no explanation as to what types of programs to promote diversity, equity, and inclusion "violate any applicable Federal anti-discrimination laws," or how.  The anti-diversity EOs offer no guidelines to understand the diversity, equity, and inclusion initiatives they prohibit, and some provisions of the anti-diversity EOs—such as the J20 EO's reach to control programs "misleadingly labeled" and "under whatever name"—have no bounds at all.

9.     In the absence of such explanation, contractors, grantees, and private institutions are at a loss as to whether the programs they administer to promote diversity, equity, and inclusion "violate any applicable Federal anti-discrimination laws" that could result in termination of their grants or contracts, or subject them to civil investigations and/or liability under the False Claims Act.

10.    The inscrutability and indeterminacy of the anti-diversity EOs is intentional.  As President Trump's Deputy Chief of Staff Stephen Miller declared, "[a]ll [Diversity, Equity, and Inclusion] must be abolished nationwide."[2]

11.    Indeed, the inscrutability and indeterminacy of the anti-diversity EOs, coupled with the potential financial consequences of violating these edicts, has had a predictable chilling effect, and has led to incongruous actions undertaken due to fear of facing the administration's

---

[2] Stephen Miller (@StephenM), X (Jan. 12, 2025, 9:36 AM), https://x.com/StephenM/status/1878450912621994410.

retribution.  For example, following issuance of the anti-diversity EOs, the U.S. Air Force

removed from its website "training courses with videos of its storied Tuskegee Airmen and

Women Airforce Service Pilots" in order "to comply with the Trump administration's crackdown

on diversity, equity, and inclusion initiatives."[3]  (Thankfully, those videos were later restored.)

Similarly, a week after the anti-diversity EOs' issuance, the website of a federally funded

observatory named after Vera C. Rubin, a pioneering female researcher on dark matter, removed

a section of Rubin's online biography titled, "She advocated for women in science."[4]  And at the

National Science Foundation, officials were reportedly instructed to manually remove grants

flagged by a software algorithm that included the terms "institutional," "underappreciated,"

"women," "bias," and "polarization."[5]

      12.     Against this backdrop, Plaintiff Chicago Women in Trades ("CWIT") brings this

lawsuit.  CWIT is a non-profit organization working toward the goal of preparing women across

the country to enter and remain in high-wage skilled trades, including carpentry, electrical work,

welding, plumbing, and others.  Approximately 70% of participants in CWIT's programs identify

as Black and Latina.  In other words, CWIT is an organization ***dedicated*** to promoting diversity,

equity, and inclusion within the skilled trades industry, given the reality of discrimination and

occupational segregation, as set forth below.

---

[3] *See* Tara Copp, *More DEI fallout: Air Force scraps course that used videos of Tuskegee Airmen and Female WWII pilots* (Jan. 26, 2025), https://apnews.com/article/air-force-dei-tuskegee-women-wwii-pilots-ecdeac68dc7696535d093c7690ab73bc.

[4] Lisa Song, *The Rewriting of a Pioneering Female Astronomers, Legacy Shows How Far Trump's DEI Purge Will Go*, ProPublica (Jan. 30, 2025), https://www.propublica.org/article/vera-rubin-astronomer-dei-trump.

[5] Katrina Miller & Roni C. Rabin, *Ban on D.E.I. Language Sweeps Through the Sciences*, New York Times (Feb. 9, 2025), https://www.nytimes.com/2025/02/09/science/trump-dei-science.html?unlocked_article_code=1.yk4.uFGS.0SEDfvYpG32k&smid=url-share.

13.    CWIT's work is vital for women, including for Black and Latina women who disproportionately face deeply entrenched barriers to accessing jobs in the skilled trades.  CWIT seeks to promote equal opportunity, an effort that plainly does not run afoul of federal anti-discrimination laws.  But given the broad, vague language of the anti-diversity EOs, CWIT simply does not know whether the administration believes this work constitutes "illegal DEI."

14.    CWIT is also a recipient of multiple federal grant awards.  As a result of the anti-diversity EOs, CWIT had its grant funding frozen.  Although it was made available again following a temporary restraining order entered by a different District Court in separate litigation, CWIT's grants remain under threat of termination given the J20 Termination Provision.

15.    And the Certification Provision of the J21 EO requires CWIT to certify that it "does not operate any programs promoting [diversity, equity, or inclusion] that violate any applicable Federal anti-discrimination laws" under threat of False Claims Act liability.  But CWIT (and scores of other similarly situated grant recipients) cannot know whether the Trump administration will construe any of the diversity, equity, or inclusion programs it administers—or indeed its very existence—to "violate any applicable Federal anti-discrimination laws."  This is both because the anti-diversity EOs do not reference or comport with relevant precedent interpreting federal anti-discrimination laws and because the broad, vague language of the anti-diversity EOs suggests the Trump administration believes *any* diversity, equity, and inclusion is prohibited and must be eliminated.  Indeed, the clear purpose of the anti-diversity EOs is to prevent organizations like CWIT from doing any work at all.

16.    Women and tradeswomen-led organizations across the country turn to CWIT for assistance, guidance, and as a model of what is possible.  The harm resulting from CWIT's

inability to provide education, training, support, and guidance for women in trades—building both personal and economic growth—would be immeasurable.  CWIT's impact extends far beyond the women they individually serve: it shapes the trades industry, communities, and the future of the nationwide workforce.  Ultimately, the harm resulting from CWIT's inability to promote equity is not just financial—it is a loss of opportunity, empowerment, and progress.

17.    The anti-diversity EOs trample CWIT's right to free speech under the First Amendment of the U.S. Constitution.  The anti-diversity EOs impose restrictions on CWIT that are overbroad, impossibly vague, discriminate against CWIT (and other similarly situated entities) based on the administration's preferred anti-diversity viewpoint, and condition CWIT's receipt of federal funding upon the stifling of CWIT's protected speech, trampling CWIT's due process rights.

18.    Moreover, it is the Constitution's separation of powers that protects these free speech and due process rights.  In the words of James Madison, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."  The Federalist No. 47 (James Madison).  As a result, it has long been the law in this country that "a President does not 'stand exempt from the general provisions of the constitution.'"  *Trump v. United States*, 603 U.S. 593, 612 (2024) (quoting *United States v. Burr*, 25 F. Cas. 30, 33-34 (C.C.D. Va. 1807)).

19.    The "Termination Provisions," "Certification Provision," and the "Enforcement Threat Provision" of the anti-diversity EOs violate the First and Fifth Amendments and Article I, § 8 (Spending Clause and Separation of Powers) of the U.S. Constitution.  They are unlawful and unconstitutional.

20.     The Executive Branch of Government cannot punish CWIT for espousing

viewpoints with which the administration disagrees.  But the Termination Provisions,

Enforcement Threat Provision, and the Certification Provision under the threat of liability

confirm this is the plain purpose of the anti-diversity EOs.  CWIT therefore brings this suit and

requests that the Court declare unconstitutional and enjoin enforcement of the J20 Termination

Provision (§ 2(b)(i) of the J20 EO), the J21 Termination Provision (§ 3(c)(iii) of the J21 EO), the

Certification Provision (§ 3(b)(iv) of the J21 EO), and the Enforcement Threat Provision

(§ 4(b)(iii)) of the J21 EO).[6]

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

2201(a), and because the Defendants are United States officials, 28 U.S.C. § 1346(a)(2).

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1)

because Plaintiff CWIT is based in Chicago, Illinois, and each defendant is an agency or officer

of the United States sued in his or her official capacity.  CWIT is a resident of this district, and a

substantial part of the events or omissions giving rise to this Complaint occurred and continue to

occur within this District.

## THE PARTIES

**A.      Plaintiff Chicago Women in Trades**

23.     CWIT is a not-for-profit 501(c)(3) organization based in Chicago, Illinois.

---

[6] On February 21, 2025, the United States District Court for the District of Maryland issued a nationwide injunction of the requirement in the J20 EO that all "DEI"-related grants and contracts be terminated, and the certification requirement and enforcement threats contained in the J21 EO.  *See Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *2 (D. Md. Feb. 21, 2025).

8

24.    CWIT receives funding from a range of private and public sources.  This includes federal grants from the U.S. Department of Labor ("DOL") to improve and expand foundational skill training programs for underrepresented populations, particularly women in pre-apprenticeships, with a focus on the building, manufacturing, and transportation industries.

**B.    Defendants**

25.    Defendant Donald J. Trump ("President Trump") is the President of the United States of America.  He issued the anti-diversity EOs.  He is sued in his official capacity.

26.    Defendant DOL is directed to implement the Executive Orders in various ways and DOL has proceeded to do so.  DOL provides grant funding to CWIT.

27.    Defendant Vincent Micone is the Acting Secretary of Labor.  He is sued in his official capacity.  Acting Secretary Micone and DOL have begun implementing the anti-diversity EOs.

28.    Defendant Office of Management and Budget ("OMB") is directed to implement the Executive Orders in various ways, which OMB has proceeded to do.

29.    Defendant Russell Vought is the Director of the Office of Management and Budget.  He is sued in his official capacity.  Director Vought and OMB have begun implementing the anti-diversity EOs.

30.    Defendant Department of Justice ("DOJ") is directed to implement the Executive Orders in various ways, which DOJ has proceeded to do.

31.    Defendant Pamela Bondi is the Attorney General of the U.S. Department of Justice.  She is sued in her official capacity.  Attorney General Bondi and DOJ have begun implementing the anti-diversity EOs.

**FACTUAL ALLEGATIONS**

A.    **CWIT's Background, Programming, and Federal Funding**

1.    **CWIT Promotes the Goals of Diversity, Equity, and Inclusion in the Skilled Trades to Combat Occupational Segregation and Strengthen the Nation's Economy**

32.    CWIT was established in 1981 by tradeswomen leaders in Chicago, with a goal of creating more equitable opportunities for women to enter high-wage employment in the skilled trades, including carpentry, electrical work, welding, and plumbing, among others. CWIT has a rich 44-year history of tradeswomen advocacy: creating women-focused trades pipeline programs, establishing women-focused pre-apprenticeship programs, developing best practices to recruit and retain tradeswomen, and implementing innovative approaches to gender equity work in nontraditional occupations nationwide.

33.    CWIT's mission and day-to-day work are based on the reality that women face gender-based structural barriers, often compounded by race, to entering and staying in the skilled trades occupations, including carpentry, electrical work, welding, and plumbing. CWIT does not know whether this critical work, or any of its critical work described in this section, is prohibited under the anti-diversity EOs.

34.    Women make up only 3.9% of the skilled trades workforce in the United States, despite comprising half of the population, even though these are in-demand jobs with competitive wages and benefits that can rival or exceed those of professions requiring a four-year degree. Women are disproportionately excluded from the skilled trades in part because of lack of opportunities for pre-apprenticeship training, bias in the recruitment process, and a hostile work environment.

35.    CWIT's extensive programming (ranging from pre-apprenticeship training to mentorship cohorts across the country) is centered on equity—ensuring meaningful access to opportunity and making the workplace safer for women in the skilled trades.

36.    CWIT's programming also focuses on providing gender equity training for industry stakeholders in the skilled trades nationwide.  In short, CWIT seeks to reduce and eliminate sex- and race-based discrimination, as they poses a barrier to women and women of color entering the skilled trades.  Demand for CWIT's equity training has substantially increased over the past four years because there is a reported shortage of 650,000 skilled tradespeople in the U.S. and companies are actively recruiting to fill these vacancies.  CWIT's gender equity training helps employers address this shortage by more effectively recruiting and retaining women in the skilled trades to ensure a stronger economy for all Americans.

37.    While the majority of CWIT's work in the past 40 years has been in Chicago, the organization has a national reach, and its programming and impact is nationwide.  CWIT has provided technical assistance and gender equity training to industry stakeholders in nearly all fifty states.  For example, CWIT has implemented mentorship programs for co-ed apprenticeship programs in Illinois, New York, and Michigan.  CWIT has also worked with new and emerging tradeswomen organizations in Texas, Pennsylvania, and Ohio to start their women-focused pre-apprenticeship training programs.

38.    In addition, CWIT's policy team works at the local, state, and federal levels to "advocate for the implementations of best practices and legal interventions to counteract cultural biases and historic discrimination against women and people of color in the construction industry."[7]  Further, CWIT's work under various grant programs supports its mission in a variety

---

[7] *See* https://cwit.org/policy-and-advocacy/.

of localities, cities, and states across the country.  CWIT's WANTO grant work covers projects in

Pennsylvania, Texas, and Ohio.  CWIT's work under its IDOL Tradeswomen Building

Infrastructure Initiative targets projects in Illinois, Pennsylvania, Missouri, Ohio, Texas, and

West Virginia.  And CWIT's work under its JFF subaward covers programs in Minnesota,

Michigan, Wisconsin, and Illinois.

39.     CWIT also focuses on addressing specific barriers faced by Black and Latina

women and assisting them as they navigate unique challenges arising from the

underrepresentation, harassment, and discrimination they face in the trade industries.  CWIT's

efforts in this respect—which may be prohibited by the anti-diversity EOs to the extent they fall

within those EOs' definitions of diversity, equity, and inclusion—are particularly important

because Black and Latina women are disproportionately underrepresented group in the industry.[8]

Indeed, a study from the Institute for Women's Policy Research found one in five women of

color in the construction industry reported "always" or "frequently" experiencing racial

discrimination and sexual harassment on the job—the highest of any demographic group in the

study.[9]

40.     The work CWIT performs is vital.  A 2021 study commissioned by the City of

Chicago concluded that "women continue to suffer from significant discriminatory barriers to

full and fair access to City construction contracts," and that women in the Chicago construction

---

[8] *See e.g.*, Report of Chair Charlotte A. Burrows (U.S. E.E.O.C.), *Building for the Future: Advancing Equal Employment Opportunity in the Construction Industry* (May 2023), https://www.eeoc.gov/sites/default/files/2023-05/Building%20for%20the%20Future.pdf

[9] *See e.g.*, Ariane Hegewisch and Eve Mefferd, *A Future Worth Building: What Tradeswomen Say about the Change They Need in the Construction Industry*, Institute for Women's Policy Research (2009), https://iwpr.org/wp-content/uploads/2022/02/A-Future-Worth-Building_What-Tradeswomen-Say_FINAL.pdf

industry reported having "experienced sex discrimination, ranging from gender bias to hostile

work environments to outright sexual harassment."[10]  But CWIT does not know if its work to

address these injustices is now prohibited by the anti-diversity EOs (such that CWIT's grants

could be subject to termination) because of the broad, vague language of those EOs.

41.    CWIT's mission has proven successful.  For example, CWIT's pre-apprenticeship

training programs prepare individuals with the essential skills and knowledge, ranging from math

and test preparation to hands-on experience, to enter a registered apprenticeship of their

choosing.  These programs also identify and address unconscious bias, systemic barriers, and

discriminatory practices that Black and Latina women disproportionately experience to create a

more inclusive and fair work environment for women in the skilled trades.  Addressing the racial

and gender bias Black and Latina women experience in the skilled trades industry is essential to

the success of the pre-apprenticeship programs.  For example, data shows that two-thirds of

minority and women apprentices drop out of union apprentice programs that do not explicitly

address racial and gender bias prior to completion.

## 2.    CWIT's Federal Grant and Contract Funding

42.    Approximately 40% of CWIT's annual budget originates with the federal

government.  CWIT operates as a federal grantee, sub-grantee, and sub-contractor.  The

remainder of CWIT's activities are funded by private donors and grants from non-federal

sources.

---

[10] Colette Holt & Associates, City of Chicago Disparity Study for Construction Contracts 2021 at 9 (2021),
https://www.chicago.gov/content/dam/city/depts/dps/Outreach/City%20of%20Chicago%20Disparity%20Study%20for%20Construction%20Contracts%202021.pdf

43.     CWIT currently receives federal funding through five federal programs that are directly affected by the anti-diversity EOs.

44.     The first grant is a Women in Apprenticeship and Nontraditional Occupations ("WANTO") Grant from DOL. It funds CWIT's "Transforming the Workforce System to Ensure Gender Equity in Infrastructure" program, which provides services in three states outside of Illinois. The program has four goals: (1) provide technical assistance to workforce development board staff to help more women enter the skilled trades and embed gender equity into their workforce systems; (2) develop women-focused pre-apprenticeship programs; (3) develop workforce equity plans for infrastructure projects run by public agencies; and (4) create women-focused cohorts for co-educational pre-apprenticeship programs. CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated. Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

45.     The WANTO grant is authorized by the Women in Apprenticeship and Nontraditional Occupations Act. Pub. L. No. 102-530, 106 Stat 3465 § 2 (1992). The WANTO Act requires the Secretary of Labor to "make grants to community-based organizations to provide technical assistance to employers and labor unions." 29 U.S.C. § 2503. This technical assistance includes, *inter alia*, "developing outreach and orientation sessions to recruit women into the employers' apprenticeable occupations and nontraditional occupations." *Id*.

46.    In enacting this law, Congress found that "women face significant barriers to their full and effective participation in apprenticeable occupations and nontraditional occupations." Pub. L. No. 102-530, 106 Stat 3465 § 2.

47.    The "purpose" of the Act, *inter alia*, is "to encourage employment of women in apprenticeable occupations and nontraditional occupations." *Id*. To achieve this purpose, the Act, *inter alia*, "provid[es] grants to community-based organizations to deliver technical assistance to employers and labor unions to prepare them to recruit, train, and employ women in apprenticeable occupations and nontraditional occupations." *Id*.

48.    The WANTO Act also requires the Secretary of Labor to give priority to grant applications from community-based organizations that, *inter alia*, "demonstrate experience preparing women to gain employment in apprenticeable occupations or other nontraditional occupations" and "demonstrate experience working with the business community to prepare them to place women in apprenticeable occupations or other nontraditional occupations." 29 U.S.C. § 2504.

49.    The Further Consolidated Appropriations Act of 2024 directs that "funds available to the [DOL's] Women's Bureau may be used for grants to serve and promote the interests of women in the workforce: Provided further, that of the amounts made available to the Women's Bureau, not less than $5,000,000 shall be used for grants authorized by the Women in Apprenticeship and Nontraditional Occupations Act." Pub. L. No. 118-47, 138 Stat. 460, 641.

50.    CWIT's second grant is an Apprenticeship Building America ("ABA") grant, also from DOL. CWIT's ABA grant partially funds two pre-apprenticeship programs. These programs provide math and test preparation, workplace readiness, physical conditioning, basic construction, and hands-on trade-specific experience in partnership with apprenticeship

programs.  Graduates also earn nationally recognized credentials, such as OSHA 10 and First Aid/CPR.  CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated.  Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

51.     The ABA grant is authorized by the National Apprenticeship Act and the American Competitiveness and Workforce Improvement Act.  The funds from this grant were appropriated in the Consolidated Appropriations, 2021, Public Law 116-260, Division H, Title I, which provides that "any grant funds used for apprenticeships shall be used to support only apprenticeship programs registered under the National Apprenticeship Act."  Pub. L. No. 116-260, 134 Stat. 1182, 1548 (2020).

52.     The National Apprenticeship Act, in turn, authorizes DOL to "bring together employers and labor for the formulation of apprenticeship."  29 U.S.C. § 50.

53.     The ABA grant is also authorized by the American Competitiveness and Workforce Improvement Act § 414(c), which requires the Secretary of Labor to use funds and "award grants" "to establish demonstration programs or projects to provide technical skills training for workers, including both employed and unemployed workers."  Pub. L. No. 105-277, 112 Stat. 2681-641, 653 (1998).  This is statutorily authorized work promoting equity.

54.     CWIT's third source of federal funding is a subcontract from Jobs for the Future's ("JFF") Improving Diversity and Equity in Apprenticeship for Manufacturing ("IDEA-M")

program.  CWIT is a subcontractor to JFF under this contract, which requires CWIT to provide services to increase the number of women entering and retained in advanced manufacturing apprenticeship programs, with a focus on providing online and in-person diversity, equity, and inclusion training to sponsors of apprenticeship programs.  CWIT does not know if this work is now prohibited under the anti-diversity EOs.  Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws."  Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

55.     CWIT's fourth source of federal funding is again a grant where CWIT is a subrecipient, this time to JFF's Apprenticeship USA grant from DOL.  Pursuant to the terms of the grant, CWIT must: (1) contribute to written resources and conduct virtual training to facilitate the inclusion of women in pre-apprenticeship and apprenticeship programs; (2) serve as subject matter experts at events; (3) research and document best practices for the recruitment, outreach and mentoring, and retention of women; and (4) lead efforts to improve and expand foundational skills training to include women in pre-apprenticeships.  CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated.  Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws."  Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

56.     Finally, CWIT's fifth source of federal funding is the Tradeswomen Building Infrastructure Initiative ("TBII") grant program, where CWIT is performing a subaward through the Illinois Department of Labor ("IDOL"). The TBII grant program is authorized by the Workforce Innovation and Opportunity Act, Pub. L. No. 113-128, 128 Stat. 1425 (2014).

57.     Under the TBII grant, CWIT's scope of work as a subrecipient to IDOL includes: (i) intensive support for local community investments in four identified cities, including meetings with key policymakers and state agencies to identify resources, design state, municipal or project-wide campaigns to promote, create, and sustain inclusive and diverse infrastructure worksites; (ii) best practice training and convening to gain stakeholder acceptance for the Framework for Workforce Equity for Women and People of Color; (iii) promoting respectful and harassment-free workplaces; and (iv) state-level support and data evaluation, performed jointly with IDOL. CWIT does not know if this work is prohibited by the anti-diversity EOs such that the grant will be terminated. Nor could CWIT comply with the certification requirement that it does not "operate programs promoting DEI that violate any applicable Federal anti-discrimination laws," because "promoting" is vague and undefined and the anti-diversity EOs offer no guidance as to what types of DEI programs "violate any applicable Federal anti-discrimination laws." Diversity, equity, and inclusion, as aspirational goals, do not violate federal anti-discrimination laws.

**B.      The Implementation of the Anti-Diversity EOs**

**1.      President Trump Signs Executive Order 14151 "Ending Radical and Wasteful DEI Programs and Preferencing"**

58.     On January 20, 2025, President Trump signed Executive Order 14151, titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." The J20 EO is attached as **Exhibit A** to this Complaint.

18

GA18

59.     The stated "Purpose and Policy" of the J20 EO is to reverse "[t]he Biden Administration['s] forced illegal and immoral discrimination programs, going by the name 'diversity, equity and inclusion' (DEI), into all aspects of the Federal Government" and to "end[]" "DEIs [sic] infiltration of the Federal Government."  J20 EO, § 1.

60.     The J20 EO directs the Director of OMB, assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  J20 EO, § 2(a).

61.     The J20 EO instructs, *inter alia*, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to within sixty days of the order "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions (including but not limited to 'Chief Diversity Officer' positions); all 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  J20 Termination Provision, J20 EO, § 2(b)(i).

62.     The J20 EO does not define "DEI," "DEIA," "diversity," "equity," "equity-related," "inclusion," or "accessibility."

63.     The J20 EO also requires that each executive agency, department, or commission head provide the OMB Director with a list of all:

> (A) Agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly

relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or "environmental justice" programs, services, or activities since January 20, 2021.

*Id*. § 2(b)(ii).

64.     In sum, the J20 EO prohibits (1) "diversity, equity, and inclusion" programs, mandates, policies, preferences, factors, goals, requirements, and activities; (2) "diversity, equity, inclusion, and accessibility" programs, mandates, policies, preferences, factors, goals, requirements, and activities; (3) "environmental justice" offices and positions; (4) "equity" actions, initiatives, or programs; (5) "equity-related" grants or contracts; and (6) "DEI" or "DEIA" performance requirements.  In addition to the above prohibitions, the J20 EO states that any such programs are "illegal and immoral" and "discriminatory."  J20 EO §§ 1, 2.

### 2.     President Trump Signs Executive Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

65.     On January 21, 2025, President Trump signed Executive Order 14173, titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  The J21 EO is attached as **Exhibit B** to this Complaint.

66.     The purported "[p]urpose" of the J21 EO is to address "'diversity, equity, and inclusion' (DEI) or 'diversity, equity inclusion, and accessibility' (DEIA) that can violate [United States] civil-rights laws."  J21 EO § 1.

67.     The J21 EO states that "diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA" policies are "illegal," "dangerous," and "immoral."  J21 EO § 1.

20

GA20

68.    The J21 EO further claims that "[i]llegal DEI and DEIA policies . . . undermine our national unity" and "threaten the safety of American men, women, and children." *Id.*

69.    The J21 EO declares:

> It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

J21 EO § 2.

70.    Section 2 of the J21 EO directs "all executive departments and agencies . . . to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements" to "protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work" and "to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*

71.    Section 3(b) of the J21 EO instructs the Office of Federal Contract Compliance Programs within the Department of Labor to "immediately cease: . . . [p]romoting 'diversity'" and "[h]olding Federal contractors or subcontractors responsible for taking 'affirmative action'"; and "[a]llowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin." *Id.* § 3(b).

72.    The Certification Provision of the J21 EO also requires every agency head to "include in every contract or grant award: (A) a term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section

21

GA21

3729(b)(4) of title 31, United States Code,'" and "(B) a term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *See* Certification Provision, J21 EO, § 3(b)(iv).

73.     The J21 EO further orders the OMB Director, with the Attorney General's assistance, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* § 3(c)(ii-iii).

74.     Section 4(a) of the J21 EO directs the heads of all agencies to "take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work," which the J21 EO implies is inconsistent with the principles of diversity, equity, inclusion, and accessibility. *Id.* § 4(a).

75.     The J21 EO contains a variety of directives aimed at ending whatever is meant by "DEI" and "DEIA." These directives include calling for executive branch officials to, among other things:

- require all federal contractors or grantees to "certify that [they do] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws;"

- take "all appropriate action with respect to the operation of their agencies to advance in the private sector" the policy positions outlined in the EO, including by creating a "proposed strategic enforcement plan;"

- create a list of "[t]he most egregious and discriminatory DEI practitioners in each sector of concern;"

- create a "plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise);"

- identify "up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500

million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;" and

- identify "[l]itigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest."  J21 EO, § 4(b).

76.    In sum, the J21 EO directs subordinate executive officials to "recommend actions . . . to align agency or department" enforcement, litigating positions, and other regulations to conform with the viewpoint that promoting ideas of diversity, equity, inclusion, and accessibility or environmental justice are "illegal and immoral."  *See, e.g.*, J21 EO §§ 1; 2(b)(ii); and 2(b)(iii).

### C.    The Application of the Anti-Diversity EOs Across All Federal Agencies, and Specifically to CWIT's Grants

77.    On January 21, 2025, OPM's Acting Director issued a memorandum to all "heads and acting heads of departments and agencies" providing "Initial Guidance Regarding DEIA Executive Orders."[11]  Among other things, OPM's January 21, 2025, Memorandum directed agency heads to, by January 22, 2025, "terminate any DEIA-related contractors," and by January 23, 2025, provide OPM with "a complete list of all DEIA-related agency contracts **as of November 5, 2024**."[12]

78.    On January 22, 2025, the White House released a fact sheet entitled "President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI."[13] That fact sheet states that the J21 EO "expands individual opportunity by terminating radical DEI

---

[11] *See* https://www.opm.gov/media/e1zj1p0m/opm-memo-re-initial-guidance-regarding-deia-executive-orders-1-21-2025-final.pdf

[12] *Id.*

[13] *See* https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-protects-civil-rights-and-merit-based-opportunity-by-ending-illegal-dei/

23

GA23

preferencing in federal contracting," and "terminates 'diversity, equity, and inclusion' (DEI) discrimination . . . in federal contracting and spending."[14]

79. Consistent with the instructions in OPM's January 21, 2025, Memorandum, on January 22, 2025, CWIT received an email from the grant administrator at the DOL Women's Bureau charged with dispersing the WANTO grant. The email instructed that "effective immediately, all recipients of federal financial assistance are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the [anti-diversity EOs]." CWIT did not know, and still does not know, whether this email applies to their work under the WANTO grant. DOL's email further stated that the agency was "reviewing all active federal awards and will take appropriate action, including terminating the awards, consistent with the [anti-diversity EOs]." CWIT did not know, and still does not know, how this statement applies to their WANTO grant work.

80. IDOL received an identical email from the DOL Women's Bureau on January 22, 2025, in regard to the TBII grant program, and forwarded it to CWIT the same day. CWIT did not know, and still does not know, whether this email applies to their work under the TBII grant. Further, CWIT did not know, and still does not know, whether (and if so, how) the DOL email's statement about termination applies to its work on the TBII grant.

81. Also on January 22, 2025, CWIT received Training and Employment Notice ("TEN") No. 21-24 from DOL Acting Deputy Assistant Secretary Michelle Paczynski with the subject "Immediate Implementation of [the anti-diversity EOs]." TEN No. 21-24 instructed that "[e]ffective immediately, all recipients of federal financial assistance awards are directed to cease

---

[14] *Id.*

24

all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of [the anti-diversity EOs]."[15]  CWIT did not know, and still does not know, whether this notice applies to their work.

82.     On January 23, 2025, CWIT received an email from JFF, the prime grant recipient for DOL's Apprentice USA grant and its IDEA-M grant.  The JFF email directed CWIT to cease work on any so-called "DEI" or "DEIA" requirements in accordance with TEN No. 21-24. CWIT did not know, and still does not know, whether this email applies to their work.

83.     On January 23, 2025, President Trump declared at the World Economic Forum that his Administration "has taken action to abolish all discriminatory diversity, equity, and inclusion nonsense . . . through the government and the private sector."[16]  CWIT did not know, and still does not know, whether this declaration applies to their work.

84.     On January 27, 2025, OMB issued Memorandum M-25-13, instructing all federal agencies, as of January 28, 2025, to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."[17] CWIT did not know, and still does not know, whether this memorandum applies to their work.

---

[15] *See* https://www.dol.gov/sites/dolgov/files/ETA/advisories/TEN/2024/TEN%2021-24/TEN%2021-24%20%28Accessible%20PDF%29.pdf

[16] *See* https://www.whitehouse.gov/remarks/2025/01/remarks-by-president-trump-at-the-world-economic-forum/

[17] *See* https://s3.documentcloud.org/documents/25506186/m-25-13-temporary-pause-to-review-agency-grant-loan-and-other-financial-assistance-programs.pdf

85.     On January 28, 2025, the White House issued a "Fact Sheet" entitled "OMB Q&A Regarding Memorandum M-25-13," which confirmed that the pause called for in the memorandum applied to "programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI."[18]  CWIT did not know, and still does not know, whether its work is covered by this fact sheet.

86.     On January 29, 2025, OMB's Acting Director, in response to a federal district court order prohibiting OMB from implementing the pause outlined in Memorandum M-25-13, rescinded that memorandum.  But later that day, the White House Press Secretary explained the rescission was "NOT a rescission of the federal funding freeze," and that the "President's EO's [sic] on federal funding remain in full force and effect and will be rigorously implemented."[19]  CWIT did not know, and still does not know, whether this statement applies to their work.

87.     On January 31, 2025, CWIT received an email from ETA stating the "OMB's memo has been rescinded.  DOL grants can continue in accordance with TEN 21-24."

88.     The anti-diversity EOs, however, have not been rescinded.  And upon information and belief, CWIT's grants remain under threat of termination pursuant to the J20 Termination Provision, and False Claims Act liability under the J21 EO.

89.     On February 5, 2025, the Attorney General issued a memorandum that cited the J21 EO and stated that DOJ's Civil Rights Division "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private

---

[18] *See* https://web.archive.org/web/20250129143354/https://www.whitehouse.gov/fact-sheets/2025/01/omb-q-a-regarding-memorandum-m-25-13/

[19] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:30 p.m.), https://x.com/PressSec/status/1884672871944901034

sector and in educational institutions that receive federal funds."[20] CWIT did not know, and still does not know, whether this memorandum applies to its work.

### D. The Anti-Diversity EOs Provide No Guidance or Clarity to CWIT as to Prohibited "DEI"-Related Activities

90.     Despite prohibiting various so-called "DEI"-related activities, declaring them illegal, and requiring certification not to promote so-called "DEI" on threat of government civil action, the anti-diversity EOs make no effort to define or describe the prohibited activities that would subject CWIT to penalty in the termination of its grants or contracts.  Nowhere do they define (1) "diversity, equity, and inclusion;" (2) "diversity, equity, inclusion, and accessibility;" (3) "environmental justice;" (4) "equity;" (5) "equity-related;" or (6) "promoting DEI."  Nor do they define or describe the standards by which these activities will be analyzed to determine permissibility.  Though the anti-diversity EOs allude to "illegal" "DEI," they provide no explanation as to what that means.  CWIT is thus at a loss regarding the extent of the threats against it, forcing it to choose between potential legal liability or self-censorship in the face of confusion and lack of guidance.

91.     The failure of the anti-diversity EOs to define the individual terms and/or phrases used, such as (1) "diversity, equity, and inclusion;" (2) "diversity, equity, inclusion, and accessibility;" (3) "environmental justice;" (4) "equity;" (5) "equity-related;" or "(6) "promoting DEI" has created significant confusion and caused harm to federal contractors and grantees like CWIT.  This indeterminacy places CWIT in fear of loss of federal funding, and potential monetary penalties, if it promotes "equitable" treatment of anyone under the law—even if that

---

[20] *See* https://www.justice.gov/ag/media/1388501/dl?inline

means nothing more than advocating for objectively fair treatment, equal opportunity, or compliance with federal civil rights law.

### E.    The Adverse Impacts of the Anti-Diversity EOs on CWIT

92.    The anti-diversity EOs and the emails, memoranda, and statements referenced above implicate CWIT's programs in their entirety, all of which use terms like equity, inclusion, and diversity.  Indeed, CWIT's ***purpose*** is to ensure that women have the skills to obtain employment in the skilled trades and are not discriminated against.

93.    The anti-diversity EOs have had a significant chilling effect on CWIT's First Amendment rights and the diversity, equity, and inclusion efforts it promotes in the skilled trades industry.  CWIT's mission is to achieve gender equity in male-dominated industries.  Equity is the throughline across everything CWIT does.  Equity—in terminology and spirit—is included in the research publications, trainings, reports on countering sexual harassment, information sessions to new pre-apprenticeship participants, and grant agreements CWIT prepares.  But, because of the anti-diversity EOs, CWIT has lost its ability to do and promote its work without fear of violating these EOs.  Put simply, the programs CWIT supports, and the work it does, is threatened for its speech promoting women in the skilled trades and its speech for stating facts, such as acknowledging that women face discrimination in the skilled trades.

94.    This includes CWIT's fears of exercising its free speech rights during internal and external training sessions, in employee handbooks, or between employees and outside entities, and during day-to-day organizational governance.

95.    CWIT also had to spend hundreds of hours overhauling its existing budget to devise an emergency budget in case it loses federal funding, which would necessarily require CWIT to repurpose private funding, cut programs, and potentially furlough or lay off employees.

96.     Additionally, CWIT has lost partnerships with other organizations because of the anti-diversity EOs and their chilling of CWIT's free speech rights.  For example, prior to the issuance of the anti-diversity EOs, CWIT was preparing to partner with and sub-award to an organization in the Southwest, to provide technical assistance, create a pre-apprenticeship program, and embed gender equity into the workforce development board in the Southwest.  But after the release of the anti-diversity EOs, one of their new partners abruptly decided to end a collaboration for fear of being associated with CWIT.[21]  CWIT believes that this is because CWIT decided to not change its equity-driven mission and approach to collaborations and even though CWIT is not even certain that its programs fall under the anti-diversity EOs.

97.     Moreover, CWIT currently has fourteen grants from sources other than the federal government.  Many of these grants direct CWIT to perform work related to diversity, equity, inclusion, or accessibility initiatives.

98.     Even though these grants are not federal funds, and even though the work done pursuant to these grants is not related to federal funding, CWIT's ongoing ability to benefit from these grants is in jeopardy due to the anti-diversity EOs.  This is so even though CWIT does not know whether its performance under these grants is prohibited under the anti-diversity EOs.

99.     One such grant, which makes up approximately 4% of CWIT's total budget in 2025, is provided by a commercial bank.  This private grant funds research on childcare needs for tradeswomen in order to improve retention of women in the trade industry.

---

[21] CWIT is not including more identifying information because its sub-awardees fear being included in the legal process, and any attendant retribution.

100.     Another non-federal grant, which makes up approximately 3% of CWIT's total 2025 budget, supports the policy and advocacy work that CWIT completes on behalf of the women in welding programs.

101.     In total, approximately 20% of CWIT's 2025 funding is based on private grants that have no relation to federally funded projects and that require CWIT to perform work that may or may not relate, as understood by the anti-diversity EOs, to diversity, equity, inclusion, and accessibility.  Because of the anti-diversity EOs, all of this work is threatened.

### CAUSES OF ACTION[22]

### Count I
### U.S. Constitution, First Amendment
### Free Speech Clause (Overbreadth and Vagueness)

102.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

103.     The First Amendment to the United States Constitution provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.

104.     Under the First Amendment overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008).  *See also Brown v. Kemp*, 86 F.4th 745, 711-78 (7th Cir. 2023).

105.     The anti-diversity EOs prohibit protected speech because of their failure to properly identify or define the specific speech and expressive conduct that is prohibited.  For

---

[22] Although CWIT does not currently assert any claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA"), it reserves the right to amend this Complaint to include APA claims.

example, they purport to ban "equity" programs and mandates even if those programs seek to ensure that all have an equal opportunity based on merit, free from discrimination.

106. The Termination Provisions prohibit CWIT's constitutionally protected speech and also chill CWIT's willingness to engage in constitutionally protected speech out of a credible concern that the vital work CWIT does will be terminated based on what it says.

107. The Certification Provision prohibits CWIT's constitutionally protected speech and also chills CWIT's willingness to engage in constitutionally protected speech out of a credible concern that CWIT will be subject to civil liability based on what it says.

108. The Enforcement Threat Provision prohibits CWIT's constitutionally protected speech and also chills CWIT's willingness to engage in constitutionally protected speech out of a credible concern that CWIT will be subject to a DOJ investigation and enforcement based on what it says.

109. Accordingly, the challenged provisions of the anti-diversity EOs are unconstitutional because they violate the First Amendment and the overbreadth doctrine.

**<u>Count II</u>**
**U.S. Constitution, First Amendment**
**Free Speech Clause (Viewpoint Discrimination)**

110. CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs. CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

111. The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech." U.S. CONST. AMEND. I.

112.    The Termination Provisions violate the Free Speech Clause of the First
Amendment because they impermissibly chill the exercise of CWIT's constitutionally protected
speech, based on its content and viewpoint.

113.    The Certification Provision violates the Free Speech Clause of the First
Amendment because it impermissibly chills the exercise of CWIT's constitutionally protected
speech, based on its content and viewpoint.

114.    The Enforcement Threat Provision violates the Free Speech Clause of the First
Amendment because it impermissibly chills the exercise of CWIT's constitutionally protected
speech, based on its content and viewpoint.

115.    Content based regulations "target speech based on its communicative content."
*Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

116.    The Termination Provisions, Certification Provision, and Enforcement Threat
Provision violate the Free Speech Clause of the First Amendment because they impermissibly
chill the exercise of CWIT's constitutionally protected speech based on its viewpoint,
specifically the viewpoint that seeking to improve diversity, equity, inclusion, accessibility, and
economic justice is *not* immoral, illegal, dangerous, demeaning, corrosive, or pernicious.

117.    The Termination Provisions, Certification Provision, and Enforcement Threat
Provision do so by calling for the denial of federal funds to anyone espousing that viewpoint; by
ordering executive officials to begin listing and tracking individuals and organizations that
espouse those viewpoints; and by ordering executive officials to begin taking enforcement
actions to punish individuals and organizations that espouse such viewpoints.  The anti-diversity
EOs also require anyone who wants federal funds to certify that they will not promote such
viewpoints.

32

GA32

118.    In doing so, the Termination Provisions, Certification Provision, and Enforcement Threat Provision chill CWIT's speech by silencing it from discussing issues core to its mission.

119.    Accordingly, the Termination Provisions, Certification Provision, and Enforcement Threat Provision penalize CWIT's specific content and viewpoints and violate the First Amendment.

### Count III
### U.S. Constitution, First Amendment
### Free Speech Clause (Unconstitutional Condition)

120.    CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

121.    The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. CONST. AMEND. I.

122.    Conditioning federal funds on the grantee's agreement not to engage in protected speech even when engaging in activities that are not funded by the federal government is a violation of the First Amendment.  *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-49 (2001); *FCC v. League of Women Voters*, 468 U.S. 364, 400 (1984).

123.    The J21 EO requires the heads of each agency to include in every contract or grant a requirement to certify that the grantee "does not operate *any* programs promoting DEI that violate any applicable Federal anti-discrimination laws," Certification Provision, J21 EO, § 3(b)(iv)(B) (emphasis added), while also declaring that "DEI" programs are illegal and immoral, *id.* § 1.

33

124. In other words, the Certification Provision conditions the receipt of federal funds on a certification not to operate or promote "DEI" programs purportedly in violation of "Federal anti-discrimination laws" that the J21 EO neither identifies nor explains.

125. Promoting the concepts of diversity, equity, and inclusion does not violate any federal anti-discrimination law and is protected speech. Conditioning federal funds on the grantee's agreement not to engage in protected speech even where the protected speech is not federally funded is a violation of the First Amendment. *Agency for Int'l Dev.*, 570 U.S. at 214-15; *Legal Servs. Corp.*, 531 U.S. at 548-49; *FCC*, 468 U.S. at 400. But that is exactly what the challenged provisions of the J21 EO do.

126. For example, approximately 60% of CWIT's funding comes from non-federal sources; CWIT utilizes that funding in furtherance of its mission—supporting equality amongst the sexes in the skilled trades. Absent any explanation of what constitutes illegal "DEI," in order to obtain federal grant funding, CWIT would have to forgo its underlying purpose entirely.

127. Accordingly, the challenged provisions of the J21 EO are unconstitutional because they violate the First Amendment.

## Count IV
### U.S. Constitution Fifth Amendment
### Due Process Clause (Vagueness)

128. CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs. CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

129. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V.

130.    Due process requires that parties "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012).  Clear guidance ensures "those enforcing the law do not act in an arbitrary or discriminatory way." *Id*.

131.    The anti-diversity EOs provide no guidance as to what is required of contractors and grantees to allow them to "act accordingly."

132.    The anti-diversity EOs do not define or describe the prohibited activities that would subject CWIT to penalty in the termination of grants, claw-back of funds, civil investigation, civil enforcement, or other enforcement actions by the government, nor do they define or describe the standards by which these activities will be analyzed to determine their permissibility.

133.    The anti-diversity EOs are so vague and indeterminate that it is impossible for CWIT to determine what conduct is prohibited.  For example, the J20 EO does not define "DEI," "DEIA," "equity-related," "equity action plans," or "environmental justice," or provide examples of "DEI, DEIA, or 'environmental justice' positions, committees, programs, services, activities, budgets, and expenditures" that may have been "misleadingly relabeled," or that appear "under whatever name."  But the J20 EO nevertheless orders the termination of "DEI, DEIA, and 'environmental justice' offices and positions (including but not limited to 'Chief Diversity Officer' positions); all 'equity action plans,' 'equity' actions, initiatives or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  *See* J20 Termination Provision, J20 EO, § 2(b)(i).

134.    Likewise, the J21 EO does not define "DEI," "DEIA," "equity," equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," or "like mandates, requirements, programs or activities."  In a similarly vague manner,

the J21 EO also requires the termination of "grants" for "all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate," all without definition or guidance as to what these terms mean or any specific activities that are actually prohibited. J21 Termination Provision, J21 EO, § 3(c)(iii).

135.    Additionally, the J21 EO requires certification, enforceable through the False Claims Act, that a contractor and grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," all without definition or guidance as to what these terms mean or any specific activities that are actually prohibited. *See* Certification Provision, J21 EO, § 3(b)(iv).

136.    And the J21 EO orders the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]." *See* Enforcement Threat Provision, J21 EO, § 4(b)(iii).

137.    The vagueness of the anti-diversity EO's terminology requires subjective interpretation by government agencies and therefore lends itself to discriminatory enforcement. By the anti-diversity EOs' terms (or lack thereof), each agency head is authorized to exercise unfettered discretion to determine whether a federal grant, training or program is "equity-related."

138.    Accordingly, CWIT has not received fair (or any) notice of what is prohibited under the anti-diversity EOs, making it impossible for CWIT to adjust its activity to come into compliance with the anti-diversity EOs.

139. The challenged provisions of the anti-diversity EOs are, therefore, unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment.

### Count V
### *Ultra Vires* – U.S. Const., Article I, § 8 (Spending Clause)
### Regarding Section 2 of J20 EO

140. CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs. CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

141. Article I of the United States Constitution exclusively grants Congress the federal spending powers. U.S. Const. art. I § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

142. The J20 Termination Provision purports to direct subordinate executive branch officials to unilaterally "terminate, to the maximum extent allowed by law, all 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts." *See* J20 Termination Provision, J20 EO, § 2(b)(i).

143. The Constitution does not permit the President or his subordinate executive branch officials to unilaterally terminate "'equity-related' grants and contracts" without express statutory authority.

144. Though the J20 EO purports to limit terminations "to the maximum extent allowed by law," President Trump and his subordinate agencies have already acted contrary to that limitation.

145. A general statement about nominal adherence to the law does not suffice to evade judicial review.

146.     The Constitution does not give the President nor any agencies the authority to take the actions challenged in this Complaint.

147.     Accordingly, the J20 EO is *ultra vires* and unconstitutional.

**Count VI**
***Ultra Vires* – U.S. Const., Article I, § 8 (Spending Clause)**
**Regarding Section 3 of the J21 EO**

148.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

149.     Article I of the United States Constitution exclusively grants Congress the federal spending powers.  U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

150.     The Certification Provision of the J21 EO requires the head of each executive agency to "include in every contract or grant award" *inter alia* "[a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."  *See* Certification Provision, J21 EO, § 3(b)(iv).

151.     The Constitution does not permit the President or his subordinate executive branch officials to exercise the spending power and condition grant awards on requiring a compliance condition.

152.     Further, the J21 Termination Provision requires the OMB Director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate."  J21 Termination Provision, J21 EO, § 3(c)(iii).

38

GA38

153.     Congress has authorized and appropriated funds of which CWIT is a recipient. The President does not have unilateral authority to refuse to spend those funds on the basis that the funds are "programs" or "activities" that constitute "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," or "advancing equity."

154.     The Constitution does not give the President nor any agencies the authority to take the action challenged in this Complaint.

155.     Accordingly, the J21 EO is *ultra vires* and unconstitutional.

**Count VII**
**Violation of Separation of Powers**
**Regarding Section 2 of the J20 EO**

156.     CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

157.     The J20 EO violates constitutional separation of powers.

158.     The President and executive branch have no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

159.     Article I of the United States Constitution exclusively grants Congress the federal spending powers.  U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

160.     The J20 EO aims to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  J20 EO § 2(a).

161.    The J20 Termination Provision orders Executive Branch agencies, departments, and commission heads, in consultation with the Attorney General, the OMB Director, and the OPM Director, to "terminate," *inter alia*, "all 'equity action plans,' 'equity' actions, initiatives, or programs, [and] 'equity-related' grants or contracts."  *See* J20 Termination Provision, J20 EO, § 2(b)(i).

162.    Congress has not authorized the Executive Branch to withhold, withdraw, or terminate federal grant moneys from grant recipients like CWIT, on the basis that the grants involve "equity action plans," "equity actions, initiatives, or programs" or that they are considered "'equity-related' grants or contracts."

163.    On the contrary, Congress has authorized the federal moneys granted to CWIT. The Executive Branch does not have the power to unilaterally veto federal statutes and block congressionally-authorized and appropriated funding to the extent the grant and its respective programming is deemed an "equity action plan," "equity action, initiative[], or program," or a "equity-related grant or contract."

164.    The J20 EO imposes a sweeping funding restriction (and threat of termination) on grantees like CWIT.  This violates constitutional separation of powers principles and amounts to an unconstitutional exercise of executive authority over federal appropriations.

165.    The J20 EO is contrary to the federal interests advanced by the funding statutes applicable to CWIT, including the Women in Apprenticeship and Nontraditional Occupations Act, the Further Consolidated Appropriations Act of 2024, The National Apprenticeship Act, and the American Competitiveness and Workforce and Improvement Act.

166.    The J20 EO requires the Executive Branch to terminate grants based on conditions wholly unrelated to and antithetical to the purpose and intent of the laws authorizing these grants.

167.    "[T]he Executive Branch does not [] have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018).  "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).  When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *Id*.

168.    Accordingly, the challenged provisions of the J20 EO are unconstitutional because they violate the constitutional separation of powers.

**Count VIII**
**Violation of Separation of Powers**
**Regarding Section 3 of the J21 EO**

169.    CWIT realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.  CWIT states this cause of action against all Defendants, seeks preliminary and declaratory relief, and challenges the anti-diversity EOs, and any agency action implementing them, both facially and as applied to them.

170.    The J21 EO violates constitutional separation of powers.

171.    The President and executive branch, absent Congressional authorization, have no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

172.    Article I of the United States Constitution exclusively grants Congress the federal spending powers.  U.S. Const. art. I § 8, cl. 1; *see also Dole*, 483 U.S. at 206.

173.    The J21 EO's stated purpose is to "enforce[e] [] civil-rights laws" and address "dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)."  *See* J21 EO, § 1.

174.    Accordingly, the Certification Provision of the J21 EO purports to impose a condition on the receipt of federal funds by requiring recipients of contracts or grants to certify that they "do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."  *See* Certification Provision, J21 EO, § 3(b)(iv)(B).

175.    The President and Executive Branch lack statutory authority to impose this blanket condition on all federal funds received by grantees.

176.    While the J21 EO claims to limit itself to "programs promoting DEI" that violate "any applicable Federal anti-discrimination laws," those limitations are undefined and conflict with the rest of the order.  *Id.*

177.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

178.    No delegation of Congress's power under the Spending Clause is constitutionally permitted, nor did Congress delegate any spending power to the President with respect to the particular federal programs and funds at issue here.

179.    Further, the J21 Termination Provision requires the OMB Director to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and

42

GA42

technical assistance,' advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." J21 Termination Provision, J21 EO, § 3(c)(iii).

180.    The termination of any grants pursuant to this provision also violates the Separation of Powers because the President lacks statutory authority to withhold funding that has been appropriated by Congress on the basis that such funding involves "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," and "advancing equity."

181.    Congress has authorized the federal grant moneys for CWIT. The Executive Branch does not have the power to unilaterally veto federal law and block congressionally-authorized and appropriated funding to the extent the grant and its respective programming is deemed an "equity action plan," "equity action, initiative[], or program," or an "equity-related grant or contract."

182.    The J21 EO imposes a sweeping funding restriction on grantees like CWIT. This violates constitutional separation of powers principles and amounts to an unconstitutional exercise of executive authority over federal appropriations.

183.    The J21 EO is contrary to federal interests as set out by Congress in the funding statutes applicable to CWIT, including the Women in Apprenticeship and Nontraditional Occupations Act, the Further Consolidated Appropriations Act of 2024, The National Apprenticeship Act, and the American Competitiveness and Workforce and Improvement Act.

184.    The J21 EO requires the Executive Branch to terminate grants based on conditions wholly unrelated to and antithetical to the purpose and intent of the laws authorizing these grants.

GA43

185.    "[T]he Executive Branch does not [] have the inherent authority . . . to condition the payment of [] federal funds on adherence to its political priorities." *City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *City & Cnty. of San Francisco*, 987 F.3d at 1235. When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *Id*.

186.    The Constitution does not give the President or any agencies the authority to take the actions challenged in this Complaint.

187.    Accordingly, the challenged provisions of the J21 EO are unconstitutional because they violate the constitutional separation of powers.

## PRAYER FOR RELIEF

WHEREFORE, CWIT respectfully requests the Court enter an order:

a.  Declaring that the Termination Provision of the J20 EO, § 2(b)(i), is unlawful and unconstitutional;

b.  Declaring that the Certification Provision (§ 3(b)(iv)), the J21 Termination Provision (§ 3(c)(iii)), and the Enforcement Threat Provision (§ 4(b)(iii)), of the J21 EO are unlawful and unconstitutional;

c.  Granting a preliminary and permanent injunction enjoining Defendants other than the President from enforcing those sections of the anti-diversity EOs that the Court finds unlawful and unconstitutional;

d.  Awarding CWIT its reasonable attorneys' fees and costs;

e.  Issuing such other relief as the Court may deem appropriate.

CWIT requests a trial by jury on all issues so triable.

Dated: February 26, 2025

Respectfully Submitted,

/s/ *Jason P. Stiehl*
Jason P. Stiehl
CROWELL & MORING LLP
455 N Cityfront Plaza Dr.
Suite 3600
Chicago IL 60611
Tel: (312) 840-3108
jstiehl@crowell.com

/s/ *Anuj Vohra*
Anuj Vohra
Keith J. Harrison*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
avohra@crowell.com
kharrison@crowell.com

/s/ *Meshach Y. Rhoades*
Meshach Y. Rhoades*
CROWELL & MORING LLP
1601 Wewatta Street
Suite 815
Denver, CO 80202
Tel: (303) 524-8660
mrhoades@crowell.com

/s/ *Warrington Parker*
Warrington Parker*
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, CA 94111
Tel: (415) 986-2800
wparker@crowell.com

/s/ *Elizabeth E. Theran*
Elizabeth E. Theran*
Adrienne DerVartanian*
National Women's Law Center
1350 I Street NW, Suite 700
Washington, DC 20005
Telephone: (202) 588-5180
Fax: (202) 588-5185
etheran@nwlc.org
adervartanian@nwlc.org

/s/ *Sabrina A. Talukder*
Sabrina A. Talukder*
Kathryn J. Youker*
Adria J. Bonillas*
Olivia Sedwick*
Gillian Cassell-Stiga*
Lawyers' Committee for Civil Rights Under
Law
1500 K Street, N.W. Suite 900
Washington, D.C. 20005
Telephone: (202) 662-8600
Facsimile: (202) 783-0857
stalukder@lawyerscommittee.org
kyouker@lawyerscommittee.org
abonillas@lawyerscommittee.org
osedwick@lawyerscommittee.org
gcassell-stiga@lawyerscommittee.org

/s/ *Lourdes M. Rosado*
Lourdes M. Rosado*
Rafaela Uribe*
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Telephone: (212) 739-7583
lrosado@latinojustice.org
ruribe@latinojustice.org

/s/ *Aneel L. Chablani*
Aneel L. Chablani (No. 6242658)
Ami D. Gandhi (No. 6282924)
Chicago Lawyers' Committee for Civil
Rights
100 N. LaSalle St., Ste. 600
Chicago, IL 60602
Telephone: (312) 630-9744

45

GA45

Facsimile: (312) 630-1127
achablani@clccrul.org
agandhi@clccrul.org

*Attorneys for Chicago Women in Trades*

*\*Pro hac vice motion forthcoming*

# Exhibit A


# Presidential Documents

Executive Order 14151 of January 20, 2025

## Ending Radical and Wasteful Government DEI Programs and Preferencing

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose and Policy.* The Biden Administration forced illegal and immoral discrimination programs, going by the name "diversity, equity, and inclusion" (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Under-served Communities Through the Federal Government."

Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

**Sec. 2**. *Implementation.* (a) The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and "diversity, equity, inclusion, and accessibility" (DEIA) mandates, policies, programs, pref-erences, and activities in the Federal Government, under whatever name they appear. To carry out this directive, the Director of OPM, with the assistance of the Attorney General as requested, shall review and revise, as appropriate, all existing Federal employment practices, union contracts, and training policies or programs to comply with this order. Federal employ-ment practices, including Federal employee performance reviews, shall re-ward individual initiative, skills, performance, and hard work and shall not under any circumstances consider DEI or DEIA factors, goals, policies, mandates, or requirements.

(b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:

(i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not lim-ited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or con-tracts; and all DEI or DEIA performance requirements for employees, con-tractors, or grantees.

(ii) provide the Director of the OMB with a list of all:

(A) agency or department DEI, DEIA, or "environmental justice" posi-tions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expendi-tures have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or ''environmental justice'' programs, services, or activities since January 20, 2021.

(iii) direct the deputy agency or department head to:

(A) assess the operational impact (e.g., the number of new DEI hires) and cost of the prior administration's DEI, DEIA, and ''environmental justice'' programs and policies; and

(B) recommend actions, such as Congressional notifications under 28 U.S.C. 530D, to align agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions with the policy of equal dignity and respect identified in section 1 of this order. The agency or department head and the Director of OMB shall jointly ensure that the deputy agency or department head has the authority and resources needed to carry out this directive.

(c) To inform and advise the President, so that he may formulate appropriate and effective civil-rights policies for the Executive Branch, the Assistant to the President for Domestic Policy shall convene a monthly meeting attended by the Director of OMB, the Director of OPM, and each deputy agency or department head to:

(i) hear reports on the prevalence and the economic and social costs of DEI, DEIA, and ''environmental justice'' in agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions;

(ii) discuss any barriers to measures to comply with this order; and

(iii) monitor and track agency and department progress and identify potential areas for additional Presidential or legislative action to advance the policy of equal dignity and respect.

**Sec. 3.** *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01953
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

# Exhibit B


# Presidential Documents

Executive Order 14173 of January 21, 2025

## Ending Illegal Discrimination and Restoring Merit-Based Opportunity

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* Longstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin. These civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans. As President, I have a solemn duty to ensure that these laws are enforced for the benefit of all Americans.

Yet today, roughly 60 years after the passage of the Civil Rights Act of 1964, critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called ''diversity, equity, and inclusion'' (DEI) or ''diversity, equity, inclusion, and accessibility'' (DEIA) that can violate the civil-rights laws of this Nation.

Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system. Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex.

These illegal DEI and DEIA policies also threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society, including all levels of government, and the medical, aviation, and law-enforcement communities. Yet in case after tragic case, the American people have witnessed first-hand the disastrous consequences of illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing.

The Federal Government is charged with enforcing our civil-rights laws. The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination.

**Sec. 2.** *Policy.* It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

**Sec. 3.** *Terminating Illegal Discrimination in the Federal Government.* (a) The following executive actions are hereby revoked:

(i) Executive Order 12898 of February 11, 1994 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations);

(ii) Executive Order 13583 of August 18, 2011 (Establishing a Coordinated Government-wide Initiative to Promote Diversity and Inclusion in the Federal Workforce);

(iii) Executive Order 13672 of July 21, 2014 (Further Amendments to Executive Order 11478, Equal Employment Opportunity in the Federal Government, and Executive Order 11246, Equal Employment Opportunity); and

(iv) The Presidential Memorandum of October 5, 2016 (Promoting Diversity and Inclusion in the National Security Workforce).

(b) The Federal contracting process shall be streamlined to enhance speed and efficiency, reduce costs, and require Federal contractors and subcontractors to comply with our civil-rights laws. Accordingly:

(i) Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), is hereby revoked. For 90 days from the date of this order, Federal contractors may continue to comply with the regulatory scheme in effect on January 20, 2025.

(ii) The Office of Federal Contract Compliance Programs within the Department of Labor shall immediately cease:

(A) Promoting "diversity";

(B) Holding Federal contractors and subcontractors responsible for taking "affirmative action"; and

(C) Allowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin.

(iii) In accordance with Executive Order 13279 of December 12, 2002 (Equal Protection of the Laws for Faith-Based and Community Organizations), the employment, procurement, and contracting practices of Federal contractors and subcontractors shall not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws.

(iv) The head of each agency shall include in every contract or grant award:

(A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

(B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

(c) The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall:

(i) Review and revise, as appropriate, all Government-wide processes, directives, and guidance;

(ii) Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and

(iii) Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance," "advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

**Sec. 4.** *Encouraging the Private Sector to End Illegal DEI Discrimination and Preferences.* (a) The heads of all agencies, with the assistance of the

Attorney General, shall take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work identified in section 2 of this order.

(b) To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying:

(i) Key sectors of concern within each agency's jurisdiction;

(ii) The most egregious and discriminatory DEI practitioners in each sector of concern;

(iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated ''DEI'' or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;

(iv) Other strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws;

(v) Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and

(vi) Potential regulatory action and sub-regulatory guidance.

**Sec. 5.** *Other Actions.* Within 120 days of this order, the Attorney General and the Secretary of Education shall jointly issue guidance to all State and local educational agencies that receive Federal funds, as well as all institutions of higher education that receive Federal grants or participate in the Federal student loan assistance program under Title IV of the Higher Education Act, 20 U.S.C. 1070 *et seq.,* regarding the measures and practices required to comply with *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College,* 600 U.S. 181 (2023).

**Sec. 6.** *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 7.** *Scope.* (a) This order does not apply to lawful Federal or private-sector employment and contracting preferences for veterans of the U.S. armed forces or persons protected by the Randolph-Sheppard Act, 20 U.S.C. 107 *et seq.*

(b) This order does not prevent State or local governments, Federal contractors, or Federally-funded State and local educational agencies or institutions of higher education from engaging in First Amendment-protected speech.

(c) This order does not prohibit persons teaching at a Federally funded institution of higher education as part of a larger course of academic instruction from advocating for, endorsing, or promoting the unlawful employment or contracting practices prohibited by this order.

**Sec. 8.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to and does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 21, 2025.*

[FR Doc. 2025–02097
Filed 1–30–25; 8:45 am]
Billing code 3395–F4–P

**UNITED STATES DISTRICT COURT OF THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHICAGO WOMEN IN TRADES,<br><br>       Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP,<br>DEPARTMENT OF LABOR, ACTING<br>SECRETARY OF LABOR VINCENT<br>MICONE, OFFICE OF MANAGEMENT<br>AND BUDGET, DIRECTOR OF THE<br>OFFICE OF MANAGEMENT AND<br>BUDGET RUSSELL VOUGHT, U.S.<br>DEPARTMENT OF JUSTICE, ATTORNEY<br>GENERAL OF THE U.S. DEPARTMENT OF<br>JUSTICE PAMELA BONDI,<br><br>       Defendants. | Case No. 1:25-cv-02005<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

## <u>DECLARATION OF WARRINGTON PARKER</u>

I, Warrington Parker, hereby declare upon penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

1.       I am a partner at Crowell & Moring LLP and one of the attorneys representing Chicago Women in Trades ("CWIT") in this action.

2.       Attached herein at **Exhibit A** is a true and correct copy of the February 19, 2025, transcript of the temporary restraining order hearing in the matter *Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025).

3.       Attached herein as **Exhibit B** is a true and correct copy of the January 21, 2025, memorandum issued by the Acting Director of the Office of Personnel Management.

1

4.      Attached herein as **Exhibit C** is a true and correct copy of the January 27, 2025, memorandum issued by the Office of Management and Budget ("OMB")

5.      Attached herein as **Exhibit D** is a true and correct copy of a Fact Sheet released by OMB on January 28, 2025.

6.      Attached herein as **Exhibit E** is a true and correct copy of a January 29, 2025, memorandum issued by the OMB.

7.      Attached herein as **Exhibit F** is a true and correct copy of the statement made by the White House Press Secretary regarding Exhibit Orders 14151 and 14173.

8.      Attached herein as **Exhibit G** is a true and correct copy of the February 5, 2025, memorandum issued by the United States Attorney General.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of March, 2025 at Miami, Florida.

_____
Warrington S. Parker III

# Exhibit B



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | January 21, 2025 |
| **RE**: | Initial Guidance Regarding DEIA Executive Orders |

---

Pursuant to its authority under 5 U.S.C. § 1103(a)(1) and (a)(5), the U.S. Office of Personnel Management ("***OPM***") is providing the following initial guidance to agencies regarding the President's executive orders titled *Ending Radical and Wasteful Government DEI Programs and Preferencing* and *Initial Rescissions of Harmful Executive Orders and Actions*, which repeals Executive Order 14035, *Diversity, Equity, Inclusion and Accessibility in the Federal Workforce*.

**Steps to Close Agency DEIA Offices**: In light of the above Executive Orders, each should take prompt actions regarding the offices and agency sub-units focusing exclusively on DEIA initiatives and programs (the "***DEIA offices***"). Specifically, agency heads should take the following steps:

1. No later than **5:00 pm EST on Wednesday, January 22, 2025**

   a. Send an agency-wide notice to employees informing them of the closure and asking employees if they know of any efforts to disguise these programs by using coded or imprecise language a template agency-wide notice is attached as <u>Appendix 1</u>.

   b. Send a notification to all employees of DEIA offices that they are being placed on paid administrative leave effective immediately as the agency takes steps to close/end all DEIA initiatives, offices and programs.[1] A template employee letter is attached as <u>Appendix 2</u>.

   c. Take down all outward facing media (websites, social media accounts, etc.) of DEIA offices.

---

[1] The authority for placing these employees on paid administrative leave is set forth in the OPM memorandum entitled "Guidance on Probationary Periods, Administrative Leave and Details" issued January 20, 2025.

Case: 1:25-cv-02005 Document #: 26-3 Filed: 03/05/25 Page 3 of 5 PageID #:284
Case: 25-2144    Document: 14    Filed: 08/18/2025    Pages: 202

Page 2

    d.   Withdraw any final or pending documents, directives, orders, materials, and equity plans issued by the agency in response to now-repealed Executive Order 14035, *Diversity, Equity, Inclusion and Accessibility (DEIA) in the Federal Workforce* (June 25, 2021).

    e.   Cancel any DEIA-related trainings, and terminate any DEIA-related contractors.

2.   No later than **<u>12:00 pm EST on Thursday, January 23, 2025</u>**, report to OPM on all steps taken to implement this memorandum, including:

    a.   a complete list of DEIA offices and any employees who in those offices **<u>as of November 5, 2024</u>**,

    b.   a complete list of all DEIA-related agency contracts **<u>as of November 5, 2024</u>**, and

    c.   any agency plans to fully comply with the above Executive Orders and this memorandum.

3.   No later than **<u>5:00 pm EST on Friday, January 31, 2025</u>**, submit to OPM:

    a.   a written plan for executing a reduction-in-force action regarding the employees who work in a DEIA office. Agencies should coordinate with OPM in preparing these plans,

    b.   a list of all contract descriptions or personnel position descriptions that were changed since November 5, 2024 to obscure their connection to DEIA programs.

Please contact Amanda Scales at amanda.scales@opm.gov if you have any questions regarding this memorandum. Please send any reports requested by this guidance memo to DEIAreports@opm.gov, with a copy to amanda.scales@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

## **Appendix 1**
### Template Email - Agency Head to Employees

Dear agency employees,

We are taking steps to close all agency DEIA offices and end all DEIA-related contracts in accordance with President Trump's executive orders titled *Ending Radical and Wasteful Government DEI Programs and Preferencing* and *Initial Rescissions of Harmful Executive Orders and Actions*.

These programs divided Americans by race, wasted taxpayer dollars, and resulted in shameful discrimination.

We are aware of efforts by some in government to disguise these programs by using coded or imprecise language. If you are aware of a change in any contract description or personnel position description since November 5, 2024 to obscure the connection between the contract and DEIA or similar ideologies, please report all facts and circumstances to DEIAtruth@opm.gov within 10 days.

There will be no adverse consequences for timely reporting this information. However, failure to report this information within 10 days may result in adverse consequences.

Thank you for your attention to this important matter.

**<u>Appendix 2</u>**
Template Email - Administrative Leave Notice (Sent to Employees)

Dear [Employee],

This email provides important information regarding your employment status. Effective January 2[_], 2025 at [__] [_]m EST, all employees within [ODEIA] will be placed on administrative leave with full pay and benefits. This administrative leave is not being done for any disciplinary purpose.

Please note the following:

- **Pay and Benefits:** You will continue to receive your full salary and benefits during the entirety of this administrative leave period.

- **Work Responsibilities:** You are not required or expected to perform any work-related tasks during this period of administrative leave.

- **Office Attendance:** You are not required or expected to come to the office during this time.

- **Email Access:** Your email access will be suspended. Please make sure that your address of record and contact information are current with your agency.

We will provide you with updates as soon as they are available. We appreciate your patience and cooperation.

If you have any concerns or questions, please contact [Designated Contact Person] at [Email].

Respectfully,

[Name/Title of Authorizing Official]

[Office/Agency]

# Exhibit C



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 27, 2025

M-25-13

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:        Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT:     Temporary Pause of Agency Grant, Loan, and Other Financial Assistance
             Programs

The American people elected Donald J. Trump to be President of the United States and
gave him a mandate to increase the impact of every federal taxpayer dollar. In Fiscal Year 2024,
of the nearly $10 trillion that the Federal Government spent, more than $3 trillion was Federal
financial assistance, such as grants and loans. Career and political appointees in the Executive
Branch have a duty to align Federal spending and action with the will of the American people as
expressed through Presidential priorities. Financial assistance should be dedicated to advancing
Administration priorities, focusing taxpayer dollars to advance a stronger and safer America,
eliminating the financial burden of inflation for citizens, unleashing American energy and
manufacturing, ending "wokeness" and the weaponization of government, promoting efficiency
in government, and Making America Healthy Again. The use of Federal resources to advance
Marxist equity, transgenderism, and green new deal social engineering policies is a waste of
taxpayer dollars that does not improve the day-to-day lives of those we serve.

This memorandum requires Federal agencies to identify and review all Federal financial
assistance[1] programs and supporting activities consistent with the President's policies and
requirements.[2]  For example, during the initial days of his Administration, President Donald J.
Trump issued a series of executive orders to protect the American people and safeguard valuable
taxpayer resources, including *Protecting the American People Against Invasion* (Jan. 20, 2025),
*Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), *Putting America First in
International Environmental Agreements* (Jan. 20, 2025), *Unleashing American Energy* (Jan. 20,
2025), *Ending Radical and Wasteful Government DEI Programs and Preferencing* (Jan. 20,

---

[1] 2 CFR 200.1 defines Federal financial assistance to mean "[a]ssistance that recipients or subrecipients receive or
administer" in various forms, but this term does not include assistance provided directly to individuals. For the
purposes of this memorandum, Federal financial assistance includes: (i) all forms of assistance listed in paragraphs
(1) and (2) of the definition of this term at 2 CFR 200.1; and (ii) assistance received or administered by recipients or
subrecipients of any type except for assistance received directly by individuals.
[2] Nothing in this memo should be construed to impact Medicare or Social Security benefits.

2025), *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Jan. 20, 2025), and *Enforcing the Hyde Amendment* (Jan. 24, 2025). These executive orders ensure that Federal funds are used to support hardworking American families.

To implement these orders, each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders.  In the interim, to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

This temporary pause will provide the Administration time to review agency programs and determine the best uses of the funding for those programs consistent with the law and the President's priorities.  The temporary pause will become effective on January 28, 2025, at 5:00 PM. Even before completing their comprehensive analysis, Federal agencies must immediately identify any legally mandated actions or deadlines for assistance programs arising while the pause remains in effect. Federal agencies must report this information to OMB along with an analysis of the requirement. OMB also directs Federal agencies to pause all activities associated with open NOFOs, such as conducting merit review panels.

No later than February 10, 2025, agencies shall submit to OMB detailed information on any programs, projects or activities subject to this pause. Each agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

OMB may grant exceptions allowing Federal agencies to issue new awards or take other actions on a case-by-case basis.  To the extent required by law, Federal agencies may continue taking certain administrative actions, such as closeout of Federal awards (2 CFR 200.344), or recording obligations expressly required by law.

Additionally, agencies must, for each Federal financial assistance program: (i) assign responsibility and oversight to a senior political appointee to ensure Federal financial assistance conforms to Administration priorities; (ii) review currently pending Federal financial assistance announcements to ensure Administration priorities are addressed, and, subject to program statutory authority, modify unpublished Federal financial assistance announcements, withdraw any announcements already published, and, to the extent permissible by law, cancel awards already awarded that are in conflict with Administration priorities, and; (iii) ensure adequate oversight of Federal financial assistance programs and initiate investigations when warranted to identify underperforming recipients, and address identified issues up to and including cancellation of awards.

# Exhibit D

3/4/25, 5:24 PM    OMB Q&A Regarding Memorandum M-25-13 – The White House

Case: 1:25-cv-02005 Document #: 26-5 Filed: 03/05/25 Page 2 of 5 PageID #:291
Case: 25-2144    Document: 14    Filed: 08/18/2025    Pages: 202

The Wayback Machine – https://web.archive.org/web/20250129143354/https:...



In implementing President Trump's Executive Orders, OMB issued guidance requesting that agencies temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs that are implicated by the President's Executive Orders.

**Any program not implicated by the President's Executive Orders is not subject to the pause.**

The Executive Orders listed in the guidance are:

*Protecting the American People Against Invasion*

*Reevaluating and Realigning United States Foreign Aid*

*Putting America First in International Environmental Agreements*

*Unleashing American Energy*

3/4/25, 5:24 PM

Case: 1:25-cv-02005 Document #: 26-5 Filed: 03/05/25 Page 3 of 5 PageID #:292
Case: 25-2144     Document: 14     Filed: 08/18/2025     Pages: 202

*Ending Radical and Wasteful Government DEI Programs and Preferencing*

*Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*

*Enforcing the Hyde Amendment*

Any program that provides direct benefits to individuals is not subject to the pause.

The guidance establishes a process for agencies to work with OMB to determine quickly whether any program is inconsistent with the President's Executive Orders. A pause could be as short as day. In fact, OMB has worked with agencies and has already approved many programs to continue even before the pause has gone into effect.

Any payment required by law to be paid will be paid without interruption or delay.

**Q: Is this a freeze on all Federal financial assistance?**

A: No, the pause does not apply across-the-board. It is expressly limited to programs, projects, and activities implicated by the President's Executive Orders, such as ending DEI, the green new deal, and funding nongovernmental organizations that undermine the national interest.

**Q: Is this a freeze on benefits to Americans like SNAP or student loans?**

A: No, any program that provides direct benefits to Americans is explicitly excluded from the pause and exempted from this review process. In addition to Social Security and Medicare, already explicitly excluded in the guidance, mandatory programs like Medicaid and SNAP will continue without pause.Funds for small businesses, farmers, Pell grants, Head Start, rental assistance, and other similar programs will not be paused. If agencies are concerned that these programs may implicate the President's Executive Orders, they should consult OMB to begin to unwind these objectionable policies without a pause in the payments.

**Q: Is the pause of federal financial assistance an impoundment?**

**A:** No, it is not an impoundment under the Impoundment Control Act. It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law. Temporary pauses are a necessary part of program implementation that have been ordered by past presidents to ensure that programs are being executed and funds spent in accordance with a new President's policies and do not constitute impoundments.

**Q: Why was this pause necessary?**

**A:** To act as faithful stewards of taxpayer money, new administrations must review federal programs to ensure that they are being executed in accordance with the law and the new President's policies.



News

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

GA69

3/4/25, 5:24 PM
Case: 1:25-cv-02005 Document #: 26-5 Filed: 03/05/25 Page 5 of 5 PageID #:294
OMB Q&A Regarding Memorandum M-25 - The White House

Case: 25-2144     Document: 14     Filed: 08/18/2025     Pages: 202

WH.GOV

Copyright

Privacy

# Exhibit E



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF MANAGEMENT AND BUDGET
WASHINGTON, D.C. 20503

**THE DIRECTOR**

January 29, 2025

M-25-14

MEMORANDUM FOR HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM: Matthew J. Vaeth, Acting Director, Office of Management and Budget

SUBJECT: Rescission of M-25-13

    OMB Memorandum M-25-13 is rescinded.  If you have questions about implementing the President's Executive Orders, please contact your agency General Counsel.

# Exhibit F

Case: 1:25-cv-02005 Document #: 26-7 Filed: 03/05/25 Page 2 of 2 PageID #:298

𝕏

⚙ Settings

← **Post**



Karoline Leavitt ✔ 🏛
@PressSec                                    ⊡  ⋯

This is NOT a rescission of the federal funding freeze.

It is simply a rescission of the OMB memo.

Why? To end any confusion created by the court's injunction.

The President's EO's on federal funding remain in full force and effect, and will be rigorously implemented.

12:40 PM · Jan 29, 2025 · **12.2M** Views

💬 5.4K          ⇄ 16K          ♡ 59K          🔖 2.3K          ⬆

💬  Read 5.4K replies

**New to X?**

Sign up now to get your own personalized timeline!



🔵 **Sign up with Google**

 **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

↻ Retry

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2025 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in          Sign up

GA74

# Exhibit G



**Office of the Attorney General**
**Washington, D. C. 20530**

February 5, 2025

MEMORANDUM FOR ALL DEPARTMENT EMPLOYEES

FROM:            THE ATTORNEY GENERAL

SUBJECT:         ENDING ILLEGAL DEI AND DEIA DISCRIMINATION
                 AND PREFERENCES

The Department of Justice is committed to enforcing all federal civil rights laws and ensuring equal protection under the law. As the United States Supreme Court recently stated, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). On January 21, 2025, President Trump issued Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), making clear that policies relating to "diversity, equity, and inclusion" ("DEI") and "diversity, equity, inclusion, and accessibility" ("DEIA") "violate the text and spirit of our longstanding Federal civil-rights laws" and "undermine our national unity." *Id.* at 8633.

To fulfill the Nation's promise of equality for all Americans, the Department of Justice's Civil Rights Division will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds.[1]

**I.      Ending Illegal DEI And DEIA Discrimination and Preferences**

By March 1, 2025, consistent with Executive Order 14173, the Civil Rights Division and the Office of Legal Policy shall jointly submit a report to the Associate Attorney General containing recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including policies relating to DEI and DEIA. The report should address:

- Key sectors of concern within the Department's jurisdiction;

---

[1] This memorandum is intended to encompass programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex. It does not prohibit educational, cultural, or historical observances—such as Black History Month, International Holocaust Remembrance Day, or similar events—that celebrate diversity, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination.

GA76

Memorandum for all Department Employees                                    Page 2
Subject: Ending Illegal DEI And DEIA Discrimination and Preferences

- The most egregious and discriminatory DEI and DEIA practitioners in each sector of concern;

- A plan including specific steps or measures to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences, including proposals for criminal investigations and for up to nine potential civil compliance investigations of entities that meet the criteria outlined in section 4(b)(iii) of Executive Order 14173;

- Additional potential litigation activities (including interventions in pending cases, statement of interest submissions, and amicus brief submissions), regulatory actions, and sub-regulatory guidance; and

- Other strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws.

## II.    Guidance to Institutions Receiving Federal Funds

Educational agencies, colleges, and universities that receive federal funds may not "treat some students worse than others in part because of race." *Students for Fair Admissions*, 600 U.S. at 304 (Gorsuch, J., concurring). Consistent with the January 21, 2025, Executive Order, the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue actions, regarding the measures and practices required to comply with *Students for Fair Admissions*.

## UNITED STATES DISTRICT COURT OF THE
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CHICAGO WOMEN IN TRADES,<br><br>        Plaintiff,<br><br>v.<br><br>PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,<br><br>        Defendants. | Case No. 1:25-cv-02005<br><br>Judge: Hon. Matthew F. Kennelly<br><br>JURY TRIAL DEMANDED |

## <u>DECLARATION OF JAYNE VELLINGA</u>

I, Jayne Vellinga, hereby declare upon penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

1.      I am the Executive Director of Chicago Women in Trades ("CWIT"), a not-for-profit 501(c)(3) based in Chicago, Illinois. I have served in this capacity since 2010.

2.      I submit this declaration in support of Plaintiff's Motion for a Preliminary Injunction to prevent Defendants from enforcing certain provisions of Executive Order No. 14151 titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" ("EO 14151") and Executive Order No. 14173 titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("EO 14173") (collectively, the "Executive Orders").

1

**Equity is What We are and What We Do**

3.      CWIT was established in 1981 by tradeswomen leaders in Chicago, with a shared goal of creating more equitable opportunities for women to enter high-wage employment in the skilled trades, which include carpentry, electrical work, welding, plumbing, and more. CWIT has a rich 44-year history of tradeswomen advocacy; creating women-focused trades pipeline programs, establishing women-focused pre-apprenticeship programs, developing best practices to recruit and retain tradeswomen, and implementing innovative approaches to gender equity work in nontraditional occupations in Chicago and across the country.

4.      CWIT is more than just a workforce development program. It offers more than job-readiness and job placement. CWIT prepares women, especially women of color, to enter and remain in traditionally male-dominated skilled trades, assists other organizations in efforts to do the same, and advocates for policies that support women's success in skilled trades across the country. Approximately 70% of all CWIT participants identify as women of color, nearly all of whom identify as Black or Latina. CWIT's mission and day-to-day work are based on the reality that women face race- and gender-based structural barriers to entering and staying in the skilled trades occupations.

5.      Our mission also has a national reach beyond pre-apprenticeship programs. Entities from across the country, ranging from local unions to the Department of Transportation, rely on CWIT for technical assistance, data driven and evidence-based research, customized diversity, equity, and inclusion ("DEI") trainings, and more to learn how to successfully address the race and gender-based barriers for women in the skilled trades.

6.      Women make up only 3.9% of the skilled trades workforce even though these are in-demand jobs with competitive wages and benefits that can rival or exceed those of professions requiring a four-year degree. However, women are disproportionately excluded from the skilled

trades in part because of a lack of opportunities for pre-apprenticeship training, lack of outreach and lack of recruitment, bias in the recruitment process, and a hostile work environment. Black and Latina women are disproportionately underrepresented in the skilled trade industry overall, and especially in the higher-paid, higher-skilled trades, as a result of discrimination based not only on sex but also on race, ethnicity, and national origin. Access to these kinds of high-quality jobs with lower barriers to entry is crucial for Black and Latina women, who have been hit hardest by pandemic-related job losses and who also face persistent race and gender wage gaps.

7.    A study from the Institute for Women's Policy Research found that nearly half of women in male-dominated skilled trades experience some form of discrimination, with over 44.4% citing "lack of respect" and "harassment" as the primary issue. One in five women of color reported "always" or "frequently" experiencing racial harassment on the job. Approximately 26% of women of color have reported seeing racist graffiti or symbols at a construction job site, though anecdotally, through my own observations, I believe that number should be higher. As a result, women are most likely to report sexual harassment to the Equal Employment Opportunity Commission in industries that are the most male-dominated, such as construction, utilities, mining, and transportation and warehousing.

8.    CWIT cannot ignore the intersectional, structural barriers rooted in racial and gender bias that Black and Latina women endure. CWIT's extensive programming (ranging from pre-apprenticeship training to mentoring cohorts across the country) is centered on equity—making the workplace meaningfully accessible and safer for women in the skilled trades.

9.    CWIT's mission also tackles occupational segregation in the skilled trades along racial and gender-based lines. In traditionally male-dominated skilled trades, occupational segregation is the phenomenon where certain demographic groups (most commonly women) are significantly underrepresented in traditionally male-dominated skilled trades leading to a disparity

in access to higher-paying jobs within these sectors. Rates of occupational segregation are highest for Black women—especially in Chicago, where Black women are under-represented in the construction trades and overrepresented among the ranks of the Chicago's poor. The poverty rate for Black women in Chicago is nearly three times that of white men.

10.     CWIT's programming also focuses on providing gender equity training for participants and stakeholders in the skilled trade industry. For participants, the trainings for participants help them prepare to navigate workplace harassment on the job site. For example, our gender equity training in construction focuses on implementing policies that define the range of work-site harassment, advising unions on proper protocols requiring anonymity in reporting discrimination, and helping participants understand and be able to navigate local and federal protections against workplace harassment. For stakeholders, these trainings identify and address combatting unconscious bias, systemic barriers, and discriminatory practices to create a more inclusive and fair work environment for women, and particularly Black and Latina women, in skilled trades.

11.     Demand for CWIT's gender equity training has increased substantially over the past four years because there is a reported shortage of 650,000 skilled tradespeople in the U.S. and companies are actively recruiting to fill these vacancies. CWIT's gender equity training ensures that employers and industry stakeholders can effectively recruit and retain women in the skilled trades to ensure a stronger economy for all Americans.

12.     CWIT's mission has proven to be successful. For example, CWIT's pre-apprenticeship training programs prepare individuals with the essential skills and knowledge to enter a registered apprenticeship of their choosing. The pre-apprenticeship training programs provide math and test preparation, workplace readiness, physical conditioning, basic construction skills, mentorship cohorts, and hands-on experience in a variety of trades to ensure that participants

can both pass an apprenticeship test and succeed on a job site. In addition, these pre-apprenticeship training programs address the racism and sexism Black and Latina women disproportionately experience in trying to break barriers to both enter and stay in the skilled trades. Addressing the racial and gender bias that Black and Latina women experience in the skilled trades industry is essential to the success of the pre-apprenticeship programs.

13. Before entering a CWIT program, the average monthly income of CWIT participants was $2,068. In addition, 32% of CWIT participants were unemployed prior to entering the program, Now, program graduates have been placed in a skilled trades job that starts with a minimum wage exceeding $22 an hour and offers full benefits and a pension plan. Within a few years of graduating from a CWIT program, participants can expect to earn at least $55 an hour.

14. Our technical assistance work centered on equity reaches stakeholders across the country. Employers in the skilled trade occupations want to improve workforce retention and recruit new people to fill a current shortage of skilled tradespeople. It is difficult for employers to do that, however, without understanding the barriers, obstacles, and discrimination that women experience in the industry. CWIT's customized diversity, equity and inclusion trainings for apprenticeship programs as well as public and private agencies provide the framework that employers need to achieve their goals.

15. While the majority of CWIT's work has historically been in Chicago for the past 40 years, CWIT's work also has a national reach. CWIT has provided technical assistance and gender equity training to industry stakeholders in all 50 states. CWIT has implemented mentorship programs for co-ed apprenticeship programs in Illinois and Michigan. CWIT has also worked with new and emerging tradeswomen organizations in Texas, Pennsylvania, and Ohio to start their women-focused pre-apprenticeship and apprenticeship training programs.

**Our Funding Structure**

16.     CWIT's 2024 annual budget was originally $5,221,151, of which $2,425,871 – or approximately 40 percent – was comprised of federal government funding. CWIT operates as a federal grantee, sub-grantee, and sub-contractor, and currently receives funding through seven federal grants and contract programs, described below.  Five of these grants are directly impacted by the Executive Orders.

17.     The remaining balance of CWIT's budget is provided by state and private funders. Among our non-federal funding, CWIT receives grants that include goals to support racial and gender-specific efforts.  For example, CWIT received non-federal grants to support: recruitment and retaining women of color in apprenticeship programs; encouraging low-income and women of color to enter the welding trade; building a gender- and racially diverse workforce; and understanding childcare needs for tradeswomen to improve job retention.

18.     Other non-federal grants support CWIT's training and apprenticeship programs, which are also supported by the federal grants described below.  Specifically, fourteen grants from sources other than the federal government support our work related to diversity, equity, inclusion, and accessibility.

**Federal Grants and Federal Contract Programs Implicated by the Executive Orders**

19.     CWIT currently receives federal funding under five federal programs: the Women in Apprenticeship and Nontraditional Occupations ("WANTO") grant program; the Apprenticeship Building America ("ABA") grant program; Jobs for the Future ("JFF") Improving Diversity and Equity in Apprenticeship for Manufacturing ("IDEA-M") contract (subcontract); the JFF HUB- Apprenticeship USA grant (subaward); and the Tradeswomen Building Infrastructure Initiative ("TBII") grant program (subaward through the Illinois Department of Labor ("IDOL")).

//

6

GA83

## I.      The WANTO Grant

20.      The WANTO grant is funded by the U.S. Department of Labor ("DOL"), Women's Bureau.  CWIT competed for WANTO funding and received a WANTO award in which CWIT sub-awards WANTO funding to much smaller, emerging tradeswomen organizations in three states outside of Illinois.

21.      CWIT received $716,701 to support its "Transforming the Workforce System to Ensure Gender Equity in Infrastructure" proposal, which provides services and sub-awards to tradeswomen groups in Pennsylvania, Texas, and Ohio.  The WANTO grant is funded from September 30, 2024, through September 30, 2026, meaning CWIT has approximately seventeen months of performance remaining.

22.      CWIT's WANTO grant project has 4 goals: (1) provide technical assistance to workforce development board staff to help more women enter the skilled trade and embed gender equity into their workforce system; (2) develop women-focused pre-apprenticeship programs; (3) develop workforce equity plans for infrastructure projects run by public agencies; and (4) create women-focused cohorts for coeducational pre-apprenticeship programs.

23.      The WANTO grant was funded with the goal of supporting gender equity training and technical assistance to workforce development staff; enrolling more women in co-ed pre-apprenticeship programs; facilitate the employment of more women in apprenticeship programs; and provide educational materials on women in skilled trade occupations to more than 1,000 women and young girls..

## II.     The ABA Grant

24.      Funded by DOL Employment and Training Administration ("ETA"), the ABA grant awarded CWIT $3,000,000 for the period from July 1, 2022, to June 30, 2026. The express

goal of the ABA grant was to expand and diversify the number of pre-apprenticeships programs, but also diversify industries for underrepresented populations and underserved communities.

26.    The ABA grant partially funds two pre-apprenticeship programs that provide math and test preparation, workplace readiness, physical conditioning, basic construction skills, and hands-on experience in partnership with apprenticeship programs. Graduates also earn nationally recognized credentials, such as OSHA 10 and First Aid/CPR.

26.    Additionally, the ABA grant is the sole funder of a CWIT's new trade-specific program, which is done in partnership with specific unions (i.e. carpenters, painters, millwrights, and ironworkers).

27.    The ABA grant also funds the development of a mentorship program through CWIT's National Center for Equity.

28.    As a result of the ABA grant, from approximately 2022 to 2024, CWIT has established partnerships with unions and apprenticeships; enrolled women into the training programs; placed women in new apprenticeships; and has already launched new mentorship pilots in Michigan and New York.

### III.    The JFF IDEA-M Contract

29.    CWIT is a subcontractor under JFF's IDEA-M contract, which is also funded by DOL ETA. JFF is one of the industry intermediaries for the manufacturing and agriculture sectors. Through the JFF IDEA-M subcontract, CWIT will receive $97,200.00 from the period of September 28, 2024 through September 27, 2025.  Under the JFF IDEA-M subcontract, CWIT provides project management, subject matter expertise, and technical assistance services designed to increase the number of women entering and retained in advanced manufacturing apprenticeship programs. Part of CWIT's subcontracted scope of work specifically focuses on providing online and in-person DEI training to sponsors of apprenticeship programs.

30. From 2023 to present, the JFF-IDEA-M subcontract required CWIT to provide technical assistance to manufacturing programs so that they can implement best practices to recruit and retain a dynamic talent pool. To date, that technical assistance has included CWIT's delivery of customized DEI trainings for apprenticeship program sponsors in the advanced manufacturing industry sector.

## IV. The JFF HUB-Apprenticeship USA Grant

31. This federal grant is again supported by DOL ETA. JFF received the Apprenticeship USA Grant and issued a subaward to CWIT for $1,000,000 for the period from September 24, 2021, through June 30, 2025.

32. CWIT's subaward primarily supports JFF's Registered Apprenticeship Technical Assistance Center of Excellence for Diversity and Inclusion, which in turn aims to expand the number of people from populations underrepresented in registered apprenticeship programs.

33. CWIT's subaward requires it to: (1) contribute to written resources and conduct virtual training to facilitate the inclusion of women in pre-apprenticeship and apprenticeship programs; (2) serve as subject matter experts in events; (3) research and document best practices for the recruitment, outreach, mentoring, and retention of women; and (4) lead efforts to improve and expand foundational skills training to include women in pre-apprenticeships.

34. Through this grant, CWIT has thus far engaged with industry stakeholders through one-on-one technical assistance, group technical assistance, webinars, and panels. CWIT has prepared one long-form briefing paper, "Here to Stay," which provides examples of best practices to support apprentices through family friendly policies, harassment prevention training, and other technical assistance training; prepared four documents for employers on proven strategies to increase numbers of women in pre-apprenticeships and apprenticeships – including one paper on the benefits of including women and people of color in apprenticeships from the perspective of

9

male allies; and has facilitated two webinars highlighting accessibility and gender equity and best practices for LGBTQIA+ inclusion in the skilled construction trade.

35.　　CWIT also provides one-on-one coaching and technical assistance to employers and stakeholders with an emphasis on providing supportive services to people underrepresented in registered apprenticeship programs, particularly women.

36.　　Through the subaward, CWIT is also in the process of securing commitments from businesses, unions, or associations to join partnerships to substantially increase employment and training opportunities for populations underrepresented in registered apprenticeship programs, including women.

## V.　　The Tradeswomen Building Infrastructure Initiative Grant

37.　　As a subrecipient to the IDOL, CWIT received the DOL Women's Bureau-funded TBII grant with a period of performance from July 1, 2023 to June 30, 2025.  IDOL received $2,100,000 in grant funds, of which IDOL subawarded $1,688,000 to CWIT.

38.　　CWIT's scope of work includes (i) intensive support for local community investments in four identified cities, including meetings with key policymakers and state agencies to identify resources, design state, municipal or project-wide campaigns to promote, create, and sustain inclusive and diverse infrastructure worksites; (ii) best practice training and convening to gain stakeholder acceptance for the Framework for Workforce Equity for Women and People of Color; (iii) promoting respectful and harassment-free workplaces; and (iv) state-level support and data evaluation, performed jointly with IDOL.

### Recent Communications Regarding Federal Grants

39.　　On January 22, 2025, CWIT received two emails from DOL, and one from IDOL.

40.　　The first email was sent by the Women's Bureau DOL, the grant administrator charged with dispersing the WANTO grant. The email stated, in part, that:

> [e]ffective immediately. . . . All recipients of federal financial assistance awards are
> directed to cease all activities related to "diversity, equity, and inclusion" (DEI) or
> "diversity, equity, inclusion, and accessibility" (DEIA) under their federal awards,
> consistent with the requirements of the EOs titled "Ending Radical and Wasteful
> Government DEI Programs and Preferencing," issued on January 20, 2025 and
> "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" issued on
> January 21, 2025. Any cost incurred on such activities after the issuance of this
> notice, will be not considered allowable and if incurred disallowed.

A true and correct copy of this email is attached as **Exhibit 1.** CWIT received an email from the

Women's Bureau on March 3, 2025, rescinding this communication. A true and correct copy of

the email is attached as **Exhibit 5**.

    41.    IDOL received an identical notice in regards to the TBII Grant, which it transmitted

to CWIT.

    42.    The second email from DOL was a Training and Employment Notice ("TEN No.

21-24") from the Acting Deputy Assistant Secretary of the DOL ETA, the office administering the

ABA grant.  A true and correct copy of this email is attached as **Exhibit 2**.

    43.    TEN No. 21-24 referenced the same "effective immediately" language noted above,

with an additional note that "all awardees must immediately cease all award activities related to

DEI or DEIA.  All other award activities should continue."

    44.    On January 23, 2025, CWIT received an email from JFF stating that any further

work on DEI or DEIA requirements must stop in light of the TEN No. 21-24.  A true and correct

copy of this email is attached as **Exhibit 3**.

    45.    On January 31, 2025, CWIT received an email from ETA DOL stating the "OMB's

memo has been rescinded. DOL grants can continue in accordance with TEN 21-24." However,

there was no further clarification on defining "equity."  A true and correct copy of this email is

attached as **Exhibit 4**.

    46.    On February 25, 2025, one of our contractors contacted CWIT regarding the

presentations. They wanted to know if we could do a presentation without saying or including

content regarding diversity, equity, and inclusion. The contractor suggested that it asked these questions because of the Executive Orders. If we said no, the contractor would require a presentation on a topic that did not involve diversity, equity, and inclusion.

### Impact of the Executive Orders

47.    As a result of the Executive Orders, and the subsequent communications from DOL and JFF, CWIT finds itself in an impossible situation that requires immediate clarification. We have no choice but to do our work in a climate of fear and uncertainty. Our day-to-day work, as required by the federal grants and subcontracts, is centered on creating more diversity, equity, and inclusion for women in the skilled trades. It remains unclear how we can continue our work if we do not know what activities qualify as "diversity", "equity", and "inclusion" under the EOs and are therefore prohibited by the government. CWIT remains in fear that we may not successfully process invoices or reimbursement requests as required by the federal grants and contract in question because the work is, by the nature of its grants, associated with equity. The EOs therefore appears to be at odds with CWIT's ability to satisfy its grant and subcontract deliverables.

48.    CWIT urgently needs clarity to undertake the federally funded work required of us without fear of triggering prohibited conduct under the Executive Orders. Currently, CWIT has no clear sense of what we can or cannot do to avoid triggering the Executive Orders, which can result in exposure to investigations, lawsuits, and criminal sanctions in addition to terminating the federal funding CWIT relies on

49.    We believe we could have been targeted because all five of CWIT's federal grants are explicitly associated with or require diversity, equity, inclusion, and accessibility. The titles of the grants, notices of funding opportunities, scope of proposed activities in the signed grant agreements, the required grant deliverables, and measurements of success in the quarterly grant reports have race and gender related goals.

50.     Additionally, the entire premise of CWIT's mission is to achieve gender equity in male-dominated industries.  Equity is the throughline across everything CWIT does.  Equity – in terminology and spirit – is included in CWIT's research publications, training curricula, reports on countering sexual harassment, information sessions to new pre-apprenticeship enrollees, and grant agreements we prepare. "Equity for all" is the first phrase a visitor sees on our website. As a result, CWIT remains in the untenable position of potentially triggering the termination of some or all its federal funding at any time and for any reason.

51.     The Executive Orders tell us to look at the sky and say it is green when it is not. They ask us to look at the communities we serve and pretend as if we cannot see the structural barriers, obstacles, and biases that low-income women and women of color endure.

52.     The Executive Orders have forced CWIT to choose between compliance with the orders or eliminating its essential work. Eliminating equity from the terminology, mission, and spirit of CWIT would reduce the program to a workforce development program that provides basic job readiness and job placement.

53.     Although we provide vital job training, ultimately, we cannot effectively prepare women to succeed in the skilled trades industry if we do not prepare them for the stark realities of the industry.

54.     In other words, we must talk about the realities of being a woman on a construction site so women can succeed in these high-wage careers.  Our success is premised on acknowledging and addressing the gender- and race-based structural barriers women, and particularly Black and Latina women, face in the skilled trades.

55.     This dilemma also extends to CWIT's mission to tackle occupational segregation. Our technical assistance work focuses on equity so that prospective employers can understand the race and gender related barriers, obstacles, and discrimination women experience in the industry.

13

56.     CWIT has already been negatively impacted by the Executive Orders. As part of the WANTO grant, CWIT was preparing to partner with and subaward part of the grant funding to an organization in the Southwest. CWIT's plan had been to provide technical assistance, create a women-focused cohort for pre-apprenticeship programs, and embed gender equity into that organization's workforce development board to ensure the recruitment and retainment of women. However, a few days after the release of the Executive Orders, that organization told CWIT that they wanted to end the partnership with CWIT for fear of triggering the Executive Order and losing federal funding. I am not identifying this group because of its fear of being included in the legal process, and any possible retribution.

57.     Furthermore, CWIT has spent over 100 hours overhauling its existing budget to devise an emergency budget in case we lose federal funding. We have repurposed our private funding and cut costs across all programs, including forgoing the purchase of expensive and much-needed equipment in the welding training program. We have asked our partners to provide trade-specific training for free while also seeking out additional sources of private funding.  We have also established a date where we would have to begin potential furloughs and layoffs in case we lose federal funding.

58.     If CWIT were to lose federal funds – even just one source of federal funds – it would have significant repercussions for CWIT, the communities we serve, and the skilled trades industry overall. Yet, if CWIT were to comply with the provision of the Executive Order that requires us to certify that we do not operate any programs that promote DEI, then we would be unable to use our non-federal funding allocated towards work related to diversity, equity, inclusion, and accessibility.

**Harm if WANTO Grant Funding is Lost**

14

59.     CWIT has approximately 17 months left on the WANTO grant. Losing WANTO means that critical programs and sub-awards of funding to other tradeswomen organizations would be cut. Without WANTO funding, the emerging and much smaller tradeswomen organizations would not receive funding that is critical to their development, allowing them to hire staff instead of relying on volunteer support, among other things.

60.     If CWIT were to lose its WANTO funding, CWIT would be unable to provide technical assistance to its subrecipients in in three states outside of Illinois.

61.     These stakeholders include workforce development boards, American Job Centers, and training providers that will use marketing material and outreach activities to expand the number of women informed about the skilled trades.

62.     Furthermore, without the WANTO funding, CWIT will not be able to deliver technical assistance to ensure that companies are not engaged in race and gender-based discrimination regarding recruiting, hiring, promotions, and on-site harassment. The goal of this technical assistance is to increase the hiring and retention of women in the skilled trades occupations to address the industry wide shortage across the country.

63.     CWIT will not be able to provide training and best-practice models to contractors, public agencies, apprenticeship programs, and unions enabling them to adopt gender-equity policies on safe and respectful worksites and trades pipeline training programs.

**Harm if ABA Grant Funding is Lost**

64.     CWIT has approximately sixteen months left on the ABA grant. Losing the ABA grant would mean losing instructors and CWIT staff that are essential to the successful placement of participants. ABA funding accounts for over a quarter of CWIT's budget and supports several direct-service staff who provide critical outreach, case management, job placement, and retention

15

monitoring services. The ABA grant also accounts for more than a quarter of CWIT's funding for contracted instructors, and for apprenticeship programs' training costs.

65.     The ABA grant in 2024 enabled CWIT hire additional instructors and staffing to train and place over 150 women in the skilled trades. The loss of this essential staff and the ability to partner with apprenticeship programs would impact CWIT's success rate because it would increase the instructor-to-participant ratio. Individualized attention is critical for pre-apprenticeship participants to successfully pass the multiple exams required to join a registered apprenticeship.

### Harm if JFF IDEA-M Funding is Lost

66.     CWIT has approximately seven months left on its IDEA-M subcontract agreement with JFF. Losing the contract equates to losing the ability to provide technical assistance to advanced manufacturing companies on best practices to recruit and retain women in their fields.

### Harm if JFF HUB Apprenticeship USA Funding is Lost

67.     CWIT has approximately four months left on the JFF HUB subaward agreement. Losing this grant equates to CWIT losing access to a national platform that connects the CWIT gender-equity mission to over two hundred new stakeholders. The subaward also enables CWIT to travel across the country to provide technical assistance on improving race and gender equity in the skilled trades, document best practices and policies for apprenticeship programs to recruit and retain women, and funding for CWIT-authored evidence-based research on dismantling structural barriers in the skilled trades.

68.     Without this funding, CWIT will not be able to provide industry stakeholders with one-on-one technical assistance, group technical assistance, webinars, and panels. It will no longer be able to share proven strategies to increase numbers of women in pre-apprenticeships and

apprenticeships or highlight accessibility and gender equity and best practices for LGBTQIA+ inclusion in the skilled trades.

**Harm if IDOL TBII Funding is Lost**

69.     CWIT is in the last days of the TBII funding, but CWIT has already received a no-cost extension, which permits CWIT to continue working on the grant program and continue drawing down on the funds obligated by DOL to that grant.

70.     If this funding were suspended, we would be unable to prepare women for critical infrastructure jobs, just as major federal infrastructure projects are underway. The construction and infrastructure industries are facing a severe workforce shortage, with thousands of positions going unfilled due to an aging workforce and increasing project demands. Investing in women as part of the labor force is not just an issue of diversity—it is an economic necessity.

71.     As industries evolve and workforce challenges grow, failing to fully utilize the available labor pool means missed opportunities, stalled projects, higher costs for projects that require skilled trades, and lost opportunity into a skilled, motivated workforce that has historically been underrepresented.

**Emergency Relief is Appropriate**

72.     CWIT requests emergency relief because the Executive Orders have forced us into an impossible situation with far-reaching consequences for the women and skilled trade stakeholders CWIT serves. CWIT will remain committed to making worksites safer for women, ensuring equitable workforce opportunities for women in male-dominated industries, and providing skilled trade stakeholders evidence-based resources for recruiting and retaining women in the workforce. However, our work would be seriously impeded if we abruptly lost 40% of our funding at any time simply because we were continuing the work we have undertaken for over

forty years. More importantly, low-income women and women of color would be denied the opportunity to work towards a more financially secure life.

73.    Women and tradeswomen-led organizations across the country turn to CWIT for assistance, guidance, and as a model of what is possible. The loss of an organization that serves as a pipeline for education, training, support, and guidance—building both personal and economic growth—would be immeasurable. The impact extends far beyond individuals, it shapes the construction industry, communities, and the future of the workforce. Ultimately, a loss is not just financial – it is a loss of opportunity, empowerment, and progress.

74.    CWIT is more than an organization. It is an institution of hope, embodying the vision of a world that is diverse, inclusive, equitable, and respectful. The Executive Orders frustrate our core mission to ensure that all Americans have the opportunity to earn a fair living, work in a safe environment, and pursue the American dream.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of March, 2025 at Chicago Illinois.

Jayne Vellinga

# Exhibit 1

**Jayne Vellinga**

WANTO

| From: | Delamater, Eleanor M - WB <Delamater.Eleanor.M@dol.gov> |
|-------|------------------------------------------------------------|
| Sent: | Wednesday, January 22, 2025 3:56 PM |
| To: | Lark Jackson; Jayne Vellinga |
| Cc: | Schulz, Katrin A - WB; Shaw, Elyse R - WB; King, Ashlyn E - WB |
| Subject: | Please Read: DOL Grant Updates |

All Federal Project Officers have been asked to share the following message to grantees:

OPEN/CLOSED FOAs

The U.S. Department of Labor is reviewing all Funding Opportunity Announcements for consistency with the Executive Orders titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025. The Department will take necessary action with the Funding Opportunity Announcement and issue additional guidance including adjusting the close date if appropriate.

ONGOING WORK

Effective immediately, all recipients of federal financial assistance are directed to cease all activities related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) under their federal awards, consistent with the requirements of the Executive Orders titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025. Any cost incurred on such activities, after the issuance of this notice, will not be considered allowable, and if incurred will be disallowed. Additional guidance will be provided.

TERMINATION

The U.S. Department of Labor is reviewing all active federal awards and will take appropriate action, including terminating the award, consistent with the requirements of the Executive Orders titled "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025.

This is the extent of information we have currently. Additional guidance is forthcoming.

1

# Exhibit 2

*Apprenticeship Building Ameri*

| **TRAINING AND EMPLOYMENT NOTICE** | **NO.** 21-24 |
|---|---|
| | **DATE** January 22, 2025 |

**TO:**   STATE WORKFORCE AGENCIES
STATE WORKFORCE LIAISONS
STATE WORKFORCE DEVELOPMENT BOARDS AND STAFF
LOCAL WORKFORCE DEVELOPMENT BOARDS AND STAFF
AMERICAN JOB CENTER DIRECTORS
ETA COMPETITIVE GRANTEES
COMMUNITY COLLEGES AND TRIBAL COLLEGES
STATE APPRENTICESHIP AGENCIES
JOB CORPS CENTER DIRECTORS

**FROM:**   MICHELLE PACZYNSKI /s/
Acting Deputy Assistant Secretary

**SUBJECT:**   Immediate Implementation of Executive Orders "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

1. **Purpose.** To notify all Employment and Training Administration (ETA) recipients about changes ETA is making to federal financial assistance awards to prohibit activities described in President Trump's Executive Orders (EOs) titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025.

2. **Action Requested.** Effective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) under their federal awards, consistent with the requirements of the EOs titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025. Additional guidance will be provided.

3. **Summary and Background.**

   a. Summary – This notice shares recent EO requirements to eliminate DEI activities that constitute illegal discrimination or preferences.

   b. Background – President Trump has issued several EOs, which are available at https://www.whitehouse.gov/presidential-actions/, including the EOs titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity,"

issued on January 21, 2025. All federal agencies are taking steps to implement these EOs, and promptly notifying all federal awardees. ETA, like all federal agencies, will provide further guidance on specific programs and activities within those programs.

4. **Ceasing DEIA activities.** All awardees must immediately cease all award activities related to DEI or DEIA. All other award activities should continue.

ETA will issue further guidance on specific activities that are allowable and unallowable.

5. **Inquiries.** Please direct inquiries to the appropriate Regional Office.

6. **References.**
   - Executive Order, "Ending Radical and Wasteful Government DEI Programs and Preferencing," January 20, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.
   - Executive Order, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," January 21, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/.

7. **Attachments.** N/A

# Exhibit 3

Pages: 202

Filed: 08/18/2025

Document: 14

Case: 25-2144

**From:** Vinz Koller <vkoller@jff.org>
**Sent:** Thursday, January 23, 2025 2:35 AM
**To:** Gary Courtney <gcourtney@jff.org>; Myriam Sullivan <msullivan@jff.org>; Vinz Koller <vinz_koller@spra.com>
**Subject:** Important Update Regarding DEIA Hub Project Work Due to Recent Federal Training and Employment Notice (TEN)

You don't often get email from vkoller@jff.org. Learn why this is important

Dear Hub Partner,

The U.S. Department of Labor has issued a Training and Employment Notice (TEN) that requires JFF to pause immediately all activities directly tied to our federally funded work related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA), consistent with the requirements of the Executive Orders referenced in the TEN. Most immediately, this includes our Apprenticeship DEIA Hub work.

Therefore, we ask you to stop any further work on the Hub at this time. Please avoid incurring any additional staff time or expenses. If you are already on travel for an event, we ask that you return to your home base and that you discontinue current and cancel future events.

Please submit invoices for work conducted up to Jan 22nd to JFF's business unit as soon as possible.

JFF has successfully navigated changes in Administrations many times over the years. However, that doesn't make moments like these any easier, especially when work that is central to our mission is impacted. As always, we are committed to proactively navigating today's situation on behalf of our mission, our North Star, and our partners across the country. And, of course, we will communicate transparently with you every step of the way.

In the meantime, please feel free to contact Gary Courtney, Myriam Sullivan, or me if you have questions.

Our team so appreciates the contribution that you have made to the success of the Hub.

In partnership,

Vinz

**Vinz Koller**
Vice President, Center for Apprenticeship and Work-Based Learning
*Pronouns: he/him/his*
831-277-4726 | LinkedIn
Connect with the Center for Apprenticeship and Work-Based Learning



# Exhibit 4

**From:** ABA Grant <ABA.Grant@dol.gov>
**Sent:** Friday, January 31, 2025 3:19 PM
**To:** ABA Grant <ABA.Grant@dol.gov>
**Subject:** Follow-up re: E.O.'s and Office of Management and Budget directive M-25-13

Dear ABA1 Grantees,

Many States, Tribes, and grantees have asked staff at the USDOL Employment and Training Administration (ETA) if we have additional information on the Executive Orders and recent Office of Management and Budget (OMB) directive M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*.

OMB's memo has been rescinded.  DOL grants can continue in accordance with TEN No. 21-24.

We are also aware that the Payment Management System (PMS) used to disburse funds was unavailable to many users on January 28, including those trying to draw down funds. PMS has changed its operating hours to 5:00 AM to 4:00 PM EST Monday through Friday and may experience periodic interruptions. PMS should be available and grantees should be able to draw down funds.

We understand grantees may continue to have questions. Please continue sending us your questions to regional offices. We are reviewing them and using them to develop further guidance.

-The OA grants team

# Exhibit 5

**From:** King, Ashlyn E - WB <King.Ashlyn.E@dol.gov>
**Sent:** Monday, March 3, 2025 2:44 PM
**Cc:** Women's Bureau Grants <WBgrants@dol.gov>
**Subject:** Please check your messages from Grant Solutions for a message from our Office of Grants Management

Good afternoon,

You all received a message sent via Grant Solutions on Friday. For those that could not view the message, this is what it said:

Please be advised: In compliance with the Preliminary Injunction issued on February 21, 2025, in the United District Court for the District of Maryland, National Association of Diversity Officers in Higher Education v. Trump, 25-cv-333, effective immediately the Employment and Training Administration has rescinded the following communication Immediate Implementation of Executive Orders Ending Radical and Wasteful Government DEI Programs and Preferencing and Ending Illegal Discrimination and Restoring Merit-Based Opportunity which was issued on January 22, 2025.If you have questions regarding this rescission, please contact WBgrants@dol.gov

We will continue to send further guidance and updates as we receive them.

Very Respectfully,

Ashlyn E. King
Policy Analyst
Women's Bureau | Department of Labor
king.ashlyn.e@dol.gov
**(202) 693-6745**
http://www.dol.gov/wb/



**UNITED STATES DISTRICT COURT OF THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO WOMEN IN TRADES, | |
| Plaintiff, | Case No. 1:25-cv-02005 |
| v. | Judge: Hon. Matthew F. Kennelly |
| PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI, | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>SUPPLEMENTAL DECLARATION OF JAYNE VELLINGA</u>

I, Jayne Vellinga, hereby declare upon penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

1.      I am the Executive Director of Chicago Women in Trades ("CWIT"), a not-for-profit 501(c)(3) based in Chicago, Illinois. I have served in this capacity since 2010.

2.      This declaration supplements the March 5, 2025 declaration I previously submitted in support of Plaintiff's Motion for Preliminary Injunction. Both this and my March 5, 2025 declaration support Plaintiff's Motion for Temporary Restraining Order to prevent Defendants from enforcing certain provisions of Executive Order No. 14151 titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" and Executive Order No.

14173 titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

(collectively, the "Executive Orders").

**Status of and Funding for CWIT's Current Federally Supported Programs**

3.      As described in my March 5, 2025 declaration, five of the programs under which

CWIT receives federal funding are impacted by the Executive Orders.

4.      The four grant programs (the Women in Apprenticeship and Nontraditional

Occupations ("WANTO") grant program; the Apprenticeship Building America ("ABA") grant

program; Jobs for the Future ("JFF") HUB- Apprenticeship USA grant (subaward), and the

Illinois Department of Labor ("IDOL") Tradeswomen Building Infrastructure Initiative ("TBII")

grant program (subaward)) are operated on a cost reimbursement structure, where the federal

agency or contractor will reimburse CWIT for the costs *after* CWIT has incurred the costs for

performing work under the grant.

5.      Under CWIT's subcontract through JFF Improving Diversity and Equity in

Apprenticeship for Manufacturing ("IDEA-M") contract (subcontract), CWIT receives payment

on a fixed-fee basis, according to a budget.

6.      When my March 5, 2025 declaration was prepared, it was my understanding that

relevant provisions of the Executive Orders were not enforceable because a federal court in

Maryland had issued a nationwide injunction which effectively stayed the Executive Orders.  As

a result, CWIT believed that the five grants and contracts under which CWIT receives federal

funds could not be terminated while the injunction remained in place.

7.      But I learned that on March 14, 2025, a federal appeals court overturned that

preliminary injunction which means that the Department of Labor ("DOL") and other agencies

can now enforce the terms of the Executive Orders.

8.      CWIT, therefore, expects its grants, subgrants, and subcontract to be terminated at any moment.

9.      If that happens, CWIT further expects that DOL would not reimburse CWIT, IDOL, or JFF for the work already performed in meeting the required grant deliverables.  If IDOL or JFF's grants or contracts are not reimbursed, then CWIT's subawards or subcontract work will also not be reimbursed.

10.     CWIT is also concerned that even if its grants, subgrants, and subcontract are not terminated, CWIT will not be reimbursed for any work that DOL decides is within the scope of the Executive Orders.

11.     As discussed in my March 5, 2025 declaration, DOL informed both CWIT and CWIT's pass-through entities that all "DEI"[1] related costs in the performance of the grants were no longer allowable after January 22, 2025 under the Executive Orders.[2]  However, DOL did not provide any additional details about what grant-related work or incurred costs qualified as "DEI" that would therein fall within the scope of the Executive Orders.

**Recent Threats to Punish and Suppress CWIT's Speech Regarding "DEI" and "DEIA"**

12.     CWIT's core mission is to dismantle racial- and gender-based barriers to recruiting and retaining women in the skilled trades. The Executive Orders convey a threat of harm and retaliation by the government if we use terms like "DEI" and "DEIA"[3] to describe our work. CWIT has already been told that under the Executive Orders we cannot describe ourselves as an organization involved in advancing our core principles of "Diversity and Equity." As a result, we are being required to self-censor our program descriptions or lose our grant funding.

---

[1] "DEI" commonly refers to diversity, equity, and inclusion.
[2] *See* March 5, 2025 Declaration of Jayne Vellinga ("March 5, 2025 Vellinga Decl.") ¶¶ 39-44.
[3] "DEIA" commonly refers to "diversity," "equity," "inclusion," and "accessibility."

Given our core mission, it is hard to imagine how we can describe our mission, promote our mission, or carry out our mission and comply with the Executive Orders.

13.     In the last week, even before the preliminary injunction was lifted, CWIT's federal funding was in jeopardy due to the way CWIT described its programs and effectuated its equity-related work. There is a risk that CWIT will not be reimbursed for grant-related work that CWIT undertakes to meet grant deliverables.

14.     Specifically, one of the pass-through entities with which CWIT works informed CWIT that subsequent to the Executive Orders, its contract with DOL had been unilaterally modified to remove all references to "DEI" and "DEIA."

15.     Under the guise of that amendment, the pass-through entity threatened to terminate CWIT's subgrant unless it self-censored and amended the content, title, and audience questions to eliminate any references to "DEI" and "DEIA" for an upcoming technical assistance program done through CWIT's Equity Resource Center.  However, CWIT's training materials center on the need to recruit and retain women in the male-dominated skilled trades, which inherently promotes diversity, equity, inclusion, and accessibility.  To date, our pass-through entity has rejected CWIT's proposed training materials that retained the words "Diversity and Equity" in the title, though the materials did not otherwise mention diversity, equity, or inclusion.

16.     Despite several attempts, CWIT has not been able to get clarity from the pass-through entity about how to change its training to comply with the amended contract requirement.

17.     Given that the preliminary injunction is no longer in place, CWIT expects its grants and contracts to be terminated or, at best, to receive no further information about how to self-censor its speech to comply with the Executive Orders.

**Impact to CWIT if Executive Orders are not Enjoined**

18. Cumulatively, and as described in further detail below, CWIT is planning to seek reimbursement for approximately $460,000 in costs incurred in the performance of the five grants and contracts through which CWIT receives federal funding.

*The WANTO Grant*

19. CWIT is planning on submitting a reimbursement request in April 2025 for costs already and to-be-incurred in March 2025 under the WANTO program which is funded by DOL.

20. In light of the decision overturning the preliminary injunction related to the Executive Orders, CWIT expects this WANTO grant to be terminated at any moment. Even if it is not outright terminated, if DOL enforces the Executive Orders as expected, CWIT is concerned that DOL will not reimburse CWIT for work already performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these costs will not be paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The ABA Grant*

21. The ABA Grant, which is supported by DOL Employment and Training Administration ("ETA"), allows grantees, including CWIT, to request reimbursement for incurred grant-related costs at any time. CWIT is planning to submit a reimbursement request in April 2025 for costs incurred in March 2025.

22. CWIT now fears that the ABA grant will be terminated as well. Even if it is not outright terminated, if DOL enforces the Executive Orders as expected, CWIT is concerned that DOL will not reimburse CWIT for work already performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these costs will not be

paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The JFF IDEA-M Contract*

23.    CWIT submits reimbursement requests on a monthly basis under the JFF-IDEA-M subaward contract, which is also funded by DOL ETA.  CWIT is planning on submitting a reimbursement request in April 2025 for work undertaken in March 2025.

24.    CWIT again expects the IDEA-M Contract to be terminated due to the lifting of the preliminary injunction, and as a consequence, CWIT's subcontract would be terminated as well.  Even if it is not outright terminated, CWIT expects DOL not to reimburse JFF for work that CWIT has already performed, and that JFF will not be able to pay CWIT for work it has performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these costs will not be paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The JFF HUB-Apprenticeship USA Grant*

25.    CWIT submits quarterly reimbursements requests for costs incurred in the performance of the JFF HUB- Apprenticeship USA subaward, also supported by DOL ETA. CWIT is planning on submitting a reimbursement request in April 2025 for costs incurred from January through March 2025.

26.    However, CWIT again expects that the JFF HUB- Apprenticeship USA subaward will be terminated due to the lifting of the preliminary injunction.  Whether or not this grant is outright terminated, CWIT further expects DOL not to reimburse JFF for work already performed, and that JFF will not be able to pay CWIT for work it has performed that the DOL views to be in furtherance of diversity, equity, and inclusion. Thus, CWIT is concerned these

costs will not be paid if the grant is terminated or if CWIT's work is deemed "unallowable" because the work relates to diversity, equity, and inclusion.

*The Tradeswomen Building Infrastructure Initiative Grant*

27.    CWIT receives quarterly reimbursements for costs incurred in the performance of the TBII sub-grant, per the terms of CWIT's subrecipient agreement with IDOL.

28.    CWIT expects that the TBII sub-grant will be terminated due to the lifting of the preliminary injunction.  Whether or not this subaward is terminated, CWIT further expects DOL not to reimburse IDOL for work CWIT already performed, and that IDOL will not be able to pay CWIT for work it has performed.

29.    CWIT is planning on submitting a reimbursement request in April 2025 for costs incurred from January through March 2025, which it is concerned would not be paid if the grant were terminated or if CWIT's work is deemed "unallowable" because it promotes diversity, equity, and conclusion.

### CWIT Will Suffer Immediate and Profound Harm if Its Grants or Subcontract are Terminated Pursuant to the Mandates of the Executive Orders.

30.    CWIT will suffer additional immediate and profound harm if its federal grants or the subawards it holds under federal grants, or the subcontract it holds under a federal contract are terminated.

31.    Although CWIT will attempt to implement an emergency budget that reduces its total budget by approximately $1,000,000, CWIT will still have to take immediate action to simply keep its doors open, including laying off employees, terminating its trade specific apprenticeship programs, and reducing its support services fund.

32.     These drastic actions are harmful to CWIT's core mission to place women, including women of color, in the traditionally male-dominated skilled trades by addressing race and gender-based barriers.

*CWIT would lose crucial full-time staff members that drive CWIT's national reach*

33.     CWIT would be forced to immediately begin the process of terminating three full-time staff members that work exclusively on the Training and Technical Assistance Program ("TTA") across the country.  This work is funded by the five federal grants and contracts.  CWIT would be unable to keep the work portfolios of the three full-time staff members.  CWIT's TTA workforce would be reduced from five to two full time staff members.  We will have no choice but to tap into our emergency reserves in order to retain these two full time staff members.

34.     The TTA work includes the implementation of mentorship cohorts for women in male-dominated skilled trade occupations, developing new women-focused pre-apprenticeship programs, individual technical assistance for industry stakeholders in the skilled trades, mentoring of emerging tradeswomen organizations, and more.

35.     A significant portion of the training and technical assistance work occurs outside of Illinois.  The work of the three dedicated TTA staff members reaches all 50 states.  Losing the federal grants and subcontract would effectively eliminate CWIT's national presence.

36.     The remaining two staff members could no longer sustain the TTA program as it is currently structured. The federal funding dedicated to TTA enables CWIT to provide these much-needed services for free.  To continue the program, CWIT would have to swiftly develop a new "service for fee" model where industry stakeholders would have to pay for CWIT's services.

37.     The immediate loss of staff members and national reach of the TTA program will have ripple effects across the country.  CWIT has a rich 44-year history of successfully

developing and implementing innovative approaches to dismantle race- and gender-based barriers in the skilled trades. CWIT has spent years developing relationships with a range of stakeholders, from public agencies to national construction companies, to support them in their capacity to recruit and retain tradeswomen.

38.     Without our federal funding, we will no longer be able to provide trainings which remain essential to successfully addressing the national worker shortage of 650,000 in the skilled trades.

*The trade-specific apprenticeship program would immediately be terminated*

39.     If the ABA grant were terminated, CWIT would have no choice but to immediately stop the new trade-specific apprenticeship program because it is solely funded by the ABA grant. CWIT's emergency budget cannot cover any of the expenses associated with the trade-specific apprenticeship program.

40.     The trade-specific apprenticeship program is done in partnership with union apprenticeship programs like ironworkers, painters, or carpenters. These skill-specific union apprenticeships are highly competitive to get in to. There are few skill-specific apprenticeships that exist with even fewer job openings available. CWIT facilitates and matches the interests of the program participant with the mentorship and specialized training of the union apprenticeship program.

41.     In 2024, almost all participants in the trade-specific apprenticeship program obtained employment in union apprenticeship programs in the skilled trades. These were high-wage unionized jobs with full benefits and pensions.

42.     Losing the trade-specific apprenticeship program directly equates to fewer women getting high quality jobs in the skilled trades that historically have been shut off to women.

*The Support Service Fund would be dramatically reduced*

43.    CWIT's emergency budget would not be able to fully maintain CWIT's Support

Service Fund, which supports CWIT participants in overcoming the steep financial barriers to

successful job placement in the skilled trades.

44.    The Support Service Fund helps program graduates with expensive fees that arise

after someone is placed into a skilled trades position. For example, the skilled trade with one of

the steepest financial barriers is the electrician trade. New electricians are required to pay a $500

union initiation fee and a $750 new tool fee on top of completing a full-time 11-week

apprenticeship program without pay.  The Support Service Fund is used to cover these additional

fees.

45.    CWIT participants also rely on the Support Service Fund as a stipend to cover

costs associated with attending the programs, like paying for transportation or childcare, which is

sometimes a non-negotiable for women to even consider participating in any apprenticeship

program.

46.    Losing any of the Support Service Funds would be harmful to CWIT participants,

who are generally low-income.  Almost one-third of all new CWIT participants are unemployed

and the average monthly income of a new CWIT participant is approximately $2,000.  Fewer

women will be able to move forward in a skilled trades position that they worked hard to qualify

for without the Support Service Fund.

*A significant share of assistant instructors would be immediately laid off*

47.    Assistant instructors in CWIT's pre-apprenticeship programs are funded largely

through the ABA grants.  Assistant instructors are essential to the successful training and

placement of women in the skilled trades.

48.    CWIT has a high placement rate for our program graduates because they receive individualized attention from assistant instructors during their pre-apprenticeship training. This individualized instruction is critical for participants to pass the multiple exams required to join a registered apprenticeship.

49.    The loss of this essential staff and the ability to partner with apprenticeship programs would negatively impact CWIT's success rate because it would increase the instructor-to-participant ratio.

## CONCLUSION

50.    The government's message is that any programs advancing diversity, equity, and inclusion are "dangerous, demeaning, and immoral," and the mere use of terms like "diversity, equity, and inclusion" will be punished.  We are under constant fear that we must censor the descriptions of our programs or suffer the loss of federal funding.

51.    CWIT is requesting emergency relief because this chilling effect currently inhibiting our free speech and each loss resulting from the potential termination of federal grants and contracts will each have long-term detrimental impacts for CWIT and the women we strive to serve.  Cumulatively, these losses will weaken our ability to discuss and promote, much less carry out our core mission to dismantle gender- and race-based structural barriers to recruiting women in the skilled trades.

52.    Our beloved staff, the women we serve, and the industry stakeholders we work alongside to improve the skilled trades simply deserve better.

Executed this 18th day of March 2025 at Chicago, Illinois.

Jayne Vellinga

# EXHIBIT A



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

**TO:**    Heads and Acting Heads of Departments and Agencies

**FROM:**    Charles Ezell, Acting Director, U.S. Office of Personnel Management

**DATE**:    February 5, 2025

**RE**:    Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives

Pursuant to its authority under 5 U.S.C. § 1103(a)(1) and (a)(5), the U.S. Office of Personnel Management ("**OPM**") is providing additional guidance regarding the President's executive orders, including those titled, "*Ending Radical and Wasteful Government DEI Programs and Preferencing,*" "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity,*" and "*Initial Rescissions of Harmful Executive Orders and Actions.*"

**Equal Employment Opportunity Offices:**

To promote a federal workplace committed to equal dignity and respect, and to avoid expending precious taxpayer resources on wasteful and discriminatory programs, agencies should terminate all illegal DEIA initiatives. Agencies should therefore eliminate DEIA offices, policies, programs, and practices (including policies, programs, and practices outside of any DEIA offices) that unlawfully discriminate in any employment action or other term, condition, or privilege of employment, including but not limited to recruiting, interviewing, hiring, training or other professional development, internships, fellowships, promotion, retention, discipline, and separation, based on protected characteristics like race, color, religion, sex, national origin, age, disability, genetic information, or pregnancy, childbirth or related medical condition ("protected characteristics").[1]

Unlawful discrimination related to DEI includes taking action motivated, in whole or in part, by protected characteristics. To be unlawful, a protected characteristic does not need to be the sole or exclusive reason for an agency's action.  Among other practices, this includes ending unlawful diversity requirements for the composition of hiring panels, as well as for the composition of candidate pools (also referred to as "diverse slate" policies).

This does not apply to, and agencies should retain, personnel, offices and procedures required by statute or regulation to counsel employees allegedly subjected to discrimination, receive discrimination complaints, collect demographic data, and process accommodation

---

[1] *See* 42 U.S.C. § 2000e-16; 29 C.F.R. § 1614.101.

requests.[2] Such functions can and should be transferred among personnel and offices at the agency if those functions were previously handled by a DEIA office that is subject to a reduction-in-force action. In doing so, agencies should take care that the functions of any such office are strictly limited to the duties within its statutory authority and that staffing levels are consistent with those responsibilities.

**Accessibility and Reasonable Accommodation:**

The Biden-Harris Administration conflated longstanding, legally-required obligations related to disability accessibility and accommodation with DEI initiatives. President Trump's executive orders require the elimination of discriminatory practices. Agencies should thus rescind policies and practices that are contrary to the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. But agencies should not terminate or prohibit accessibility or disability-related accommodations, assistance, or other programs that are required by those or related laws.[3] In executing reduction-in-force actions regarding employees in DEIA offices, agencies should therefore retain the minimum number of employees necessary to ensure agency compliance with applicable disability and accessibility laws, including those requiring the collection, maintenance, and reporting of disability information.[4]

**Employee Resource Groups:**

The revocation of Executive Orders 13583 and 14035 removed two of the primary legal authorities for Employee Resource Groups ("ERGs"). Consistent with the President's orders, agencies should prohibit all discriminatory programs. They should thus prohibit ERGs that promote unlawful DEIA initiatives or advance recruitment, hiring, preferential benefits (including but not limited to training or other career development opportunities), or employee retention agendas based on protected characteristics.[5]

Nevertheless, agency heads retain the discretion to allow employees to host affinity group lunches, engage in mentorship programs, and otherwise gather for social and cultural events. When exercising this discretion, agency heads should consider whether activities under consideration are consistent with the "*Ending Radical and Wasteful Government DEI Programs and Preferencing*" and "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*" executive orders, and the broader goal of creating a federal workplace focused on individual merit.

For any such activities which are retained, agencies must ensure that attendance at such events is not restricted (explicitly or functionally) by any protected characteristics, and that attendees are not segregated by any protected characteristics during the events. For example, it

---

[2] *See* 29 C.F.R. § 1614 et seq.

[3] *See, e.g.*, 29 U.S.C. §§ 729, 791; 29 C.F.R. § 1614 et seq.; 42 U.S.C. § 2000e et seq.

[4] *See, e.g.*, 29 C.F.R. § 1614.601.

[5] 5 C.F.R. § 251.202 (allowing agencies to provide support and agency resources to ERGs only where doing so would "benefit the agency.") Different considerations may apply where employees form workplace groups on the basis of similar interests or experiences, and not protected characteristics.

Case: 1:25-cv-02005 Document #: 44-1 Filed: 03/24/25 Page 4 of 4 PageID #:451
Case: 25-2144    Document: 14    Filed: 08/18/2025    Pages: 202

Page 3

would be unlawful discrimination for an agency to limit attendance at an ethnic affinity group lunch to only members of the ethnic group, or to permit employees to discourage attendance by employees outside of the ethnic group.  It would be similarly unlawful to host social or cultural event or other "inclusion"-related event or training while segregating participating employees into separate groups of "White" and "People of Color" (or other compositions based upon protected characteristics). Finally, to the extent that an agency exercises its discretion to permit ERGs, affinity group events, or other similar events, the agency may not draw distinctions based on any protected characteristic in granting permission to groups and events. For example, an agency cannot permit the formation of ERGs only for certain racial groups but not others, or only for one sex, or only certain religions but not others.

### Special Emphasis Programs:

Agencies should promptly end illegal preferences and discrimination and restore merit-based equal employment opportunity. Agencies should accordingly reorganize and, to the extent necessary, eliminate Special Emphasis Programs that promote DEIA based on protected characteristics in any employment action or other term, condition, or privilege of employment, including but not limited to recruiting, interviewing, hiring, training or other professional development, internships, fellowships, promotion, retention, discipline, and separation. Consistent with the President's directives and civil rights law, including Executive Order 11478 and 29 C.F.R. § 1614.101 *et seq.*, agencies should focus personnel efforts on rewarding individual excellence.

### Other Authorities:

The Constitution vests the executive power in the President.[6] The President accordingly sets Executive Branch policy. It is the President's policy to eliminate all unlawful discrimination in the federal workforce. Agencies should therefore adhere to the President's orders rather than non-binding opinions and guidance promoting DEIA through ERGs, Special Emphasis Programs, or otherwise.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

---

[6] *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).

# EXHIBIT B



**PRESS RELEASE**

# EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination

Wednesday, March 19, 2025

**For Immediate Release**

Office of Public Affairs

## Employers' DEI Policies, Programs, and Practices Can Violate Title VII of the Civil Rights Act of 1964

WASHINGTON — Today, the U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Justice (DOJ) released two technical assistance documents focused on educating the public about unlawful discrimination related to "diversity, equity, and inclusion" (DEI) in the workplace.

DEI is a broad term that is not defined in Title VII of the Civil Rights Act of 1964. Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated — in whole or in part — by an employee's or applicant's race, sex, or another protected characteristic.

In the past five years, DEI policies, programs, and practices have become increasingly prevalent in many of our nation's largest and most prominent businesses, universities, and cultural institutions. The widespread adoption of DEI, however, does not change longstanding legal prohibitions against the use of race, sex, and other protected characteristics in employment.

GA124

To help educate the public about how well-established civil rights rules apply to employment policies, programs, and practices — including those labeled or framed as "DEI" — the EEOC and the DOJ today released a joint one-page technical assistance document, "What To Do If You Experience Discrimination Related to DEI at Work." The EEOC also released a longer question-and-answer technical assistance document, "What You Should Know About DEI-Related Discrimination at Work." Both documents are based on Title VII, existing EEOC policy guidance and technical assistance documents and Supreme Court precedent.

"Far too many employers defend certain types of race or sex preferences as good, provided they are motivated by business interests in 'diversity, equity, or inclusion.' But no matter an employer's motive, there is no 'good,' or even acceptable, race or sex discrimination," said EEOC Acting Chair Andrea Lucas. "In the words of Justice Clarence Thomas in his concurrence in *Students for Fair Admissions*, 'two discriminatory wrongs cannot make a right.'"

Lucas emphasized, "While the public may be confused about what rules apply to DEI, the law itself is clear. And there are some serious implications for some very popular types of DEI programs. These technical assistance documents will help employees know their rights and help employers take action to avoid unlawful DEI-related discrimination."

"The Department of Justice is committed to ending illegal DEI initiatives, policies, and programs," said Deputy Attorney General Todd Blanche. "The technical assistance document provides clear information for employees on how to act should they experience unlawful discrimination based on DEI practices."

*Updated March 20, 2025*

## Topic

**CIVIL RIGHTS**

## Component

Office of the Attorney General

Press Release Number: 25-277

GA125

3/24/25, 12:20 PM Office of Public Affairs | EEOC and Justice Department Warn Against Unlawful DEI-Related Discrimination | United States Depart…

Case: 25-2144    Document: 14    Filed: 08/18/2025    Pages: 202

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

# Exhibit A

# Redacted – Privileged Attorney-Client Communication

**From:** Gibson, Barbara J - ETA <Gibson.Barbara.J@dol.gov>
**Sent:** Thursday, March 20, 2025 1:44 PM
**To:** Catrina Gray <catrinagray@cccneb.edu>; CRussell <crussell1@southeast.edu>; Dominick Chase <dchase@ivytech.edu>; Erin Riffle <ERiffle@greatercle.com>; Haley Sides <haley.sides@springfieldmo.gov>; Jayne Vellinga <JVellinga@CWIT2.ORG>; Jessica Rohan <jessicarohan@cccneb.edu>; Kara Carter <kcarter@greatercle.com>; Kevin Julesgard <kevinjulesgard@cccneb.edu>; Matthew Gotschall <MGOTSCHALL@CCCNEB.EDU>; Michele Ureste <michele.ureste@winintelligence.org>; Rebecca R. Ryan <rrryan@madisoncountyil.gov>; Robin Douthitt <rdouthitt@ivytech.edu>; Sally Payne (SPAYNE@SPRINGFIELDMO.GOV) <SPAYNE@SPRINGFIELDMO.GOV>; sulbrena Day <s.day@midwestcareersource.com>; Anna Loftus <anna.loftus@i-car.com>; Becky Kickkert <bkikkert@wdbscw.org>; Catherine Main <cmain@uic.edu>; Chance Shannan <cshannan@aspyrworkforce.org>; Donna Brake <Donna.Brake@dhewd.mo.gov>; Emily Goad <egoad@wdbscw.org>; Jennifer Deamud <deamudj@kinexsus.org>; Jennifer Roy <jroy@aspyrworkforce.org>; Jessica Weithman <jweithman@aspyrworkforce.org>; Josephine Kershaw <jkershaw@jeffco.edu>; Kelly Wallace <kwallace@aspyrworkforce.org>; Kenneth Wilson <kwilso20@jeffco.edu>; Lamecce Tyne <ltyne@wdbscw.org>; Paul Kirk <kirkp@miworks.org>; Rebecca Fletcher <Rebecca.Fletcher@dhewd.mo.gov>; Samantha Roberson <srobers1@jeffco.edu>; Seth Lentz <slentz@wdbscw.org>; Todd Gustafson <tgustafson@kinexsus.org>; Katy Robertson <katy@rungforwomen.org>; Lisa Humphrey <lhumphrey@bbbsflint.org>; Manny Rodriguez <mrodriguez@revolutionworkshop.org>; Michele Smith <michele.smith4@aah.org>; Paja Xiong <pajax@thesannehfoundation.org>; Reginald Best <arbest1@hfcc.edu>; Robert Palmer <rpalmer1@wcccd.org>; Robin Christine Kildall <rkildall@employmindy.org>; Stacy Ignoffo <stacy.ignoffo@sinai.org>; Wytedgurie Winston <blackfirebrigade@gmail.com>; Abigail Nichols <adrennan@harpercollege.edu>; Ken Kompelien <kendall.kompelien@minnesota.edu>; Lisa Arendt <larendt1@cvtc.edu>; 'mkaravit@harpercollege.edu' <mkaravit@harpercollege.edu>; Shana Schmidt <sschmidt42@cvtc.edu>; Susanne Brock <sbrock@harpercollege.edu>; Andrea Price <APrice@STARKSTATE.EDU>; Brenda Rubey <brubey@scciowa.edu>; Grant Schubert <g.schubert@rockvalleycollege.edu>; Heather Snider <h.snider@rockvalleycollege.edu>; Liz Wallace <WallaceE@westerntc.edu>; Nancy McDonald <n.mcdonald@rockvalleycollege.edu>; Nicole Sawyer <SawyerN@westerntc.edu>; Sam Renfroe <Srenfroe@starkstate.edu>; Tammy Kaylor <TKaylor@STARKSTATE.EDU>
**Subject:** ETA TEN published 1/22/25

You don't often get email from gibson.barbara.j@dol.gov. Learn why this is important

Good day, Grantees.

Please review and retain the attached Training and Employment Notice published January 22, 2025. This notice provides important updates and information relevant to your grant agreement with the Department of Labor, Employment and Training Administration.

Thank you! ~BG



**Barbara Gibson**
Workforce Development Specialist
Employment and Training Administration
Region 5 (Chicago)
U.S. Department of Labor
(312) 353-2373

 Book time to meet with Barbara Gibson

| | NO. |
|---|---|
| **TRAINING AND EMPLOYMENT NOTICE** | |
| | **DATE** |

**TO:**     STATE WORKFORCE AGENCIES
STATE WORKFORCE LIAISONS
STATE WORKFORCE DEVELOPMENT BOARDS AND STAFF
LOCAL WORKFORCE DEVELOPMENT BOARDS AND STAFF
AMERICAN JOB CENTER DIRECTORS
ETA COMPETITIVE GRANTEES
COMMUNITY COLLEGES AND TRIBAL COLLEGES
STATE APPRENTICESHIP AGENCIES
JOB CORPS CENTER DII

**FROM:**   MICHELLE PACZYNSKI
Acting Deputy Assistant Secretary

**SUBJECT:**   Immediate Implementation of Executive Orders "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

1. **Purpose.** To notify all Employment and Training Administration (ETA) recipients about changes ETA is making to federal financial assistance awards to prohibit activities described in President Trump's Executive Orders (EOs) titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025.

2. **Action Requested.** Effective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) under their federal awards, consistent with the requirements of the EOs titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025.  Additional guidance will be provided.

3. **Summary and Background.**

   a.   Summary – This notice shares recent EO requirements to eliminate DEI activities that constitute illegal discrimination or preferences.

   b.   Background – President Trump has issued several EOs, which are available at https://www.whitehouse.gov/presidential-actions/, including the EOs titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity,"

issued on January 21, 2025. All federal agencies are taking steps to implement these EOs, and promptly notifying all federal awardees. ETA, like all federal agencies, will provide further guidance on specific programs and activities within those programs.

4. **Ceasing DEIA activities.** All awardees must immediately cease all award activities related to DEI or DEIA. All other award activities should continue.

ETA will issue further guidance on specific activities that are allowable and unallowable.

5. **Inquiries.** Please direct inquiries to the appropriate Regional Office.

6. **References.**
- Executive Order, "Ending Radical and Wasteful Government DEI Programs and Preferencing," January 20, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.
- Executive Order, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," January 21, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/.

7. **Attachments.** N/A

# Exhibit A

Redacted - Privileged Attorney-Client Communication

---

**From:** Misty Schutt <mschutt@jff.org> on behalf of Vinz Koller <vkoller@jff.org>
**Sent:** Wednesday, March 26, 2025 1:45 PM
**To:** Lark Jackson <ljackson@cwit.org>
**Cc:** Gary Courtney <gcourtney@jff.org>; Myriam Sullivan <msullivan@jff.org>
**Subject:** RE: Important Update Regarding DEIA Hub Project Work Due to Recent Federal Training and Employment Notice (TEN)

You don't often get email from vkoller@jff.org. Learn why this is important

Dear Lark,

The Registered Apprenticeship Technical Assistance Center of Excellence team expresses our sincere appreciation for your patience and partnership as we have navigated the evolving landscape of the TEN 21-24 and assessed its impact on our work.

Unfortunately, due to the requirements outlined in the TEN 21-24 restricting activities related to DEI and DEIA, our project has been significantly impacted. As a result, we regret to inform you that we will no longer be able to move forward with the previously scoped activities with your organization. JFF contracted with Chicago Women in the Trades expressly to engage in activities no longer 'allowable' under Federal guidelines, pursuant to Executive Orders 14151 and 14173. Because once-allowable activities are no longer allowable, corresponding funding is no longer available and thus, reduced. As a consequence, JFF will be issuing a notice of Termination of agreement with Chicago Women in the Trades.

Formal termination documents will be provided in the coming weeks. In the meantime, please submit any outstanding reimbursable expenses no later than **Friday, April 4, 2025,** following the previously established submittal procedures.

We recognize and honor the important work your organization does, and while we are disappointed by this outcome, we remain grateful for the time, expertise, and passion you all have brought to this initiative. Your efforts have made a lasting impact, and we remain committed to finding opportunities to collaborate in the future.

If you have questions, please contact Gary Courtney, Myriam Sullivan, or me.

Sincerely,

Vinz

**Vinz Koller**
Vice President, Center for Apprenticeship and Work-Based Learning
*Pronouns: he/him/his*
831-277-4726 | LinkedIn
Connect with the Center for Apprenticeship and Work-Based Learning



---

**From:** Vinz Koller <vkoller@jff.org>
**Date:** Thursday, January 23, 2025 at 2:35 AM
**To:** Gary Courtney <gcourtney@jff.org>, Myriam Sullivan <msullivan@jff.org>, Vinz Koller <vinz_koller@spra.com>
**Subject:** Important Update Regarding DEIA Hub Project Work Due to Recent Federal Training and Employment Notice (TEN)

Dear Hub Partner,

The U.S. Department of Labor has issued a Training and Employment Notice (TEN) that requires JFF to pause immediately all activities directly tied to our federally funded work related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA), consistent with the requirements of the Executive Orders referenced in the TEN.  Most immediately, this includes our Apprenticeship DEIA Hub work.

Therefore, we ask you to stop any further work on the Hub at this time.  Please avoid incurring any additional staff time or expenses. If you are already on travel for an event, we ask that you return to your home base and that you discontinue current and cancel future events.

Please submit invoices for work conducted up to Jan 22nd to JFF's business unit as soon as possible.

JFF has successfully navigated changes in Administrations many times over the years.  However, that doesn't make moments like these any easier, especially when work that is central to our mission is impacted.  As always, we are committed to proactively navigating today's situation on behalf of our mission, our North Star, and our partners across the country.  And, of course, we will communicate transparently with you every step of the way.

In the meantime, please feel free to contact Gary Courtney, Myriam Sullivan, or me if you have questions.

Case 1:25-cv-02005 Document #: 45-1 Filed: 03/26/25 Page 4 of 44 PageID #:427

Our team so appreciates the contribution that you have made to the success of the Hub.

In partnership,

Vinz

**Vinz Koller**
Vice President, Center for Apprenticeship and Work-Based Learning
*Pronouns: he/him/his*
831-277-4726 | LinkedIn
Connect with the Center for Apprenticeship and Work-Based Learning



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO WOMEN IN TRADES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 25 C 2005** |
| | ) | |
| **PRESIDENT DONALD J. TRUMP,** | ) | |
| **DEPARTMENT OF LABOR, ACTING** | ) | |
| **SECRETARY OF LABOR VINCENT** | ) | |
| **MICONE, OFFICE OF MANAGEMENT** | ) | |
| **AND BUDGET, DIRECTOR OF THE** | ) | |
| **OFFICE OF MANAGEMENT AND** | ) | |
| **BUDGET RUSSELL VOUGHT, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE, ATTORNEY** | ) | |
| **GENERAL OF THE U.S. DEPARTMENT** | ) | |
| **OF JUSTICE PAMELA BONDI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

In this order, the Court considers plaintiff CWIT's motion for a temporary restraining order. The order describes the lawsuit, the motion, and the basis for the Court's ruling.

**Background**

Chicago Women in Trades (CWIT) is a non-profit organization based in Illinois that operates in all fifty states. Compl. ¶ 38. CWIT is dedicated "to promoting diversity, equity, and inclusion within the skilled trades industry" through "preparing women across the country to enter and remain in high-wage skilled trades, including carpentry, electrical work, welding, plumbing, and others." *Id*. ¶ 12. Federal funding accounts for

roughly forty percent of CWIT's annual budget.  *Id.* ¶ 42.

On January 20, 2025, President Donald J. Trump signed Executive Order 14151 (J20 Order), which is titled "Ending Radical and Wasteful Government DEI Programs and Preferencing."  Exec. Order No. 14151, 90 Fed. Reg. 8339; Compl., Ex. A.  On January 21, the President signed Executive Order 14173 (J21 Order), which is titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity."  Exec. Order No. 14173, 90 Fed. Reg. 8633; Compl., Ex. B.  The Court will discuss the relevant language of the two Orders in the body of this decision.

On January 21, 2025, the United States Office of Personnel Management (OPM) issued a memorandum to the "Heads and Acting Heads of Departments and Agencies" directing agency heads to, among other actions, "terminate any DEIA-related contractors" by January 22, 2025.  Off. of Personnel Mgmt., Initial Guidance Regarding DEIA Executive Orders (Jan. 21, 2025); Parker Decl., Ex. B at 1–2.

On January 22, 2025, CWIT received an email from the grant administrator at the Department of Labor (DOL) Women's Bureau, which issues one of CWIT's grants, stating that "[e]ffective immediately, all recipients of federal financial assistance are directed to cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards, consistent with the requirements of the Executive Orders" and that the DOL was "reviewing all active federal awards and will take appropriate action, including terminating the awards, consistent with the Executive Orders."  Vellinga Decl., Ex. 1. That same day, CWIT received an identical email forwarded by the Illinois Department of Labor concerning a different grant.  Also on January 22, CWIT received a Training

and Employment Notice from DOL Acting Deputy Assistant Secretary Michelle Paczynski with the subject line "Immediate Implementation of Executive Orders."  The Notice stated that "[e]ffective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to 'diversity, equity and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under the federal awards, consistent with the requirements of the EOs."  *Id.*, Ex. 2 at 1.  DOL recirculated this email on March 20, 2025.  None of these emails or notices defined "DEI" or "DEIA."

On January 23, 2025, CWIT received an email from Jobs for the Future (JFF), an organization that CWIT subcontracts with, regarding two of JFF's grants.  The email stated that the executive orders required JFF "to pause immediately all activities directly tied to our federally funded work related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)."  *Id.*, Ex. 3 at 1.  In response, JFF asked CWIT to stop "any further work" on its subcontracted DEI projects as well.  *Id.*

On March 26, 2025, JFF informed CWIT via email that it would be terminating its contract with CWIT.  JFF directly cited the executive orders as the basis for termination: "JFF contracted with [CWIT] expressly to engage in activities no longer 'allowable' under Federal guidelines, pursuant to Executive Orders 14151 and 14173."  Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

CWIT filed the present suit on February 26, 2025 against President Trump and the DOL, the Office of Management and Budget (OMB), the Department of Justice, and the heads of those agencies.  CWIT alleges that five provisions of the J20 and J21 Orders violate its rights under the First and Fifth Amendments to the Constitution and also run afoul of the Constitution's Spending Clause and the separation of powers.

3

CWIT moved for a temporary restraining order (TRO) on March 18, 2025, arguing that it faces imminent, irreparable harm from various terms of the J20 and J21 Orders.

## A.    Standing

The Court first addresses CWIT's standing to assert its claims.  *See Freedom From Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988).  Standing has three elements:  a plaintiff must establish that it has (1) "suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury is fairly traceable to the defendant," and (3) "that it is likely that a favorable decision will redress that injury."  *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007).

In the First Amendment context, "[i]t is well established that preenforcement challenges are within Article III."  *ACLU v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (cleaned up).  A plaintiff may establish imminent injury prior to enforcement by showing either an "intention to engage in a course of conduct arguably affected by a policy," coupled with a "credible threat the policy will be enforced against" the plaintiff, or a "chilling effect" on its speech that is "objectively reasonable" and results in "self-censorship."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).

The burden to demonstrate standing in connection with a motion for entry of a TRO is "at least as great as the burden of resisting a summary judgment motion."  *Id.* at 638 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990) (Blackmun, J., dissenting)).  The plaintiff must "set forth by affidavit or other evidence 'specific facts,' rather than general factual allegations of injury."  *Id.* (cleaned up).

### 1.    Section 2(b)(ii)(A) of the J20 Order & Sections 3(c)(iii) & 4(b) of the J21 Order

Section 2(b)(ii)(A) of the J20 Order requires each agency to "provide the Director

of the OMB with a list of all . . . agency or department DEI" activities and expenditures.
Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(ii)(A); Compl., Ex. A at 8339.
Section 3(c)(iii) of the J21 Order requires the OMB to "[t]erminate all 'diversity'" and
"equity" "mandates, requirements, programs, or activities."  Exec. Order No. 14173, 90
Fed. Reg. 8633, § 3(c)(iii); Compl., Ex. B at 8634.  Section 4(b) of the J21 Order
requires the Attorney General to "submit a report to the Assistant to the President for
Domestic Policy containing recommendations for enforcing Federal civil-rights law,"
including a "plan" to "deter DEI programs or principles . . . that constitute illegal
discrimination."  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 4(b); Compl., Ex. B at
8635.  These provisions focus on internal government agency processes and programs
and reporting to the President from his subordinates.  CWIT, of course, is not an agency
within the executive branch of government, and it has not alleged that it conducts any
programming for the government.  And it is difficult to see how CWIT can be in imminent
danger of an injury based on a provision that simply requires a cabinet official to issue a
report at a future date.  For purposes of the present motion at least, the Court is
unpersuaded that CWIT can establish the required injury in fact with respect to these
provisions.

      **2.**    **Section 2(b)(i) of the J20 Order & Section 3(b)(iv) of the J21 Order**

      Section 2(b)(i) of the J20 Order (Termination Provision) requires each agency to
"terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants."  Exec.
Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339.  Although the
government has not yet terminated CWIT's grants, CWIT has shown a sufficiently
imminent injury to allow a pre-enforcement challenge.  CWIT's grants appear to be

squarely targeted by this Termination Provision—the provision requires the termination of "equity-related" grants, and CWIT alleges that it is a grantee that provides programming "centered on equity." *See* Compl. ¶ 35.  CWIT has also received several credible threats of enforcement, including from grant issuers, to "cease all activities related to [DEI] or [DEIA] under the federal awards, *consistent with the requirements of the Executive Orders.*"  Vellinga Decl., Ex. 1 (emphasis added).  This provision requires the termination of grants "within sixty days of this order," i.e., March 21, 2025, further indicating imminent injury.  *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339.  Finally, CWIT just had one of its subcontracts terminated due to the executive orders.  JFF, with whom CWIT subcontracts with for two of the grants at issue, has sent CWIT an email stating that "[b]ecause once-allowable activities are no longer allowable, corresponding funding is no longer available."  Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

Section 3(b)(iv) of the J21 Order (Certification Provision) states that each agency "shall include in every . . . grant award" a certification, enforceable via the False Claims Act, that the grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(c)(iv); Compl., Ex. B at 8634.  CWIT alleges that it is a grantee that provides programs promoting employment opportunities for women, so there is a strong basis to believe that its conduct might be considered by the government to fall within the scope of this provision.  And, as discussed above, CWIT has received credible threats of enforcement—as well as actual termination of a subcontract—from grantors.

In addition, CWIT has alleged a pressure to self-censor in response to the

Orders, underscoring the chilling effect of the orders on grantees..  For example, "one of the pass-through entities with which CWIT works informed CWIT that subsequent to the Executive Orders, its contract with DOL had been unilaterally modified to remove all references to 'DEI' and 'DEIA.'"  Suppl. Vellinga Decl. ¶ 14.  This pass-through entity "threatened to terminate CWIT's subgrant unless it self-censored and . . . eliminate[d] any references to 'DEI' and 'DEIA' for an upcoming technical assistance program."  *Id.* ¶ 15.  CWIT further contends that the "pass-through entity has rejected CWIT's proposed training materials that retained the words 'Diversity and Equity' in the title, though the materials did not otherwise mention diversity, equity, or inclusion."  *Id.* Despite this, CWIT alleges that it has received no guidance from the entity on how to modify its materials to comply with the amended contract requirement.  *Id.* ¶ 16. Similarly, CWIT says that one of its contractors contacted CWIT to ask if any presentations could be made without DEI content.  According to CWIT, "[t]he contractor suggested that it asked these questions because of the Executive Orders."  Vellinga Decl. ¶ 46.  CWIT contends that such instances represent the sort of self-censorship pressure that it faces and will continue to face under the threat of the J20 and J21 Orders.

These injuries are imminent enough to constitute concrete injuries in fact that support standing to challenge the Termination and Certification Provisions.  In addition to the fact that the Orders themselves, and the communications CWIT (and others) has received, indicate that enforcement is imminent, the provisions essentially put grantees like CWIT in the position of having to take action now to avoid adverse consequences in the near future.  Among other things, compliance with the Certification Provision—which

requires a verification by the grantee that none of its programs (not just its programs under government grants) "promot[e] DEI"—calls upon a grantee like CWIT to modify its activities and advocacy *now* so that it can make an appropriate certification to avoid having the axe fall.

The imminent injuries are also fairly traceable to the defendants. Specifically, the Termination and Certification Provisions are part of executive orders signed by the President that, by their terms, require implementation by DOL and other federal agencies. Finally, a restraining order preventing these provisions from being enforced would prevent the injury from taking place.

In sum, the Court is persuaded that CWIT has standing to pursue its challenges to section 2(b)(i) of the J20 Order and section 3(c)(iv) of the J21 Order.

**B.    Ripeness**

The government also argues that CWIT's challenges are not ripe. "Much like standing, ripeness gives effect to Article III's Case or Controversy requirement by 'preventing the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Sweeney v. Raoul*, 990 F.3d 555, 559–60 (7th Cir. 2021) (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 148 (1967)). In assessing ripeness, courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 560 (quoting *Abbott Laby's*, 387 U.S. at 149).

The government contends that CWIT's claims are not ripe as its claims are based on "*possible* actions that agencies *might* take under the EOs." Defs.' Resp. at 13. But as discussed above, a plaintiff may bring a pre-enforcement action when First

Amendment rights are at stake.  *See Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) ("A party who is the target of an unconstitutional law need not expose himself to liability before challenging its constitutionality . . . .").  And based on CWIT's affidavits, CWIT faces serious harm if consideration of its challenges is withheld—every day that passes increases the risk of termination of its grants and, correspondingly, increases the pressure to self-censor its speech.  In fact, JFF has already informed CWIT that it is terminating its subcontracts with CWIT due to the executive orders.  *See* Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1.

The government attempts to rebut this by arguing that under the Orders, only illegal actions by grantees are prohibited, not First Amendment-protected speech.  But, as discussed below, the orders do not define "DEI," so determining what "DEI programs" are legal or considered to be legal is left to the imagination of grantees.

The Court therefore is persuaded that CWIT's challenges to the Termination and Certification Provisions are ripe for review.

**C.    Temporary restraining order**

To obtain injunctive relief, the movant "must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest."  *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  When, as here, the government is a party to the suit, "assessing the harm to the opposing party and weighing the public interest . . . merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Because injunctive relief is "an extraordinary and drastic remedy," the party seeking a

9

TRO "carries the burden of persuasion" on each of these points.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### 1. Likelihood of success on the merits

"In First Amendment cases, the likelihood of success . . . will often be the determinative factor" in granting an injunction.  *Alvarez*, 679 F.3d at 589 (cleaned up).

### a. Termination Provision

CWIT brings a facial challenge regarding the Termination Provision of the J20 Order.  CWIT alleges that, as written, the provision violates its First Amendment right to engage in protected speech and expressive conduct—specifically, to use its grants to implement its mission, involving women-focused apprenticeship and training programs.

To succeed on a facial challenge under the First Amendment, CWIT must ultimately show that the law or regulation at issue "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). In conducting this facial analysis, the first step is to assess the enactment's scope.  *Id.* at 724.  The J20 Order's Termination Provision is plainly broad—it orders "[e]ach agency, department, or commission head" to "terminate, to the maximum extent allowed by law, all DEI, DEIA, and 'environmental justice' offices and positions . . . ; all 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees."  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b); Compl., Ex. A at 8339.

The next step in a First Amendment facial challenge "is to decide which of the [enactment's] applications violate the First Amendment, and to measure them against

the rest." *Moody*, 603 U.S. at 725.  This analysis requires "explor[ing] the . . . full range

of applications—the constitutionally impermissible and permissible both—and

compar[ing] the two sets."  *Id.*  "[T]he First Amendment prohibits government officials

from wielding their power selectively to punish or suppress speech, directly or . . .

through private intermediaries."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198

(2024).  Although government officials may "forcefully condemn[] views with which they

disagree," "the First Amendment prohibits government officials from relying on the

'threat of invoking legal sanctions and other means of coercion . . . to achieve the

suppression' of disfavored speech."  *Id.* at 189, 198 (quoting *Bantam Books, Inc. v.

Sullivan*, 372 U.S. 58, 67 (1963)).

As a starting point, in this case, the government contends that there is a clear

divide between any constitutionally impermissible enforcement of the Termination

Provision and its clearly legitimate sweep because the provision limits termination "to

the maximum extent allowed by law."  Exec. Order No. 14151, 90 Fed. Reg. 8339, §

2(b)(i); Compl., Ex. A at 8339.  Accordingly, the government argues, anything that

violates current Federal anti-discrimination laws may be terminated, and anything that

does not violate such laws may not be terminated.  As such, the government's position

is that the *Moody* balancing test comes out in its favor.

But the provision's limiting language cabining termination "to the extent allowed

by law" does not insulate the government to the extent it contends.  *See Vullo*, 602 U.S.

at 196 ("[T]he conceded illegality of the NRA-endorsed insurance programs does not

insulate Vullo from First Amendment scrutiny . . . .").  The Supreme Court has made

clear that the government may not use the "threat of invoking legal sanctions and other

means of coercion" to suppress disfavored speech, as such coercive action would violate the First Amendment.  *Id.* at 189.

To determine whether a challenged communication—here, the Termination Provision of the J20 Order—"is reasonably understood to be a coercive threat," a court considers four factors under a totality-of-the-circumstances analysis.  *Id.*; *see also Backpage.com, LLC v. Dart*, 807 F.3d 229, 230–32 (7th Cir. 2015).  These factors include:  "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and perhaps most importantly, (4) whether the speech refers to adverse consequences."  *Vullo*, 602 U.S. at 189 (quoting *Nat'l Rifle Ass'n of Am. v. Vullo*, 49 F.4th 700, 715 (2d Cir. 2022)); *see also Backpage.com*, 807 F.3d at 230–32 (considering the same factors in a totality-of-the-circumstances analysis).

The J20 Order is likely a coercive threat under this test.  First, the word choice and tone of the J20 Order indicates that the government will terminate "illegal and *immoral* discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," and empowers government officials to terminate "*all* DEI [and] DEIA . . . officers and positions . . . ; *all* 'equity action plans,' 'equity' actions, initiatives, or programs, 'equity-related' grants or contracts; and *all* DEI or DEIA performance requirements for employees, contractors, or grantees."  Exec. Order No. 14151, 90 Fed. Reg. 8339, §§ 1, 2(b)(i) (emphases added); Compl., Ex. A at 8339.  This is strong language.  Second, because CWIT's grants are federally funded, the government has the ability to terminate them.  Finally, there are explicit adverse consequences for noncompliance with the J20 Order:  termination of federally funded grants or contracts.  On the other hand, the

language limiting termination authority "to the maximum extent allowed by law" arguably reduces the perception that the Termination Provision is a coercive threat.  Exec. Order No. 14151, 90 Fed. Reg. 8339, § 2(b)(i); Compl., Ex. A at 8339.  Still, the totality of the circumstances reflect that the J20 Termination Provision may reasonably be understood as a coercive threat—and has been understood as such, as indicated by the actions subcontractors have taken vis-à-vis CWIT—selectively targeting speech regarding DEI, DEIA, and equity based on a belief that such programs are "immoral," i.e., disfavored by the government.

The Termination Provision's vagueness gives rise to additional First Amendment issues.  An enactment may be unconstitutionally vague under the First Amendment if it regulates protected speech but the scope of its applications is uncertain, which "tend[s] to produce large chilling effects."  *See Brown*, 86 F.4th at 771 (citing *NAACP v. Button*, 371 U.S. 415, 432–33 (1963)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[W]here a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden area were clearly marked." (citations and internal quotation marks omitted)).

CWIT contends that it is not possible to know whether the Termination Provision prohibits a substantial amount of protected speech relative to its legitimate sweep because there is no way for grantees to identify what falls under the provision to begin with.  Specifically, CWIT argues that the J20 Order targets "DEI," "DEIA," "environmental justice," "equity," and "equity action plans," but provides no definition of

these terms. According to CWIT, the lack of definitions inhibits its ability to understand what conduct is permissible. CWIT is thus concerned that some of its programs may violate the J20 Termination Provision, but it cannot be certain of the extent of potential violations. It contends that, as a result, it is forced to refrain from exercising its protected speech rights for fear that its grant will be terminated because a program it operates may run afoul of the J20 Order. This is particularly so given that one of its subgrants now *has* been terminated.

Returning to the steps outlined in *Moody*, if an enactment is written in such vague terms that it is not possible to determine its full range of applications, thus producing a large chilling effect, then the balancing test described in *Moody* is difficult to execute. At base, though, it seems that if the full range of the Termination Provision's applications is undefined such that it chills any protected speech that might touch upon whatever the government now contends to be "DEI," "DEIA," or "equity," then the full range of the provision's applications would be constitutionally impermissible.

The government argues that any alleged vagueness in the J20 Termination Provision does not support CWIT's claim because any vagueness prohibition is not as stringent when a criminal statute is not involved. The government is correct that "[t]he degree of vagueness that the Constitution tolerates" is dependent on the "nature of the enactment." *See Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). It relies on *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), to argue that the Termination Provision is sufficiently clear in the context of government grants.

*Finley*, however, is distinguishable. In *Finley*, the plaintiff brought a facial

14

challenge to language in the National Foundation on the Arts and Humanities Act directing the grantor to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" when issuing a grant. *Finley*, 524 U.S. at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court noted that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. The Court went on to state, however, that it was unlikely "that speakers will be compelled to steer too far clear of any 'forbidden area' in the context of grants of this nature" and therefore any concerns over chilled speech due to vagueness were "not constitutionally severe." *Id.* at 589; *see id.* at 590 (finding that the challenged language "merely adds some imprecise considerations to an already subjective selection process").

Here, unlike in *Finley*, it is likely that a speaker *would* feel compelled to steer clear of a "forbidden area": DEI. In fact, that is precisely what CWIT contends it now must do to ensure it does not violate the J20 Termination Provision. Its fear is justified—just yesterday, on March 26, 2025, CWIT had a subcontract pursuant to a grant given to JFF terminated based on JFF's determination that the executive orders and ensuing enforcement emails "restrict[ed] activities related to DEI and DEIA" and made "corresponding funding . . . no longer available." Pl.'s Second Mot. to Suppl. the Factual R., Ex. A at 1. Therefore, the vagueness at issue in the Termination Provision goes squarely to the Court's concerns in *Finley* even under a less stringent vagueness standard. The Termination Provision, although not in a criminal statute, does appear to "lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the

15

GA150

forbidden area were clearly marked." *Grayned*, 408 U.S. at 108. As described in more detail below, the Order provides no definition or even an example of what is considered "illegal DEI" that would be permissibly terminated, and the government has been unwilling or unable to clear it up during this litigation. Therefore, limiting termination to the maximum extent allowed by law offers no real protection, as the extent to which CWIT's programs may violate the law remains unclear.

The government further contends that it may, "without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). That is true. But *Vullo* makes clear that there is a line between the government enacting its policy goals by serving as patron in granting federal funding and suppressing disfavored speech through coercive threats or sanctions. Here, the government is not selectively funding some programs but not others; it is indicating an entire area of programming that is disfavored as "immoral" (as well as illegal) and threatening the termination of funding unless grantees bring their conduct into line with the government's policy agenda. Based on the totality-of-circumstances analysis above, eliminating federal funds for DEI, DEIA, and equity-related speech falls on the coercive threat side of the line. Accordingly, the present case is notably different from *Finley* and *Rust*.

The Court concludes that CWIT has shown it is likely to succeed on the merits of its claim against the Termination Provision on First Amendment grounds and thus need not address CWIT's remaining claims relating to this provision.

b.      **Certification Provision**

CWIT argues that section 3(b)(iv) of the J21 Order unconstitutionally infringes on its First Amendment rights because the order effectively regulates CWIT's conduct outside of the contours of the federal grants.  "[F]unding condition[s] can result in an unconstitutional burden on First Amendment rights" when the government goes beyond "defining the limits of the Government spending program" and extends to "leverag[ing] funding to regulate speech outside of the contours of the federal program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 206 (2013).

The government conceded at oral argument that the Certification Provision attempts to regulate grantees' speech outside of their federally-funded programs.  The provision on its face makes clear that a counterparty must certify that it does not operate *any* programs that promote DEI, irrespective of whether the program is federally funded.

The government contends that the Certification Provision is permissible, as it simply requires certification that the grantee is not breaking the law.  Because a grantee has no constitutional right to violate the law, the government argues, its receipt of funds may appropriately be conditioned upon its certification that it abides by anti-discrimination laws.  In this regard, the government emphasizes that the Certification Provision requires acknowledging only that the grantee does not operate any DEI programs that "violate any applicable Federal antidiscrimination laws."  Exec. Order No. 14173, 90 Fed. Reg. 8633, § 3(c)(iv); Compl., Ex. B at 8634.

The problem, however, is that the meaning of this is left entirely to the imagination.  The Order that contains the Certification Provision does not define the

17

term "DEI" itself, and it does not refer to any other source indicating what the term means as used in the Order—let alone what might make any given "DEI" program violate Federal anti-discrimination laws.  And although the government emphasized, both in its brief and at oral argument, that the Certification Provision implicates only *illegal* DEI programs, it has studiously declined to shed any light on what this means. The answer is anything but obvious.  Indeed, the thrust of the Orders is that the government's view of what is illegal in this regard has changed significantly with the new Administration—even though the government has not (in the Orders) and has been unwilling to (in its briefs or at argument) define how it has changed.

Against this backdrop, the Certification Provision puts CWIT (and other grantees) in a difficult and perhaps impossible position.  They have received multiple communications from the DOL directing them to ensure compliance with the J20 and J21 Orders.  As it relates to the Certification Provision, and in particular its application to programs that are *not* federally funded, this means that CWIT or any other grantee must either take steps now to revise their programmatic activity so that none of it "promote[s] DEI" (whatever that is deemed to mean), decline to make a certification and thus lose their grants, or risk making a certification that will be deemed false and thus subject the grantee to liability under the False Claims Act.  The J21 Order's reference to "programs promoting DEI," moreover, is fairly read as an *express* reference to First Amendment-protected speech and advocacy, even if cabined to promoting whatever the government may now contend is "illegal DEI."  *Cf. Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe

18

advocacy . . . of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.").

For these reasons, the Court concludes that CWIT has shown that it is likely to succeed on the merits of its claim challenging the Certification Provision.

### 2.    Irreparable harm

Given the Court's finding that CWIT has established a likelihood of success on its claims that the Termination and Certification Provisions violate its First Amendment rights, it has made a sufficient showing of irreparable harm that would result from enforcement of these provisions. *See Alvarez*, 679 F.3d at 589 ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). Further, when First Amendment rights are at stake, the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Id.* (citation omitted).

### 3.    Balancing of the harms & public interest

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* (citation omitted). Accordingly, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Id.* at 589–90. Further, because both Orders contain a severability clause, the unchallenged provisions of the Orders will remain in effect even if the Court issues a TRO. *See* Exec. Order No. 14151, 90 Fed. Reg. 8339, § 3 ("If any provision of this order . . . is held to be invalid, the remainder of this order and the application of its

19

provisions to any other persons or circumstances shall not be affected thereby."); Exec. Order No. 14173, 90 Fed. Reg. 8633, § 6 (same); Compl., Exs. A–B.  Finally, issuance of a TRO will not prevent the government from enforcing existing anti-discrimination laws.

For these reasons, the balance of harms and public interest weighs in favor of granting the TRO.

**D.     Scope**

CWIT seeks to enjoin enforcement of the relevant provisions of the Orders across the board, not just for itself but also for other grantees.  It contends that the Termination and Certification Provisions are particularly appropriate for a nationwide injunction because the government relies on a categorical policy and the facts would not require different relief for other federal grantees.

The Seventh Circuit has held that a district court has discretion to grant a nationwide injunction "to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions."  *City of Chicago v. Barr*, 961 F.3d 882, 916–17 (7th Cir. 2020) (citation omitted); *see also id.* at 916 ("[B]oth historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court.").  Still, the Seventh Circuit has made clear that nationwide injunctions "present real dangers."  *Id.* at 916.  In particular, they "can truncate the process of judicial review" by "elevating the judgment of a single district court," and thus may create "the potential for forum shopping."  *Id.*  Such broad injunctive relief is therefore "appropriate only in rare circumstances."  *Id.*

20

The Court finds that a temporary restraining order precluding any enforcement of the Certification Provision is warranted to ensure that CWIT is provided complete relief and to prevent broader impending violations against others who are similarly situated. *See id.* at 920–21 ("[A] court may impose the equitable relief necessary to render complete relief to the plaintiff . . . ."); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established . . . ."); *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) ("When the court believes the underlying right to be highly significant, it may write injunctive relief as broad as the right itself." (citation omitted)).  This situation appears to be the type of "exceptional circumstances" in which "the proper scope" of the temporary restraining order is nationwide. *Barr*, 916 F.3d at 917 ("Any number of factors could influence a court's determination as to the proper scope of an injunction, including the nature of the violation, the extent of the impact, the urgency of the situation, the multiplicity of litigation, and the ability of others to even access the courts.").

CWIT does not just work alone, but in conjunction with other organizations that may be deemed to provide DEI-related programming.  The Certification Provision requires grant recipients to certify that they do "not operate any programs promoting DEI."  In other words, as a result of this provision, CWIT will not be able to work with other recipients of government grants unless those grantees also satisfy this provision by cutting any DEI-related efforts.

As explained previously, the impact of this provision on CWIT and other grantees is likely to result in self-censorship.  CWIT has already lost its JFF subcontract due to

JFF's concern that it would run afoul of the executive orders by working with CWIT.  To afford CWIT complete relief, other entities it works with must be protected from the Certification Provision as well.

Indeed, the concern that other similarly situated grant recipients may be targeted by the Certification Provision is anything but speculative.  On March 20, 2025, roughly sixty organizations, including CWIT, received an email from DOL instructing them to "immediately cease all award activities related to DEI," "consistent with the requirements of the EOs."  Mot. to Suppl. to the Factual R., Ex. A at 1–2.  Therefore, a nationwide temporary restraining order protects similarly situated non-parties as well and ensures that CWIT is provided complete relief.

Further, the fact that the Certification Provision reaches speech beyond the federally-funded program supports a broad injunction.  Every grant recipient is expected to certify that it does not engage in *any* programs involving "illegal DEI" (not just federally funded programs) without knowing what programs fall under that umbrella.  Rather than spend their resources to challenge their patron in court or risk False Claims Act litigation, it is likely that many of these grantees will take the safer route and choose to simply stop speaking on anything remotely related to what the government might consider to promote DEI or equity.  A nationwide restraining order is appropriate to protect grantees who cannot afford the risks inherent in biting the hand that feeds them.

The Court reaches a different conclusion, however, regarding the Termination Provision.  First of all, the record does not reflect significant evidence that CWIT will not be provided complete relief without a nationwide injunction on this provision.  Once this provision is enjoined against CWIT, its government grants will be safeguarded.

22

In addition, the risk that other affected grantees will not challenge enforcement of this provision against them is likely far less than for the Certification Provision. A grantee whose funding is terminated would appear to have an ample incentive to challenge the termination so that it can retain funding; it is less likely that they will simply turn and walk away. Although there certainly is a risk that grantees will remove broad swaths of programs to avoid the potential for termination, the Court is not persuaded at this juncture that this risk outweighs the concerns with nationwide restraining orders with respect to the Termination Provision. Rather, the Court will limit its restraining order with regard to the Termination Provision to CWIT and any federal grantee through which CWIT holds a subcontract or is a subrecipient of federal funds, including JFF.

Finally, these temporary restraining orders are limited to enjoining DOL, and not other defendants. DOL administers CWIT's grants—and also administers grants to other recipients who work with CWIT. And it is with regard to DOL that CWIT has shown a risk of imminent harm, as illustrated by the emails DOL has recently sent to CWIT and other grant recipients. The Court therefore limits the reach of its temporary restraining order to DOL, at least at this juncture.

## Conclusion

For the reasons stated above, the Court grants in part CWIT's motion for a temporary restraining order [dkt. no. 40]. The Court will separately enter a temporary restraining order.[1] The preliminary injunction briefing schedule is advanced as follows:

---

[1] The Court notes that the order's language as it is being entered does not fully cover the intended scope of the TRO concerning the Termination Provision, specifically concerning the TRO's operation with regard to grants, etc. to other entities that contract with CWIT. The parties are to promptly propose modified language to cover this.

any further response by the government to the motion for preliminary injunction must be

filed by April 3, 2025, and any further reply by the plaintiff must be filed by April 7, 2025.

The preliminary injunction motion is set for an in-person hearing on April 10, 2025 at

10:00 a.m.

Date:  March 26, 2025

MATTHEW F. KENNELLY
United States District Judge

# EXHIBIT A



| | |
|---|---|
| **From:** | |
| **To:** | |
| **Cc:** | |
| **Subject:** | Temporary Restraining Order in Chicago Women in Trades v. Trump, et. al., Case No. 1:25-cv-02005 (N.D. Ill.) |
| **Date:** | Friday, March 28, 2025 11:06:00 AM |
| **Attachments:** | CWIT TRO Order.pdf |

Yesterday, the court in *Chicago Women in Trades v. Trump, et. al.*, Case No. 1:25-cv-02005 (N.D. Ill.) issued a Temporary Restraining Order (TRO) in a challenge to Executive Orders 14151 and 14173. The court instructed that its Order be provided to all agency heads and other relevant individuals in the Department. Accordingly, I've attached a copy of the court's Order, and included the relevant terms of the TRO below:

- **ORDERED** that, pending a further order by the Court, the Acting Secretary of Labor; the U.S. Department of Labor; its officers, agents, servants, employees, attorneys; and other persons who are in active concert or participation with any of them (collectively, the "Enjoined Parties"), shall not pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations (collectively, the "Current Obligations") with CWIT, or change the terms of any Current Obligations with CWIT, on the basis of the Termination Provision (§ 2(b)(i)) of Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); and it is further
- **ORDERED** that the Enjoined Parties shall not require any grantee or contractor to make any "certification" or other representation pursuant to the Certification Provision (§ 3(b)(iv)) of Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); and it is further
- **ORDERED** that the Government shall not initiate any False Claims Act enforcement action against CWIT pursuant to the Certification Provision (§ 3(b)(iv)) of [Executive Order 14173]

Please forward to any relevant staff as necessary.

Thank you.



U.S. Department of Labor
Office Phone:
Work Cell:

This message may contain information that is privileged or exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this e-mail in error, please notify the sender

immediately.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHICAGO WOMEN IN TRADES,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 25 C 2005** |
| **PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI,** | |
| **Defendants.** | |

<u>**TEMPORARY RESTRAINING ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

This matter comes before the Court on the motion by plaintiff Chicago Women in Trades's ("CWIT") motion for a temporary restraining order. CWIT's motion is GRANTED for the following reasons:

1. CWIT has standing to challenge the Termination Provision (§ 2(b)(i)) of Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ("J20 Order"), and the Certification Provision (§ 3(b)(iv)) of Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ("J21 Order"), and its claims are ripe for review.

2. CWIT has shown that it is likely to succeed on the merits of its First Amendment claims involving the Termination Provision and the Certification Provision.

3. CWIT has shown irreparable harm and that there is no adequate remedy at law.

4. The balance of equities favors CWIT because of the severity of a First Amendment injury, because the government can still enforce the provisions of the Executive Orders that are unlikely to violate the First Amendment, and because the government can still enforce existing anti-discrimination laws.

Therefore, upon consideration of CWIT's motion for a temporary restraining order and the parties' briefs and exhibits, it is hereby:

**ORDERED** that the motion for a temporary restraining order is **GRANTED** to the extent stated in this Order; and it is further

**ORDERED** that, pending a further order by the Court, the Acting Secretary of Labor; the U.S. Department of Labor; its officers, agents, servants, employees, attorneys; and other persons who are in active concert or participation with any of them (collectively, the "Enjoined Parties"), shall not pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations (collectively, the "Current Obligations") with CWIT, or change the terms of any Current Obligations with CWIT, on the basis of the Termination Provision (§ 2(b)(i)) of Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); and it is further

**ORDERED** that the Enjoined Parties shall not require any grantee or contractor to make any "certification" or other representation pursuant to the Certification Provision (§ 3(b)(iv)) of Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025); and it is further

**ORDERED** that the Government shall not initiate any False Claims Act enforcement action against CWIT pursuant to the Certification Provision (§ 3(b)(iv)) of

2

GA164

the J21 Order; and it is further

**ORDERED** that the Department of Labor shall provide a copy of this Order to all

agency and bureau heads, and all other relevant parties; and it is further

**ORDERED** that the Department of Labor file a status report within 24 hours of

the issuance of this order, and every week thereafter while this order is in effect,

confirming compliance with this order.

This order shall apply to the maximum extent provided for by Fed. R. Civ. P.

65(d)(2) and shall persist until further order of this Court.

SO ORDERED this 27th day of March, 2025.

_____

MATTHEW F. KENNELLY
United States District Court Judge

# EXHIBIT B



**From:** Gibson, Barbara J - ETA <Gibson.Barbara.J@dol.gov>
**Sent:** Tuesday, March 25, 2025 3:11 PM
**To:** Catrina Gray <catrinagray@cccneb.edu>; CRussell <crussell1@southeast.edu>; Dominick Chase <dchase@ivytech.edu>; Erin Riffle <ERiffle@greatercle.com>; Haley Sides <haley.sides@springfieldmo.gov>; Jayne Vellinga <JVellinga@CWIT2.ORG>; Jessica Rohan <jessicarohan@cccneb.edu>; Kara Carter <kcarter@greatercle.com>; Kevin Julesgard <kevinjulesgard@cccneb.edu>; Matthew Gotschall <MGOTSCHALL@CCCNEB.EDU>; Michele Ureste <michele.ureste@winintelligence.org>; Rebecca R. Ryan <rrryan@madisoncountyil.gov>; Robin Douthitt <rdouthitt@ivytech.edu>; Sally Payne (SPAYNE@SPRINGFIELDMO.GOV) <SPAYNE@SPRINGFIELDMO.GOV>; sulbrena Day <s.day@midwestcareersource.com>; Anna Loftus <anna.loftus@i-car.com>; Becky Kickkert <bkikkert@wdbscw.org>; Catherine Main <cmain@uic.edu>; Chance Shannan <cshannan@aspyrworkforce.org>; Donna Brake <Donna.Brake@dhewd.mo.gov>; Emily Goad <egoad@wdbscw.org>; Jennifer Deamud <deamudj@kinexsus.org>; Jennifer Roy <jroy@aspyrworkforce.org>; Jessica Weithman <jweithman@aspyrworkforce.org>; Josephine Kershaw <jkershaw@jeffco.edu>; Kelly Wallace <kwallace@aspyrworkforce.org>; Kenneth Wilson <kwilso20@jeffco.edu>; Lamecce Tyne

GA167

<ltyne@wdbscw.org>; Paul Kirk <kirkp@miworks.org>; Rebecca Fletcher
<Rebecca.Fletcher@dhewd.mo.gov>; Samantha Roberson <srobers1@jeffco.edu>; Seth Lentz
<slentz@wdbscw.org>; Todd Gustafson <tgustafson@kinexsus.org>; Katy Robertson
<katy@rungforwomen.org>; Lisa Humphrey <lhumphrey@bbbsflint.org>; Manny Rodriguez
<mrodriguez@revolutionworkshop.org>; Michele Smith <michele.smith4@aah.org>; Paja Xiong
<pajax@thesannehfoundation.org>; Reginald Best <arbest1@hfcc.edu>; Robert Palmer
<rpalmer1@wcccd.edu>; Robin Christine Kildall <rkildall@employmindy.org>; Stacy Ignoffo
<stacy.ignoffo@sinai.org>; Wytedgurie Winston <blackfirebrigade@gmail.com>; Abigail Nichols
<adrennan@harpercollege.edu>; Ken Kompelien <kendall.kompelien@minnesota.edu>; Lisa Arendt
<larendt1@cvtc.edu>; 'mkaravit@harpercollege.edu' <mkaravit@harpercollege.edu>; Shana
Schmidt <sschmidt42@cvtc.edu>; Susanne Brock <sbrock@harpercollege.edu>; Andrea Price
<APrice@STARKSTATE.EDU>; Brenda Rubey <brubey@scciowa.edu>; Grant Schubert
<g.schubert@rockvalleycollege.edu>; Heather Snider <h.snider@rockvalleycollege.edu>; Liz Wallace
<WallaceE@westerntc.edu>; Nancy McDonald <n.mcdonald@rockvalleycollege.edu>; Nicole Sawyer
<SawyerN@westerntc.edu>; Sam Renfroe <Srenfroe@starkstate.edu>; Tammy Kaylor
<TKaylor@STARKSTATE.EDU>
**Cc:** Kroenke, Darren - ETA <kroenke.darren@dol.gov>
**Subject:** Re: ETA TEN published 1/22/25

Good afternoon,

My March 20th email was sent in error. Please refer to the linked TEN No. 21-24, Change 1
below, which cancels the TEN No. 21-24 that I originally sent.
USDOL/ETA Advisories - Training and Employment Notice (TEN) Update TEN 21-24, Change
1 – Cancellation of Training and Employment Notice (TEN) No. 21-24: *Immediate
Implementation of Executive Orders "Ending Radical and Wasteful Government DEI
Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-
Based Opportunity"* has been added to the ETA Advisory database and is now available at
TEN 21-24, Change 1 | U.S. Department of Labor.



**Barbara Gibson**

Workforce Development Specialist

Employment and Training Administration

Region 5 (Chicago)

U.S. Department of Labor

(312) 353-2373

Book time to meet
with Barbara
Gibson

**From:** Gibson, Barbara J - ETA
**Sent:** Thursday, March 20, 2025 1:43 PM
**To:** Catrina Gray <catrinagray@cccneb.edu>; CRussell <crussell1@southeast.edu>; Dominick Chase

<dchase@ivytech.edu>; Erin Riffle <ERiffle@greatercle.com>; Haley Sides
<haley.sides@springfieldmo.gov>; Jayne Vellinga <JVellinga@CWIT2.ORG>; Jessica Rohan
<jessicarohan@cccneb.edu>; Kara Carter <kcarter@greatercle.com>; Kevin Julesgard
<kevinjulesgard@cccneb.edu>; Matthew Gotschall <MGOTSCHALL@CCCNEB.EDU>; Michele Ureste
<michele.ureste@winintelligence.org>; Rebecca R. Ryan <rrryan@madisoncountyil.gov>; Robin
Douthitt <rdouthitt@ivytech.edu>; Sally Payne (SPAYNE@SPRINGFIELDMO.GOV)
<SPAYNE@SPRINGFIELDMO.GOV>; sulbrena Day <s.day@midwestcareersource.com>; Anna Loftus
<anna.loftus@i-car.com>; Becky Kickkert <bkikkert@wdbscw.org>; Catherine Main
<cmain@uic.edu>; Chance Shannan <cshannan@aspyrworkforce.org>; Donna Brake
<Donna.Brake@dhewd.mo.gov>; Emily Goad <egoad@wdbscw.org>; Jennifer Deamud
<deamudj@kinexsus.org>; Jennifer Roy <jroy@aspyrworkforce.org>; Jessica Weithman
<jweithman@aspyrworkforce.org>; Josephine Kershaw <jkershaw@jeffco.edu>; Kelly Wallace
<kwallace@aspyrworkforce.org>; Kenneth Wilson <kwilso20@jeffco.edu>; Lamecce Tyne
<ltyne@wdbscw.org>; Paul Kirk <kirkp@miworks.org>; Rebecca Fletcher
<Rebecca.Fletcher@dhewd.mo.gov>; Samantha Roberson <sroberts1@jeffco.edu>; Seth Lentz
<slentz@wdbscw.org>; Todd Gustafson <tgustafson@kinexsus.org>; Katy Robertson
<katy@rungforwomen.org>; Lisa Humphrey <lhumphrey@bbbsflint.org>; Manny Rodriguez
<mrodriguez@revolutionworkshop.org>; Michele Smith <michele.smith4@aah.org>; Paja Xiong
<pajax@thesannehfoundation.org>; Reginald Best <arbest1@hfcc.edu>; Robert Palmer
<rpalmer1@wcccd.edu>; Robin Christine Kildall <rkildall@employmindy.org>; Stacy Ignoffo
<stacy.ignoffo@sinai.org>; Wytedgurie Winston <blackfirebrigade@gmail.com>; Abigail Nichols
<adrennan@harpercollege.edu>; Ken Kompelien <kendall.kompelien@minnesota.edu>; Lisa Arendt
<larendt1@cvtc.edu>; 'mkaravit@harpercollege.edu' <mkaravit@harpercollege.edu>; Shana
Schmidt <sschmidt42@cvtc.edu>; Susanne Brock <sbrock@harpercollege.edu>; Andrea Price
<APrice@STARKSTATE.EDU>; Brenda Rubey <brubey@scciowa.edu>; Grant Schubert
<g.schubert@rockvalleycollege.edu>; Heather Snider <h.snider@rockvalleycollege.edu>; Liz Wallace
<WallaceE@westerntc.edu>; Nancy McDonald <n.mcdonald@rockvalleycollege.edu>; Nicole Sawyer
<SawyerN@westerntc.edu>; Sam Renfroe <Srenfroe@starkstate.edu>; Tammy Kaylor
<TKaylor@STARKSTATE.EDU>
**Subject:** ETA TEN published 1/22/25

Good day, Grantees.

Please review and retain the attached Training and Employment
Notice published January 22, 2025. This notice provides important
updates and information relevant to your grant agreement with the
Department of Labor, Employment and Training Administration.

Thank you! ~BG



**Barbara Gibson**

Workforce Development Specialist

Employment and Training Administration

Region 5 (Chicago)

U.S. Department of Labor

(312) 353-2373

 Book time to meet with Barbara Gibson

## UNITED STATES DISTRICT COURT OF THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHICAGO WOMEN IN TRADES, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-02005 |
| | Judge: Hon. Matthew F. Kennelly |
| PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI, | JURY TRIAL DEMANDED |
| Defendants. | |

## SECOND SUPPLEMENTAL
## DECLARATION OF JAYNE VELLINGA

I, Jayne Vellinga, hereby declare upon penalty of perjury that the following statements are true and correct to the best of my knowledge and belief.

1.      I am the Executive Director of Chicago Women in Trades ("CWIT"), a not-for-profit 501(c)(3) based in Chicago, Illinois. I have served in this capacity since 2010.

2.      I submit this second supplemental declaration in further support of Plaintiff's Motion for a Preliminary Injunction to prevent Defendants from enforcing certain provisions of Executive Order No. 14151 titled "Ending Radical And Wasteful Government DEI Programs And Preferencing" and Executive Order No. 14173 titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (collectively, the "Executive Orders").

1

3.     Since March 18, 2025, when I submitted my supplemental declaration, CWIT has received a number of confusing and inconsistent communications from DOL and JFF. Some of these have already been presented to the Court but are referenced again below with additional context.

4.     On Thursday, March 20, 2025, following the Fourth Circuit stay of the Maryland District Court's nationwide injunction in *National Association of Diversity Officers in Higher Education, et al. v. Trump, et al.*, No. 25-1189 (4th Cir. Mar. 14, 2025), I received an email from Barbara Gibson, Workforce Development Specialist at the DOL's Employment and Training Administration.

5.     The DOL's March 20, 2025 email recirculated a copy of the TEN No. 21-24 first published and sent to CWIT January 22, 2025 (and which is attached as Exhibit 2 to my March 5, 2025 Declaration (Dkt. 26-9)). Among other things, the TEN No. 21-24 directs CWIT, and numerous other agencies and organizations, to "[e]ffective immediately . . . cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) under their federal awards."[1]

6.     On March 25, 2025 (and again on March 31, 2025), I received an email from DOL notifying me, along with many other grantees, that the March 20, 2025 email was sent in error and referring me to TEN No. 21-24, Change 1.

7.     The email included a link to the DOL's Grant Solution portal, which is used by DOL to communicate with grantees, where I was able to review TEN No. 21-24, Change 1. TEN No. 21-24, Change 1 bears the date of February 27, 2025, which is six days after the Maryland District Court issued its injunction in *National Association of Diversity Officers in Higher Education v. Trump*, 25-cv-333. In relevant part, TEN No. 21-24, Change 1 states:

---

[1] *See* Dkt. No. 47.

> In compliance with the Preliminary Injunction issued on February
> 21, 2025, in the United District Court for the District of Maryland,
> *National Association of Diversity Officers in Higher Education v.*
> *Trump*, 25-cv-333, effective immediately the Employment and
> Training Administration is rescinding the communication, Training
> and Employment Notice (TEN) No. 21-24 . . ..

8.      A true and correct copy of TEN No. 21-24, Change 1 is attached as **Exhibit A**.

9.      On March 26, CWIT received an email from JFF, the pass-through entity which issued the HUB-Apprenticeship USA Grant subaward to CWIT, notifying CWIT that it will be terminating CWIT's contract under the HUB-Apprenticeship USA Grant.  Specifically, the email states:

> Unfortunately, due to the requirements outlined in the TEN 21-24
> restricting activities related to DEI and DEIA, our project has been
> significantly impacted. As a result, we regret to inform you that we
> will no longer be able to move forward with the previously
> scoped activities with your organization. JFF contracted with
> Chicago Women in the Trades expressly to engage in activities no
> longer 'allowable' under Federal guidelines, pursuant to Executive
> Orders 14151 and 14173. Because once-allowable activities are no
> longer allowable, corresponding funding is no longer available and
> thus, reduced.  As a consequence, JFF will be issuing a notice of
> Termination of agreement with Chicago Women in the Trades.[2]

10.     The "TEN 21-24" referenced in this email is the same one published by DOL and first sent to CWIT on January 22, 2025 and then resent on March 20, 2025.

11.     Despite the temporary restraining order issued by the Court on March 27, 2025 (and amended on April 1, 2025), CWIT remains uncertain about what activities the government views as equity related.  As a result, CWIT is still forced to continue working in a climate of fear and uncertainty given that their grants can be terminated at any moment.

12.     Three of CWIT's grants and subawards already require CWIT to comply with applicable Federal statutes.

---

[2] *See* Dkt. No. 51.

13.     Additionally, none of the grants or subgrants at issue in this case contain a "termination for convenience" clause.

Dated: April 7, 2025

Jayne Vellinga

# Exhibit A

| **TRAINING AND EMPLOYMENT NOTICE** | **NO.** 21-24, Change 1 |
| | **DATE** February 27, 2025 |

**TO:**     STATE WORKFORCE AGENCIES
            STATE WORKFORCE LIAISONS
            STATE WORKFORCE DEVELOPMENT BOARDS AND STAFF
            LOCAL WORKFORCE DEVELOPMENT BOARDS AND STAFF
            AMERICAN JOB CENTER DIRECTORS
            ETA COMPETITIVE GRANTEES
            COMMUNITY COLLEGES AND TRIBAL COLLEGES
            STATE APPRENTICESHIP AGENCIES
            JOB CORPS CENTER DIRECTORS

**FROM:**   AMY SIMON
            Acting Assistant Secretary

**SUBJECT:** Cancellation of Training and Employment Notice (TEN) No. 21-24:  *Immediate Implementation of Executive Orders "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"*

1. **Purpose.** To change the status of TEN No. 21-24 from active to cancelled.

2. **Action Requested.** Please disseminate this information to appropriate staff.

3. **Summary and Background.**

   a. Summary – TEN No. 21-24, Change 1, changes the status of TEN No. 21-24 to cancelled.

   b. Background – In compliance with the Preliminary Injunction issued on February 21, 2025, in the United District Court for the District of Maryland, *National Association of Diversity Officers in Higher Education v. Trump*, 25-cv-333, effective immediately the Employment and Training Administration is rescinding TEN No. 21-24, *Immediate Implementation of Executive Orders "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity,"* which was issued on January 22, 2025.

4. **Details.** The status of TEN No. 21-24 has been changed to cancelled.

5. **Inquiries.** Please direct inquiries to the appropriate Regional Office.

6. **References.** N/A

7. **Attachments.** N/A

**EMPLOYMENT AND TRAINING ADMINISTRATION**
**U.S. DEPARTMENT OF LABOR**
**WASHINGTON, D.C. 20210**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO WOMEN IN TRADES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 25 C 2005** |
| | ) | |
| **PRESIDENT DONALD J. TRUMP,** | ) | |
| **DEPARTMENT OF LABOR, ACTING** | ) | |
| **SECRETARY OF LABOR VINCENT** | ) | |
| **MICONE, OFFICE OF MANAGEMENT** | ) | |
| **AND BUDGET, DIRECTOR OF THE** | ) | |
| **OFFICE OF MANAGEMENT AND** | ) | |
| **BUDGET RUSSELL VOUGHT, U.S.** | ) | |
| **DEPARTMENT OF JUSTICE, ATTORNEY** | ) | |
| **GENERAL OF THE U.S. DEPARTMENT** | ) | |
| **OF JUSTICE PAMELA BONDI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Chicago Women in Trades (CWIT) has moved under Federal Rule of Civil

Procedure 59(e) to modify the preliminary injunction the Court entered on April 15,

2025.  *See Chi. Women in Trades v. Trump*, No. 25 C 2005, 2025 WL 1118659, at *1

(N.D. Ill. Apr. 15, 2025).  Specifically, CWIT asks the Court to modify its decision

regarding section 2(b)(i) (Termination Provision) of Executive Order 14151, 90 Fed.

Reg. 8339 (Jan. 20, 2025) (hereinafter J20 Order).  The Court preliminarily enjoined the

Secretary of Labor, the U.S. Department of Labor, and its officers, agents, and other

persons in active concert or participation with any of them, from terminating CWIT's

Women in Apprenticeship and Nontraditional Occupations (WANTO) Act grant.[1]  CWIT asks the Court to broaden the preliminary injunction to preclude enforcement of the Termination Provision of the J20 Order against its other four federal funding sources.

## Background

The Court assumes familiarity with the facts as described in the preliminary injunction opinion.  *See Chi. Women in Trades v. Trump*, --- F. Supp. 3d ---, 2025 WL 1114466, at *1–5 (N.D. Ill. Apr. 14, 2025).

CWIT receives five sources of federal funding:  (1) a WANTO grant, (2) a Tradeswomen Building Infrastructure Initiative (TBII) grant, (3) an Apprenticeship Building America (ABA) grant, (4) a HUB Apprenticeship USA (HUB) grant, and (5) an Intermediary Industry Contract (IIC)[2].  CWIT is a subrecipient of the HUB grant and a subcontractor to the IIC through Jobs for the Future (JFF).

On April 14, 2025, the Court issued a decision on CWIT's preliminary injunction motion.  The Court found that CWIT was likely to succeed on the merits of its claim that the Termination Provision of the J20 Order violated the Spending Clause and the separation of powers with respect to CWIT's WANTO grant.  *See id.* at *16–18.  The congressional appropriation for the WANTO grant states that "not less than $5,000,000 shall be used for grants authorized by the Women in Apprenticeship and Nontraditional Occupations Act."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 641.  Under the WANTO Act, DOL "shall make grants to community-

---

[1] CWIT does not seek modification of the portion of the preliminary injunction pertaining to section 3(b)(iv) of Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025).
[2] The IIC was formerly known as the Improving Diversity and Equity in Apprenticeship for Manufacturing (IDEA-M) contract.  Pl.'s Corrected Mem. in Supp. of Mot. to Modify Prelim. Inj. at 8.

2

based organizations to provide technical assistance to employers and labor unions."

29 U.S.C. § 2503(a).  Because "every example of 'technical assistance' that the Act lists

involves supporting women, in particular, who hold nontraditional occupations," "the

Court [was] unable to conceive of any grant issued under the WANTO Act that would

not be an 'equity-related' grant."  *Chi. Women in Trades*, 2025 WL 1114466, at *17.

Accordingly, the Court found CWIT was likely to succeed on the merits of its claim that

the directed termination of "equity-related" grants violated the Spending Clause and the

separation of powers with respect to its WANTO grant.  For this and the other reasons

described in the Court's opinion, it issued the above-referenced preliminary injunction.

CWIT now seeks modification of the preliminary injunction to prevent termination

of its remaining funding sources pursuant to the J20 Order's Termination Provision.

**Discussion**

CWIT argues that this Court misunderstood the nature of four of its federal

funding sources, specifically the TBII grant, ABA grant, and two grants administered

through JFF.  It contends that these grants, like the WANTO grant, should be

characterized as equity-related grants based on their statutory language and legislative

history.  Under this reading, these four remaining grants would then be at risk of

termination under the Termination Provision of the J20 Order, namely under its directive

that agency and department heads "shall . . . terminate, to the maximum extent allowed

by law, all . . . 'equity-related' grants or contracts."  Executive Order 14151, 90 Fed.

Reg. 8339, § 2 (Jan. 20, 2025).  CWIT contends that this outcome would conflict with

the Court's reasoning in its preliminary injunction ruling, which prevented the termination

of grants that Congress specified as equity-focused.  CWIT argues that, similar to the

3

WANTO grant, Congress has specifically allocated funds for these four allegedly "equity-related" grants.  Therefore, CWIT argues that the Court's logic enjoining termination of the WANTO grant should also preclude termination of CWIT's other grants.  Accordingly, CWIT contends that this Court erred by declining to preliminarily enjoin termination of those grants.

Before turning to the merits of CWIT's motion, the Court addresses an argument raised in the government's brief in response to the motion.

**A.    Reviewability by this Court**

The government, for the first time in any of the briefs it has filed in this case (specifically, its briefs filed on the motion for temporary restraining order and the motion for preliminary injunction), argues that the Supreme Court's holding in *Dalton v. Specter*, 511 U.S. 462 (1994), precludes the Court from considering CWIT's constitutional separation of powers argument as applied to each of its grants.

In *Dalton*, the Supreme Court determined that the plaintiffs could not challenge based on the separation of powers that the President's closure of a naval base was allegedly "in excess of his statutory authority."  *Id.* at 471, 477–78.  The Court noted that it had "often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority."  *Id.* at 472.  The Court found that these past decisions "establish[ed] that claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Id.* at 473.  For plaintiffs to allege a constitutional separation of powers claim, the Court held, the plaintiffs must base their claim on the "*absence* of *any* statutory authority," not just "that the President acted in excess of such authority."  *Id.* (distinguishing *Youngstown Sheet & Tube Co. v.*

4

*Sawyer*, 343 U.S. 579 (1952)); *see also City of Chicago v. Barr*, 961 F.3d 882, 919 (7th Cir. 2020) (noting that *Dalton* "distinguish[ed] ultra vires claims, alleging an action that exceeded the authority, from constitutional claims, alleging an absence of *any* authority").

The government appears to contend that, under *Dalton*, CWIT's claim that the Termination Provision of the J20 Order constitutes an impermissible *ultra vires* act by the President is not a constitutional claim, but a statutory one.  Therefore, the government says, *Dalton* instructs that the claim is properly reviewable in a district court only by raising it vis-à-vis the Administrative Procedures Act.  With regard to CWIT's WANTO grant, the government's argument reads like a motion for reconsideration:  it contends that the Court's ruling on the WANTO grant "is erroneous because . . . it contravenes binding precedent under *Dalton*."  Defs.' Mem. in Opp. to Pl.s' Mot. to Modify Prelim. Inj. at 2.  The government bases this argument at least partly on its apparent contention that CWIT did not assert an *ultra vires*, as-applied challenge under the Spending Clause.  *Id.* at 4 (suggesting that CWIT had asserted only a facial Spending Clause challenge and arguing that "Plaintiff's case must rise and fall *on the claims it chooses to bring*" (emphasis added)).  For the reasons stated below, the Court finds the government's argument under *Dalton* unavailing.

### 1.    Forfeiture and waiver

At the outset, the government has forfeited or waived the argument that *Dalton v. Specter* forecloses this Court's review.  "Forfeiture is the failure to make the timely assertion of a right."  *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017) (cleaned up).  A party forfeits an argument even if its failure to raise it was

"inadvertent." *Love v. Vanihel*, 73 F.4th 439, 449 & n.5 (7th Cir. 2023); *see also United States v. Kopp*, 922 F.3d 337, 341 (7th Cir. 2019) ("[A] party forfeits an issue when it fails to raise an argument due to accident or neglect." (cleaned up)). And a party's "inadequately briefed arguments are forfeited" even if the party intended to raise the issue. *Dalton v. Teva N. Am.*, 891 F.3d 687, 692 (7th Cir. 2018).

"[W]aiver," on the other hand, "is the intentional relinquishment or abandonment of a known right." *Hamer*, 583 U.S. at 20 n.1 (cleaned up). A party is not required "to expressly state on the record [it]s intent to waive a challenge before [a court] will consider it waived." *United States v. Hathaway*, 882 F.3d 638, 641 (7th Cir. 2018). Instead, a court "evaluate[s] the record as a whole" to determine whether a party waived an argument by failing to raise it. *Id.*

"When a party selects among arguments as a matter of strategy, [it] also waives those arguments [it] decided not to present." *Holder v. Ill. Dept. of Corr.*, 751 F.3d 486, 493 (7th Cir. 2014). For example, the Seventh Circuit has "repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived." *O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) (Barrett, J.); *see also Tuduj v. Newbold*, 958 F.3d 576, 579 (7th Cir. 2020) ("[A]rguments not raised in an opening brief are waived."). This is because it is the parties', not the Court's, "responsibility to research and construct [their] arguments." *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) (citation omitted); *see also id.* ("[C]onclusory analysis will be construed as waiver.").

In its complaint, CWIT expressly alleged the Termination Provision was *ultra vires* in violation of the Spending Clause and that it violated the separation of powers

"both facially and as applied."  Compl. ¶¶ 140–147, 156–168.  CWIT then made its

Spending Clause and separation of powers arguments in its preliminary injunction

opening brief and incorporated those arguments in its temporary restraining order

briefing.  Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 12–13; Pl.'s Mem. in Supp. of

Mot. for TRO at 14.

In its response to these motions, the government solely relied on one out-of-

circuit case to dispute CWIT's separation of powers arguments on the merits:  the D.C.

Circuit's decision in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*,

295 F.3d 28 (D.C. Cir. 2002).  According to the government, *Allbaugh* was dispositive

on the separation of powers issue, as the D.C. Circuit reasoned that an executive order

limited "to the extent permitted by law" merely "instruct[ed] . . . agenc[ies] to follow the

law."  *See* Defs.' Mem. in Opp. to Pl.'s Mot. for Prelim. Inj. at 32–33.  The Court

ultimately found, in its preliminary injunction ruling, that *Allbaugh* was unpersuasive.

*See Chi. Women in Trades*, 2025 WL 1114466, at *18 (distinguishing *Allbaugh* based

on the Ninth Circuit's reasoning in *City & County of San Francisco v. Trump*, 897 F.3d

1225 (9th Cir. 2018)).

Prior to this point, the government has not mentioned *Dalton v. Specter* in its

briefing at all.  The closest the government got to citing *Dalton* anywhere in these

proceedings was during the preliminary injunction hearing.  During the hearing, the

Court asked the government whether the Termination Provision of the J20 Order

violated the separation of powers by requiring the termination of equity-related grants in

contravention of the WANTO Act.  Citing no case in particular, the government argued

"[t]he Supreme Court has distinguished between a claim that says the [E]xecutive

[B]ranch has acted outside the scope of its statutory authority as opposed to a separation of powers argument."  Tr. of Proceedings, 78, Apr. 10, 2025.  Yet when asked "[w]hat's the difference" between the Executive overstepping its statutory authority and a separation of powers violation, the government backtracked to previous arguments, stating it had "not really looked at [this] very closely because, again, plaintiffs have raised this separation of powers argument very cursor[ily] and again we're not there yet because WANTO hasn't been terminated."  *Id.* at 78–79.  Only when further pressed did the government assert that a specific challenge to the Termination Provision based on the WANTO Act would require arguing "the [P]resident has violated the statute, perhaps" under the "APA."  *Id.* at 79.  Lastly, when the Court asked the government whether the WANTO Act required funding equity-related grants in conflict with the Termination Provision's termination of such grants, the government resorted to its argument from *Allbaugh* that the Termination Provision's "extent permitted by law" language simply instructed agencies to follow the law.  *Id.* at 80–81.

By referencing *Dalton*'s reasoning only during the preliminary injunction hearing, the government has at least forfeited the argument.  The government had multiple timely opportunities to raise this issue, as it could (and should) have done so in its briefs on the motion for temporary restraining order and the motion for preliminary injunction. Instead, the government failed to brief the argument *at all* and only vaguely alluded to the principle discussed in *Dalton* during the preliminary injunction hearing.  Whether by accident or neglect, the government at least forfeited the argument that *Dalton* forecloses this Court's review by failing to raise it earlier in a non-conclusory way.  *See Teva N. Am.*, 891 F.3d at 692.

Moreover, the record reflects not just inadvertent forfeiture, but a deliberate focus on arguments other than the government's current *Dalton*-based argument. The government's briefing relied on one case, and one case only, in its separation of powers section—*Allbaugh*. When questioned by the Court on whether CWIT could challenge the Termination Provision on separation of powers grounds as applied to the WANTO grant, the government alluded to a *Dalton*-esque argument, but failed to cite any authority in particular and conceded it had "not really looked at" the argument "very closely." *Id*. at 78–79. The government then immediately shifted to its ripeness arguments, emphasizing that "we're not there yet because WANTO hasn't been terminated." *See id*. Finally, when asked specific questions about what grants the government was required to fund under the WANTO Act, the government again relied on *Allbaugh*'s reasoning to assert the Termination Provision could not violate the Act. This is the government "select[ing] among arguments"—ripeness and *Allbaugh*—"as a matter of strategy." *Holder*, 751 F.3d at 493. The Court concludes that this amounts to a waiver of the *Dalton*-based argument, at least with respect to the ruling on the WANTO grant, which is not before the Court by way of CWIT's motion to modify.

### 2.     Applicability of *Dalton*

Even if the Court found that the government did not waive its *Dalton* argument, the Court is not convinced that it is foreclosed from reviewing CWIT's Spending Clause and separation of powers claims at this time. As a preliminary matter, *Dalton* did not involve the Spending Clause, so it is distinguishable from the present action.

But even going to the heart of *Dalton*'s rationale, the Court finds the government's argument unpersuasive. To reiterate, *Dalton* distinguished between a

claim that the President acted in a "conceded *absence* of *any* statutory authority" and "a claim that the President acted in excess of such authority." *Dalton*, 511 U.S. at 473. The Court in *Dalton* "assume[d] for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA" but found that "longstanding authority holds that such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* at 474.

Here, however, no such discretionary power exists. The federal spending power lies exclusively with Congress. U.S. Const., art. 1, § 8, cl. 1. The Executive Branch *must* respect congressional appropriations; it does not retain discretion to condition the payment of grants based on its political priorities absent a congressional delegation of such authority. *See In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections."); *see also City of Chicago v. Sessions*, 888 F.3d 272, 283 (7th Cir. 2018). The WANTO Act and its relevant appropriation acts, as discussed in the preliminary injunction order, likewise do not leave room for discretion permitting the President or DOL to withhold or terminate WANTO grant funds. *See Chi. Women in Trades*, 2025 WL 1114466, at *16–18 (discussing the specific language of the WANTO Act and relevant appropriations acts).

Accordingly, then, CWIT's claim regarding the Termination Provision as applied to its WANTO grant is best characterized as a claim that the President acted in the absence of any authority, and not a claim that he exceeded statutory authority. As the Court emphasized in its preliminary injunction order, the only authority given to the

Executive regarding the WANTO grant is a congressional mandate that "not less than $5,000,000 *shall* be used for *grants* authorized by the Women in Apprenticeship and Nontraditional Occupations Act."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 641 (emphases added).  Put differently, the WANTO Act and relevant appropriations acts do not allow for discretionary action by the Executive and contain a single permissible use of Executive authority:  spend the money Congress allocated for the WANTO grants.  In other words, the President lacks authority to allocate these funds towards any other grant and further lacks authority to terminate these grants.  For these reasons, *Dalton* is inapposite.

## B.    Rule 59(e)

Under Rule 59(e), a party may file a motion to alter or amend a judgment, including an order for an injunction.  *See* Fed. R. Civ. P. 59(e); *Su v. Fensler*, No. 22 C 1030, 2023 WL 8446380, at *2 (N.D. Ill. Nov. 28, 2023).  "In general, to prevail on a motion for reconsideration a party must establish a 'manifest error of law or fact,' or must show there is 'newly discovered evidence' that would have precluded the order for which they seek reconsideration."  *Su*, 2023 WL 8446380, at *2 (citations omitted). Manifest error of law requires the movant to establish a court's "wholesale disregard, misapplication, or failure to recognize controlling precedent."  *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000).

CWIT contends that, like its WANTO grant, its four other sources of federal funding call for funding of equity-related projects based on statutory language and the congressional record.  CWIT thus asks the Court to preclude termination of these four other sources of funding based on its reasoning in the preliminary injunction decision.

11

The Court finds CWIT's arguments unpersuasive.

### 1.    TBII grant

The TBII grant is awarded under the Workforce Innovation and Opportunity Act (WIOA).  DOL's Women's Bureau administers grants authorized by the WIOA.  As CWIT notes, Congress established DOL Women's Bureau in part to "formulate standards and policies which shall promote the welfare of wage-earning women, improve their working conditions, increase their efficiency, and advance their opportunities for profitable employment."  29 U.S.C. § 13.  According to CWIT, then, any grant administered by DOL Women's Bureau pursuant to the WIOA necessarily is an equity-related grant, "and therefore, for the same reason the Court enjoined termination of the WANTO grant, it should similarly enjoin termination of the TBII grant."  Pl.'s Corrected Mem. in Supp. of Mot. to Modify Prelim. Inj. at 5.  CWIT further emphasizes this argument by pointing to the scope of work for its TBII grant, which CWIT contends "effectuates the original directive of the Women's Bureau's organic statute."  *Id.*

The Court is not persuaded.  As the government points out, the organic statute creating the DOL Women's Bureau does not mandate the funding of any grants, let alone the TBII grant.  The only statutory authorization for Women's Bureau to allocate funds to the TBII grant comes from the 2024 Appropriations Act.  And there, Congress did not use the same sort of language to fund WIOA grants that it used to fund WANTO grants.

In the 2024 Appropriations Act, Congress's allocation of funds to DOL included this language:  "*[p]rovided further*, That the funds available to the Women's Bureau *may* be used for grants to serve and promote the interests of women in the workforce."

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 641 (second emphasis added).  By contrast, for the WANTO Act, the 2024 Appropriations Act stated:  "*[p]rovided further*, That of the amounts made available to the Women's Bureau, not less than $5,000,000 *shall* be used for grants authorized by the Women in Apprenticeship and Nontraditional Occupations Act."  *Id.* (second emphasis added).

The difference between "shall" and "may" is clear:  although the 2024 Appropriations Act mandates that "not less than $5,000,000" must be used for WANTO Act grants, remaining "funds available" after that may, possibly, be used for other grants.  *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").  In short, DOL may, but is not required to, provide equity-related grants under WIOA.

The Women's Bureau's organic statute does not instruct otherwise.  Although CWIT points to language in the statute that references equity, the language in an agency's organic statute does not, in this context, supersede directly applicable language that Congress placed in the relevant appropriations statute.  Regarding the 2024 Appropriations Act, Congress made clear that DOL Women's Bureau is required to fund WANTO grants but gave it discretion to fund other grants that "serve and promote the interests of women in the workforce."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 641.  And although that language does sound in gender-based equity, the use of the permissive "may" in the 2024 Act indicates that Congress has different requirements for how, and whether, the Women's Bureau allocates funds to WIOA grants and, by extension, CWIT's TBII grant.  This difference

leads the Court to conclude that it did not commit a manifest error of law in limiting its preliminary injunction to CWIT's WANTO grant.

### 2.    ABA grant

In describing the funding goals of the Apprenticeship Building America (ABA) grant, CWIT refers to the ABA's appropriation statute, the Consolidated Appropriations Act of 2021, and highlights its reference to "equity intermediaries" as one of the recipients of allocated funds for ABA grants.  CWIT then refers to the explanatory statement and legislative history to emphasize that the ABA grants target "equity intermediaries" and "underserved and underrepresented populations."  *See* Consolidated Appropriations Act, 2021 Committee Print on H.R. 133, Pub. L. No. 116-260 at 1594; H.R. Rep. No. 116-450, at 16 (2020).

The Consolidated Appropriations Act, 2021, provides that:

> For necessary expenses of the Workforce Innovation and Opportunity Act (referred to in this Act as "WIOA") and the National Apprenticeship Act, $3,663,200,000, plus reimbursements, shall be available. Of the amounts provided: . . .

> (2) for national programs, $817,868,000 as follows:

> . . .

> (G) $185,000,000 to expand opportunities through apprenticeships only registered under the National Apprenticeship Act and as referred to in section 3(7)(B) of the WIOA, to be available to the Secretary to carry out activities through grants, cooperative agreements, contracts and other arrangements, with States and other appropriate entities, including equity intermediaries and business and labor industry partner intermediaries, which shall be available for the period July 1, 2021 through June 30, 2022.

*See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. I, 134 Stat. 1182, 1547–49 (emphasis added).

CWIT argues that this language confirms that Congress has required DOL to

14

fund equity-related programming through the ABA grant and that the application of the Termination Provision to the ABA grant would therefore be unlawful, similar to this Court's finding in the context of the WANTO grant.

The Court disagrees with CWIT's reading of the statute. Although CWIT focuses on the statute's reference to "equity intermediaries," this reference is incomplete. The key language in the provision is "including," which directly precedes "equity intermediaries." The use of the preposition "including" indicates that the Secretary of Labor *may* choose to fund an "equity intermediary" but that it is not required to do so. The use of "including" begins a non-exhaustive list. In other words, equity intermediaries are just *one potential* category of "appropriate entities," in addition to entities such as "business and labor industry partner intermediaries." *See Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) ("It is true that use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive."); *see also Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 862 (D.C. Cir. 1984) (indicating that interpretations of statutes that maintain the discretion of the Executive are more consistent with the usual understanding of lump-sum appropriations).

This phrasing is in stark contrast with the WANTO grant, which expressly states that the Executive "shall" award grants for projects benefitting women. *See* 29 U.S.C. § 2503(a). Though equity-related projects are certainly a permitted use of the funds, as conveyed by the mention of "equity intermediaries," there is no language in the statute that *requires* the Executive to fund equity intermediaries. In fact, by mentioning other permissible recipients such as business partners, a more general reference that is not

15

equity related, the language suggests the opposite.

Moreover, as the government argues, it is well-established that legislative history does not bind agencies in the context of congressional appropriations. Indeed,

> a fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency.

*Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citations and internal quotation marks omitted); *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 200 (2012) ("An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history." (citation omitted)).

CWIT has not pointed to any language in the actual appropriations statute that requires the government to fund equity-related grants akin to the Court's conclusion regarding the WANTO grants. The Court therefore concludes that it did not commit a manifest error of law with respect to CWIT's ABA grant.

### 3.    JFF-related funding

CWIT's last two federal funding sources, its HUB grant and IIC, are administered through a different entity, Jobs for the Future; CWIT is a subawardee and subcontractor to JFF under these grants. According to CWIT, "[t]he Authorizing Statute and Appropriations are the same for both JFF grants." Pl.'s Corrected Mem. in Supp. of Mot. to Modify Prelim. Inj. at 8. In particular, CWIT emphasizes that the 2021 Appropriations Act allocated "$185,000,000 to *expand opportunities* through apprenticeships only registered under the National Apprenticeship Act and . . . the

16

WIOA."  Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. H, Tit. I, § (G), 134 Stat. 1182, 1549 (emphasis added).  Based on this language and relevant legislative history, CWIT contends that both JFF grants are congressional mandates directing DOL to disburse funds for equity-related grants.  Accordingly, CWIT argues that terminating these grants would directly violate the congressional mandate regarding how to spend these funds.

For the reasons outlined above, the Court does not find CWIT's arguments persuasive.  A general reference to "expand[ing] opportunities" is nothing like the women-focused mandate relating to WANTO grants.  As the Court set out in its preliminary injunction order, Congress expressly directed DOL's Women's Bureau to allocate not less than a specified amount of federal funds to WANTO grants; in turn, every permissible use of grant funds under the WANTO Act required implementing programs supporting women in particular.  The Court found that grants that fund programs focused on helping women to enter skilled labor jobs in which they are underrepresented could only be characterized as "equity-related grants."  *See Chi. Women in Trades*, 2025 WL 1114466, at *16–18.  It was in stepping through this analysis that the Court determined that the President lacked authority to terminate funding that Congress mandated under the WANTO Act and accompanying appropriation acts.

CWIT's brief does not discuss with particularity the statutory language or appropriations act for either JFF grant.  Instead, CWIT focuses on the legislative history for the 2021 Appropriations Act, which it contends shows that "Congress specifically expressed its concern for and intent to target 'gender-inequity.'"  Pl.'s Corrected Mem. in

Supp. of Mot. to Modify Prelim. Inj. at 9.  The specific legislative history highlighted by

CWIT states:

> Furthermore, the Committee is concerned with the persistent gender inequity in apprenticeship programs.  While apprenticeships are an important path to the middle-class, women are often underrepresented in apprenticeship programs, and women who do participate often make far less than their male counterparts.  The Committee encourages the Department to commit to addressing these inequities within the apprenticeship programs and directs the Department to include an update on such efforts in its fiscal year 2021 Congressional Budget Justification.

Report of the Committee on Appropriations House of Representatives on H.R. 2740,

H.R. Rep. No. 116-62, at 16 (2019).

As explained earlier, this legislative history, although referencing concerns over

gender inequity, does not carry the force and effect of a congressional mandate.  Nor

does it contain direct language akin to the WANTO Act that would persuade this Court

that modification of the preliminary injunction is called for.  The only "mandate" arguably

found in the legislative history "directs" DOL to update the Committee on its "efforts" to

address gender inequity—not to allocate funds to programs addressing such inequity.

In sum, then, the Court concludes that CWIT has not shown a manifest error of

law warranting modification of the preliminary injunction to encompass any of CWIT's

other sources of federal funding.

### Conclusion

For the reasons stated above, the Court denies CWIT's motion to modify [dkt. no.

73].  A supplement to the April 28 joint status report (dkt. 84) is to be filed by May 9,

2025.  The case is set for a telephonic status hearing on May 14, 2025 at 9:15 a.m.,

using call-in number 650-479-3207, access code 2305-915-8729.  The Court intends to

set at that time a schedule for any further proceedings needed to bring the case to a

conclusion.

Date:  May 7, 2025

_____
MATTHEW F. KENNELLY
United States District Judge

GA195

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHICAGO WOMEN IN TRADES, | |
| Plaintiff, | |
| | Case No. 1:25-cv-02005 |
| v. | |
| | Judge: Hon. Matthew F. Kennelly |
| PRESIDENT DONALD J. TRUMP, DEPARTMENT OF LABOR, ACTING SECRETARY OF LABOR VINCENT MICONE, OFFICE OF MANAGEMENT AND BUDGET, DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET RUSSELL VOUGHT, U.S. DEPARTMENT OF JUSTICE, ATTORNEY GENERAL OF THE U.S. DEPARTMENT OF JUSTICE PAMELA BONDI, | JURY TRIAL DEMANDED |
| Defendants. | |

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the Seventh Circuit from this Court's Memorandum Opinion and Order. *See* ECF Nos. 68 & 69.

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

ANDREW S. BOUTROS
United States Attorney

THOMAS P. WALSH
PATRICK JOHNSON
Assistant United States Attorneys

*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Gabriel I. Schonfeld*
Gabriel I. Schonfeld