No. 25-2144

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

CHICAGO WOMEN IN TRADES,

   Plaintiff-Appellee,

DONALD J. TRUMP, President of
the United States; U.S.
DEPARTMENT OF LABOR;
VINCENT MICONE, Acting
Secretary of Labor; RUSSELL
VOUGHT, Director of the Office of
Management and Budget; U.S.
DEPARTMENT OF JUSTICE;
PAMELA BONDI, Attorney General
of the United States,

   Defendants-Appellants.

Appeal from the United States
District Court for the Northern
District of Illinois

District Court No. 25-cv-02005

Hon. Matthew F. Kennelly,
District Judge

---

## BRIEF FOR AMICI CURIAE
## INSTITUTE FOR WOMEN'S POLICY RESEARCH, NATIONAL
## PARTNERSHIP FOR WOMEN & FAMILIES, SHRIVER CENTER ON
## POVERTY LAW, WOMEN EMPLOYED, AND LEGAL ACTION CHIAGO
## IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

---

Caryn Lederer
Kate Schwartz
Justin Tresnowski
Hughes Socol Piers Resnick & Dym, Ltd.
clederer@hsplegal.com
kschwartz@hsplegal.com
jtresnowski@hsplegal.com
(312) 580-0100
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602
*Counsel for Amici Curiae*

Save As      Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2144

Short Caption: Chicago Women in Trades v. Donald J. Trump, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Institute for Women's Policy Research; National Partnership for Women & Families; Shriver Center on Poverty Law;

Women Employed; and Legal Action Chicago

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hughes Socol Piers Resnick & Dym, Ltd.

(3)      If the party, amicus or intervenor is a corporation:

i)       Identify all its parent corporations, if any; and

n/a

ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Kate Schwartz          Date: Sept. 22, 2025

Attorney's Printed Name: Kate Schwartz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).      Yes [✓]   No [ ]

Address: 70 W. Madison St., Suite 4000, Chicago, IL 60602

Phone Number: 312-580-0100                     Fax Number: 312-580-1994

E-Mail Address: kschwartz@hsplegal.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2144

Short Caption: Chicago Women in Trades v. Donald J. Trump, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Institute for Women's Policy Research; National Partnership for Women & Families; Shriver Center on Poverty Law;

Women Employed; and Legal Action Chicago

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Hughes Socol Piers Resnick & Dym, Ltd.

(3)    If the party, amicus or intervenor is a corporation:

     i)      Identify all its parent corporations, if any; and

       n/a

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
n/a

Attorney's Signature: /s/ Caryn C. Lederer     Date: Sept. 24, 2025

Attorney's Printed Name: Caryn C. Lederer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: 70 W. Madison St., Suite 4000, Chicago, IL 60602

Phone Number: 312-580-0100     Fax Number: 312-580-1994

E-Mail Address: clederer@hsplegal.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2144

Short Caption: Chicago Women in Trades v. Donald J. Trump, et al.

　　To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

　　The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Institute for Women's Policy Research; National Partnership for Women & Families; Shriver Center on Poverty Law;

Women Employed; and Legal Action Chicago

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Hughes Socol Piers Resnick & Dym, Ltd.

(3)　　If the party, amicus or intervenor is a corporation:

i)　　Identify all its parent corporations, if any; and

n/a

ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Justin Tresnowski　　　　Date: Sept. 24, 2025

Attorney's Printed Name:  Justin Tresnowski

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　**Yes** ☐　**No** ☑

Address:  70 W. Madison St., Suite 4000, Chicago, IL 60602

Phone Number: 312-580-0100　　　　Fax Number: 312-580-1994

E-Mail Address: jtresnowski@hsplegal.com

rev. 12/19 AK

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .......................................................................... ii

INTEREST AND IDENTITY OF AMICI CURIAE ..................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................... 4

ARGUMENT ............................................................................................ 6

I.     CWIT Has Long Played a Critical Role in Breaking Down Historic
Gender Barriers to Employment in the Trades .................................. 6

        A.     CWIT's Core Programming Employs the Most Effective Methods
for Improving Women's Opportunities to Access, Remain, and
Advance in Trades Work ........................................................... 7

                1.     *CWIT's Pre-Apprenticeship Training Programs
Breakdown Women's Barriers to Accessing Trades Work* ............ 8

                2.     *CWIT's Provision of Technical Assistance Helps Industry
Stakeholders to Attract and Retain Skilled Tradeswomen* ....... 11

        B.     Due in Large Part to the Tireless Work of CWIT and Similar
Organizations—And the Congressional Commitment to Funding
That Work—The Share of Trades Jobs Held by Women Has
Gradually Increased ................................................................ 15

II.    Work In the Trades Provides Women—Especially Single Women and
Women Without College Degrees—With Virtually Unmatched
Opportunities for Upward Economic Mobility for Themselves and Their
Families ............................................................................................. 18

III.   CWIT's Work to Remove Barriers to Trades Jobs for Women Benefits
the Trades Industries, the National Economy, and the Public At Large ....... 23

IV.   CWIT's Work Remains Critical for Addressing the Major Systemic
Barriers That Continue to Cause Occupational Gender Segregation in
the Trades ......................................................................................... 26

CONCLUSION ....................................................................................... 29

CERTIFICATE OF COMPLIANCE ....................................................... 30

CERTIFICATE OF SERVICE ............................................................... 31

<u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advocates for Women v. Marshall*,
No. 76-0862 (D.D.C. filed May 14, 1976)..................................................6

*Eldredge v. Carpenters 46 N. Cal. Ctys. Joint Apprenticeship & Training Comm.*,
662 F.2d 534 (9th Cir. 1981) ........................................................................6

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ......................................................................................5

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ................................................................................5, 23

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*,
699 F.3d 962 (7th Cir. 2012) ......................................................................17

*Women Working in Const. v. Marshall*,
No. 76-527 (D.D.C. filed Apr. 13, 1976)......................................................6

**Statutes, Orders, Rules, and Regulations**

29 C.F.R. § 30.8(a)(1)(iv) ...............................................................................17

29 U.S.C. § 2501(a)(3) ....................................................................................16

43 Fed. Reg. 14899 (Apr. 7, 1978) ...................................................................7

Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 (Jan. 31, 2025).............................................4, 17

Federal Rule of Appellate Procedure 29(a)(4) ..................................................1

**Other Authorities**

*2024 Workforce Survey Analysis*, ASSOCIATED GENERAL CONTRACTORS OF AMERICA & ARCORO (2024), https://www.agc.org/sites/default/files/Files/Communications/2024_Workforce_Survey_Analysis.pdf ....................................................24

*About Intimate Partner Violence*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (May 16, 2024), https://www.cdc.gov/intimate-partner-violence/about/index.html ....................................................22

Andrea Lee & Kaleigh DuVernet, *Building diversity: the value of inclusivity in the construction industry*, INTERNATIONAL BAR ASSOCIATION (Nov. 2019), https://www.ibanet.org/article/ff0e6d55-2a4e-46f5-a159-5b38b592962f#9 ........... 24

Ariane Hegewisch & Eve Mefferd, *2021 IWPR Tradeswomen's Retention and Advancement Survey*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Nov. 16, 2021), https://iwpr.org/wp-content/uploads/2021/11/Tradeswomens-Retention-Advancement-Survey_2021.pdf .................................................................... 8, 27

Ariane Hegewisch & Eve Mefferd, *A Future Worth Building,* INSTITUTE FOR WOMEN'S POLICY RESEARCH (Nov. 2021), https://iwpr.org/wp-content/uploads/2022/02/A-Future-Worth-Building_What-Tradeswomen-Say_FINAL.pdf.................................................................................... passim

Ariane Hegewisch & Tanima Ahmed, *Growing The Numbers of Women in the Trades: Building Equity And Inclusion Through Pre-Apprenticeship Programs*, CHICAGO WOMEN IN TRADES (Nov. 14, 2019), https://iwpr.org/wp-content/uploads/2020/07/Growing-the-Number-in-the-Trades_revision1.pdf ....... 10

Ariane Hegewisch & Zohal Barsi, *The Gender Wage Gap by Occupation 2019 and by Race and Ethnicity*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Mar. 2020), https://iwpr.org/wp-content/uploads/2020/07/2020-Occupational-wage-gap-FINAL.pdf ................................................................................................ 20

Ariane Hegewisch et al., *Untapped Resources, Untapped Labor Pool*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Dec. 2014), https://iwpr.org/wp-content/uploads/2020/12/Untapped-Resources_FINAL.pdf.................................................. 10

Ariane Hegewisch, *As Apprenticeships Expand, Breaking Down Occupational Segregation Is Key to Women's Economic Success*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/IWPR-Apprenticeship-Report-March-2024.pdf.................................................... 20

Ariane Hegewisch, *Numbers Matter: Women Working in Construction*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Aug. 2025), https://iwpr.org/wp-content/uploads/2025/08/Women-in-Construction-QF_2025.pdf......................................... 15

Ariane Hegewisch, *Quick Figure: Women Need Better Access to High-Paying Apprenticeships*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Nov. 2024), https://iwpr.org/wp-content/uploads/2024/11/2024-Women-in-Apprenticeships-Quick-Figure-2.pdf .............................................................................................. 19

Barbara A. Butrica et al., W*omen in Apprenticeships and Nontraditional Occupations in the United States*, URBAN INSTITUTE (May 2023), https://www.apprenticeship.gov/sites/default/files/WANTO-knowledge-report-508%206.15.23.pdf ................................................................................... 9

Chandra Childers et al., *Here to Stay: Black, Latina, and Afro-Latina Women in Construction Trades Apprenticeships and Employment*, CHICAGO WOMEN IN TRADES (Mar. 9, 2021), https://iwpr.org/wp-content/uploads/2021/03/Here-to-Stay_revision2.pdf ................................................................................. passim

Chang-Tai Hsieh et al., *The Allocation of Talent and U.S. Economic Growth*, in 87 ECONOMETRICA 1439 (Sept. 30, 2019),https://web.stanford.edu/~chadj/HHJK.pdf ............................................................................................................ 23

Crystal Weise, *The Business Case for Good Jobs*, CENTER FOR AMERICAN PROGRESS (Sept. 12, 2023), https://www.americanprogress.org/article/the-business-case-for-good-jobs/ .................................................................................... 25

Daeyoun Won et al., *Assessing the effects of workforce diversity on project productivity performance for sustainable workplace in the construction industry*, SUSTAINABLE DEVELOPMENT (2020), https://diversityatlas.io/wp-content/uploads/2023/08/2020-Assessing-the-effects-of-workforce-diversity-on-project-productivity-performance-for-sustainable-workplace-in-the-construction-industry.pdf ................................................................................. 24

David Gyarmati et al., Social Research and Demonstration Corporation, *Enhancing the Retention and Advancement of Women in Trades in British Columbia: Final Report*, SOCIAL RESEARCH AND DEMONSTRATION CORPORATION (Feb. 2017), https://www.workbc.ca/sites/default/files/Construction_Retention_and_Advancement_of_Women_in_Trades_Feb-2017.pdf ................................ 8

*Diversity matters even more: The case for holistic impact*, MCKINSEY & COMPANY (Dec. 5, 2023), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-matters-even-more-the-case-for-holistic-impact .................... 23

*Economic Justice Policy*, NATIONAL NETWORK TO END DOMESTIC VIOLENCE (2024), https://nnedv.org/content/economic-justice-policy/ .................................. 22

Elyse Shaw et al., *Undervalued and Underpaid in America: Women in Low-Wage, Female-Dominated Jobs*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (2016), https://iwpr.org/wp-content/uploads/2020/09/D508-Undervalued-and-Underpaid.pdf ................................................................................. 25

*Equity Resource Center*, CHICAGO WOMEN IN TRADES (2025), https://cwit.org/equity-resource-center/ .................................................................................. 14

Frank Manzo & Robert Bruno, *The Impact of Pre-Apprenticeship Programs in Illinois*, ILLINOIS ECONOMIC POLICY INSTITUTE (Aug. 20, 2025), https://cwit.org/wp-content/uploads/2025/08/ilepi-pmcr-impact-of-pre-apprenticeship-programs-in-illinois-final.pdf ................................................................ 10, 26

Gretchen Rachel Hammond, *Chicago Women in Trades forges new, nontraditional lives*, WINDY CITY TIMES (Jan. 28, 2015), https://windycitytimes.com/2015/01/28/chicago-women-in-trades-forges-new-nontraditional-lives/ .................................... 7

Isabela Salas-Betsch, *The Economic Status of Single Mothers*, CENTER FOR AMERICAN PROGRESS (Aug. 7, 2024), https://www.americanprogress.org/article/the-economic-status-of-single-mothers/........................................................ 20, 21, 26

Jasmine Tucker & Julie Vogtman, *Hard Work Is Not Enough: Women in Low-Paid Jobs*, National Women's Law Center (July 2023), https://nwlc.org/wp-content/uploads/2020/04/%C6%92.NWLC_Reports_HardWorkNotEnough_LowPaid_2023.pdf ....................................................................... 19, 21

Jessica Kutz, *'We just don't hire women': In the construction industry, discrimination runs rampant*, THE 19TH (July 7, 2023), https://19thnews.org/2023/07/construction-industry-women-people-of-color-discrimination/........... 24, 27

John A. Gambatese et al., *Development of a workforce sustainability model for construction*, THE CENTER FOR CONSTRUCTION RESEARCH AND TRAINING (2019), https://www.cpwr.com/wp-content/uploads/publications_SS2019-workforce-sustainability-model-development.pdf.................................................... 24

Kate Rubin & Doug Slater, *Winning Construction Jobs for Local Residents*, BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW (July 2025), https://www.brennancenter.org/media/86/download/Report_Winning-Construction-Jobs-for-Local-Residents.pdf .............................................. 10

Marina Zhavoronkova & Rose Khattar, *Infrastructure Bill Must Create Pathways for Women To Enter Construction Trades*, CENTER FOR AMERICAN PROGRESS (Sept. 20, 2021), https://www.americanprogress.org/article/infrastructure-bill-must-create-pathways-women-enter-construction-trades/ ........................................ 16, 18

Mark C. Perna, *4 Research-Based Strategies to Make Skilled Trade Careers More Attractive to Gen-Z*, FORBES (Apr. 5, 2022), https://www.forbes.com/sites/markcperna/2022/04/05/4-research-based-strategies-to-make-skilled-trade-careers-more-attractive-to-gen-z/ ............................................................ 8

*Policy and Practice: Women's Experiences and Advancement in Construction*, NCCER (Apr. 2025), https://www.nccer.org/media/2025/04/NCCER_Women-in-Construction_Report-Final-04232025.pdf............................................ 13

Robert Bruno & Frank Manzo, *White Paper: Living Wages in Registered Apprenticeship Programs, An Assessment by Industry, Demographics, State, and Labor Policy*, U.S. DEPT. OF LABOR CHIEF EVALUATION OFFICE (Jan. 20, 2025), https://illinoisepi.wordpress.com/wp-content/uploads/2024/12/pmcr-ilepi-living-wages-in-registered-apprenticeship-programs-final.pdf ................................ 18, 22

Stephanie Ferguson Melhorn & Isabella Lucy, *Data Deep Dive: Women in the Workforce,* U.S. CHAMBER OF COMMERCE (June 26, 2024), https://www.uschamber.com/workforce/data-deep-dive-a-decline-of-women-in-the-workforce ................................................................................................ 18, 19

Stephanie Ferguson Melhorn et al., *The Workforce Impact of Second Chance Hiring*, U.S. CHAMBER OF COMMERCE (Sept. 18, 2024), https://www.uschamber.com/workforce/data-deep-dive-the-workforce-impact-of-second-chance-hiring-3 ......... 22

Susan Moir & Elizabeth Skidmore, *Policy Group on Tradeswomen's Issues*, *in* ORGANIZING FOR POWER: BUILDING A TWENTY-FIRST CENTURY LABOR MOVEMENT IN BOSTON 185 (Aviva Chomsky & Steve Striffler, eds. 2021), available at https://policygroupontradeswomen.org/wp-content/uploads/2021/12/MoirSkidmore2021.pdf ............................................................................................. 15

*Technical Assistance,* CHICAGO WOMEN IN TRADES (2025), https://cwit.org/technical-assistance/ ................................................................................................ 14

*Training Programs*, CHICAGO WOMEN IN TRADES (2025), https://cwit.org/training/ ... 9

*Women in the Nontraditional Workforce: Hearing Before the Subcomm. on Labor of the Comm. on Labor and Human Res.*, 100th Cong. (1987) (statement of Portia Davis, Chillicothe, OH), available at https://files.eric.ed.gov/fulltext/ED295012.pdf ................................................................................................ 21

*Women in the Skilled Trades: More Than Just Boots on the Ground*, NATIONAL CENTER FOR CONSTRUCTION EDUCATION AND RESEARCH (2025), available at https://hs.nccer.org/women-in-the-skilled-trades-more-than-just-boots-on-the-ground ............................................................................................ 11, 12

## INTEREST AND IDENTITY OF AMICI CURIAE[1]

Amici Curiae—the Institute for Women's Policy Research, the National Partnership for Women & Families, the Shriver Center on Poverty Law, Women Employed, and Legal Action Chicago (collectively "Amici")—are non-profit organizations, both national and local to Illinois, who share a commitment to achieving economic equity for traditionally marginalized groups, including women and low-income families. From their longstanding work conducting rigorous policy research, engaging in various forms of advocacy, and directly supporting women and families with lived experiences of employment discrimination and inequity, Amici have important knowledge and expertise concerning what is at stake if the Certification Provision is enforced. Their detailed explanation of what is at stake— not only for CWIT and women, but also, more broadly, for construction and other skilled trade industries, and for the public at large—provides important context for the legal issues in this case.

**The Institute for Women's Policy Research (IWPR)** is a nonpartisan, nonprofit organization that conducts and disseminates rigorous research and engages in strategic advocacy concerning the challenges women face to shape public policy and improve the lives and opportunities of women from diverse backgrounds. The pillars of IWPR's work include a focus on equitable work and wages, as well as

---

[1] Pursuant to Rule 29(a)(4) of the Federal Rules of Appellate Procedure, counsel for Amici Curiae state that: the parties have consented to the filing of this brief; no counsel for a party authored this brief in whole or in part; and, no party, counsel for a party, or other person—other than Amici Curiae, their members, or their counsel—made a monetary contribution to the preparation or submission of this brief.

education and career advancement. As a leading national thinktank, IWPR is comprised of economists, sociologists and specialists in various fields, who utilize their expertise to achieve economic equality for all women and eliminate barriers to their full participation in society. For years, IWPR has studied and published reports focusing on the advancement of women in the trades.

**The National Partnership for Women & Families (NPWF)** is a national, non-profit, non-partisan advocacy organization with a mission to improve the lives of women and families by achieving equality and equity for all women. NPWF accomplishes its work in numerous ways, including through advocacy in the public and private sectors and at the federal, state, and local level; policy research and analysis; the provision of technical assistance to policymakers, media, and allies; leadership and participation in diverse coalitions and stakeholder relationships; and public education and engagement. NPWF places particular focus on impacting the lived experience of women and families who face the greatest barriers to equity and opportunity.

**The Shriver Center on Poverty Law (Shriver Center)** is an Illinois non-profit organization that provides national leadership in advancing laws and policies to secure justice for and improve the lives and opportunities of people living in poverty. Through litigation, policy reform, and the training and convening of multi-state networks of lawyers, community leaders, and activists nationwide, the Shriver Center has secured hundreds of victories with and for people living in poverty in Illinois and across the country. One of the Shriver Center's core areas of focus is on

economic justice, including the fight for low-income people to achieve financial stability and for all workers to have a fair and equitable workplace. Shriver Center's Women's Law and Policy Initiative Director, Wendy Pollack, is a former union carpenter who was a cofounder of Chicago Women Carpenters and Chicago Women in Trades.

**Women Employed (WE)** is a nonpartisan Illinois non-profit organization whose principal mission is to improve the economic status of women and remove their barriers to economic equity. WE pursues equity for women in the workforce by effecting policy change, expanding access to educational opportunities, and advocating for fair and inclusive workplaces. WE is also a trusted expert on career pathway programs in Illinois. The organization strives for a future in which every woman, regardless of her background or personal circumstance, is able to get the education and training she needs for the family-sustaining job she wants.

**Legal Action Chicago (Legal Action)** is an organization committed to eliminating poverty through legal and policy advocacy. For those who are living in poverty, Legal Action works to improve their quality of life and promote their upward mobility. The organization addresses a wide range of problems that affect low-income communities using systemic solutions, including class action litigation, legislative advocacy, and policy initiatives. A core focus for Legal Action is ensuring that systems that affect children and families experiencing poverty are rooted in and guided by equity and justice.

Amici have a strong collective interest in ensuring that organizations like CWIT are not silenced and defunded by enforcement of the Certification Provision and thereby prevented from making critically needed progress toward integration in historically male dominated industries like the trades. Accordingly, Amici urge this Court to affirm the district court's preliminary injunction prohibiting the Department of Labor from enforcing the Certification Provision.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Amici agree with Appellee Chicago Women in Trades (CWIT) and the district court that CWIT is likely to prevail on the merits of its challenge to the Certification Provision of Executive Order 14173 (EO 14173), *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8,633 § 3(b)(iv)(B) (Jan. 31, 2025) (Certification Provision). The irredeemably vague Certification Provision is, as the district court determined, an impermissible attempt "to regulate grantees' speech outside of their federally-funded programs" in violation of the First Amendment. (SA24.) As policy researchers and advocates for equal opportunities in employment, Amici submit this brief to highlight the vital social importance of CWIT's equity-based mission and the threat the Certification Provision poses to the public interest.

CWIT works to increase women's participation in high-wage, blue-collar trade occupations by, among other things: (1) teaching trade skills through hands-on training, (2) advocating for policy reforms, and (3) providing technical assistance to employers and other stakeholders in trades industries. For decades, that work has directly advanced a core purpose of Title VII of the Civil Rights Act of 1964: "the removal of artificial, arbitrary, and unnecessary barriers to employment when the

barriers operate invidiously to discriminate" against protected classes. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). As the Supreme Court has long recognized, Congress aimed to benefit everyone by eliminating discriminatory employment barriers through Title VII: "The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973).

Research shows that the work performed by organizations like CWIT has been instrumental in fostering the integration of women into the trades, a development that has indeed produced the broad benefits Congress intended—for women, for the trades industries, and for the larger national economy. In Section I, Amici detail CWIT's work and its contribution toward the gradual integration of women into the trades. In Sections II and III respectively, Amici discuss the unique benefits trades work offers to women and the significant benefits that their integration in the field provide to the broader public. In Section IV, Amici underscore that current data shows that CWIT's work remains essential, as women continue to face immense barriers to employment entry and growth in the trades industries.

Without the ability of organizations like CWIT to continue working to break down the barriers that persist, progress toward gender integration in the trades will stall or regress, causing substantial harm to women, the trades industries, and the broader economy. That harm is inevitable if the Certification Provision is enforced.

Because the very nature of CWIT's work is to promote equity in the trades and because CWIT cannot predict which equity-advancing work the government will deem "illegal," thereby subjecting CWIT to False Claims Act liability, enforcement would effectively eliminate all federal funding for CWIT and similar organizations. Slashing what now accounts for over 40 percent of CWIT's funding would severely hinder ongoing work to foster equal employment in male-dominated fields and jeopardize future progress. Combined with CWIT's likelihood of success on the merits, the irreparable harm the Certification Provision poses to CWIT, the women it serves, and the public interest weigh decisively in favor of the preliminary injunction entered by the district court.

## ARGUMENT

### I.  CWIT Has Long Played a Critical Role in Breaking Down Historic Gender Barriers to Employment in the Trades

The founding of CWIT in 1981 complemented ongoing legal and regulatory efforts to combat discrimination in the decade following Title VII's enactment. A series of class action lawsuits during that period highlighted the extent to which discrimination was blocking women's access to trades work in particular.[2] Recognizing that continued use of "established hiring practices" would likely result in the "continuation of almost total female exclusion" from construction employment, the Department of Labor in 1978 set a target goal of 6.9 percent

---

[2] *See, e.g.*, *Eldredge v. Carpenters 46 N. Cal. Ctys. Joint Apprenticeship & Training Comm.*, 662 F.2d 534, 535 (9th Cir. 1981) (alleging sex discrimination in apprenticeship training program); *Advocates for Women v. Marshall*, No. 76-0862 (D.D.C. filed May 14, 1976); *Women Working in Const. v. Marshall*, No. 76-527 (D.D.C. filed Apr. 13, 1976).

female participation in federally funded construction projects.[3] Three years later, a small group of tradeswomen established CWIT to help combat systemic sex-based discrimination and harassment that they routinely experienced as minorities in their fields by focusing on direct skills trainings for employees and technical assistance for trades employers.[4] Today, CWIT has become a leading advocate for women in nontraditional industries and has assisted scores of women to secure employment in lucrative trades traditionally dominated by men.

### A.    CWIT's Core Programming Employs the Most Effective Methods for Improving Women's Opportunities to Access, Remain, and Advance in Trades Work

Women face numerous barriers that tend to impede their entry, retention, and promotion in job fields like the trades, where female workers are viewed as "nontraditional" or, in some cases, even unwelcome. CWIT effectively breaks down those barriers by directly assisting both prospective trades workers on the one hand, and trades employers, unions, and other industry stakeholders on the other. For example, to address worksite safety barriers to female employment, CWIT not only offers hands-on safety training to women interested in trades work, but also offers companies that may later employ them with optimal policies to ensure their female trades workers will have appropriately sized personal protective equipment to keep them safe on the job. Conducted in tandem, this multifaceted work creates a

---

[3] 43 Fed. Reg. 14899 (Apr. 7, 1978).

[4] Gretchen Rachel Hammond, *Chicago Women in Trades forges new, nontraditional lives*, WINDY CITY TIMES (Jan. 28, 2015), https://windycitytimes.com/2015/01/28/chicago-women-in-trades-forges-new-nontraditional-lives/.

newly skilled workforce to meet the needs of employers, while at the same time
ensuring that those employers have the resources they need to support the workers'
continued employment and professional development.

### 1. *CWIT's Pre-Apprenticeship Training Programs Breakdown Women's Barriers to Accessing Trades Work*

As a result of gender stereotypes and the general lack of female
representation in the trades, women leaving high school are less likely than their
male counterparts to have used tools,[5] received encouragement to pursue trades-
relevant coursework, or even heard from teachers or counselors that trades work is
a possible career path.[6] Women who might otherwise be interested in trades jobs
are thus far more likely than men to reach employment age without exposure to or
awareness of opportunities to work in the trades.[7] As one trades apprentice and

---

[5] David Gyarmati et al., Social Research and Demonstration Corporation, *Enhancing the Retention and Advancement of Women in Trades in British Columbia: Final Report*, SOCIAL RESEARCH AND DEMONSTRATION CORPORATION, at 36 (Feb. 2017), https://www.workbc.ca/ sites/default/files/Construction_Retention_and_Advancement_of_Women_in_Trades_Feb-2017.pdf.

[6] For instance, in a 2021 survey of 2,635 tradeswomen only 6 percent of the survey respondents found out about opportunities in the trades from a high school counselor. *See* Ariane Hegewisch & Eve Mefferd, *2021 IWPR Tradeswomen's Retention and Advancement Survey*, INSTITUTE FOR WOMEN'S POLICY RESEARCH, at 42 (Nov. 16, 2021), https://iwpr.org /wp-content/uploads/2021/11/Tradeswomens-Retention-Advancement-Survey_2021.pdf.

[7] *See, e.g.*, Mark C. Perna, *4 Research-Based Strategies to Make Skilled Trade Careers More Attractive to Gen-Z*, FORBES (Apr. 5, 2022), https://www.forbes.com/sites/markcperna/ 2022/04/05/4-research-based-strategies-to-make-skilled-trade-careers-more-attractive-to-gen-z/ ("Teen boys are more familiar with skilled trades than teen girls (53% vs. 36%) and are more likely to consider a career in a skilled trade (64% vs. 49%). Fewer than half of the young women surveyed thought that the skilled trades would be a good path for them, compared to 69% of boys.").

survey respondent recounted, "If I had known about the trades and what they offer in high school, I would've been a journeywoman by now."[8]

Ideally, individuals who have the necessary skills and who wish to use them to enter a trade will do so through an apprenticeship program. Apprenticeships are extremely valuable because they provide paid on-the-job training, an industry-recognized credential upon completion, and higher long-term career earnings.[9] But the process of applying and successfully gaining admission to such programs can be opaque and difficult.

Pre-apprenticeship programs, like those provided by CWIT, directly address these barriers to career entry through practical training that shores up gaps in participants' technical knowledge and physical skills, while also ensuring that women receive information about job opportunities and support throughout the application process. CWIT's 12-week Technical Opportunities Program, for instance, includes hands-on workshops led by experienced tradeswomen, a range of safety trainings, apprenticeship entry exam preparation, mock interviews, and apprenticeship application support.[10] The most effective programs, like the ones CWIT provides, also ensure access to supportive wraparound services like childcare

---

[8] Ariane Hegewisch & Eve Mefferd, *A Future Worth Building,* INSTITUTE FOR WOMEN'S POLICY RESEARCH, at 8 (Nov. 2021), https://iwpr.org/wp-content/uploads/2022/02/A-Future-Worth-Building_What-Tradeswomen-Say_FINAL.pdf.

[9] Barbara A. Butrica et al., W*omen in Apprenticeships and Nontraditional Occupations in the United States*, URBAN INSTITUTE, at 16 (May 2023), https://www.apprenticeship.gov/sites/default/files/WANTO-knowledge-report-508%206.15.23.pdf.

[10] *Training Programs*, CHICAGO WOMEN IN TRADES (2025), https://cwit.org/training/.

providers, domestic violence resources, and mental health counselors to prevent other longstanding barriers to women's employment from impeding the valuable pre-apprenticeship training the women receive.[11]

Pre-apprenticeship programs work. Researchers have repeatedly found that high-quality, comprehensive pre-apprenticeship programs of the kind CWIT provides are critical for increasing women's participation in trades work.[12] In regions served by organizations offering quality pre-apprenticeship programs—like CWIT, in Chicago—women's share of apprenticeships across multiple trades industries is several times higher than the corresponding national levels.[13] And today, tradeswomen are almost three times as likely to have heard about trades

---

[11] *See, e.g.*, Frank Manzo & Robert Bruno, *The Impact of Pre-Apprenticeship Programs in Illinois*, ILLINOIS ECONOMIC POLICY INSTITUTE, at 6 (Aug. 20, 2025), https://cwit.org/wp-content/uploads/2025/08/ilepi-pmcr-impact-of-pre-apprenticeship-programs-in-illinois-final.pdf.

[12] *See, e.g.*, *id.* at 20-22; Ariane Hegewisch et al., *Untapped Resources, Untapped Labor Pool*, INSTITUTE FOR WOMEN'S POLICY RESEARCH, at 2 (Dec. 2014), https://iwpr.org/wp-content/uploads/2020/12/Untapped-Resources_FINAL.pdf; Kate Rubin & Doug Slater, *Winning Construction Jobs for Local Residents*, BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW, at 31 (July 2025), https://www.brennancenter.org/media/86/download/Report_Winning-Construction-Jobs-for-Local-Residents.pdf.

[13] Ariane Hegewisch & Tanima Ahmed, *Growing The Numbers of Women in the Trades: Building Equity And Inclusion Through Pre-Apprenticeship Programs*, CHICAGO WOMEN IN TRADES, at 7-8 (Nov. 14, 2019), https://iwpr.org/wp-content/uploads/2020/07/Growing-the-Number-in-the-Trades_revision1.pdf (citing examples of higher female apprenticeship levels in regions with quality pre-apprenticeship programs including Chicago, northern California, Mississippi, Massachusetts, New York City, Oregon, Washington, and West Virginia).

work opportunities through a woman's organization or tradeswomen's organization like CWIT than they are to have learned of opportunities through high school.[14]

### 2. *CWIT's Provision of Technical Assistance Helps Industry Stakeholders to Attract and Retain Skilled Tradeswomen*

CWIT not only expands the pool of prospective tradeswomen by improving job preparedness and awareness of opportunities, but the organization also provides direct technical assistance to employers, unions, and other industry stakeholders to make it possible to recruit, hire, and retain more female employees. A welding shop searching for capable welders, for example, may realize that its existing recruiting methods are not reaching skilled female welders in the labor market. Or a construction contractor may have difficulty retaining its talented female laborers due to common retention barriers like worksite harassment or female-specific health and safety hazards.

Common health and safety hazards for tradeswomen at work include having to travel long distances to use a bathroom, having to work with tools designed for larger body types more typically representative of men, and having to advocate for or be denied personal protective equipment suitable for women.[15]  For instance, in a 2024 survey concerning the experiences of craftswomen in the construction

---

[14] Hegewisch & Mefferd, *supra* note 8, at 42.

[15] Chandra Childers et al., *Here to Stay: Black, Latina, and Afro-Latina Women in Construction Trades Apprenticeships and Employment*, CHICAGO WOMEN IN TRADES, at 7 (Mar. 9, 2021), https://iwpr.org/wp-content/uploads/2021/03/Here-to-Stay_revision2.pdf; *Women in the Skilled Trades: More Than Just Boots on the Ground*, NATIONAL CENTER FOR CONSTRUCTION EDUCATION AND RESEARCH, at 8 (2025), available at https://hs.nccer.org/women-in-the-skilled-trades-more-than-just-boots-on-the-ground.

industry, two respondents reported having to petition their employers to purchase a gender-specific fall prevention harness that would fit them.[16] It is also common for women in the trades to feel isolated and alienated because oftentimes they rarely or never work alongside another tradeswoman.[17] One respondent to the 2021 IWPR Tradeswomen's Retention and Advancement Survey shared: "Despite a lot of men who are great to work with, the overall environment makes me miserable and exhausted. I want to feel valued and respected for my abilities. I can't have that if I stay in the field."[18] Female trades employees also report experiencing gender bias, such as repeatedly having their experience questioned or being mistaken for someone with less experience.[19]

These issues often are exacerbated by overt harassment, which women report to be prevalent throughout the trades. In the 2021 IWPR Tradeswomen's Retention and Advancement Survey of 2,635 tradeswomen, more than a quarter of respondents reported that they always or frequently experience gender harassment, nearly a quarter of respondents reported that they always or frequently experience sexual harassment, and over a quarter of respondents reported encountering pornography or graffiti that is disparaging to women at work.[20]

---

[16] *Women in the Skilled Trades: More Than Just Boots on the Ground*, *supra* note 15, at 8-9.

[17] Hegewisch & Mefferd, *supra* note 8, at 10.

[18] *Id.* at 17.

[19] *Women in the Skilled Trades: More Than Just Boots on the Ground*, *supra* note 15, at 7.

[20] Hegewisch & Mefferd, *supra* note 8, at 14-16.

Women also face numerous barriers to promotion and career growth, including limited access to leadership roles, lack of opportunities to showcase their capabilities, and systemic biases that undermine their contributions.[21]  As one 2024 survey participant shared, "Unfortunately, in my experience, I do still see being part of the 'good ol' boys club' influencing promotions and/or advancements. We, as women, have created quite a way already but we are still in a male-dominant field. I am fortunate to have many business partners, both male and female, that have supported and pushed me in this industry, but I still witness the male dominance play a part."[22]

CWIT's programming addresses these issues—inadequate and ineffective recruitment, health and safety hazards, worksite harassment, promotion barriers, and others—by directly providing interested industry stakeholders with the technical tools necessary to address them. Through training workshops, resource sharing, policy development, and other targeted strategies, CWIT points employers toward more effective and inclusive recruiting methods and assists employers and unions in developing and adopting policies and best practices to retain and support existing female employees and reduce workplace discrimination. CWIT's trainings and recommended policies promote optimal retention practices such as those that minimize workplace gender harassment, ensure that women have appropriately

---

[21] *Policy and Practice: Women's Experiences and Advancement in Construction*, NCCER, at 10 (Apr. 2025), https://www.nccer.org/media/2025/04/NCCER_Women-in-Construction_Report-Final-04232025.pdf.

[22] *Id.* at 20.

sized tools and equipment to keep them safe on the job, allow sufficient flexibility and leave opportunities to accommodate workers' parenting or other family obligations, and increase leadership development opportunities for tradeswomen.[23]

Like pre-apprenticeship programs, technical assistance services have proven highly effective for gender integration in the workplace. Research shows that supportive policies and employer commitment to an integrated workforce are key contributors to women's success in trades work.[24] In Boston and Oregon, for example, where tradeswomen organizations work closely with public and private owners and developers in the trades to broaden the diversity of their workforce, the percentage of women in trades apprenticeships is at least double the national average.[25]

Indeed, research shows that the effectiveness of "supply-side" integration efforts like pre-apprenticeship programs depends in large part on the "demand-side" efforts from employers and unions, as supported by technical assistance. In Massachusetts, for example, though thousands of women went through pre-apprenticeship programs over nearly thirty years, female apprenticeship rates stagnated around the national rates of 3-4 percent until effective technical assistance programs finally addressed the "demand side," allowing the gap in union

---

[23] *See Equity Resource Center*, CHICAGO WOMEN IN TRADES (2025), https://cwit.org/equity-resource-center/; *see also Technical Assistance*, CHICAGO WOMEN IN TRADES (2025), https://cwit.org/technical-assistance/.

[24] Hegewisch & Mefferd, *supra* note 8, at 31-32.

[25] *Id.* at 32-33.

construction apprenticeships to further close, reaching 9.5 percent female participation in 2020.[26]

**B. Due in Large Part to the Tireless Work of CWIT and Similar Organizations—And the Congressional Commitment to Funding That Work—The Share of Trades Jobs Held by Women Has Gradually Increased**

Since the passage of Title VII, and especially in recent years, women have made real—albeit slow—progress in accessing and advancing in trades jobs. In 2024, over 366,000 women—the largest number ever—worked construction and extraction jobs, representing a 77.3 percent increase over less than a decade, since 2015.[27] In that same time period, the share of construction managers who were female grew by 185.9 percent to a total of 10,834 women.[28] And from 2016 to 2019, the number of Latina apprentices in the trades almost doubled, while the number of Black women apprentices in construction grew by almost 50 percent.[29]

Policy researchers specifically credit CWIT and similar organizations for leading the efforts, like pre-apprenticeship trainings and employer partnerships,

---

[26] Susan Moir & Elizabeth Skidmore, *Policy Group on Tradeswomen's Issues*, *in* ORGANIZING FOR POWER: BUILDING A TWENTY-FIRST CENTURY LABOR MOVEMENT IN BOSTON 185, 195-97 (Aviva Chomsky & Steve Striffler, eds. 2021), available at https://policygroupontradeswomen.org/wp-content/uploads/2021/12/MoirSkidmore2021.pdf.

[27] Ariane Hegewisch, *Numbers Matter: Women Working in Construction*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Aug. 2025), https://iwpr.org/wp-content/uploads/2025/08/Women-in-Construction-QF_2025.pdf.

[28] *Id.*

[29] Childers et al., *supra* note 15, at 3.

that have fueled women's increased participation in trades work.[30] The Center for American Progress, for example, notes the increased employment of women in construction and extraction occupations from 2008 (2.5 percent) to 2020 (4 percent)—an increase of around 91,000 workers—and highlights the role played by CWIT and similar organizations to help women to breakthrough barriers and remain in trades jobs.[31]

Historically, Congress and the Department of Labor have also recognized the value of work like CWIT's in realizing the promise of federal anti-discrimination laws. Since at least the bipartisan passage of the Women in Apprenticeship and Nontraditional Occupations (WANTO) grant program in 1992, and repeatedly thereafter, Congress has promoted pathways for women to enter and lead in the trades. Congress and the Department of Labor have also consistently recognized the crucial role organizations like CWIT play in reducing barriers to entry and retention. *See*, *e.g.*, 29 U.S.C. § 2501(a)(3) (finding that "women face significant barriers to their full and effective participation in apprenticeable occupations and nontraditional occupations"); *id.* § 2501(b)(2) (announcing congressional purpose to "provid[e] grants to community-based organizations to deliver technical assistance

---

[30] *See, e.g., id.* at 12 ("Behind every successful tradeswoman interviewed for this project were the resources of an organization such as Chicago Women in Trades . . . and similar women-focused pre-apprenticeship programs across the country.").

[31] Marina Zhavoronkova & Rose Khattar, *Infrastructure Bill Must Create Pathways for Women To Enter Construction Trades*, CENTER FOR AMERICAN PROGRESS (Sept. 20, 2021), https://www.americanprogress.org/article/infrastructure-bill-must-create-pathways-women-enter-construction-trades/.

to employers and labor unions to prepare them to recruit, train, and employ women in apprenticeable occupations and nontraditional occupations"); 29 C.F.R. § 30.8(a)(1)(iv) (requiring apprenticeship sponsors with equal employment opportunity barriers to partner with organizations like CWIT). Accordingly, for decades, CWIT has relied on federal grants to perform its work—federal funding that, according to researchers, has "played a crucial role by supporting women-focused pre-apprenticeship programs and providing new and established tradeswomen with information, resources, mentoring, and support."[32]

It is perversely ironic that an executive order purportedly concerned with upholding the "text and spirit of our longstanding Federal civil-rights laws" now places this critical federal funding in jeopardy, threatening work that research and decades of experience have proven to be effective at advancing Congress's goal of promoting equal opportunity. EO 14173 § 1. Rather than advancing that goal, the Certification Provision—if enforced—will instead irreparably harm CWIT and disserve the public interest. *See, e.g.*, *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 981 (7th Cir. 2012) (affirming district court's finding that threatened withholding of federal funds to medical services provider was against the public interest and would cause immediate and irreparable harm to provider).

---

[32] *See, e.g.*, Childers et al., *supra* note 15, at 12.

## II. Work In the Trades Provides Women—Especially Single Women and Women Without College Degrees—With Virtually Unmatched Opportunities for Upward Economic Mobility for Themselves and Their Families

Barriers to entry and retention in the trades matter. They deprive excluded individuals of the benefits that make trades work so highly coveted, namely: lucrative compensation, health care and pension benefits, and opportunities for career growth, generally without requiring any college degree.[33] Most trades offer training through paid apprenticeships, which not only allow prospective employees to avoid amassing crippling student debt,[34] but also enable apprentices to earn a living during the years that they are learning the requisite skills for a lifelong career path.[35] For these reasons, opportunities to enter the trades are life changing for women, who represent 47 percent of all U.S. employees,[36]  yet comprise nearly

---

[33] Zhavoronkova & Khattar, *supra* note 31 ("Construction industry employees, from electricians to carpenters to plumbers, can earn a family-sustaining wage without obtaining a college degree.").

[34] *See* Robert Bruno & Frank Manzo, *White Paper: Living Wages in Registered Apprenticeship Programs, An Assessment by Industry, Demographics, State, and Labor Policy*, U.S. DEPT. OF LABOR CHIEF EVALUATION OFFICE, at 3 (Jan. 20, 2025), https:// illinoisepi.wordpress.com/wp-content/uploads/2024/12/pmcr-ilepi-living-wages-in-registered-apprenticeship-programs-final.pdf (discussing the substantial rise in the cost of higher education, with average tuition, fees, and room board costs growing by 180 percent over the last 40 years, adjusting for inflation, resulting in Americans collectively owing more than $1.7 trillion in student loan debt and individual average loan balances of nearly $40,000).

[35] Hegewisch & Mefferd, *supra* note 8, at 4, 24.

[36] Stephanie Ferguson Melhorn & Isabella Lucy, *Data Deep Dive: Women in the Workforce,* U.S. CHAMBER OF COMMERCE (June 26, 2024), https://www.uschamber.com/workforce/data-deep-dive-a-decline-of-women-in-the-workforce.

two-thirds of the workforce in the lowest-paying jobs.[37] The disproportionate representation of women in the lowest-paid jobs is a problem for women across races, but especially for women of color whose share of the low-paid workforce is 1.5 to 2 times greater than their share of the overall workforce.[38]

For a variety of reasons, including gender stereotypes and decades of overt gender discrimination, women historically have been most likely to work in the education and healthcare industries, or in other low wage roles that entail providing care for others.[39] In comparison to these types of female-dominated occupations with similar educational requirements, trades employees are uniquely well compensated. For instance, women who completed an electrician apprenticeship in 2024 earned a median hourly wage ($35.37) nearly two times higher than the median hourly wage for women who completed a nursing assistant apprenticeship the same year ($18.00).[40] Similarly, in 2023, the median hourly exit wage for women who completed an apprenticeship in the construction industry ($34.00)[41] was more than double the median exit wage earned by women who

---

[37] Jasmine Tucker & Julie Vogtman, *Hard Work Is Not Enough: Women in Low-Paid Jobs*, National Women's Law Center, at 3 (July 2023), https://nwlc.org/wp-content/uploads/2020/04/%C6%92.NWLC_Reports_HardWorkNotEnough_LowPaid_2023.pdf

[38] *Id.* at 7.

[39] Melhorn & Lucy, *supra* note 36.

[40] Ariane Hegewisch, *Quick Figure: Women Need Better Access to High-Paying Apprenticeships*, INSTITUTE FOR WOMEN'S POLICY RESEARCH, at 2 (Nov. 2024), https://iwpr.org/wp-content/uploads/2024/11/2024-Women-in-Apprenticeships-Quick-Figure-2.pdf.

[41] Ariane Hegewisch, *As Apprenticeships Expand, Breaking Down Occupational Segregation Is Key to Women's Economic Success*, INSTITUTE FOR WOMEN'S POLICY RESEARCH, at 7 (Mar.

completed apprenticeships in other occupations commonly filled by women, namely: teacher aide ($13.00), early childhood education/care ($14.00), cosmetologist ($15.00), medical assistant ($15.51), and home health aide ($16.75).[42] Given the disparity in income across occupations, reducing occupational segregation—such as by increasing trades opportunities for women—represents a powerful way to help narrow the existing gender wage gap.[43]

Opportunities in the trades can be particularly life altering for the roughly 7.3 million single working mothers in the United States (who represent more than 4 in 5 of all single parents), the majority of whom do not have a college degree.[44] For decades, the small minority of women who have had the opportunity to enter the field have realized the transformational possibilities of trades work. Nearly 40 years ago, at a congressional hearing on "Women in the Nontraditional Workforce" in 1987, a single parent of children aged ten and two described being accepted into a union apprenticeship program: "I was ecstatic, to say the least. I would not only be making an above-average wage; I would also enjoy retirement and insurance benefits. I would even be able to afford to finish college upon completion of my

---

2024), https://iwpr.org/wp-content/uploads/2024/03/IWPR-Apprenticeship-Report-March-2024.pdf.

[42] *Id.* at 17.

[43] *See* Ariane Hegewisch & Zohal Barsi, *The Gender Wage Gap by Occupation 2019 and by Race and Ethnicity*, INSTITUTE FOR WOMEN'S POLICY RESEARCH (Mar. 2020), https://iwpr.org/wp-content/uploads/2020/07/2020-Occupational-wage-gap-FINAL.pdf.

[44] Isabela Salas-Betsch, *The Economic Status of Single Mothers*, CENTER FOR AMERICAN PROGRESS (Aug. 7, 2024), https://www.americanprogress.org/article/the-economic-status-of-single-mothers/.

apprenticeship. But most important, my children and I would have dignity and hope for the future."[45] Today, tradeswomen who are single parents express similar sentiments about how work in the trades has enabled them to provide for their families in otherwise unattainable ways. As one who participated in a focus group of unionized tradeswomen from across the country described: "I'm a single mother . . . [of] a 16-year-old and a 10-year-old and . . . I just bought a house a month ago. My house is still a mess, but it's my house, and it's my mess. Without the trades I wouldn't have ever accomplished this."[46]

Increased earnings that make home ownership achievable is one of the many ways in which work in the trades offers women unmatched upward economic mobility and transforms their lives. In 2022, single mothers who worked full-time had a median annual income of just $40,000.[47] A parent with two children living in a location like Columbus, Ohio would require at least an additional $30,190 per year to maintain a basic but adequate standard of living (and even more in higher-cost regions of the country).[48] Meanwhile, research shows that 98 percent of exit wages from registered construction apprenticeships could cover such basic expenses,

---

[45] *Women in the Nontraditional Workforce: Hearing Before the Subcomm. on Labor of the Comm. on Labor and Human Res.*, 100th Cong. 6 (1987) (statement of Portia Davis, Chillicothe, OH), available at https://files.eric.ed.gov/fulltext/ED295012.pdf.

[46] Childers et al., *supra* note 15, at 4.

[47] Salas-Betsch, *supra* note 44.

[48] Tucker & Vogtman, *supra* note 37, at 13.

and 82 percent could cover the cost of modest two-bedroom apartments.[49] As another participant in a focus group of unionized tradeswomen described the transformation: "I experienced homelessness at the beginning of my apprenticeship . . . [but] through my apprenticeship I now have my own home."[50]

Working in the trades can offer income and stability to some of the most vulnerable groups of women. For instance, the trades offer formerly incarcerated women a unique opportunity for economic stability because the construction trades historically do not discriminate against people with a criminal record.[51] Work in construction therefore enables women with such records to earn a living wage, reintegrate themselves in society, and build successful new lives. The same is true for women who have survived or are seeking to flee domestic violence. According to the U.S. Center for Disease Control and Prevention, 41 percent of women experience physical violence, sexual violence, or stalking by an intimate partner.[52] A common reason victims stay in or return to such abusive relationships is concern for their ability to financially provide for themselves and their children.[53] As with

---

[49] Bruno & Frank, *supra* note 34, at 2, 20.

[50] Childers et al., *supra* note 15, at 4.

[51] *Id.* at 5; *see also* Stephanie Ferguson Melhorn et al., *The Workforce Impact of Second Chance Hiring*, U.S. CHAMBER OF COMMERCE (Sept. 18, 2024), https://www.uschamber.com/workforce/data-deep-dive-the-workforce-impact-of-second-chance-hiring-3 (highlighting construction as among the industries most likely to employ those with criminal records).

[52] *About Intimate Partner Violence*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION (May 16, 2024), https://www.cdc.gov/intimate-partner-violence/about/index.html.

[53] *Economic Justice Policy*, NATIONAL NETWORK TO END DOMESTIC VIOLENCE (2024), https://nnedv.org/content/economic-justice-policy/.

all women facing the numerous systemic barriers to economic security, women whose physical safety and survival depends upon their ability to attain financial autonomy are especially likely to benefit from increased opportunities in the trades.

### III.   CWIT's Work to Remove Barriers to Trades Jobs for Women Benefits the Trades Industries, the National Economy, and the Public At Large

Employment discrimination is, by its nature, inefficient. Artificial barriers to employment operate as a group-specific "tax" for each occupation, resulting in fewer jobs being filled by the most talented and productive employees.[54] Indeed, economists estimate that a significant percentage of national economic growth from 1960 to 2010—between 20 to 40 percent of aggregate market output per person—is attributable to declining occupational barriers for women and black men.[55] Thus, employees share an "overriding interest" with employers and consumers in assuring "fair" and "neutral" personnel decisions throughout occupations. *McDonnell Douglas Corp.*, 411 U.S. at 801.

The trades industries are no exception, as the empirical data bears out. For example, research consistently shows that construction workers are more productive when they work on projects with more diverse workforces.[56] Advocates

---

[54] Chang-Tai Hsieh et al., *The Allocation of Talent and U.S. Economic Growth*, in 87 ECONOMETRICA 1439, 1440 (Sept. 30, 2019), https://web.stanford.edu/~chadj/HHJK.pdf.

[55] *Id.* at 1472-73; *see also Diversity matters even more: The case for holistic impact*, MCKINSEY & COMPANY (Dec. 5, 2023), https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-matters-even-more-the-case-for-holistic-impact (finding that the "business case" for more diverse workforces and more diverse leadership within workforces holds across industries and across time).

[56] *See, e.g.*, Daeyoun Won et al., *Assessing the effects of workforce diversity on project productivity performance for sustainable workplace in the construction industry,*

for more diverse trades workforces highlight the productivity gains likely to result from the influx of new ideas and problem-solving perspectives.[57] But the business case for reducing gender disparities is far simpler: removing barriers for women is necessary so that trades employers can fill vacant jobs, as recent survey data reveals significant workforce shortages across trades industries. For example, 94 percent of trades employers with openings for craft workers reported that the positions are hard to fill and 92 percent reported similar difficulties filling jobs for salaried workers.[58] Employers specifically report shortages of high-skilled workers, a gap that quality pre-apprenticeship programs can help to plug.[59] As long as barriers to women's employment remain in place, however, firms that fail to fill contract vacancies with otherwise-qualified women will be "leaving money on the table."[60] And, of course, work shortages in the trades harm not only firms' profits

---

SUSTAINABLE DEVELOPMENT, at 18 (2020), https://diversityatlas.io/wp-content/uploads/2023/08/2020-Assessing-the-effects-of-workforce-diversity-on-project-productivity-performance-for-sustainable-workplace-in-the-construction-industry.pdf; John A. Gambatese et al., *Development of a workforce sustainability model for construction*, THE CENTER FOR CONSTRUCTION RESEARCH AND TRAINING (2019), https://www.cpwr.com/wp-content/uploads/publications_SS2019-workforce-sustainability-model-development.pdf.

[57] Andrea Lee & Kaleigh DuVernet, *Building diversity: the value of inclusivity in the construction industry*, INTERNATIONAL BAR ASSOCIATION (Nov. 2019), https://www.ibanet.org/article/ff0e6d55-2a4e-46f5-a159-5b38b592962f#9.

[58] *2024 Workforce Survey Analysis*, ASSOCIATED GENERAL CONTRACTORS OF AMERICA & ARCORO, at 3 (2024), https://www.agc.org/sites/default/files/Files/Communications/2024_Workforce_Survey_Analysis.pdf.

[59] *Id.*

[60] Jessica Kutz, *'We just don't hire women': In the construction industry, discrimination runs rampant*, THE 19TH (July 7, 2023), https://19thnews.org/2023/07/construction-industry-women-people-of-color-discrimination/.

but also the general public who deal with the resulting construction delays or shortage of available workers like plumbers or electricians.

The public benefits of employing women in the trades—and implementing policies to retain them—also go well beyond a more efficient social allocation of labor resources. Employers benefit, for example, from implementing policies aimed at retaining female employees by reducing sexual harassment, as harassment at work has been shown to hamper overall worker productivity, increase turnover rates, and decrease overall profitability.[61] Research shows that employers also have better results when their employees are well trained (such as through a pre-apprenticeship program) and have access to the family-friendly benefits (like paid family leave) for which CWIT advocates.[62]

Governments and taxpayers also stand to benefit from increased gender integration in the trades. By providing women with alternatives to low-paying work in other fields that do not provide health insurance, for example, trades work reduces women's necessary reliance on public assistance—like Medicaid, SNAP, and EITC—to support their families.[63] And the financial benefits trades work offers to single mothers, discussed in section II, *supra*, can provide enormous benefits to

---

[61] *See, e.g.*, Crystal Weise, *The Business Case for Good Jobs*, CENTER FOR AMERICAN PROGRESS (Sept. 12, 2023), https://www.americanprogress.org/article/the-business-case-for-good-jobs/ (collecting research).

[62] *Id.*

[63] Elyse Shaw et al., *Undervalued and Underpaid in America: Women in Low-Wage, Female-Dominated Jobs*, INSTITUTE FOR WOMEN'S POLICY RESEARCH, at 38 (2016), https://iwpr.org/wp-content/uploads/2020/09/D508-Undervalued-and-Underpaid.pdf.

their children who might otherwise grow up in poverty, increasing the likelihood of future adverse life outcomes and reliance on public benefits.[64] Research confirms the fiscal benefits of government investment in pre-apprenticeship programs: for every public dollar spent on such programs, female participants are expected to earn, on average, nine times as much over the following ten years.[65]

The public benefits of increasing the number of women in the trades and implementing policies to keep them there are indisputable. Doing away with—or drastically reducing—the socially important work CWIT has been doing for decades would therefore significantly, and unnecessarily, harm the public interest.

## IV. CWIT's Work Remains Critical for Addressing the Major Systemic Barriers That Continue to Cause Occupational Gender Segregation in the Trades

Although the last decade has shown important progress for women in the trades, *see supra* section I(B), the work of CWIT and similar organizations to realize the promise of Title VII is far from finished. Women still make up only a tiny fraction of all skilled trade workers: The most current data reflects that women comprise just 4.3 percent of all skilled construction trade workers, 3.5 percent of all laborers, 3.2 percent of all plumbers, pipefitters, and steamfitters, and 2.9 percent

---

[64] Salas-Betsch, *supra* note 44 (noting higher likelihood that children of single parents will live in poverty and citing research regarding adverse outcomes for poor children).

[65] Manzo & Bruno, *supra* note 11, at 24.

of all electricians.[66] They also remain massively underrepresented in apprenticeships: In 2023, for instance, nearly eight in ten construction apprenticeship programs—78.5 percent—included no women apprentices at all, and women comprised only 4.5 percent of all apprentices in the construction industry.[67] Existing data strongly supports expanding the work of CWIT and similar organizations. Yet the Certification Provision poses a grave threat to those organizations and their missions, jeopardizing the progress they have made toward integrating the trades and thereby significantly harming the public interest.

The trades remain segregated by gender because the longstanding barriers to entry, retention and advancement, discussed in section I(A), have not been fully dismantled. Discrimination in hiring persists, with some construction companies going so far as to expressly tell female job applicants that they will not hire women.[68] And female high school students are still unlikely to learn about trades opportunities from their school counselors.[69] Even when women discover trades work and secure an opportunity to enter the field, on-the-job discrimination and harassment remain all too prevalent. A 2021 survey of tradeswomen, for example, reported 44.4 percent of respondents had either seriously considered exiting the

---

[66] Hegewisch, *supra* note 27 (showing that even when non-skilled workers in construction are counted, such as office and administrative workers, women fill only 11.2 percent of the jobs in the industry.)

[67] Hegewisch, *supra* note 41, at 7, 29.

[68] Kutz, *supra* note 60.

[69] Hegewisch & Mefferd, *supra* note 6, at 42.

field or already left it, with close to half of them indicating that the driving force of their dissatisfaction was "lack of respect/harassment."[70] Moreover, nearly 60 percent of female apprentices reported being treated worse than men when it comes to promotion and leadership development, with over half reporting that they felt less respected than their male coworkers.[71]

Current data on women in the trades is concerning, especially given the obvious benefits of gender integration for women and society, as outlined in sections II and III. Even more concerning, however, is the prospect that the organizations like CWIT who have fought—effectively—for decades to break down barriers for tradeswomen might see their federal funding stripped because of vague concerns about something called "illegal DEI." Appellants' suggestion that the equitable factors weigh against an injunction and that the government's interest in imposing the Certification Provision somehow "merge[s]" with the public interest here is unsupported and untrue. (Appellants' Br. at 33.) As Amici know from their research and advocacy work and detail here, the potential harm to organizations like CWIT—not to mention the women they serve, those women's families, and the public that stands to benefit from trades industries free of discrimination—is real and far outweighs the imagined harm suggested by appellants. Thus, the district court's conclusion that the balance of harms and the public interest support a preliminary injunction was correct and certainly not an abuse of discretion. Because

---

[70] Hegewisch & Mefferd, *supra* note 8, at 17-18.

[71] *Id.* at 11.

CWIT is also likely to succeed on the merits, the district court's entry of a preliminary injunction should be affirmed.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order partially granting plaintiff-appellee's motion for a preliminary injunction.


Respectfully Submitted,

/s/ Kate Schwartz

Caryn Lederer
Kate Schwartz
Justin Tresnowski
Hughes Socol Piers Resnick & Dym, LLP
kschwartz@hsplegal.com
jtresnowski@hsplegal.com
(312) 580-0100
70 W. Madison Street, Suite 4000
Chicago, Illinois 60602

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a) and Circuit Rule 29, I certify as follows:

1.     The foregoing amicus brief complies with the type-volume requirement of Circuit Rule 29 because this brief contains 6,952 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Circuit Rule 32(b) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Word for Microsoft 365 in Century Schoolbook font, a proportionally-spaced typeface, in 12-point font in the body of the brief, and 11-point font in footnotes.

<u>/s/ Kate Schwartz</u>
Kate Schwartz

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I electronically filed the foregoing with the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Kate Schwartz</u>
Kate Schwartz