No. 25-2144

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

CHICAGO WOMEN IN TRADES,

*Plaintiff-Appellee,*

*v.*

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

---

On Interlocutory Appeal from the United States District Court
for the Northern District of Illinois

No. 25-cv-2005
The Honorable Matthew F. Kennelly

---

## BRIEF FOR AMICI CURIAE ILLINOIS, CALIFORNIA, MASSACHUSETTS, COLORADO, CONNECTICUT, DELAWARE, HAWAII, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON SUPPORTING PLAINTIFF-APPELLEE AND AFFIRMANCE

---

SARAH A. HUNGER
*Deputy Solicitor General*
SAMANTHA SHERMAN
*Assistant Attorney General*
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for State of Illinois

*(Additional counsel on next page)*

ROB BONTA
Attorney General
State of California

MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
WILLIAM H. DOWNER
*Supervising Deputy Attorney General*
JAMES E. RICHARDSON
*Deputy Attorney General*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6698
James.Richardson@doj.ca.gov


Counsel for State of California

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

DAVID UREÑA
*Assistant Attorney General*
Civil Rights Division
AMY LAURA CAHN
*Special Assistant Attorney General*
Energy & Environment Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2281
Amy.Laura.Cahn@mass.gov


Counsel for Commonwealth of Massachusetts

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTERESTS OF AMICI CURIAE ........................................................ 1

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT ....................................................................................... 6

I.     Principles And Practices Related To Diversity, Equity, Inclusion, And
       Accessibility Are Grounded In Longstanding Antidiscrimination Laws
       And Confer Substantial Benefits To Amici States. ......................... 6

       A.     Practices promoting diversity, equity, inclusion, and
              accessibility are grounded in, and integral to complying with,
              federal antidiscrimination laws. ............................................ 7

       B.     Diversity, equity, inclusion, and accessibility policies and
              programs provide important benefits to amici States and their
              residents. ............................................................................. 12

II.    The Vague And Unclear Certification Provision Harms Amici States ........... 16

       A.     Notices purporting to implement the Certification Provision are
              placing amici States and their agencies in an untenable position ....... 18

       B.     The Certification Provision is creating a chilling effect on private
              entities that provide critical benefits to amici States' residents ......... 21

CONCLUSION ..................................................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ...................................................................... 2

*Griggs v. Duke Power Co.,*
    401 U.S. 424 (1971) ...................................................................... 9

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ...................................................................... 8

*Nat'l Assoc. of Diversity Offs. in Higher Ed v. Trump,*
    767 F. Supp. 3d 243 (D. Md. 2025) ........................................ 21, 22

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) ...................................................................... 3

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ................................................................... 3, 4

*S.F. Unified Sch. Dist. v. AmeriCorps,*
    No. 25-cv-02425, 2025 WL 974298 (N.D. Cal. Mar. 31, 2025) ................... 21, 24

*Students for Fair Admissions, Inc. v. Harvard,*
    600 U.S. 181 (2023) ...................................................................... 3

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj.,*
    576 U.S. 2507 (2015) ................................................................. 3, 10

*U.S. Airways, Inc. v. Barnett,*
    535 U.S. 391 (2002) ...................................................................... 9

**Statutes, Orders, and Regulations**

Exec. Order No. 14,151, Ending Radical and Wasteful Government DEI
    Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) ............... 1, 4, 9

Exec. Order No. 14,173, Ending Illegal Discrimination and Restoring
    Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) ................. 1, 4, 16

34 C.F.R. § 106.8(a) (2020) ........................................................... 9

20 U.S.C.
    § 1092(a) ................................................................................ 9
    § 1401(9) .............................................................................. 10
    § 6311(b) .............................................................................. 10

29 U.S.C. § 557b ......................................................................... 11

42 U.S.C.
    § 3616a ................................................................................ 11
    § 12112(b) ............................................................................. 9

Equal Pay Act of 1963,
    Pub. L. No. 88-38, 77 Stat. 56 ............................................... 7

Civil Rights Act of 1964,
    Pub. L. No. 88-352, 78 Stat. 241 ....................................... 7, 8

Age Discrimination in Employment Act of 1967,
    Pub. L. No. 90-202, 81 Stat. 602 ............................................ 7

Fair Housing Act of 1968,
    Pub. L. No. 90-284, §§ 801-901, 82 Stat. 73, 81-90 ............... 7, 10, 12

Education Amendments of 1972,
    Pub. L. No. 92-318, 86 Stat. 235, 373-75 ............................... 8

Rehabilitation Act of 1973,
    Pub. L. No. 93-112, 87 Stat. 355 ............................................ 8

Individuals with Disabilities Education Act,
    Pub. L. No. 94-142, 89 Stat. 773 (1975), *as amended by* Pub. L. No.
    101-476, 104 Stat. 1103 (1990) ............................................ 8

Americans with Disabilities Act of 1990,
    Pub. L. No. 101-336, 104 Stat. 327 ....................................... 8

Women in Apprenticeship and Nontraditional Occupations Act,
    29 U.S.C. §§ 2501-2509 ...................................................... 11

## Other Authorities

Anand, Rohini & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training From 1964 to the Present*, 7 Acad. Mgmt. Learning & Ed. 356 (2008) ................................................................................... 7

Azevedo, Kate, *Corporate Diversity Goals Vanish in Wake of Workplace Diversity EO*, *in Executive Orders: Focus on DEI* Initiatives, Bloomberg Law (2025) .. 23

Carter-Edwards, Lori, et al., *Diversity, Equity, Inclusion, and Access Are Necessary for Clinical Trial Site Readiness*, 7 J. Clinical & Translational Sci. 1 (2023) ...................................................................................... 14

Charles, J. Brian, *The Evolution of DEI*, Chron. Higher Ed. (June 23, 2023) .......... 13

Cohen, Sascha, *This Is What Breast Cancer Activism Looked Like Before the Pink Ribbon*, Time (Oct. 17, 2016) ........................................................... 14

Compl., *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025) .............................................................. 18, 19

*Diversity Matters Even More: The Case for Holistic Impact*, McKinsey & Co. (Dec. 5, 2023) ......................................................................... 13

E-mail from Andrew Gradison, Acting Asst. Sec. of Admin. for Children & Families (Mar. 14, 2025) ............................................................... 20

*Executive Orders: Focus on DEI Initiatives*, Bloomberg Law (2025) ................. 23, 24

*Fair Housing Act Remedies*, Nat'l Ctr. for State Cts .................................. 12

Ferguson Melhorn, Stephanie, & Makinizi Hoover, *Understanding America's Labor Shortage: The Most Impacted Industries*, U.S. Chamber of Com. (Apr. 18, 2025) ........................................................................ 13

FY2025 DHS Standard Terms & Conditions (Mar. 27, 2025) ......................... 18

Girardin, Lauren, *Nonprofits Self-Censoring in Wake of Trump Actions*, Nonprofit Quarterly (Feb. 14, 2025) ................................................. 23

Hernandez, Tanya Kateri, *Can CRT Save DEI?: Workplace Diversity, Equity & Inclusion in the Shadow of Anti-Affirmative Action*, 71 UCLA L. Rev. Discourse 282 (2024) ............................................................ 7, 11, 12

Kelly, Harry J., *Fallout: The Impact of Supreme Court's Disparate Impact Decision and HUD's AFFH Rule*, Nat'l Hous. & Rehab. Ass'n ...................... 10

Kratz, Julie *The Little Known History of DEI and Why It's Critical to Its Survival*, Forbes (Dec. 29, 2024) ................................................... 7, 13

Letter from Edward R. Martin, Interim U.S. Att'y for D.C. to William M. Treanor, Dean of Geo. L. Sch. (Feb. 17, 2025) ................................. 20

*Lives at Risk: Komen Calls on Congress to Restore Funding and Protect Lifesaving Breast Cancer Programs*, Susan G. Komen (Mar. 17, 2025) ......... 14

Loyola Univ. Chi. Inst. for Racial Just.*, DEI in K-12: Case Study Profiles* (2022) ... 15

Park, Julie J. & Jonathan Feingold, *How Universities Can Build and Sustain Welcoming and Equitable Campus Environments*, Campaign for Coll. Opportunity (2024) ............................................................... 16

Press Release: FTC Chairman Ferguson Announces that DEI Is Over at the FTC, Fed. Trade Comm. (Jan. 22, 2025) ................................................. 20

Remarks by President Trump in Joint Address to Congress (Mar. 4, 2025) ........... 20

Schwartz, Aaron L., et al., *Why Diverse Clinical Trial Participation Matters*, 388 NEJM 1252 (2023) ................................................................. 15

U.S. Dep't of Just. Civ. Rts. Div., *Know Your Rights: Title II of the Civil Rights Act of 1964* (Apr. 2024).......................................................... 12

Veltman, Chloe, *PBS Shutters DEI Office*, NPR (Feb. 11, 2025) ............................. 22

**INTERESTS OF AMICI CURIAE**

The amici States of Illinois, California, Massachusetts, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, and Washington ("amici States") submit this brief in support of Plaintiff-Appellee Chicago Women in Trades ("CWIT") pursuant to Fed. R. App. P. 29(a)(2).

In January 2025, President Trump issued two Executive Orders that target "diversity, equity, inclusion, and accessibility" (referred to as "DEI" or "DEIA").[1] The Orders provide no definition for these and other key terms, but nonetheless direct executive agencies to take sweeping actions to "combat" and ultimately "end" so-called "illegal DEI and DEIA."[2]  As relevant here, Executive Order 14,173 requires agencies to "include in every contract or grant award" a certification that the contractor or grantee "does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" ("Certification Provision").[3] Further, every contractor or grantee must agree that this representation "is material to the government's payment decisions for purposes of" establishing liability under the False Claims Act, 31 U.S.C. § 3729.[4]

---

[1]  *See* Exec. Order No. 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025).

[2]  Exec. Order 14,173 §§ 1, 2; *see also* Exec. Order 14,151 § 1.

[3]  Exec. Order 14,173 § 3(b)(iv)(B).

[4]  Exec. Order 14,173 § 3(b)(iv)(A).

CWIT, a nonprofit organization that is dedicated to addressing "gender-based structural barriers, often compounded by race, to entering and staying in the skilled trades occupations," brought suit.  Doc. 1 ¶ 33.  CWIT moved for preliminary injunctive relief on multiple grounds, including that the Certification Provision violates the First Amendment because it (1) is overbroad and vague, and thus "chills CWIT's willingness to engage in constitutionally protected speech out of a credible concern that CWIT will be subject to civil liability based on what it says"; (2) discriminates based on viewpoint; and (3) imposes unconstitutional conditions on CWIT's federal grants.  *Id.* ¶¶ 107, 113, 125.  The district court partially granted CWIT's preliminary injunction motion upon concluding, in relevant part, that CWIT was likely to succeed on the merits of its claim that the Certification Provision violates its First Amendment rights because it attempts to "leverag[e] funding" in order to "regulate grantees' speech outside of their federally-funded programs." SA24 (quoting *Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013)).[5]

This appeal, which is limited to that aspect of the preliminary injunction order, implicates several of amici States' interests.  Indeed, amici States have a fundamental interest in ensuring that all of their residents can reap "the benefits of wide participation in political, economic, and cultural life."  *Roberts v. U.S. Jaycees*,

---

[5]  The district court granted CWIT's motion for preliminary injunction in part and denied it in part.  However, CWIT has not cross-appealed the partial denial of its preliminary injunction motion, and defendants have appealed the preliminary injunction order only with respect to the Certification Provision.  *See* Appellants' Br. 3 n.1.

468 U.S. 609, 625 (1984).  As such, amici States embrace diversity, equity, inclusion, accessibility, and related principles, and are deeply committed to enforcing civil rights laws to ensure a safe, welcoming environment for all.  As detailed below, *infra* Section I.B., abundant research shows that practices informed by the principles of diversity, equity, inclusion, and accessibility are key to advancing these interests.  To that end, amici States rely on federal grant programs and contracts to fund activities incorporating diversity, equity, inclusion, and accessibility principles.  Likewise, amici States are home to many businesses and organizations that, like CWIT, receive federal grants and contracts involving such activities.  The Certification Provision interferes with these interests by unlawfully deterring federal funding recipients from providing these critical services to amici States' residents, regardless of whether such activities or services are directly supported by federal funds.  Accordingly, amici States urge this Court to affirm the district court's preliminary injunction.

## SUMMARY OF ARGUMENT

Diversity, equity, inclusion, and accessibility are laudable goals that governments, schools, businesses, organizations, and others may lawfully pursue.[6]

---

[6]  *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 214 (2023) (recognizing that preparing students "to adapt to an increasingly pluralistic society," "producing new knowledge stemming from diverse outlooks," "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes" are "commendable goals"); *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj., Inc.*, 576 U.S. 519, 545 (2015) ("When setting their larger goals, local housing authorities may choose to foster diversity and combat racial isolation with race-neutral tools" and may use "race-neutral efforts to encourage revitalization of communities that have long suffered the harsh consequences of segregated housing patterns"); *id.* ("[M]ere awareness of race in attempting to solve . . . problems . . .

As the district court rightly determined, the Certification Provision unconstitutionally burdens CWIT's ability to pursue these goals because it "attempts to regulate grantees' speech outside of their federally-funded programs" in violation of the First Amendment.  SA23-24.  In reaching this conclusion, the court explained that the challenged Executive Orders contained no meaningful definitions or other guideposts for terms that are critical to understanding and implementing the Certification Provision.  *See* SA24-25.  Indeed, the Orders fail to define or explain "DEI," "DEIA," and "programs promoting DEI," among other terms.[7]  At the same time, the Orders condemn these undefined practices as "illegal, pernicious conduct" that "violates longstanding Federal civil rights laws" and results in "disastrous consequences."[8]  Amici States agree with CWIT that the district court's decision was correct in light of these flaws.  Amici States write separately to highlight two issues that are particularly germane to their interests.

---

does not doom that endeavor at the outset."); *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009) ("[W]e [do not] question an employer's affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made."); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in judgment) ("School boards may pursue the goal of bringing together students of diverse backgrounds and races through . . . including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods."); *Roberts*, 468 U.S. at 626 (noting the "importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women").

[7]  *See* Exec. Order 14,173; Exec. Order 14,151.

[8]  Exec. Order 14,173 § 1; *see also* Exec. Order 14,151 § 1 (describing DEI as involving "illegal and immoral discrimination programs" and referring to "equity action plans" as "shameful").

First, amici States disagree with the underlying premise of the Executive Orders — that practices intended to promote "DEI," "DEIA," or any of its component principles are "pernicious" or "illegal."  On the contrary, DEIA-informed principles and practices are grounded in, and have played an essential role in enforcing compliance with, longstanding civil rights laws in a wide range of contexts, including employment, education, and housing.  Indeed, many longstanding diversity, equity, inclusion, and accessibility practices are *required* under antidiscrimination laws.  And, even when unnecessary to comply with legal obligations, many entities have broadly adopted lawful DEIA-related principles and practices precisely because they produce robust benefits, not "disastrous consequences."

Second, the lack of clear standards or terms in the Executive Orders, and the Certification Provision in particular, has resulted in substantial confusion and uncertainty for amici States, as well as for their resident federal funding recipients, notwithstanding the federal government's representation that the Certification Provision requires only a "straightforward promise."  Appellants' Br. 19.  Indeed, federal agencies are implementing the Certification Provision in a variety of contexts across the country without providing appropriate assurances that the Certification Provision is limited in the way that the federal government now sets forth in this appeal.  Given the shifting and often inconsistent statements made by officials in the federal government, the Certification Provision places amici States in the difficult position of attempting to determine what activities the administration

may consider to be "programs promoting DEI that violate any applicable Federal anti-discrimination laws." It also has had a chilling effect on private entities, many of which have self-censored by eliminating any conceivably "DEIA"-related programming and references to avoid abrupt loss of funding and other harsh consequences.

As a result, if not enjoined, the Certification Provision will harm residents in amici States by threatening the many valuable benefits associated with workplaces, schools, and communities that have adopted practices related to diversity, equity, inclusion, and accessibility. Amici States thus respectfully request that this Court affirm the district court's decision granting a preliminary injunction.

## ARGUMENT

### I. Principles And Practices Related To Diversity, Equity, Inclusion, And Accessibility Are Grounded In Longstanding Antidiscrimination Laws And Confer Substantial Benefits To Amici States.

The Certification Provision, and the anti-DEIA Executive Orders more broadly, begin from the mistaken premise that "DEI" or "DEIA" refers to an unlawful and harmful set of policies that should be eradicated. As amici States know from experience, this is simply incorrect. First, diversity, equity, inclusion, and accessibility practices are firmly rooted in longstanding civil rights legislation and the programs that were instituted to ensure compliance with these antidiscrimination laws. In other words, while the acronym "DEIA" may be relatively new, the principles underlying it are not. Furthermore, many practices related to diversity, equity, inclusion, and accessibility are mandated by federal law,

and thus not illegal in any respect.  Second, empirical research confirms that, far from being harmful, DEIA is beneficial for society.

### A.    Practices promoting diversity, equity, inclusion, and accessibility are grounded in, and integral to complying with, federal antidiscrimination laws.

Modern diversity, equity, inclusion, and accessibility practices originated with the passage of landmark civil rights legislation in the 1960s,[9] including the Equal Pay Act of 1963,[10] the Civil Rights Act of 1964,[11] the Age Discrimination in Employment Act of 1967,[12] and the Fair Housing Act of 1968.[13]  These statutes established a legal framework for recognizing, rectifying, and preventing discrimination on the basis of characteristics including race, color, religion, sex, national origin, and age.[14]  Other key antidiscrimination laws subsequently built upon this foundation, such as Title IX of the Education Amendments of 1972,[15]

---

[9] *See, e.g.*, Tanya Kateri Hernandez, *Can CRT Save DEI?: Workplace Diversity, Equity & Inclusion in the Shadow of Anti-Affirmative Action*, 71 UCLA L. Rev. Discourse 282, 291 (2024) (explaining that, to promote compliance with these new civil rights laws, many businesses and organizations held "[e]arly iterations of DEI training," which primarily focused "on educating institutions about legal prohibitions and avoiding lawsuits"); *see also* Rohini Anand & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training from 1964 to the Present*, 7 Acad. Mgmt. Learning & Ed. 356, 357 (2008); Julie Kratz, *The Little Known History of DEI and Why It's Critical to Its Survival*, Forbes (Dec. 29, 2024), https://tinyurl.com/3mundfcn/.

[10] Pub. L. No. 88-38, 77 Stat. 56.

[11] Pub. L. No. 88-352, 78 Stat. 241.

[12] Pub. L. No. 90-202, 81 Stat. 602.

[13] Pub. L. No. 90-284, §§ 801-901, 82 Stat. 73, 81-90.

[14] *See, e.g.*, Kratz, *supra* note 9.

[15] Pub. L. No. 92-318, 86 Stat. 235, 373-75.

which prohibited sex-based discrimination in educational institutions that receive federal funding, and the Rehabilitation Act of 1973,[16] the Individuals with Disabilities Education Act,[17] and the Americans with Disabilities Act of 1990,[18] which outlawed discrimination based on disability by federal funding recipients, in public schools, and in all areas of public life.

Contrary to the Executive Orders' assertions that DEIA practices "violate the text and spirit of our longstanding Federal civil-rights laws," Exec. Order 14,173 § 1, and constitute "illegal and immoral discrimination," Exec. Order 14,151 § 1, many well-established practices designed to promote diversity, equity, inclusion, and accessibility are, in fact, *required* by these antidiscrimination laws and integral to ensuring they are adequately enforced.

Particularly relevant to this case, federal laws requiring employers to ensure that employees and job applicants are not discriminated against on the basis of protected characteristics have long required employers to take active steps toward diversity, equity, inclusion, and accessibility. For example, employers must affirmatively make changes — even to neutral policies and requirements — in order to accommodate employees' religious beliefs or disabilities. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (Title VII of the Civil Rights Act requires employers to accommodate an employee's sincere religious beliefs unless "the burden of granting

---

[16] Pub. L. No. 93-112, 87 Stat. 355.

[17] Pub. L. No. 94-142, 89 Stat. 773 (1975) (short title changed to Individuals with Disabilities Act by Pub. L. No. 101-476, 104 Stat. 1103 (1990)).

[18] Pub. L. No. 101-336, 104 Stat. 327.

an accommodation would result in substantial increased costs in relation to the conduct of its particular business"); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002) (The Americans with Disabilities Act "says that an employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" (quoting 42 U.S.C. § 12112(b)(5)(A))).

Similarly, because Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation," employers must consider "the consequences of [their] employment practices [on protected classes], not simply the motivation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431-32 (1971). DEIA-related principles help employers identify and mitigate practices that may pose "artificial, arbitrary, and unnecessary barriers to employment." *Id.* at 431.

Likewise, in the education context, schools have many affirmative responsibilities under federal law that are directly related to diversity, equity, inclusion, and accessibility. These obligations include, for example, collecting and reporting information about "student body diversity at the institution," 20 U.S.C. § 1092(a)(1)(Q); designating a staff member as a "Title IX Coordinator" responsible for overseeing efforts to comply with Title IX's prohibition on sex discrimination, 34 C.F.R. § 106.8(a) (2020); working closely with parents of students with disabilities to develop Individualized Education Plans, 20 U.S.C. § 1401(9); and requiring inclusion of English language learners, 20 U.S.C. § 6311(b)(2)(B)(vii)(III).

9

The Fair Housing Act, too, creates a responsibility for builders, lenders, real estate agents, landlords, and others in the housing industry to employ basic practices related to diversity, equity, inclusion, and accessibility. As the Supreme Court has recognized, the "FHA's central purpose" was to "eradicate discriminatory practices within a sector of our Nation's economy," including practices that "escape easy classification as disparate treatment" such as "unconscious prejudices," "covert and illicit stereotyping," and "zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj.*, 576 U.S. 519, 539-40 (2015). Because the Fair Housing Act prohibits these and other practices that have a disparate impact on protected classes without sufficient business justification, *see id.* at 519, real estate industry professionals must assess whether policies like rental requirements and occupancy standards have disparate impacts on protected classes and determine whether they can employ less discriminatory alternatives to such policies.[19]

Many entities, moreover, provide services related to diversity, equity, inclusion, and accessibility with federal funds that have been specifically appropriated for that purpose. CWIT is a prime example: Congress for decades has appropriated funds under the Women in Apprenticeship and Nontraditional Occupations Act, 29 U.S.C. §§ 2501-2509, to provide grants to community-based

---

[19] *See, e.g.*, Harry J. Kelly, *Fallout: The Impact of Supreme Court's Disparate Impact Decision and HUD's AFFH Rule*, Nat'l Hous. & Rehab. Ass'n, https://tinyurl.com/4s3p5pm4.

organizations like CWIT to lower barriers to full and effective participation in occupations where women make up less than 25% of the workforce.  As another example, in 2001, Congress enacted legislation establishing the Office of Disability Employment Policy within the Department of Labor to "provide leadership, develop policy and initiatives, and award grants furthering the objective of eliminating barriers to the training and employment of people with disabilities."  29 U.S.C. § 557b.  And in the context of housing, Congress has provided funds under the Fair Housing Initiative Program to private nonprofit housing organizations that carry out investigatory, enforcement, education, and outreach activities aimed at rooting out discrimination in the provision of housing, including "new or sophisticated forms of discrimination."  42 U.S.C. § 3616a(b)-(d).  Each of these programs reflect principles of diversity, equity, inclusion, and accessibility — and all are designed to support the enforcement of civil rights laws, not to undermine them.

Finally, activities associated with diversity, equity, inclusion, and accessibility are often required by court order to remedy illegal discrimination after it has been found to occur.  "[C]onsent decrees resolving discrimination lawsuits often include mandatory training of relevant stakeholders on matters of discrimination and require reforms of exclusionary institutional policies and practices."[20]  The Equal Employment Opportunity Commission, for example, frequently has included such conditions in consent decrees in class action employment discrimination cases.  Similarly, courts have required defendants who

---

[20]  Hernandez, *supra* note 9, at 290-91.

have violated the Fair Housing Act or laws prohibiting discrimination in public accommodations to undergo antidiscrimination trainings and to adopt new antidiscrimination policies.[21]

**B.     Diversity, equity, inclusion, and accessibility policies and programs provide important benefits to amici States and their residents.**

In addition to serving as a basis for compliance with longstanding federal antidiscrimination laws, DEIA policies and practices are also well-recognized, lawful methods of achieving critical economic and social benefits for amici States and their residents, businesses, and organizations.  They are not, as the Executive Orders state, "pernicious" activities that cause harm.

After the civil rights laws of the 1960s and 1970s paved the way for more diverse educational institutions and workplaces, there was "a surge in social science research detailing how diversity enhances innovation and efficiency."[22]  This research, alongside "increased concern with remaining competitive in a globalized economy," led to a shift in "the perceived utility of DEI."[23]  Businesses and other entities began to incorporate trainings designed to help individuals improve their "cross-cultural understanding and interpersonal communications," "to increase awareness of one's own cultural lens," and "to increase one's skills in working

---

[21] *Id.*; *Fair Housing Act Remedies*, Nat'l Ctr. for State Cts., https://tinyurl.com/yj2w6r2e; S. Dep't of Just. Civ. Rts. Div., *Know Your Rights: Title II of the Civil Rights Act of 1964* (Apr. 2024), https://tinyurl.com/48n768sa.

[22] Hernandez, *supra* note 9, at 293.

[23] *Id.*

effectively in a diverse team."[24]  By the 2000s, many universities, corporations, and other institutions had established "cabinet-level" or "C-Suite" positions dedicated to DEIA-related work, with titles such as "Chief Diversity Officer" or "Vice President of Diversity."[25]  These entities created such positions and programs — and continue to utilize them today — not because they are legally required to do so, but because they recognize that DEIA-focused strategies can bring significant value.[26]

For example, research shows that diversity drives economic growth in numerous ways.  Companies with strong, diverse leadership teams overperform compared to companies that are more homogenous:  diversity is associated with higher financial returns and higher social and environmental impact scores.[27]  In addition, many employers that struggle with labor shortages, retention, or lack of competitive candidates have successfully mitigated these problems by adopting strategies based on principles of diversity, equity, inclusion, and accessibility, such as offering subsidized childcare benefits or by participating in second-chance programs for individuals with certain felony convictions.[28]  Indeed, a recent study by the Illinois Economic Policy Institute and the University of Illinois's Project for

---

[24]  *Id.* at 293-94.

[25]  *See, e.g.*, Kratz, *supra* note 9; J. Brian Charles, *The Evolution of DEI*, Chron. Higher Ed. (June 23, 2023), https://tinyurl.com/9e97z9ew.

[26]  *See, e.g.*, Kratz, *supra* note 9; Charles, *supra* note 25.

[27]  *Diversity Matters Even More: The Case for Holistic Impact*, McKinsey & Co. (Dec. 5, 2023), https://tinyurl.com/263af5h8.

[28]  Stephanie Ferguson Melhorn & Makinizi Hoover, *Understanding America's Labor Shortage: The Most Impacted Industries*, U.S. Chamber of Com. (Apr. 18, 2025), https://tinyurl.com/dmv5p25t.

Middle Class Renewal reported that inclusive pre-apprenticeship programs —
including CWIT's Women Build Illinois program — have significantly increased the
number of qualified workers in the construction industry, helped combat skilled
labor shortages, and will deliver an estimated 900% return on investment over 10
years.[29]

Principles and practices related to diversity, equity, inclusion, and
accessibility have also proven critical to advances in healthcare.  Greater equity in
research funding for diseases that disproportionately affect women, for instance,
has led to medical advances that have dramatically increased survival rates for
diseases like breast cancer.[30]  Similarly, in the context of clinical trials, it is crucial
that the development of new treatments be based on DEIA-informed practices to
ensure researchers are selecting participants (and acting on behalf of future
patients) who represent a fair cross-section of the American public with respect to
race, ethnicity, sex, and other demographic factors.[31]  Benefits of diverse

---

[29]  Frank Manzo IV & Robert Bruno, *The Impact of Pre-Apprenticeship Programs in
Illinois:  Evidence from the Highway Construction Careers Training Program and
the Illinois Works Pre-Apprenticeship Program Since 2017* i-ii (2025),
https://tinyurl.com/36z69zzt.

[30]  *See, e.g.*, *Lives at Risk:  Komen Calls on Congress to Restore Funding and Protect
Lifesaving Breast Cancer Programs*, Susan G. Komen (Mar. 17, 2025),
https://tinyurl.com/55x4xs3b (investment in breast cancer research contributed to
the over 44% drop in breast cancer mortality over past 3.5 decades); *see also* Sascha
Cohen, *This Is What Breast Cancer Activism Looked Like Before the Pink Ribbon*,
Time (Oct. 17, 2016), https://tinyurl.com/mpr5xvda (describing "decades of
committed activism" to secure resources to combat breast cancer).

[31]  *See, e.g.*, Lori Carter-Edwards et al., *Diversity, Equity, Inclusion, and Access Are
Necessary for Clinical Trial Site Readiness*, 7 J. Clinical & Translational Sci. 1, 1
(2023) ("The lack of representation in clinical trials has impeded innovation,

representation in clinical trials include "overcoming mistrust [engendered] through a history of research abuses and restrictions on equitable access to clinical services"; ensuring that the "benefits and burdens" of participation are "shared broadly and equitably across all members of society who stand to benefit from a study's results"; and "advancing biomedical knowledge" by "improv[ing] the generalizability of research findings, produc[ing] new biologic insights, and yield[ing] targeted therapeutic results."[32]  Understanding and implementing DEIA-informed best practices helps researchers to successfully recruit and retain the participants necessary to execute their studies and secure these extensive benefits.[33]

Education, too, benefits from the work of organizations applying principles and practices related to diversity, equity, inclusion, and accessibility.  In K-12 settings, these principles have fostered initiatives to provide meals to students living with food insecurity, ensure that teachers sufficiently understand students' backgrounds to provide effective instruction, integrate students with disabilities among their peers, and ensure that subjects like sex education achieve their goals of advancing the health and safety of all students.[34]  Likewise, in higher education programs, DEIA-informed practices help ensure that all students have the same

---

compromised generalizability of evidence, and may undermine trust in the clinical trials enterprise.").

[32]  Aaron L. Schwartz et al., *Why Diverse Clinical Trial Participation Matters*, 388 NEJM 1252, 1252-53 (2023).

[33]  *Id.*

[34]  Loyola Univ. Chi. Inst. for Racial Just*., DEI in K-12: Case Study Profiles* (2022), https://tinyurl.com/bdfs4dt6.

opportunities to learn, and that their performance is evaluated without regard to factors like race and gender.  Such practices include "equipping personnel and offices with the skills and expertise necessary to design an inclusive campus community and to conduct professional and impartial investigations when discrimination complaints arise"; "supporting students' needs, like food security, emergency financial support, consideration if they work full time, and childcare"; and providing adequate funding to cultural centers, student groups, and ethnic studies programs.[35]

Although these examples are far from exhaustive, they demonstrate the wide variety of practices that promote diversity, equity, inclusion, and accessibility that are both lawful and beneficial for amici States, their businesses, and their residents.

## II.    The Vague And Unclear Certification Provision Harms Amici States.

In addition to inaccurately characterizing diversity, equity, inclusion, and accessibility policies and practices as illegal and harmful, the Executive Orders direct agencies to implement vague and unclear standards to the detriment of amici States and their residents, organizations, and businesses.  As relevant here, the Certification Provision requires federal agencies to "include in every contract or grant award" a certification, under threat of False Claims Act liability, that the contractor or grantee "does not operate any programs promoting DEI that violate

---

[35]  Julie J. Park & Jonathan Feingold, *How Universities Can Build and Sustain Welcoming and Equitable Campus Environments*, Campaign for Coll. Opportunity 10-16 (2024), https://tinyurl.com/354xew9v.

any applicable Federal anti-discrimination laws."[36]  But, as noted, *supra* pp. 1-5,

neither the Certification Provision nor the Executive Orders provide any workable

definition of key terms such as "DEI," "DEIA," "diversity," "equity," "inclusion," or

"accessibility."  Likewise, they do not explain what aspects of DEIA or related terms

the executive branch now considers to be in violation of federal antidiscrimination

laws.  Indeed, as the district court explained, "what might make any given 'DEI'

program violate Federal anti-discrimination laws" in the federal government's view

is "left entirely to the grantee's imagination."  SA25.

Amici States are harmed in at least two ways by the vague and uncertain

terms of the Certification Provision, especially when coupled with similarly vague

statements made in the broader context of the Executive Orders.  First, as federal

contractors and grantees, many agencies in amici States have received notices from

federal agencies demanding certifications that recipients do not engage in so-called

"illegal" DEI.  Second, amici States are home to many private entities that are also

subject to the Certification Provision and that must decide whether, in the face of

these vague terms and threats of False Claims Act liability, to continue to provide

services that amici States' residents rely on.  Any disruption in services because of

the chilling effect of the Certification Provision causes serious harm.

---

[36]  Exec. Order 14,173 § 3(b)(iv)(A)-(B).

**A.     Notices purporting to implement the Certification Provision are placing amici States and their agencies in an untenable position.**

Since the Executive Orders were issued, amici States have received numerous notices from federal agencies that threaten billions of dollars in federal funding for essential services like basic K-12 education, highway infrastructure, public health, workforce development, and environmental protection.  Many of these notices demand that amici States certify that they do not engage in "DEI" or "DEIA" that the executive branch might view as "illegal" and/or "in violation of Federal anti-discrimination laws."[37]  But, as explained, the Orders do not provide any workable definition of key terms like "DEI," "DEIA, "diversity," "equity," "inclusion," and "accessibility."  And the federal agencies implementing the Certification Provision have not provided any clarity or meaningful assurance that, as the federal government emphasizes in this appeal, the Certification Provision "requires nothing more than a statement that [the federal contractor or grant recipient] is complying with laws it was already required to follow."  Appellants' Br. at 19.  Instead, agency

---

[37] *See, e.g.*, Compl., *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025) (describing demands from Department of Education); FY2025 DHS Standard Terms & Conditions (Mar. 27, 2025) (recipients must certify that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of  Federal anti-discrimination laws").

communications merely repeat, without any meaningful elaboration, the vague and undefined phrases used in the Orders.

For example, the Department of Education has demanded that state and local educational authorities certify, under penalty of sanctions, that they do not and will not engage in "illegal DEI practices" in order to receive federal financial assistance totaling over $18.7 billion.[38]  But the Department of Education did not define the phrase "illegal DEI practices," much less explain how these unspecified practices purportedly violate federal law.  And although it is unclear how the Department intends to "delineate between a lawful DEI practice and an unlawful one," the certification requirement nonetheless "threatens serious consequences for [funding recipients'] failure to comply with vaguely-defined prohibitions on DEI initiatives . . . includ[ing] the termination of federal funding, breach of contract suits brought by the Department of Justice, and liability under the False Claims Act." *NAACP v. Dep't of Ed.*, 779 F. Supp. 3d 53, 66-67 (D.D.C. 2025).  This forces amici States to make an untenable choice:  deprive their students of a wide range of services and programs that the Department of Education may conceivably view as "illegal DEI" in order to complete the vague certification; make the certification without changes to existing operations and risk costly investigation and harsh penalties for alleged failure to comply with the certification's undefined standards;

---

[38]  Compl. ¶¶ 35-39, 86, *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025).

or give up significant federal funding and contracts that Congress intended for

amici States to receive in order to provide essential services to their residents.[39]

Furthermore, the federal government argues before this Court that the

Certification Provision is constitutional and, in fact, entirely "unremarkable"

because it requires only that grantees and contractors attest that they "are not

violating their pre-existing legal obligations" under federal antidiscrimination laws.

Appellants' Br. 1.  But many federal officials have taken actions that

indiscriminately conflate *all* "DEI" with unlawful discrimination.[40]  Thus, amici

States and other similarly situated entities cannot rest assured that the federal

government does not intend to use the Certification Provision as a basis to threaten

or pursue costly investigations and harsh punishments for the operation of *any*

program that the executive branch may view as "promoting DEI."

---

[39] Compl. ¶¶ 80-81, *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025).

[40] *See, e.g.*, Letter from Edward R. Martin, Interim U.S. Att'y for D.C. to William M. Treanor, Dean of Geo. L. Sch. (Feb. 17, 2025) (stating that the U.S. Attorney had "begun an inquiry" into whether "Georgetown Law School continues to teach and promote DEI" and requesting a response to whether the law school has "eliminated all DEI from your school and its curriculum"); Press Release: FTC Chairman Ferguson Announces that DEI Is Over at the FTC, Fed. Trade Comm. (Jan. 22, 2025) (stating that "DEI is a scourge on our institutions. . . . And it violates federal and natural law"); E-mail from Andrew Gradison, Acting Asst. Sec. of Admin. for Children & Families (Mar. 14, 2025) (issuing "guidance [ ] consistent with the nondiscrimination provisions . . . of the Head Start Act" stating that the Office of Head Start would not approve federal funding for programs "that promote or take part in diversity, equity, and inclusion (DEI) initiatives"); Remarks by President Trump in Joint Address to Congress (Mar. 4, 2025) ("We've ended the tyranny of so-called diversity, equity, and inclusion policies all across the entire federal government and, indeed, the private sector and our military. . . . We have removed the poison of critical race theory from our public schools.").

Unsurprisingly given these circumstances, several courts have found that the federal government has failed to meaningfully define the Executive Orders' key phrases, including the Certification Provision's proscription on "any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *See* SA11 (meaning of these terms is "left entirely to the [recipients'] imagination"); *Nat'l Assoc. of Diversity Offs. in Higher Ed v. Trump*, 767 F. Supp. 3d. 243, 282 (D. Md. 2025), *stayed pending appeal*, No. 25-1189 (4th Cir. Mar. 14, 2025) (noting that "even the government does not know what constitutes DEI-related speech that violates federal anti-discrimination law"); *cf. S.F. Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-2425, 2025 WL 974298, at *5 (N.D. Cal. Mar. 31, 2025) (finding that "the ambiguity of the conditions imposed by AmeriCorps, "particularly regarding which activities . . . 'promote DEI' . . . leaves Plaintiffs operating in the dark"). Amici States and other recipients of federal funds should not be required to engage in guesswork over the meaning of these ambiguous terms to receive essential funds or avoid harsh threats and penalties.

**B.    The Certification Provision is creating a chilling effect on private entities that provide critical benefits to amici States' residents.**

Furthermore, as courts have recognized, the "muddied language" of the Executive Orders, and the Certification Provision in particular, has "spurred a chilling effect" for a wide range of private businesses, institutions, and organizations. *SFUSD*, 2025 WL 974298, at *5; *accord* SA20 (Certification Provision chills speech by requiring "every federal grant recipient to certify that it does not engage in *any* programs involving 'illegal DEI' . . . without knowing which

programs fall under that umbrella") (emphasis in original); *NADOHE*, 767 F. Supp. 3d. at 282 ("[F]ederal contractors and grantees have shown they are unable to know which of their DEI programs (if any) violate federal anti-discrimination laws, and are highly likely to chill their own speech—to self-censor, and reasonably so— because of the Certification Provision.").

As the court below recognized, few recipients of federal funds are in a position to weather the abrupt termination of their federal funding, to "put their organizations at risk by suing the government," or to "risk False Claims Act litigation." SA45. As a result, when faced with demands to certify that they do not operate "programs promoting DEI" as required by the Certification Provision, "grantees and contractors will take the safer route, keep their heads down, and choose to simply stop speaking on anything remotely related to what the government might consider as promoting DEI or equity." *Id.*

Indeed, some recipients of federal funds have already begun removing references that even arguably invoke DEIA from their activities and cutting related offices and programs.[41] For example, "organizations that support victims of domestic and intimate partner violence have been editing or deleting websites and

---

[41] *See, e.g.*, Chloe Veltman, *PBS Shutters DEI Office*, NPR (Feb. 11, 2025), https://tinyurl.com/2h3bjw6k (quoting PBS's president as stating that it closed its DEI office and eliminated all staff members serving in that office "to best ensure we are in compliance with the President's executive order around Diversity, Equity, and Inclusion").

other public resources to eliminate language the Trump administration might find objectionable."[42]

 This chilling effect harms even those entities that continue their activities because they believe in good faith that they are compliant with the Executive Orders and federal antidiscrimination laws.  These entities must confront the trepidation of *other* organizations, which fear that by engaging with an entity incorporating "DEIA," they put at risk their own federal funds and contracts.  CWIT, for instance, has been pressured by other organizations it works with to eliminate "any references to 'DEI' and 'DEIA'" from upcoming technical assistance trainings and materials.  SA7.

 The gravity of the chilling effect is further illustrated by the fact that the Orders have caused many private-sector companies to "erase their diversity programs" — including businesses that do not receive federal grants or contracts and thus are not subject to the certification requirements.[43]  A Bloomberg Law report analyzing corporate filings with the Securities and Exchange Commission concluded that the "anti-DEI order and rhetoric has had a marked impact on corporate behavior," causing companies "to proactively remove corporate diversity programs . . . before any major federal investigation or litigation occurs."[44]  Based

---

[42]  Lauren Girardin, *Nonprofits Self-Censoring in Wake of Trump Actions*, Nonprofit Quarterly (Feb. 14, 2025), https://tinyurl.com/53t526v8.

[43]  *Executive Orders:  Focus on DEI Initiatives*, Bloomberg Law 3 (2025).

[44]  Kate Azevedo, *Corporate Diversity Goals Vanish in Wake of Workplace Diversity EO, in Executive Orders:  Focus on DEI Initiatives*, Bloomberg Law 8-9 (2025).

on the "swift and significant" reaction to the Orders, the Bloomberg report forecasts "deeper cuts to corporate programs in the months to come."[45]

\* \* \*

Allowing defendants to continue to enforce the Certification Provision will not only give the federal government a vehicle to attempt to coerce amici States and other federal grantees and contractors to halt activity that the administration disfavors, but it will also chill nonprofits, businesses, schools, and other entities from undertaking important work related to the principles of diversity, equity, inclusion, and accessibility. This will cause immeasurable harm to amici States and their residents who rely on practices and programs that advance and support diversity, equity, inclusion, and accessibility to combat discrimination and to secure extensive economic, social, and educational benefits.

---

[45] *Id.* at 9.

# CONCLUSION

This Court should affirm the district court's order granting in part CWIT's motion for a preliminary injunction.

September 24, 2025

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
SAMANTHA SHERMAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

ROB BONTA
Attorney General
State of California

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
WILLIAM H. DOWNER
*Supervising Deputy Attorney General*
JAMES RICHARDSON
*Deputy Attorney General*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6698
James.Richardson@doj.ca.gov

DAVID UREÑA
*Assistant Attorney General*
Civil Rights Division
AMY LAURA CAHN
*Special Assistant Attorney General*
Energy & Environment Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2281
Amy.Laura.Cahn@mass.gov

Counsel for State of California

Counsel for Commonwealth of
Massachusetts

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,018 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

/s/ Sarah A. Hunger
SARAH A. HUNGER

September 24, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2025, I electronically filed the foregoing Brief of Amicus Curiae State of Illinois, et al. with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger

SARAH A. HUNGER