No. 25-2144

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

CHICAGO WOMEN IN TRADES,

*Plaintiff – Appellee,*

v.

DONALD TRUMP, PRESIDENT OF THE UNITED STATES, *et al.*,

*Defendants – Appellants.*

_____

On Appeal from the United States District Court for the Northern
District of Illinois, No. 1:25-cv-02005 (Matthew F. Kennelly)

_____

**UNOPPOSED *AMICUS CURIAE* BRIEF OF PRIVATE EMPLOYERS
WITH DIVERSITY, EQUITY, AND INCLUSION PROGRAMS, AND
ORGANIZATIONS THAT SUPPORT THEM, SUPPORTING APPELLEES**

_____

Victoria Slade, State Bar No. 44597
Ambika Kumar, State Bar No. 38237
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 622-3150 Phone
ambikakumar@dwt.com
vickyslade@dwt.com

Stacey Sprenkel, State Bar No. 241689
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111
(415) 276-4847 Phone
staceysprenkel@dwt.com

Adam Sieff, State Bar No. 302030
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800 Phone
adamsieff@dwt.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1 and Fed. R. App. P. 26.1, Amici Curiae provide the following statement:

1.     The full name of every party that the attorney represents in the case:  See attached "List of Amici Curiae."

2.     The names of all law firms whose partners or associates have appeared for the party in the case: Davis Wright Tremaine LLP – Victoria Slade, Ambika Kumar, Stacey Sprenkel, and Adam Sieff.

3.     If the party, amicus or intervenor is a corporation:

i.     Identify all its parent corporations, if any: andCo Hospitality, Inc. (parent company of Salt Palm Development) and Perpetual Ltd. (parent company of Trillium Asset Management)

ii.     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock: Not applicable (none)

4.     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: Not applicable

5.     Provide Debtor information required by FRAP 26.1 (c)1 & 2: Not applicable

# TABLE OF CONTENTS

**Page**

I.     STATEMENT OF IDENTIFICATION ..........................................................1

II.    ARGUMENT...................................................................................3

    A.    Employers have adopted DEI policies and practices to support important business objectives.................................................................3

    B.    DEI arose in response to documented barriers to equal employment opportunity and is necessary to reduce the risk of traditional discrimination. ...................................................................7

        1.    Despite growing legal protections, discrimination against historically marginalized groups persists....................................8

        2.    Forcing Amici and the employers they support to end DEI work is likely to expose them to additional litigation risk.......................................................................................11

    C.    There is no conflict between DEI and "merit," and the way employers conduct this work is non-discriminatory. ..........................15

    D.    The EO and its Certification Provision are at odds with legal authority establishing that typical components of DEI practices are lawful.........................................................................................17

        1.    Common DEI policies and practices have been determined to be lawful under existing law..............................18

        2.    Despite legal authority to the contrary, the Administration has painted DEI as suspect. ............................22

    E.    The EO's Certification Provision, when viewed in conjunction with the EO's implementation, violates the First Amendment rights of private business.....................................................................24

        1.    The government's enforcement of the EO goes beyond ensuring compliance with existing law.....................................24

2.    The government's enforcement heightens the vagueness
concerns and invites self-censorship..........................................27

III.    CONCLUSION.............................................................................30

CERTIFICATE OF COMPLIANCE.........................................................1

CERTIFICATE OF SERVICE ................................................................2

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baggett v. Bullitt*,
  377 U.S. 360 (1964)...........................................................................27

*Bernstein v. St. Paul Cos., Inc.*,
  134 F.Supp. 2d 730 (D. Md. 2001)....................................................19

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020).......................................................................23

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ...........................................................19

*Counterman v. Colorado*,
  600 U.S. 66 (2023).............................................................................27

*De Piero v. Pennsylvania State Univ.*,
  711 F. Supp. 3d 410 (E.D. Pa. 2024).................................................21

*De Piero v. Pennsylvania State Univ.*,
  No. CV 23-2281, 2025 WL 723029 (E.D. Pa. Mar. 6, 2025) ............21

*Diemert v. City of Seattle*,
  No. 2:22-CV-1640, 2025 WL 446753 (W.D. Wash. Feb. 10, 2025)...........20, 21

*Dothard v. Rawlinson*,
  97 S. Ct. 2720 (1977).........................................................................8

*Filozof v. Monroe Cmty. Coll.*,
  583 F. Supp. 2d 393 (W.D.N.Y. 2008),
  *aff'd*, 411 F. App'x 423 (2d Cir. 2011)...............................................19

*Griggs v. Duke Power*,
  91 S. Ct. 849 (1971)...........................................................................8

*Jones v. Bernanke*,
  493 F. Supp. 2d 18 (D.D.C. 2007)......................................................19

*Lutes v. Goldin*,
    62 F. Supp. 2d 118 (D.D.C. 1999)......................................................19

*Meritor Savings Bank, FSB v. Vinson*,
    106 S. Ct. 2399 (1986)......................................................................8

*Moranski v. Gen. Motors Corp.*,
    433 F.3d 537 (7th Cir. 2005) ...........................................................20

*NAACP v. Button*,
    371 U.S. 415 (1963)........................................................................27

*Norgren v. Minnesota Dep't of Hum. Servs.*,
    No. 22-489 ADM/TNL, 2023 WL 35903
    (D. Minn. Jan. 4, 2023), *aff'd*,
    96 F.4th 1048 (8th Cir. 2024) ...........................................................22

*President & Fellows of Harvard College v. United States Dep't of Health &
    Human Servs.*,
    No. 1:25-cv-11048-ADB, Mem. & Order (D. Mass. Sept. 3, 2025).................28

*Reed v. Agilent Techs., Inc.*,
    174 F. Supp. 2d 176 (D. Del. 2001)...................................................19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    College*,
    600 U.S. 181 (2023) (Kavanaugh, J., concurring).......................................12, 21

*United States v. Williams*,
    553 U.S. 285 (2008).........................................................................27

*Vavra v. Honeywell Int'l, Inc.*,
    2024 WL 645993 ............................................................................21

**STATUTES**

29 U.S.C. § 621 *et seq*.......................................................................9

42 U.S.C. § 12101 *et seq*....................................................................9

Title VII of the Civil Rights Act .........................................................23

RULES

Fed. R. App. P. 29(a) ................................................................3

CONSTITUTIONAL PROVISIONS

United States Constitution, First Amendment .........................3, 24, 27, 28

OTHER AUTHORITIES

*Costco Defies Trump's DEI Order and Embraces Diversity as Other Companies Scale Back*, Fortune (Jan. 24, 2025), available at https://fortune.com/2025/01/24/costco-anti-dei-proposal/ ...................................4

Deputy Att'y Gen., Civil Rights Fraud Initiative to Office of the Assoc. Att'y Gen., Civ. Div., Civ. Rts. Div., Crim. Div., Exec. Office for U.S. Att'ys, and All U.S. Att'ys (May 19, 2025) (available at https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=govdelivery).........................................................25

Doug Melville, *Have DEI? The FCC May Block Your Merger-Just Ask Paramount*, Forbes (Mar. 28, 2025), https://www.forbes.com/sites/dougmelville/2025/03/28/have-dei-the-fcc-may-block-your-merger-just-ask-paramount/ ...................................26

*FCC, Disney, DEI, and Changes at ABC*, NPR (Mar. 29, 2025), https://www.npr.org/2025/03/29/nx-s1-5344469/fcc-disney-dei-changes-abc ...........................................................................26

Higher Ed Dive Staff, *Justice Department Threatens Federal Funding Over Colleges' DEI Policies*, Higher Ed Dive (Sept. 5, 2025, 3:15 PM), https://www.highereddive.com/news/justice-department-threatens-federal-funding-colleges-dei-policies/756510/...................................26

Jack Kelly, *JPMorgan's Jamie Dimon Stands Firm Amid Conservative Pressure to Dismantle DEI Initiatives*, Forbes (Jan. 23, 2025) available at https://www.forbes.com/sites/jackkelly/2025/01/23/jpmorgans-jamie-dimon-stands-firm-amid-conservative-pressure-to-dismantle-dei-initiatives/...........................................................................4

Juliet R. Aiken, Elizabeth D. Salmon and Paul J. Hanges, *The Origins and Legacy of the Civil Rights Act of 1964*, J. Bus. Psychol 28(4) 383-99 (2013)...........................................................................8

Mari Devereaux, *HHS Probing Medical Schools' Use of DEI Policies*, Modern Healthcare (Sept. 7, 2025, 2:30 PM) ..................................................26

Office of the Attorney General, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025), https://www.justice.gov/ag/media/1409486/dl ..................................................22

Press Release, EEOC, *In EEOC Settlement, Four "BigLaw" Firms Disavow DEI and Affirm Their Commitment to Merit-Based Employment Practices* (Apr. 11, 2025), https://www.eeoc.gov/newsroom/eeoc-settlement-four-biglaw-firms-disavow-dei-and-affirm-their-commitment-merit-based ..............26

Todd Shields, *FCC's Carr Threatens to Block M&A for Companies with DEI Plans*, Bloomberg (Mar. 21, 2025), https://www.bloomberg.com/news/articles/2025-03-21/fcc-s-carr-threatens-to-block-m-a-for-companies-with-dei-plans?embedded-checkout=true ..................................................................................................26

## I.     STATEMENT OF IDENTIFICATION

Amici are private employers and firms[1] that operate diversity, equity, and inclusion ("DEI") or similar programs and practices and organizations that support them.  The private employer Amici, who collectively include firms in the hospitality, energy, financial, consumer products, manufacturing, legal, non-profit, consulting, marketing and communications, publishing, agriculture, design, real estate, and philanthropy sectors, among others, believe their DEI work is essential to their business interests and mission delivery—as well as to their ability to ensure a fair, inclusive, and non-discriminatory workplace.  Other organizations, including trade associations and industry groups, advocate for and support this work on behalf of their members and other employers.  Amici develop and manage their programs and practices to ensure compliance with governing law, and they operate them in a manner that is intended to eliminate, not create, discrimination.

The January 21, 2025 Executive Order, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("EO")[2] threatens the ability of Amici and the employers they support to combat discrimination in their workforces.  The EO's requirement that federal contractors and grantees certify, under penalty of False Claims liability, that they have no "DEI" programs the government might deem

---

[1] A few Amici are solo practitioners who apply DEI principles in advancing their business partnerships and client engagement efforts.  The individual Amici are described in Appendix A.

[2] Executive Order 14173 of January 21, 2025, 90 FR 8633 (Jan. 31, 2025), available at https://www.govinfo.gov/content/pkg/FR-2025-01-31/pdf/2025-02097.pdf.

"illegal" ("Certification Provision"), creates unprecedented enforcement and liability risks for many employers seeking to continue lawful and important business programs. Companies that do business with the federal government must ensure none of their practices could be interpreted as violating the EO's prescription against undefined "illegal DEI," and censor internal and external communications in order to align with the government's political position. Others will be forced to consider these risks in their business decisions about whether to seek government contracts or undertake partnerships with federal contractors. Amici seek to assist the court by sharing these impacts of labeling effective DEI practices as "illegal," noting that some companies and organizations who are directly impacted by the certification requirement may fear retaliation for serving as amici themselves.

Further, this Certification Provision is also part of a larger campaign that appears calculated to cause private businesses like Amici to back away from their critical commitments to ensure non-discrimination and equal employment opportunity through their DEI programs. By enjoining the Certification Provision, this Court will allow employers to continue to base their DEI work to advance non-discrimination and equal opportunity on the governing law, rather than based upon perceived conformity with the government's political position.

Amici file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and with the consent of all parties to the appeal. No party's counsel authored this brief in whole or in part. No party or its counsel contributed financial support intended to fund the preparation or submission of this brief.

## II.    ARGUMENT

The EO at issue broadly proclaims that undefined DEI efforts are unlawful and threatens significant consequences against employers that implement such anti-discrimination practices. The EO and its Certification Provision create risk and uncertainty for businesses with any DEI programs who are or aspire to be federal contractors and for companies subject to federal oversight. As private sector employers and firms who engage in DEI work, and trade associations and other organizations that support them, Amici are in a position to educate the Court on what their DEI policies and practices entail, why they exist, and how they are carried out in compliance with the law. Additionally, Amici ask the Court to consider the additional risk they incur from ending these anti-discrimination efforts, and the burden on their First Amendment rights from the self-censorship the EO and its Certification provision encourages.

### A.    Employers have adopted DEI policies and practices to support important business objectives.

Most American employers have implemented policies and practices that foster greater fairness and equal opportunities for all people under the umbrella of

3

DEI.  Although nomenclature varies, these anti-discrimination efforts largely focus on (1) casting a wide net for talent from all backgrounds; (2) increasing the equity, or fairness, of employment decisions; and (3) strengthening inclusion, or a sense of belonging and welcomeness, in workplaces.  Many policies and practices also specifically address accessibility for individuals with disabilities.  Contrary to the attempt of the EO and its Certification Provision to stereotype this longstanding work as exclusionary or involving improper racial or other preferences, DEI efforts open doors of opportunity, giving more people the chance to succeed based on their unique talents.

Employers and firms adopt DEI practices for many reasons, but a primary goal is to advance legitimate business objectives.  For decades, corporate leaders have promoted diversity as "good for business."  Their experience has shown these anti-discrimination efforts will promote innovation, improve customer experience, expand the reach of products and services, and strengthen their ability to recruit and retain talent.  For this reason, organizational leaders often speak of how their diversity, equity, and inclusion commitments advance market share,[3] improve the

---

[3] *See Costco Defies Trump's DEI Order and Embraces Diversity as Other Companies Scale Back*, Fortune (Jan. 24, 2025), available at https://fortune.com/2025/01/24/costco-anti-dei-proposal/ (citing Costco Board of Directors' proxy filing assertion that DEI has increased the "creativity and innovation in the merchandise and services we offer" and increased customer satisfaction).  *See also* Jack Kelly, *JPMorgan's Jamie Dimon Stands Firm Amid Conservative Pressure to Dismantle DEI Initiatives*, Forbes (Jan. 23, 2025) (describing positive impact of diversity initiative in expanding the bank's customer base), available at https://www.forbes.com/sites/jackkelly/2025/01/23/jpmorgans-jamie-dimon-stands-firm-amid-conservative-pressure-to-dismantle-dei-initiatives/.

quality of talent acquisition,[4] and promote financial growth and profitability,[5] while reducing discrimination.

This experience is backed by decades of research showing that companies with more demographically diverse leadership are more successful.[6]  Diverse teams boost innovation, reduce the dangers of "groupthink" and serve as a catalyst for new ideas or viewing the same problem from a different lens.[7]  Hiring people with different backgrounds and experiences can also make it easier to reach different markets, customers, and clients.

An important and oft-cited justification behind efforts to recruit and retain talent from all backgrounds has been the need to effectively market to a more interconnected world and a more ethnically and racially diverse U.S. population.[8]

---

[4] Mark Maske, *NFL Reaffirms Diversity Hiring Efforts Despite Trump's Moves Against DEI*, Washington Post (Feb. 3, 2025), available at https://www.washingtonpost.com/sports/2025/02/03/nfls-diversity-efforts-focus-after-trumps-moves-against-dei/ (NFL diversity efforts are "fundamental" to hiring the best talent).

[5] *See, e.g.*, Joshua Nelken-Zitser, *DEI Is Good for Our Business, Coca-Cola Says*, Business Insider (Feb. 21, 2025), available at https://www.msn.com/en-ae/money/companies/dei-is-good-for-our-business-coca-cola-says/ar-AA1zvNFk.

[6] McKinsey's analysis found the companies with the most diverse executive leadership were nearly 40% more likely to financially outperform those with the least diversity.  McKinsey, *Diversity Matters Even More: The Case for Holistic Impact* (2023), available at https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-matters-even-more-the-case-for-holistic-impact#/.  *See also* Katherine W. Phillips, *How Diversity Makes Us Smarter*, Scientific American (2014), available at http://www.scientificamerican.com/article/how-diversity-makes-us-smarter/ (same).

[7] Alison Reynolds and David Lewis, *Teams Solve Problems Faster When They Are Cognitively Diverse*, Harvard Business Review (Mar. 30, 2017), available at https://hbr.org/2017/03/teams-solve-problems-faster-when-theyre-more-cognitively-diverse.  *See* Sylvia Ann Hewlett, Melinda Marshall, and Laura Sherbin, *How Diversity Can Drive Innovation,* Harvard Business Review (Dec. 2013), available at https://hbr.org/2013/12/how-diversity-can-drive-innovation.

[8] Jennifer Miller, *For younger job seekers, diversity and inclusion in the workplace aren't a preference. They're a requirement*, Washington Post (Feb. 18, 2021); https://www.washingtonpost.com/business

DEI encompasses far more than race, however, and includes efforts pertaining to all kinds of diversity, such as neurodiversity,[9] non-traditional educational and economic backgrounds,[10] family status, military service experience, age, and other traits—based on the belief that such diversity can provide a "culture add" that advances the mission more effectively.[11]

DEI is also not just about hiring. To leverage talent from all backgrounds, workplaces need to ensure everyone has a fair opportunity to thrive. DEI practices support respectful communication across differences, increase engagement, and support retention—which in turn saves money and advances management goals.[12] Shareholders have recently resoundingly rejected proposals to cut back on these programs, showing that investors "believe DEI is good for business."[13]

---

/2021/02/18/millennial-genz-workplace-diversity-equity-inclusion/.

[9] Deloitte Center for Integrated Research, *The Neurodiversity Advantage: How Neuroinclusion can Unleash Innovation and Create Competitive Edge,* available at https://www2.deloitte.com/us/en/insights/topics/value-of-diversity-and-inclusion/unleashing-innovation-with-neuroinclusion.html; Alison Reynolds and David Lewis, *Teams Solve Problems Faster When They're More Cognitively Diverse,* Harvard Business Review (Mar. 30, 2017), available at https://hbr.org/2017/03/teams-solve-problems-faster-when-theyre-more-cognitively-diverse.

[10] Case studies show how employers remove degree requirements to access talent with different skills and perspectives. *See* https://www.opportunityatwork.org/stars.

[11] Louis Montgomery, Jr., *Culture Fit Versus Culture Add: Hiring for Growth,* Forbes (June 8, 2022), available at https://www.forbes.com/councils/forbeshumanresourcescouncil/2022/06/08/culture-fit-versus-culture-add-hiring-for-growth/.

[12] Francis X. Frei and Anne Morriss, *10 Reasons Why Inclusion Is a Competitive Advantage*, Harvard Business Review (2023), available at https://hbr.org/2023/10/10-reasons-why-inclusion-is-a-competitive-advantage; Catalyst, *Why Diversity and Inclusion Matter*, available at https://www.catalyst.org/insights/2020/why-diversity-and-inclusion-matter (summarizing research).

[13] Nathan Meyersohn, *DEI is Winning with Costco, Apple and Levi's Shareholders*, CNN (May 2, 2025), available at https://www.cnn.com/2025/05/02/business/costco-apple-levi-shareholders-dei.

Employers also implement DEI programs to better align their practices with their values and those of their communities. Indeed, a majority of Americans agree that DEI initiatives promote broadly accepted norms of fairness and opportunity at work.[14] This public support makes these commitments a strong selling point for new hires and for companies' public brands.

It is essential that employers remain free to continue this work that promotes equal opportunity and benefits the economy, without the improper burdens the EO and the threat implicit in its Certification Provision place on lawful and effective DEI work.

## B. DEI arose in response to documented barriers to equal employment opportunity and is necessary to reduce the risk of traditional discrimination.

DEI policies and practices are not only critical to advance business initiatives and create workplaces where all employees can thrive, they are also critical for combatting discrimination. For decades, our nation's legal institutions have built a strong framework to address discrimination in hiring, promotion and pay, and unfair workplace practices like harassment. But legal rules are insufficient—proactive efforts by employers to advance workplace equality are

---

[14] *Most Americans Approve of DEI, According to Post-Ipsos Poll*, Washington Post (June 18, 2024), available at https://www.washingtonpost.com/nation/2024/06/18/affirmative-action-dei-attiudes-poll/; Jessica Stillman, *Inc.* (Mar. 12, 2025), available at https://www.inc.com/jessica-stillman/you-are-probably-wildly-underestimating-how-many-americans-support-dei-new-study-shows/91157848 (citing data from Univ. of Wisconsin at Madison).

essential to carry out the promise of these laws.  Moreover, abandoning them because of elevated risk of government sanction could expose Amici and the employers they support to significant risk of traditional discrimination claims.

### 1.     Despite growing legal protections, discrimination against historically marginalized groups persists.

The Civil Rights Act of 1964 provided a clear Congressional mandate prohibiting discrimination in employment.  Covert and systemic discrimination persisted, producing unequal outcomes, including biased hiring that kept women and People of Color from competing for better-paying jobs.[15]  The federal government took additional steps to combat embedded discrimination, including requiring federal contractors to proactively review their hiring and other practices for potential discrimination.[16]

Since then, Congress, the courts, and the President have repeatedly acted to strengthen laws addressing unintentional or systemic discrimination.  *See*, *e.g.*, *Griggs v. Duke Power*, 91 S. Ct. 849 (1971) (holding unanimously that employers could be held liable not only for intentional discrimination, but also for neutral practices that adversely affect different groups); *Meritor Savings Bank, FSB v.*

---

[15] Juliet R. Aiken, Elizabeth D. Salmon and Paul J. Hanges, *The Origins and Legacy of the Civil Rights Act of 1964*, J. Bus. Psychol 28(4) 383-99 (2013) (the passage of the Civil Rights Act did not make immediate, dramatic change but "paved the way for progress").  *See also Dothard v. Rawlinson*, 97 S. Ct. 2720, (1977) (height and weight requirements had no proven relation to job performance, but had a disparate impact on women).

[16] *See Aiken et al. supra n.15*; see also Heather Timmons, *Why LBJ signed executive order 11246 that Trump rescinded*, Reuters (Jan. 23, 2025), available at https://www.reuters.com/world/us/why-president-johnson-signed-executive-order-1965-that-trump-rescinded-2025-01-23/

*Vinson*, 106 S. Ct. 2399 (1986) (establishing cause of action for sexual harassment); Executive Order 13672 (amending EO 11246 requiring affirmative action to include sexual orientation and gender identity as protected classes); the Americans with Disabilities Act;[17] and the Age Discrimination in Employment Act.[18]  Countless states and local governments have also enacted non-discrimination laws across the nation.

Despite these legal efforts, however, significant demographic disparities persist.  For example, data reveals that, despite making up 50.5% of the U.S. population, women constituted only 29% of C-Suite executives as of 2024, which was up from 17% in 2015.[19]  Women are underrepresented at every other step in the pipeline as well, from entry-level up to senior vice president roles.  While this underrepresentation exists for women of all races, disparities are more significant for women of color.[20]  Moreover, there are significant racial disparities.  A 2021 Washington Post review of the top 50 companies in America uncovered that only eight percent of C-suite executives are Black, despite this group making up 14% of

---

[17] 42 U.S.C. § 12101 *et seq*.

[18] 29 U.S.C. § 621 *et seq*.

[19] Women in the Workplace 2024: The 10th Anniversary Report, McKinsey & Company (Sept. 17, 2024), available at https://www.mckinsey.com/featured-insights/diversity-and-inclusion/women-in-the-workplace; *see also* Ruchika T. Malhotra, *How Work Has Changed for Women in Corporate America Over the Last 10 Years*, Harvard Business Review (Sept. 17, 2024), available at https://hbr.org/2024/09/work-has-changed-for-women-in-corporate-america-over-the-last-10-years.

[20] Catalyst, Women of color in the United States: Quick Take (Feb. 1, 2023),  available at https://www.catalyst.org/insights/2023/women-of-color-in-the-united-states.

the U.S. population.[21]  Additionally, as with gender, racial disparities exist across organizations, with private employers consistently seeing the most diversity at the entry-level of their organization, with decreasing representation at each step up the corporate ladder.

Employees in minority groups also leave their roles in corporate America at a higher rate.  In addition to reduced opportunity for advancement, this may be because these groups experience higher incidents of discrimination and lower job satisfaction.[22]  For example, a 2021 report found that over two in five Black workers (42 percent) felt they faced race- or ethnicity-based unfair treatment at work in the past five years.  Over the same period, 26 percent of Asians, and 21 percent of Hispanics or Latinos, reported experiencing unfair treatment in the workplace due to their race or ethnicity.[23]  Women and minorities also experience microaggressions, or expressions of bias that, while often unintentional or unconscious, create significant stress.[24]  A 2023 McKinsey report showed women are twice as likely to be mistaken for someone junior and hear comments on their

---

[21] Tracy Jan, *The Striking Race Gap in Corporate America*, The Washington Post (Dec. 15, 2021), available at  https://www.washingtonpost.com/business/interactive/2021/black-executives-american-companies/.

[22] SHRM Report: Racial Inequity Persists, Costs American Workplaces Billions Annually (May 24, 2021), available at https://www.shrm.org/about/press-room/shrm-report-racial-inequity-persists-costs-american-workplaces-billions-annually.

[23] SHRM, *supra* note 18.

[24] Women in the Workplace 2023, McKinsey & Company (Oct. 5, 2023), available at https://www.mckinsey.com/featured-insights/diversity-and-inclusion/women-in-the-workplace-2023; *see also* McKinsey, *supra* note 17.

emotional state, for example, while Asian and Black women are seven times more likely than white women to be confused with someone of the same race and ethnicity.[25]

Data for LGBTQ employees is also stark.  A 2022 joint study by the Center for American Progress and NORC, a nonpartisan research group based at the University of Chicago, found that nearly half (46%) of surveyed LGBTQ+ employees reported experiencing unfairness or mistreatment at work.[26]  Of these reports, 36% of those who identify as both LGBTQ and People of Color report being verbally harassed while 26% of white LGBTQ staff report the same; and 34% have reported leaving a job due to mistreatment by their employer.[27]

It is clear that, despite changes in the law to eliminate discrimination, there is more work to be done.

### 2. Forcing Amici and the employers they support to end DEI work is likely to expose them to additional litigation risk.

In the face of these continuing disparities, DEI has become a critical tool for employers to create and maintain non-discriminatory workplaces.  Amici's DEI

---

[25] *Id.*

[26] Rae Barton, *The Challenges of Being LGBTQ in the Workplace*, Mental Health America (June 13, 2024), available at  https://mhanational.org/blog/challenges-being-lgbtq-workplace/#:~:text=Nearly%20half%20(46%25)%20of,with%20those%20who%20identify%20as (citing *Discrimination and Barriers to Well-Being: The State of the LGBTQI+ Community in 2022*, available at https://www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-of-the-lgbtqi-community-in-2022/).

[27] *Id.*

policies and practices include proactive risk management strategies, including, for example, reviewing hiring data, evaluating pay equity, and assessing employee engagement and workplace culture.  These practices also involve training employees to recognize how stereotypes may influence their behavior, build skills to act with fairness and respect, and provide better feedback on workplace concerns.  Such DEI practices enable companies to identify potential inequalities or problematic behaviors and prevent them before discrimination occurs.

Because DEI policies and practices are critical for preventing unlawful discrimination, it follows that employers face additional risk if they dismantle those programs.  After the 2023 *Students for Fair Admissions* decision, for example, Attorneys General from 20 states issued a letter to Fortune 100 companies to underscore the importance of continuing lawful DEI work.  They wrote that such efforts "to address historic inequities, increase workplace diversity, and create inclusive environments" were not only "ethically responsible, good for business, and good for building America's workforce[,]" but were also "fully compliant with state and federal law."[28]  Significantly, the officials advised employers not to retreat from DEI but instead to "double-down on diversity-

---

[28] Aaron D. Forde, et. al. Letter to Fortune 100 CEOs (July 19, 2023), available at https://illinoisattorneygeneral.gov/News-Room/Current-News/Fortune%20100%20Letter%20-%20FINAL.pdf.

focused programs because there is still much more work to be done."[29]  More
recently, Attorneys General from 16 states released guidance intended to ensure
organizations operating in the identified states "understand the continued viability
and important role of [DEI practices] in creating and maintaining legally compliant
and thriving workplaces."[30]

Amici are also mindful that ending DEI work could increase the risk of
traditional discrimination claims.  For example, the National Employment Lawyers
Association (NELA) and National Institute for Workers' Rights (NIWR) jointly
published a statement and letters they sent to employers that had ostensibly
curtailed their DEI practices in response to the EO.[31]  They wrote that DEI policies
and practices are "not only consistent with the law but are often necessary to
ensure compliance with it," and they warned employers that "***[a]bandoning these***
***efforts increases your liability risk under federal and state law***."[32]

---

[29] *Id.*

[30] *See* Multistate Guidance Concerning Diversity, Equity, Inclusion, and Accessibility Employment
Initiatives from the Commonwealth of Massachusetts and State of Illinois Offices of Attorney General
and others (Feb. 13, 2025) (available at https://www.mass.gov/doc/multi-state-guidance-concerning-
diversity-equity-inclusion-and-accessibility-employment-initiatives/download).

[31] NELA is the nation's largest professional membership organization for lawyers who represent workers
in employment, labor, and civil rights disputes.  NIWR is a nonprofit organization that advocates for non-
unionized workers.

[32] Statement on DEI rollbacks: National Institute for Workers' Rights (NIWR), NIWR and NELA Warn
Corporations Of Increased Liability Risk In Rolling Back Diversity, Equity And Inclusion Programs
(April 8, 2025), available at https://niwr.org/2025/04/08/release-risk-eliminating-dei-programs; Karen
Maoki and Jason Solomon Letter to Amy Tu (April 8, 2025), available at:
https://niwr.org/2025/04/08/letter-dei-target/.

This warning rings true.  Over the last decade, employers are increasingly concerned about claims brought by minority group plaintiffs alleging unconscious or systemic racism, or other unintentional discrimination such as microaggressions, as well as increasing numbers of internal complaints and prelitigation agency charges tied to similar issues.  Employers have also experienced an increase in pay equity[33] and class litigation,[34] areas where proactive efforts to ensure fair and nondiscriminatory workplaces are particularly important.  Stripping employers of the means to identify and rectify systemic barriers within their organization means exposing them to heightened risk of these costly discrimination claims.

No entity should unlawfully discriminate against any groups.  DEI policies and practices that are carefully constructed in compliance with the law are essential to employers' ability to mitigate risk and comply with the law.  The direct conflict between the EO and the reality of the purpose and effect of DEI work leaves employers in a double-bind, as they wish to avoid punishment under the EO while at the same time meeting their responsibility to create legitimately merit-based and non-discriminatory workplaces.

---

[33] U.S. Equal Employment Opportunity Commission, *EEOC Launches "Level the Playing Field" Equal Pay Video Campaign*, (June 9, 2023), available at https://www.eeoc.gov/newsroom/eeoc-launches-level-paying-field-equal-pay-video-campaign (discussing increase in Equal Pay Act charges).

[34] U.S. Equal Employment Opportunity Commission, *2024 Annual Performance Report* (Jan. 17, 2025), available at https://www.eeoc.gov/2024-annual-performance-report (104% increase in systemic recoveries over prior year).

**C.    There is no conflict between DEI and "merit," and the way employers conduct this work is non-discriminatory.**

Furthering the burden on Amici's interest in advancing their business and mission objectives and preventing discrimination is the government's effort through the EO and its Certification to paint DEI work as contrary to the principles of merit. Indeed, the EO strongly implies that many entities use the term "DEI" as code for intentional preferential treatment. Reality could not be further from the truth. DEI programs are intended to advance a truly merit-based workforce and to prevent discrimination, and employers strive to implement them fairly and inclusively.

DEI practices promote fair competition. For example, expansive recruitment invites a broader array of talent and backgrounds, increasing the chances an employer will find the best candidate. DEI work empowers hiring managers to choose from a wider set of skills and backgrounds when adding to their teams, including considering relevant experience as a substitute for an educational degree where appropriate, all in order to find the best talent. Such practices focus on excellence and making decisions based on skills, qualifications, and business needs, as opposed to simply hiring based on perceived pedigree and name recognition. Employers also use data to identify and reduce barriers that limit who

gets to compete for certain roles and to make sure decisions around hiring, promotion, and pay are being made on job-related criteria and not identity.[35]

DEI practices increase transparency, so all employees understand how to succeed and can access professional development, mentoring, and promotion opportunities. This may include structured mentoring and professional development programs that invite participants of all backgrounds and serve the interests of a wide variety of employees, instead of relying on individual employees and managers to take the initiative. Such intentional inclusion of all employees is the antithesis of discrimination and ensures that merit is at the forefront as employees progress. Indeed, the DEI framework evolved in response to discrimination that operates through informal, subjective, and secretive approaches to hiring and promotion, based on networks and cultural capital that not everyone can access equally.

DEI programs and practices also focus on reducing barriers so all employees can be successful, regardless of protected class. This can be as varied as ensuring employees have time and a private space to express breast milk, providing employees with disabilities with reasonable accommodations, creating cultural

---

[35] Lynn Clements, David Cohen, and Victoria Lipnic, Workforce Data Considerations After DEI Order, Law 360 (Feb. 27, 2025), available at: https://www.law360.com/articles/2300749/workforce-data-collection-considerations-after-dei-order (detailing considerations for continuing to collect workforce data).

competence so no employees are subjected to microaggressions that interfere with

their performance, supporting employees with caregiving responsibilities so they

have the flexibility to meet their care needs while succeeding at work, and

preventing older employees from being sidelined.  Finally, DEI work includes

ensuring performance management is carried out fairly and consistently, so that

strong performance is equally rewarded, and misconduct equally addressed,

regardless of one's background.

Ultimately, employers design DEI policies and practices to serve all

employees, both to meet legal requirements and foster engagement, while

recognizing that all employees have different goals and needs.  To the extent

employers' DEI efforts focus attention on race, gender, disability, LGBTQ+ status,

veterans' status, or any other identity, it is simply to ask the question: Does this

group receive the same fair and respectful treatment as everyone else in our

workplace?  Where the answer is unclear or the experiences inconsistent,

structured DEI initiatives help orient the process toward opportunity for all.

> ### D.     The EO and its Certification Provision are at odds with legal authority establishing that typical components of DEI practices are lawful.

In addition to being categorically inconsistent with the reality of what these

policies and practices look like and how they operate, the EO's claims that broad

swaths of the economy and civil society use their DEI programs to carry out illegal

and even dangerous acts of discrimination ignores numerous court decisions and agency actions applauding these practices. The Certification Provision implies federal contractors and grantees need to investigate DEI programs specifically for rampant abuse, casting improper suspicion on the lawful avenues employers use to validate the principles of our nation's civil rights laws.

### 1. Common DEI policies and practices have been determined to be lawful under existing law.

There is no question that the law favors proactive work to identify and remove barriers to equal opportunity. Indeed, the EEOC itself has expressed strong support for proactive DEI measures, stating that such initiatives "open the American workplace to historically excluded groups" and may "also help to avoid discrimination."[36] The EEOC has also expressly condoned efforts to diversify the workforce, releasing guidance encouraging employers to "recruit, hire, and promote with EEO in mind, by implementing practices designed to widen and diversify the pool of candidates considered for employment openings, including openings in upper-level management."[37] Employers have relied on this longstanding invitation from the nation's lead enforcement agency to develop and implement their programs.

---

[36] Guidance: Section 15: Race and Color Discrimination, EEOC (Apr. 19, 2006) (available at https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination).

[37] *Id.* The guidance further suggests employers "promote an inclusive culture in the workplace."

Consistent with the EEOC's support for this work, courts evaluating discrimination claims tied to DEI programs have frequently ruled that the programs are lawful as applied to the plaintiff in question.  In the context of diversity hiring practices, for example, courts have not found such programs inherently discriminatory.  *See, e.g., Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295–96 (9th Cir. 2000) (existence of program with goal of "increasing diversity in management" and fact that reduction in force "was monitored to determine whether it had any impact on women or minorities" did not constitute evidence that white male plaintiff was terminated due to race); *Filozof v. Monroe Cmty. Coll.*, 583 F. Supp. 2d 393, 402 (W.D.N.Y. 2008), *aff'd*, 411 F. App'x 423 (2d Cir. 2011) (leadership statements "emphasiz[ing] the need to increase diversity among faculty and staff" did not support discrimination claim); *Bernstein v. St. Paul Cos., Inc.*, 134 F.Supp. 2d 730, 739 (D. Md. 2001) ("A company's (or its CEO's) commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races and both genders . . . is not proof of discriminatory motive with respect to any specific hiring decision."); *Lutes v. Goldin*, 62 F. Supp. 2d 118, 131 (D.D.C. 1999) (interest in advancing diversity did not equate to proof of motive to discriminate against plaintiff); *Reed v. Agilent Techs., Inc.*, 174 F. Supp. 2d 176, 185 (D. Del. 2001) ("[T]he mere existence of a policy promoting diversity awareness is not evidence of discrimination[.]"); *Jones v. Bernanke*, 493

F. Supp. 2d 18, 29 (D.D.C. 2007) (objective of increasing workplace diversity did not support discrimination claim).

These examples show how employers have carefully followed and applied the requirements courts have placed upon DEI work to ensure it carries out its EEO mandate, advances merit, and does not operate to disfavor any group or any individual based on their identity. In addition to lawful hiring initiatives, employers have widely adopted Employee Resource Groups, sometimes known as affinity groups, where employees with shared identities and interests can find connection and community. ERGs are typically open to all and exist for the purpose of creating community and advancing inclusion for all employees. As such, they help prevent workplace discrimination and do not constitute unlawful discrimination under any interpretation of the law. *See Diemert v. City of Seattle*, No. 2:22-CV-1640, 2025 WL 446753, at *17 (W.D. Wash. Feb. 10, 2025) ("When properly structured, [ERGs] are voluntary and open to all who share the group's goals, and can foster a sense of belonging and respect that advances equity in the workplace and improves the bottom-line.") (citing *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539-542 (7th Cir. 2005) (approving of guidelines stating that membership in affinity groups was "voluntary and must be open to all current, salaried, full-time employees who share a group's goals.")).

Similarly, DEI trainings are instrumental for ensuring non-discrimination and preventing harassment in the workplace, and plaintiffs are rarely successful in showing that these trainings are discriminatory.  Again, the EEOC has endorsed this practice: "[Diversity] trainings can serve as vital measures to prevent or remediate workplace discrimination."  Brief for EEOC as Amici Curiae Supporting Neither Party, *Vavra v. Honeywell Int'l, Inc.*, 2024 WL 645993, at *13.  *See Id.* at *17 (identifying orders and consent decrees requiring employers to adopt training programs to redress discrimination, including implicit bias training).  The Courts have as well.  *See De Piero v. Pennsylvania State Univ.*, 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024) ("Training on concepts such as 'white privilege,' 'white fragility,' implicit bias, or critical race theory can contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment."); *De Piero v. Pennsylvania State Univ.*, No. CV 23-2281, 2025 WL 723029, at *15 (E.D. Pa. Mar. 6, 2025) (no rational trier of fact could view training including "being invited to review scholarly materials and engage in conversations about antiracist approaches to teaching and learning" as unlawful harassment); *Diemert*, 2025 WL 446753 at *10 (in rejecting claim related to DEI training, stating such "programs are needed because racial discrimination and inequality are present-day problems, not problems of the distant past.") (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 317 (2023)

(Kavanaugh, J., concurring) ("[R]acial discrimination still occurs and the effects of past racial discrimination still persist.")); *id.* at 393 (Jackson, J. dissenting) ("The race-based gaps that first developed centuries ago are echoes from the past that still exist today.").[38]

Similarly, courts have rejected retaliation claims by employees who claim they were punished for opposing DEI training, on the basis that such trainings do not violate Title VII. *See, e.g., Norgren v. Minnesota Dep't of Hum. Servs.*, No. 22-489 ADM/TNL, 2023 WL 35903, at *7 (D. Minn. Jan. 4, 2023), *aff'd*, 96 F.4th 1048 (8th Cir. 2024) ("being required to attend across-the-board diversity training is not a discriminatory practice under Title VII").

### 2. Despite legal authority to the contrary, the Administration has painted DEI as suspect.

The EO and its Certification Provision rely on the false assumption that private businesses and other institutions "have adopted and actively use" discriminatory policies under the "guise" of DEI. The administration stated as much through a recent Department of Justice publication. See Office of the Attorney General, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination (July 29, 2025),

---

[38] Respectful workplace and anti-harassment programs that promote an inclusive culture and reduce harmful behavior are not only consistent with legal requirements, they are also more likely to successfully lead to positive outcomes. Frank Dobbin and Sandra Kalev, Getting to Diversity: What Works and What Doesn't (2022) (on benefits of cultural inclusion training).

https://www.justice.gov/ag/media/1409486/dl.  This Guidance refers broadly to "discriminatory practices" that are "labeled as" DEI.  It proclaims, ". . . [I]n recent years, the federal government has turned a blind eye toward, or even encouraged, various discriminatory practices, seemingly because of their purportedly benign labels, objectives, or intentions.  No longer."

The Guidance does not lay out specific unlawful actions it contends the federal government had previously condoned.  Instead, it identifies various laws governing discrimination and lists a series of practices that could potentially violate the law.  The Guidance is entirely lacking in legal analysis and instead merely concludes that certain programs or practices warrant scrutiny—with the resulting conclusions in some instances actually contradicting prevailing law.[39]  It also contains a series of "non-binding suggestions" for entities to take to "avoid[] legal pitfalls" and "mitigate the legal, financial, and reputational risk associated with unlawful DEI practices . . . ."

While the Guidance is framed as an effort to assist businesses in complying with existing law, its messaging and broadbrush characterizations of conduct as discriminatory, in some cases despite existing case law to the contrary, implies that

---

[39] For example, the Guidance states that training programs that "stereotype" people by teaching about white privilege are unlawful and create a hostile work environment, even though courts have rejected this argument, as discussed above.  The Guidance also declares that permitting transgender women to access restrooms that align with their gender identities contravenes federal civil rights law, despite the Supreme Court's ruling that transgender workers are entitled to workplace protections under Title VII of the Civil Rights Act.  *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

*all DEI* is potentially unlawful.  Many employers may conclude after reading this Guidance that the most prudent action to avoid hostile federal action is to eliminate all DEI programs.

If any particular DEI policy or initiative in fact operates to preference or exclude, existing anti-discrimination law provides a clear remedy.  That law does not permit the government's effort to deter employers from implementing effective and lawful programs to reduce discrimination by branding them as suspect.

### E. The EO's Certification Provision, when viewed in conjunction with the EO's implementation, violates the First Amendment rights of private business.

#### 1. The government's enforcement of the EO goes beyond ensuring compliance with existing law.

Following issuance of the EO, businesses around the country began to receive certification requirements in order to retain existing or secure new federal grants or contracts.  These certifications typically include this or similar language:

"In accepting this funding offer, the applicant certifies its compliance in all respects with all applicable Federal anti-discrimination laws pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025. The applicant does not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173."

While the certification language references federal law, it goes further than requiring that employers meet their preexisting obligation to comply with the law; instead, the certification requires that contractors and recipients of federal funds pledge that they do not maintain any programs that violate the EO.  In other words, reliance on interpretation of existing law is insufficient—as the Guidance makes clear, the administration views any DEI program as inherently suspect, and its interpretation of the parameters of federal discrimination law differs from that of the courts.  As a result, entities signing the certification cannot rely on a good-faith belief that their programs are lawful.  Instead, they are under pressure to scale back their DEI work, or to remove language that the Administration may dislike.  This pressure is heightened by the clear signal that the Department of Justice intends to pursue False Claims Act actions against signatories.[40]

The government's actions implementing the EO are consistent with an approach that punishes all DEI, as opposed to only unlawful programs, demonstrating a dramatic intrusion upon constitutionally protected rights.  For example, pursuant to the EO, the government has engaged in broad, public

---

[40] In May of 2025 the Department of Justice issued a memorandum promising "vigorous enforcement" against "federal-funding recipients or contractors [that] certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs..."  Deputy Att'y Gen., Civil Rights Fraud Initiative to Office of the Assoc. Att'y Gen., Civ. Div., Civ. Rts. Div., Crim. Div., Exec. Office for U.S. Att'ys, and All U.S. Att'ys (May 19, 2025) (available at https://www.justice.gov/dag/media/1400826/dl?inline=&utm_medium=email&utm_source=govdelivery).

investigations into DEI programs at law firms,[41] medical schools and hospitals,[42] and media companies;[43] investigated and revoked funding from colleges and universities;[44] and withheld approval for mergers and acquisitions for companies with DEI programs.[45]

Government actions publicly attacking companies' DEI work, and seeking to compel compliance with the government's anti-DEI policy positions, show why government contractors may fear challenging the illegal requirement to certify. For employers, the message is clear: the government is holding any DEI programs against you, whether they are shown to be illegal or not. This reality should impact whether the Court gives the government the benefit of the doubt on a facial challenge.

---

[41] *See* Press Release, EEOC, *In EEOC Settlement, Four "BigLaw" Firms Disavow DEI and Affirm Their Commitment to Merit-Based Employment Practices* (Apr. 11, 2025), https://www.eeoc.gov/newsroom/eeoc-settlement-four-biglaw-firms-disavow-dei-and-affirm-their-commitment-merit-based.

[42] Mari Devereaux, *HHS Probing Medical Schools' Use of DEI Policies*, Modern Healthcare (Sept. 7, 2025, 2:30 PM), https://www.modernhealthcare.com/government/hhs-dei-investigation-medical-schools/.

[43] *FCC, Disney, DEI, and Changes at ABC*, NPR (Mar. 29, 2025), https://www.npr.org/2025/03/29/nx-s1-5344469/fcc-disney-dei-changes-abc.

[44] Higher Ed Dive Staff, *Justice Department Threatens Federal Funding Over Colleges' DEI Policies*, Higher Ed Dive (Sept. 5, 2025, 3:15 PM), https://www.highereddive.com/news/justice-department-threatens-federal-funding-colleges-dei-policies/756510/.

[45] Todd Shields, *FCC's Carr Threatens to Block M&A for Companies with DEI Plans*, Bloomberg (Mar. 21, 2025), https://www.bloomberg.com/news/articles/2025-03-21/fcc-s-carr-threatens-to-block-m-a-for-companies-with-dei-plans?embedded-checkout=true; Doug Melville, *Have DEI? The FCC May Block Your Merger—Just Ask Paramount*, Forbes (Mar. 28, 2025), https://www.forbes.com/sites/dougmelville/2025/03/28/have-dei-the-fcc-may-block-your-merger-just-ask-paramount/.

### 2. The government's enforcement heightens the vagueness concerns and invites self-censorship.

Crucially, although the text of the EO and its Certification Provision states an intention to pursue DEI programs when they violate civil rights law, the administration's actions make it unclear what the federal government considers a violation.  This vagueness chills speech and induces self-censorship.  A law is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  Vague laws regulating speech face an even more stringent test because they lead ordinary citizens "to steer far wider of the unlawful zone" by censoring their own expression.  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (even threat of legal fees to defend speech causes speakers to self-censor).  It does not matter that a regulation *could* be enforced lawfully.  Courts "cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights."  *NAACP v. Button*, 371 U.S. 415, 438 (1963).

The government has not acknowledged any material constraints on its discretion to punish protected activities.  In fact, it has already done the opposite.  Again and again, the government's actions have demonstrated that the policy objective behind the EO goes beyond ensuring compliance with anti-discrimination

law and instead prohibiting disfavored speech.  For example, in its Press Release following the settlement of investigations into several law firms' DEI programs, the EEOC celebrated having extracting law firms' concession not to "categorize" any "lawful employment activities . . . as DEI."  *See* Press Release, *In EEOC Settlement, Four 'BigLaw' Firms Disavow DEI and Affirm Their Commitment to Merit-Based Employment Practices*, EEOC (Apr. 11, 2025).  Similarly, in April 2025, federal agencies sent a letter to Harvard University stating that one of the conditions Harvard needed to meet in order to continue its funding was "shutter[ing]" all DEI programs "through structural and personnel changes."[46]

Government efforts to eliminate speech about DEI are working.  From major law firms[47] to Fortune 500 companies,[48] entities now speak differently (or not at all) now about DEI.  Many of America's largest and most important enterprises have effectively erased the term "diversity" from their vocabulary.  PepsiCo retroactively removed nearly all references to diversity in its 2024 investor report less than a year after describing DEI as a "competitive advantage" in the

---

[46] *President & Fellows of Harvard College v. United States Dep't of Health & Human Servs.*, No. 1:25-cv-11048-ADB, Mem. & Order, slip op. at 9 (D. Mass. Sept. 3, 2025). Harvard sued to prevent the termination of its grants, and the court granted summary judgment for Harvard on First Amendment grounds. *Id.* at 49-57.

[47] Kathryn Rubino, *Biglaw Is Under Attack. Here's What The Firms Are Doing About It*, ABOVE THE LAW, (Apr. 4, 2025), https://abovethelaw.com/2025/04/biglaw-is-under-attack-heres-what-the-firms-are-doing-about-it/ (tracking law firm DEI statements, or lack thereof).

[48] Jeff Green, *How Trump Reshaped Corporate DEI*, BLOOMBERG (Apr. 30, 2025), https://www.bloomberg.com/news/articles/2025-04-30/how-trump-has-reshaped-dei-in-corporate-america (including timeline of evolving DEI policies in relation to Trump Administration's Executive Orders).

marketplace.[49]  Similarly, in 2023, Intel told investors in that year's annual report that "[d]iversity and inclusion are core elements of Intel's values."  But the 2024 investor report states: "~~Diversity and~~ inclusion ~~are~~ <u>is</u> <u>a</u> core element~~s~~ of Intel's values."[50]  Amici can attest that they are themselves significantly concerned about the risk of improper government enforcement and facing serious pressure to alter how they engage in and communicate publicly about DEI—and that they are in frequent communication with other organizations about this concern.

The apparent purpose and the clear effect of the EO and its Certification Provision is to cause businesses to limit work to prevent discrimination and advance fairness in the workplace, out of fear of being targeted by the administration for lawful conduct.  Enjoining the Certification Provision will show that the government has no grounds to restrict common and lawful DEI activities and that the private sector should be free to continue its work in support of equal opportunity.

---

[49] Conor Murray and Molly Bohannon, *IBM Reportedly Walks Back Diversity Policies, Citing 'Inherent Tensions': Here Are All The Companies Rolling Back DEI Programs*, FORBES (Apr. 11, 2025), https://www.forbes.com/sites/conormurray/2025/04/11/ibm-reportedly-walks-back-diversity-policies-citing-inherent-tensions-here-are-all-the-companies-rolling-back-dei-programs/.
[50] Maria Aspan, *Exclusive: GM, Pepsi, Disney, others scrub some DEI references from investor reports*, NAT'L PUB. RADIO (Feb. 7, 2025), https://www.npr.org/2025/02/07/nx-s1-5288947/trump-dei-disney-pepsi-diversity.

### III.   CONCLUSION

Employers around the country are doing the difficult but important work of creating workplaces where all employees have the opportunity to thrive, consistent with governing law and their valid business objectives.  DEI policies and practices represent employers' best efforts to not only prevent traditional forms of discrimination, but to create workplaces where ***all*** are welcome and have the opportunity to succeed.  Amici and the employers they support truly believe that this work is crucial to their missions, their workplaces, and their effectiveness in business.  Yet the current administration seeks to make such programs too risky to continue in the short term.  As business leaders and supporters, Amici must operate both for the short and long term, outside of politics and consistent with governing law.  To meet our risk management obligations and succeed in business, abandoning our principles and approaches to creating non-discriminatory workplaces in the face of unlawful intimidation tactics is untenable.

In our republic founded on the separation of powers, it is the duty of the federal judiciary to defend liberty and protect our most fundamental freedoms whenever the government attempts to undermine them.  The Court should exercise its authority to safeguard these freedoms in this case.

Dated:  September 24, 2025       Respectfully submitted,

*Counsel for* Amici Curiae

By:   */s/ Victoria Slade*
       Victoria Slade, State Bar No. 44597

By:   */s/ Ambika Kumar*
       Ambika Kumar, State Bar No. 38237

       DAVIS WRIGHT TREMAINE LLP
       920 Fifth Avenue, Suite 3300
       Seattle, WA 98104-1610
       (206) 622-3150 Phone
       ambikakumar@dwt.com
       vickyslade@dwt.com

By:   */s/ Stacey Sprenkel*
       Stacey Sprenkel, State Bar No. 241689

       DAVIS WRIGHT TREMAINE LLP
       50 California Street, 23rd Floor
       San Francisco, CA 94111
       (415) 276-4847 Phone
       staceysprenkel@dwt.com

By:   */s/ Adam Sieff*
       Adam Sieff, State Bar No. 302030

       DAVIS WRIGHT TREMAINE LLP
       350 South Grand Avenue, 27th Floor
       Los Angeles, CA 90071
       (213) 633-6800 Phone
       adamsieff@dwt.com

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B) because it contains 7,000 words, excluding the parts of the brief

exempted by Circuit Rule 32(a)(1), as determined by the word-counting feature of

Microsoft Word.

2.     This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it

has been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman.

Dated:  September 24, 2025

By:     */s/ Victoria Slade*
Victoria Slade, State Bar No. 44597
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 622-3150 Phone
vickyslade@dwt.com

## CERTIFICATE OF SERVICE

I hereby certify under Circuit Rule 25(c), that on this 24th day of September, 2025, I caused to be electronically filed the foregoing **UNOPPOSED AMICUS CURIAE BRIEF OF PRIVATE EMPLOYERS WITH DIVERSITY, EQUITY, AND INCLUSION PROGRAMS, AND ORGANIZATIONS THAT SUPPORT THEM, SUPPORTING APPELLEES** with the Court using the CM/ECF system.  All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated:  September 24, 2025

By:     */s/ Victoria Slade*
Victoria Slade, State Bar No. 44597
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 622-3150 Phone
vickyslade@dwt.com

# APPENDIX A

## LIST OF AMICI CURIAE

Adasina Social Capital
AJL Foundation
American Sustainable Business Council
andCo Hospitality, Inc.
As You Sow
Climate Positive Consulting
Co Hospitality, Inc.
Color in Green
Colorado Inclusive Economy
Current-C Energy Systems, Inc.
Dietel Pickering & Partners
Eighty2degrees LLC
Good Business Colorado
Green Business Network at Green America
Impact GC
Interfaith Center for Corporate Responsibility
Investor Advocates for Social Justice
Latino Farmers & Ranchers International, Inc.
Law Office of Lara Pearson Ltd, PBC d/b/a/ Brand Geek
Local Business Institute
Main Street Journal
Manufacturing Renaissance
Marketing Partners
National Partnership for Women & Families
Natural Investments PBLLC
New Energy Partners
Nia Impact Capital
North Carolina Sustainable Business Council
OBERLAND
Organizational Research Services, dba ORS Impact
Oxfam America
ProsperBridge, PBC
Pure Strategies, Inc.
Racial Justice Investing
Re-Envision Wealth
Regionomics LLC
Salt Palm Development
South Carolina Small Business Chamber

SULA NYC dba Culinary Argan Oil
Sustainability Associates
Sustainable Business Network of Massachusetts
The Freedom Economy Business Association
The Verna Myers Company
Trillium Asset Management
Upstate Steel
Urban Justice Center
Vera Institute of Justice, Inc.
W.S. Badger Company, LLC
WA Lead
Whistle Stop Capital
Working IDEAL