No. 25-2144

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

———————————

CHICAGO WOMEN IN TRADES,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, President of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court for the Northern
District of Illinois, No. 1:25-cv-02005 (Matthew F. Kennelly, J.)

———————————

**REPLY BRIEF FOR APPELLANT**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ANDREW S. BOUTROS
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
JENNIFER L. UTRECHT
GABRIEL I. SCHONFELD
ATTORNEYS, APPELLATE STAFF
  *Civil Division, Room 7710*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-9039*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 1

ARGUMENT ...................................................................................... 3

I.    CWIT's Challenge to the Certification Provision Is Unlikely to Succeed........................................................................... 3

    A.    CWIT's Arguments Disregard What the Certification Provision Actually Says......................................................... 3

    B.    CWIT Lacks Standing Because Certifying Compliance with Federal Civil Rights Law Is Not an Injury-in-Fact....... 7

    C.    The Certification Provision Does Not Violate the First Amendment........................................................... 17

II.    The Equitable Factors Favor the Government............................ 23

III.    The District Court's Universal Injunction Exceeds in Any Case Its Authority......................................................... 24

CONCLUSION................................................................................. 28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Agency for Int'l Dev. v. Alliance of Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) .............................................................. 18

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) .............................................................. 15

*Clark v. City of Seattle,*
899 F.3d 802 (9th Cir. 2018) ............................................... 14

*Forsyth County v. Nationalist Movement,*
505 U.S. 123 (1992) .............................................................. 21

*Guardians Ass'n v. Civil Serv. Comm'n,*
463 U.S. 582 (1983) .............................................................. 18

*National Ass'n of Diversity Officers in Higher Educ. v. Trump,*
767 F. Supp. 3d 243 (D. Md. 2025) ...................................... 5

*National Urb. League v. Trump,*
783 F. Supp. 3d 61 (D.D.C. 2025) ............................. 5, 17, 19

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) .............................................................. 18

*San Francisco A.I.D.S. Found. v. Trump,*
786 F. Supp. 3d 1184 (N.D. Cal. June 9, 2025) ........... 5, 16, 17, 19, 28

*Speech First, Inc. v. Killeen,*
968 F.3d 628 (7th Cir. 2020) ............................... 7, 8, 14, 15

*Students for Fair Admissions, Inc. v. President & Fellows
of Harvard Coll.,*
600 U.S. 181 (2023) .............................................................. 11

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) .............................................................. 14

*Trump v. CASA, Inc.*,
　606 U.S. 831 (2025) .................................................................... 24, 27

*United States ex rel. Heath v. Wisconsin Bell, Inc.*,
　92 F.4th 654 (7th Cir. 2024) ............................................................. 13

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
　579 U.S. 176 (2016) ............................................................................ 21

**Statute:**

31 U.S.C. § 3729(a)(1)(B) ...................................................................... 20

**Regulatory Material:**

*Ending Illegal Discrimination and Restoring Merit-Based
　Opportunity*, Exec. Order No. 14,173, § 3(b)(iv)(A)-(B),
　90 Fed. Reg. 8,633 (Jan. 31, 2025) ................................. 4, 8, 11, 12, 19

**Other Authority:**

Order, *National Ass'n of Diversity Officers in Higher
　Educ. v. Trump*, No. 25-1189
　(4th Cir. Mar. 14, 2025), Dkt. No. 29 ...........................5, 17, 19, 20, 21

Order, *City of Seattle v. Trump*, No. 2:25-cv-01435,
　(W.D. Wash. Oct. 31, 2025), Dkt. No. 22................................................6

## INTRODUCTION AND SUMMARY OF ARGUMENT

As demonstrated in the government's opening brief, and as other courts have recognized, the Certification Provision at issue here requires plaintiff Chicago Women in Trades (CWIT) to do nothing more than verify its compliance with laws that do not regulate protected speech and that CWIT is already required to follow. CWIT has not demonstrated any cognizable injury that is fairly traceable to this unremarkable requirement, nor has it shown a likelihood of success on its claim that the Certification Provision—which on its face does not regulate or chill any protected speech—violates the First Amendment.

In response, CWIT—like the district court—refuses to grapple with the plain terms of the Certification Provision that it challenges. CWIT spends the bulk of its response arguing that the Certification Provision requires it to certify not only that it does not violate federal antidiscrimination laws in operating programs that promote diversity, equity, and inclusion (DEI), but that it does not promote DEI at all. Nothing in the text of Certification Provision supports that reading. CWIT does not advance its flawed interpretation of the provision it is challenging through reliance on various statements by government

officials discussing various Executive Orders, including but not limited to the Order that contains the Certification Provision. Those statements do not purport to construe the Certification Provision as prohibiting all efforts to advance diversity, equity, or inclusion, and even if they did, those extraneous statements could not alter the provision's plain meaning.

At bottom, CWIT's concern appears to be that various government officials do not share its understanding of the federal civil rights laws, and that some government actor will, at some point in the undefined future, accuse it of violating those laws. But CWIT provides no basis for attributing that risk of enforcement to the Certification Provision. Any disagreement with the government regarding the applicable civil rights laws is not traceable to the Certification Provision and would not be redressed by an injunction against it. CWIT therefore lacks standing to bring a pre-enforcement challenge to the Certification Provision.

For substantially the same reason, CWIT has not shown a likelihood of success on the merits of its First Amendment claim. There is no First Amendment right to engage in unlawful discrimination, and the government does not violate the First Amendment by requiring

federal grantees and contractors to certify that they do not do so. To the extent CWIT is concerned that some unknown government actors will purport to act in ways that contravene the text of the provision or existing federal law, the proper remedy is not a declaration that the Certification Provision is facially unconstitutional or a universal injunction of that provision. Rather, if a concrete dispute were to materialize, CWIT could seek relief from that allegedly unlawful action. The district court's preliminary injunction must therefore be vacated. At a minimum, the universal injunction, which provides relief to all Department of Labor grantees and contractors, must be modified to be no broader than necessary to redress CWIT's particular injuries.

## ARGUMENT

### I.    CWIT's Challenge to the Certification Provision Is Unlikely to Succeed.

#### A.    CWIT's Arguments Disregard What the Certification Provision Actually Says.

The Certification Provision challenged in this case provides that "[t]he head of each agency shall include in every contract or grant award": (1) a "term requiring [the contractor] or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," and (2) a "term requiring

the [contractor] or . . . recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act]." *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14,173, § 3(b)(iv)(A)-(B), 90 Fed. Reg. 8,633, 8,634 (Jan. 31, 2025) (EO 14,173). As is plain from that text, and as the government demonstrated in its opening brief, the Certification Provision imposes no new requirements on CWIT's primary conduct. It merely requires that CWIT certify compliance with preexisting antidiscrimination laws with which it was already required to comply. And because unlawful discrimination does not constitute protected speech, any chilling effect that the certification requirement may have on unlawful activity does not violate the First Amendment.

CWIT's response—both on justiciability and on the merits—is irreconcilable with what the Certification Provision actually says. CWIT demonstrates its misapprehension of the issues presented on the very first page of its brief, claiming that Executive Orders 14,151 and 14,173 "bring into question *all* diversity, equity, and inclusion programs and activities as illegal under federal antidiscrimination laws." Resp.

4

Br. 1.  But as other courts have recognized, that is not what the
Certification Provision says or does.  *See* Order, *National Ass'n of
Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar.
14, 2025), Dkt. No. 29 (staying *National Ass'n of Diversity Officers in
Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 281-83 (D. Md. 2025));
*National Urb. League v. Trump*, 783 F. Supp. 3d 61, 101-02 (D.D.C.
2025); *see also San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d
1184, 1221-22 (N.D. Cal. June 9, 2025).

As one Fourth Circuit judge explained, "[t]he Executive Orders do
not purport to establish the illegality of all efforts to advance diversity,
equity or inclusion, and they should not be so understood."  Order at 7,
*National Ass'n of Diversity Officers*, No. 25-1189 (Mar. 14, 2025)
(Harris, J., concurring).  Instead, the provision at issue here instructs
federal officers to enforce existing federal antidiscrimination law and
require recipients of federal funds to certify their compliance with federal
law.  And other provisions of the Executive Orders referenced by CWIT—
which are not at issue in this appeal—direct federal officers to use existing
lawful authority to terminate government contracts and grants that the
President has decided no longer warrant federal funding.  That all of these

5

directives come against a background policy judgment that certain efforts to promote DEI may be unlawful does not transform those directives into covert prohibitions against otherwise lawful DEI programs or activities.[1]

Indeed, despite raising a purely facial challenge to the Certification Provision itself, CWIT insists that what really matters is its fears and suspicions that various government actors might misinterpret or misapply preexisting antidiscrimination laws and conclude that some unspecified, non-federally funded activities that CWIT performs violate the applicable antidiscrimination laws. Whether viewed through the lens of threshold justiciability issues like

---

[1] On October 31, 2025, the United States District Court for the Western District of Washington granted a motion for a preliminary injunction and enjoined the government from enforcing the Certification Provision against the City of Seattle. *See* Order, *City of Seattle v. Trump*, No. 2:25-cv-01435, Dkt. No. 22 (W.D. Wash. Oct. 31, 2025). That court did not conclude that the Certification Provision barred DEI. Rather, that court expressed concern that various officials had made statements that, in the court's view, suggested that the federal government "interpret[s] federal antidiscrimination laws in a manner that is inconsistent with well-established legal precedent." *Id.* at 14. This Court has no occasion to decide if that court was correct on that point on the record in that case, however, because, as discussed below, CWIT plainly has not made such a showing here, and any potential disagreement between CWIT and federal officials about the meaning of the civil rights laws is neither ripe for adjudication, traceable to the Certification Provision, nor redressable by an injunction of that provision.

6

ripeness and standing or on the merits of plaintiffs' constitutional claims, that is wrong.

### B. CWIT Lacks Standing Because Certifying Compliance with Federal Civil Rights Law Is Not an Injury-in-Fact.

CWIT brings a pre-enforcement facial First Amendment challenge to the Certification Provision. To establish standing to bring that challenge, CWIT must satisfy at least one of the standards set forth in *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). CWIT must show either "an intention to engage in a course of conduct arguably affected by a policy, and that [it] faces a credible threat the policy will be enforced against [it] when [it] does" or "a chilling effect on [its] speech that is objectively reasonable, and that [it] self-censors as a result." *Id.* As established in the government's opening brief, Gov't Br. 16-26, CWIT has not demonstrated either.

In response, CWIT urges that it allocates non-federal funding toward work related to DEI and alleges that the Certification Provision chills this activity because, in its view, it faces a threat of enforcement for violating federal antidiscrimination laws unless it ceases this activity. Resp. Br. 21-30. But as demonstrated in our opening brief,

Gov't Br. 16-22, CWIT's theory of self-censorship is not objectively reasonable because the Certification Provision poses no such threat.

**1.** First, the Certification Provision requires CWIT to certify that it complies with *applicable* and *preexisting* antidiscrimination laws. EO 14,173, § 3(b)(iv)(B). It is those laws, and not the Certification Provision, that restricts CWIT's primary conduct, but CWIT is not challenging those laws themselves.

What the Certification Provision adds, in addition to calling CWIT's attention to laws with which it is already compelled to comply, is a requirement to expressly certify and thus increase the government's ability to punish knowing violations of the antidiscrimination laws through the False Claims Act. If CWIT intended to engage in such a knowing violation—or even "arguably" intended to do so—it would be engaging in a "course of conduct arguably affected" by the Certification Provision. *See Speech First*, 968 F.3d at 638. But CWIT has never claimed that it intends to engage in activities that it knows are inconsistent with federal antidiscrimination laws. Instead, CWIT asserts only that it intends to continue pursuing its "mission . . . to achieve gender equity in male-dominated industries," and allocate non-

8

federal funding "toward work related to diversity, equity, inclusion, and accessibility." Resp. Br. 23 (alteration in original) (quotation marks omitted). If it understands those activities to be lawful, it should have no hesitance in signing the requested certification.

CWIT urges that it "need not attest that it does or will violate the law" to establish standing to raise a pre-enforcement challenge. Resp. Br. 24. But that observation is irrelevant to the question presented here. First, CWIT does not challenge the constitutionality of any antidiscrimination statute; it challenges the constitutionality of a provision of an Executive Order directing agencies and contractors to require grantees to certify compliance with existing federal law. The federal laws implicated here are the civil rights laws, and whether CWIT could raise a pre-enforcement challenge to the constitutionality of those laws—which it has not done—without first admitting that it plans to violate them is neither here nor there. Second, the problem with CWIT's theory of standing is not that it has failed to confess that it "will violate the law." Rather, the problem is that CWIT's theory of injury is that it is not certain whether the government would agree that its conduct is consistent with applicable civil rights laws. But as explained

in our opening brief and as discussed further below (at pp. 19-21), any liability under the False Claims Act would require that CWIT made a knowingly false statement.  Thus, if CWIT attempts to conform its conduct to what it reasonably believes is required under the civil rights laws, the government would have no basis—even "arguably"—to enforce the Certification Provision.

CWIT fares no better in its reliance on what it describes as government officials' "repeated proclamations that promoting DEI constitutes a violation of federal law."  Resp. Br. 25.  Those other statements cannot change the plain meaning of the Certification Provision, and in any event CWIT misunderstands them on their own terms.

For example, CWIT entirely misreads a February 5, 2025, memorandum by the Attorney General when it asserts that the memorandum "declared that [EO 14,173] made all DEI illegal." Resp. Br. 25 (citing GA76-77).  The memorandum does not assert that the Executive Order changed the civil rights laws—which, of course, it could not and did not purport to do—but rather quotes the Executive Order's statement that certain DEI policies "'violate the text and spirit

of our longstanding Federal civil-rights laws' and 'undermine our national unity.'" GA76 (quoting EO 14,173, § 1). To the extent that the memorandum discusses particular legal authority to support the proposition that certain DEI programs are unlawful, it cites not the Executive Order but rather the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023). The memorandum thus provides no basis for interpreting the Certification Provision contrary to its express terms.

Moreover, the memorandum, on its face, makes clear that it is not targeting *all* DEI programs. Rather, it states that it is targeting "programs, initiatives, or policies that discriminate, exclude, or divide individuals based on race or sex" while expressly disclaiming any intent to "prohibit educational, cultural, or historical observances . . . that *celebrate diversity*, recognize historical contributions, and promote awareness without engaging in exclusion or discrimination." GA76 n.1 (emphasis added). And the passage of the Executive Order quoted in the memorandum (which is not, in any event, the Certification Provision itself), does not apply to all DEI programs, but instead states that "*[i]llegal* DEI and DEIA policies not only violate the text and spirit

11

of our longstanding Federal civil-rights laws, they also undermine our national unity."  EO 14,173, § 1 (emphasis added).

Further, CWIT's focus on other provisions of the Executive Order or statements by various government officials only underscores that its concern is not actually with the Certification Provision itself—which requires only that CWIT certify that it complies with applicable federal civil rights laws—but rather, that it fears a future disagreement with the government over the meaning of those laws.  But that fear of a hypothetical future disagreement (in addition to not being ripe for adjudication), is not traceable to the Certification Provision or redressable by an injunction against its implementation, because the federal civil rights laws apply to CWIT by their own terms whether or not CWIT is required to certify compliance as a condition of receiving federal funds.  To the extent CWIT fears that some government official will in the future misinterpret federal law and assert that some lawful program is actually unlawful, it can challenge that action when a concrete dispute arises—presumably by defending an enforcement action on the merits, or potentially, by bringing a declaratory-judgment action in the context of that fact-specific dispute.  Instead, CWIT has

challenged—and the district court enjoined—a Presidential directive that instructs agencies to require a certification that recipients of federal assistance are honoring their existing obligations to comply with applicable federal civil rights laws—a certification that, as the government explained in its opening brief, is commonplace, *see* Gov't Br. 28-30.

Any concern about hypothetical enforcement action against CWIT under the False Claims Act (Resp. Br. 25-26) is also several steps removed from the challenged Certification Provision. Before such a dispute could arise, a federal agency would have to place the certification terms in a grant or contract that affects CWIT, CWIT would have to make that certification, and a federal official (or relator) would have to review CWIT's conduct and the circumstances surrounding the certification and determine that the necessary elements of falsity and scienter were present before bringing an enforcement action. *See generally United States ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 659 (7th Cir. 2024).

This chain of events is far too attenuated to show a sufficiently imminent credible enforcement threat, particularly given that CWIT

has not identified any specific conduct in which it intends to engage that even arguably would create False Claims Act liability. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[W]e have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent."); *Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018) ("Where a plaintiff intends to challenge a statute prior to its enforcement, 'generalized threats of prosecution do not confer constitutional ripeness.' Rather, there must be 'a *genuine* threat of *imminent* prosecution.'" (citation omitted)). As we have explained, such liability would need to be premised on a knowing violation. CWIT has not alleged that it intends to engage in activities without a good-faith basis to believe they comply with the civil rights laws.

**2.** CWIT fares no better in arguing that the Certification Provision chills its protected speech. Resp. Br. 26-30. As established in the government's opening brief, Gov't Br. 30-33, the record does not demonstrate either an "objectively reasonable" chilling effect on CWIT's non-federally funded activities or that CWIT has "self-censor[ed] as a result." *See Speech First*, 968 F.3d at 638.

14

Indeed, it is difficult to imagine how the Certification Provision could have an "objectively reasonable" chilling effect on CWIT, as that provision imposes no new requirements on CWIT's primary conduct. Whether it certifies or not, CWIT must follow any and all federal civil rights laws that apply to its operations, including those operations that promote DEI. To the extent CWIT has changed its behavior because it erroneously believes that the Certification Provision implicates all DEI activities rather than only those that are independently unlawful, that cannot support standing. However sincerely felt, fear of adverse action cannot be objectively reasonable if it is based on an objectively incorrect understanding of the law. *See Speech First*, 968 F.3d at 638 ("A plaintiff's notional or subjective fear . . . is insufficient to sustain a court's jurisdiction under Article III." (quotation marks omitted)); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (The plaintiffs "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears."). And to the extent that CWIT believes that it must change its behavior because the Executive Branch has a more stringent understanding of the civil rights laws than CWIT does, that concern has nothing to do with the Certification Provision.

15

CWIT has identified no instance of any pressure to self-censor its non-federally funded programming traceable to the Certification Provision. As noted in the government's opening brief, Gov't Br. 21-22, the district court relied on statements by the Department of Labor intending to apply other parts of EO 14,173, *see* GA97, 99, such as provisions calling on federal agencies to exercise their discretion to terminate certain federal funding of DEI "regardless of whether those programs violate antidiscrimination law." *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1221. CWIT merely repeats those contentions, describing the termination of contracts and other related measures without explaining why they should be attributed to the Certification Provision rather than to other provisions, not at issue here, that are directly applicable to discretionary determinations about federal funding. *See* Resp. Br. 26.

CWIT argues (Resp. Br. 32-33) that the "traceability test is not a sole-causation standard" and that it may assert standing to challenge the Certification Provision even if its injuries are also attributable to other provisions that are not at issue. But that principle does not excuse CWIT from identifying some link between the Certification

Provision and its alleged injuries, much less excuse reliance on an injury that is solely attributable to some other provision or on general allegations about the overall effect of multiple executive orders or government policies.

### C. The Certification Provision Does Not Violate the First Amendment.

CWIT's arguments on the merits of its First Amendment challenge suffer from similar deficiencies.  As established in the government's opening brief and as already discussed above, the provision does not implicate protected speech; it merely requires entities receiving federal funds to certify that they comply with "applicable" federal antidiscrimination laws in any programs that promote diversity, equity, and inclusion.  *See National Urb. League*, 783 F. Supp. 3d at 102-04; *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1220-22; Order at 2, *National Ass'n of Diversity Officers*, No. 25-1189 (Mar. 14, 2025).

There is nothing remotely unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs they operate comply with applicable federal civil rights laws or to acknowledge that the government considers compliance with such laws

material to its payment decisions. To the contrary, requirements for assurances of this nature have been commonplace for decades. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 629-30, 630 n.22 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury).

CWIT's assertion that the Certification Provision "imposes a viewpoint-specific restriction" is manifestly wrong. Resp. Br. 36. Illegal conduct is not a viewpoint; there is no First Amendment right to violate federal civil rights laws. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389-90 (1992). Requiring recipients of federal funding to certify that they do not violate these laws thus does not impose an unconstitutional restriction on any activities protected by the First Amendment. *Cf. Agency for Int'l Dev. v. Alliance of Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013) (holding that the government may not impose a funding condition that "effectively prohibit[s] the recipient from engaging in" conduct protected by the First Amendment "outside the scope of the federally funded program" (quotation marks omitted)).

In arguing to the contrary, CWIT repeats its flawed argument that the Certification Provision requires funding recipients to state that they do not "promot[e] DEI." Resp. Br. 36. What the Provision actually says is that each grant recipient must "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." EO 14,173, § 3(b)(iv)(B). The Provision is not about advocacy, but about programs that attempt to enforce diversity, equity, and inclusion in a way that is contrary to preexisting laws, as multiple courts have recognized. *See* Order at 7, *National Ass'n of Diversity Officers*, No. 25-1189 (Mar. 14, 2025) (Harris, J., concurring); *National Urb. League*, 783 F. Supp. 3d at 101-02; *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1221.

CWIT acknowledges that multiple courts have rejected the broad reading of the Certification Provision on which its First Amendment claim is based. Resp. Br. 39-40. CWIT urges that this Court should depart from these decisions and ignore the plain text of the provision because, in its view, the "wider text" of Executive Orders 14,173 and 14,151 support its view that the Certification Provision in fact prohibits any DEI-related advocacy. Resp. Br. 36-40. The full text of the

Executive Orders was no less before those courts, and they concluded that the Executive Orders do not "purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood." Order at 7, *National Ass'n of Diversity Officers*, No. 25-1189 (Mar. 14, 2025) (Harris, J., concurring).

Contrary to CWIT's position, this reading of the Executive Orders in general and the Certification Provision in particular does not render phrases "meaningless" or "superfluous." Resp. Br. 40-41. As established in our opening brief, the government has a strong interest in enforcing federal grantees' compliance with long-established civil rights protections. One mechanism by which it does so is through the False Claims Act, which imposes civil liability on persons who "knowingly make[] . . . false . . . statement[s] material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The Certification Provision thus serves an important function: it focuses the funding recipient on legal obligations that are important to the government and requires the funding recipient to acknowledge that the government considers compliance with those existing laws to be a material condition on payment. Such an express certification is not required to establish

False Claims Act liability, but it can serve as evidence of materiality and scienter in a False Claim Act proceeding. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194-95 (2016).

CWIT fares no better in arguing that the Attorney General's February 5 memorandum is an "authoritative" construction of the Executive Order that supports its view that the Certification Provision effectively prohibits any DEI-related advocacy. Resp. Br. 37 (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). As already discussed, (at pp. 10-11), that memorandum does not even purport to interpret the Certification Provision. And in any event, CWIT's concern that government officials may take enforcement actions "that go beyond the [Executive] Orders' narrow scope" does not establish that the Certification Provision is facially unconstitutional. Order at 7, *National Ass'n of Diversity Officers*, No. 25-1189 (Mar. 14, 2025) (Harris, J., concurring). If such a proceeding ever arose, the relief would be limited to the specific action challenged and would not justify an injunction against the Certification Provision in its entirety.

Finally, CWIT's assertion that the certification requirement is overbroad because it proscribes an "amorphous swath of conduct, never

21

before deemed illegal," Resp. Br. 42, is both wrong and telling.  CWIT appears to be concerned that neither the relevant Executive Order nor subsequent statements by members of the Executive Branch define what kinds of DEI-related activity would violate federal antidiscrimination laws.  *E.g.*, Resp. Br. 40.  It would be extraordinary for the government to attempt to distill the universe of federal antidiscrimination laws or the robust body of case law interpreting those laws, rather than just stating that it intends to enforce the laws as it finds them.  Put another way, the day before the Executive Orders issued, a grantee deciding whether a contemplated program or action might violate federal antidiscrimination law would look to the text of relevant antidiscrimination laws and judicial opinions interpreting those laws.  The Certification Provision does not change that.

If CWIT harbors some uncertainty about what federal antidiscrimination laws require or whether any given DEI program might be unlawful, that is a problem unrelated to the Certification Provision and cannot be redressed by the injunction it has obtained.  And as noted in our opening brief, any good-faith uncertainty about the

meaning of federal antidiscrimination laws would be a complete defense to any False Claim Act action.  *See* Gov't Br. 31-32.

## II.    The Equitable Factors Favor the Government.

Because CWIT cannot establish a likelihood of success on the merits, the injunction should be reversed.  But in any event, the remaining factors—irreparable harm, the balance of harms, and the public interest—favor the government and fail to support the district court's injunction.  Unsurprisingly, CWIT's arguments on each of those factors merely restate their arguments on the merits.  Resp. Br. 43-44.

Even if CWIT were likely to prevail on the merits, the remaining factors still would not support a preliminary injunction.  The district court's injunction thwarts the government's implementation of a Presidential initiative.  Conversely, CWIT experiences no harm, let alone irreparable harm, from the mere fact that the President and his subordinates have announced policy priorities.  The balance of equities and the public interest thus strongly favor allowing the Certification Provision to remain in effect.

## III. The District Court's Universal Injunction Exceeds in Any Case Its Authority.

Finally, as explained in the government's opening brief, Gov't Br. 34-39, the district court exceeded the limits of its authority when it enjoined the Department of Labor from "enforcing the Certification Provision against *any* grantee or contractor." SA44. The Supreme Court has spoken clearly: "universal injunction[s]," like the one at issue here, "fall[] outside the bounds of a federal court's equitable authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). Instead, a court's equitable power is limited to providing, at most, "complete" relief to the parties before them. *Id.* at 851-52. It cannot provide relief designed to benefit third parties who are not before the court. The district court's injunction, which was issued before the Supreme Court's decision in *CASA*, does not comply with these strictures.

CWIT asserts that the district court's universal injunction complies with *CASA* because it was "specifically designed . . . to provide full relief to CWIT—for example, by limiting the injunction" to the Department of Labor's efforts to implement the Certification Provision. Resp. Br. 45. But the district court said, in a statement that CWIT appropriately does not even attempt to defend, that "[a] nationwide

24

injunction is appropriate to protect grantees and contractors who will have to choose between giving up their First Amendment rights on one hand and bearing the risks inherent in biting the hand that feeds them on the other." SA45. The district court's leading rationale for a universal injunction was thus entirely inconsistent with the Supreme Court's intervening decision in *CASA*, and the injunction should be vacated on that basis alone.

The district court fared no better in stating that "there is a good chance that CWIT itself will not obtain complete relief . . . in the absence of a nationwide injunction." SA46. Injunctive relief cannot be premised on a "chance" that relief is needed, without a careful weighing of the harms that have been demonstrated on the record. And CWIT's efforts to defend the injunction's scope underscore the lack of care that went into the injunction. For example, CWIT emphasizes its work with organizations that "may also provide what the government deems DEI-related programming," and urges that an injunction that does not extend to these prospective partners will not provide complete relief. Resp. Br. 45-47. But CWIT identifies no practical obstacle to drafting

an injunction applicable only to the narrow subset of federal funding recipients with whom it partners or intends to partner.

CWIT expresses concern that some yet-to-be identified prospective partner organization may be "chill[ed] from partnering with CWIT" because that organization would have to disclose association with CWIT with the government. Resp. Br. 46 (quoting SA47). The district court echoed this reasoning in its recent order denying the government's motion to issue an indicative ruling stating that it would limit the scope of the injunction if this Court were to remand the case for that purpose and to order a partial stay of the injunction pending appeal. Dkt. No. 162, at 9-11. The court stated that universal relief was appropriate because the provision "chills recipients from engaging in a wide range of activities" that "encompass much, if not all, of CWIT's programming," which "risks dissuading others from beginning discussions with CWIT" regarding potential partnerships. *Id.* at 10-11.

But that does not show that a party-limited remedy would be inadequate or incomplete. As an initial matter, neither CWIT nor the district court provides any reason beyond mere speculation to support the view that these prospective partner organizations might be chilled

by having to invoke the injunction with the government before dealing with CWIT.  Indeed, the Supreme Court rejected that very argument in *CASA*.  606 U.S. at 865 (Thomas, J., concurring) (noting that the Court's rejection of argument that relief needed to be universal in order to avoid having its intended beneficiaries "identify and disclose [their status] to the government" (quotation marks omitted)).  If these were the only injuries CWIT alleged, there can be no serious argument that it would be entitled to an injunction, and therefore these speculative claims cannot give rise to a universal injunction.

CWIT contends that this chilling effect is not speculative because it has already lost out on a prospective partnership "due to fear of triggering the [Executive Orders] and losing federal funding."  Resp. Br. 47 (citing GA29, 84, & 91).  But CWIT makes no attempt to tie this lost partnership opportunity to the Certification Provision that has been enjoined, rather than to some other unrelated fears about the overall effect of multiple executive orders that are not at issue.

To the contrary, the declaration on which CWIT relies to support this proposition discusses CWIT's work under a federally funded grant, which it uses to sub-award funding to "smaller, emerging tradeswomen

organizations." GA84. The declaration states that "a few days after the release of the Executive Orders," one organization with which CWIT wished to partner and subaward part of its grant funding "told CWIT that they wanted to end the partnership . . . for fear of triggering the Executive Order and losing federal funding." GA91. But as already noted, other provisions of Executive Order 14,173 that are not at issue here call on federal agencies to exercise their discretion to terminate certain federal funding of DEI "regardless of whether those programs violate antidiscrimination law." *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1221. There is thus no basis to conclude that this organization's apparent fear of losing federal funding is traceable to the Certification Provision. And even if it were, that harm would plainly be redressed by a limited injunction that extends to CWIT and those entities with which it partners. That fear does not justify an injunction applicable to every current or future Department of Labor grantee and contractor in the nation.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction against enforcement of the Certification

Provision. In the alternative, the Court should vacate the preliminary injunction to the extent it prohibits enforcement of the Certification Provision against persons other than CWIT and recipients of federal funds for whom CWIT is a sub-contractor or sub-grantee.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ANDREW S. BOUTROS
   *United States Attorney*

DANIEL TENNY
 *s/ Jennifer L. Utrecht*
JENNIFER L. UTRECHT
GABRIEL I. SCHONFELD
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7710*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 353-9039*
   *Jennifer.l.utrecht@usdoj.gov*

November 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,535 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/Jennifer L. Utrecht*
Jennifer L. Utrecht

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jennifer L. Utrecht*
Jennifer L. Utrecht

## CIRCUIT RULE 30(d) STATEMENT

I hereby certify that the short appendix and appendix include all of the materials required by Circuit Rule 30(a) and (b).

*s/Jennifer L. Utrecht*
Jennifer L. Utrecht